UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**
JDE Law Firm, PLLC
710 Tennent Road Suite 301
Manalapan, New Jersey 07726
Telephone: (732) 490-7120
Jesse David Eisenberg, Esq.
(Bar No. 039242013)

Proposed Special Counsel for the Defendants

| | |
|---|---|
| In re:<br><br>Supor Properties Enterprises LLC, *et al.*[1],<br><br>                Debtors. | Case No. 24-13427 (SLM)<br>Judge: Stacey L. Meisel<br>Chapter 11<br><br>(Jointly Administered) |
| Supor Properties Enterprises LLC: J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; Supor Family LLC; Supor Properties-400 Limited Liability Company; and the Marital Trust under the Last Will and Testament of Joseph Supor, Jr.,<br><br>                Plaintiffs,<br>                v.<br><br>American Dream Resorts, Ltd., RDA1: Supor Properties Enterprises LLC; RDA 2&3: Supor Properties Enterprises LLC; RDA 4: J Supor 136-1Realty LLC; RDA 5: Supor 172 Realty LLC; RDA 6: Supor Properties 600 Urban Renewal, LLC; Supor Studio City 2 LLC, Supor Studio City 3 LLC; Supor Studio City 4 LLC and Supor MT, LLC<br><br>                Defendants. | Adv. Pro. No. 24-01174 (SLM) |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Supor Properties Enterprises LLC (5580); J Supor 136-1 Realty LLC (3205); Supor-172 Realty LLC (EIN No. 5662); Supor Properties Breiderhoft LLC (7258); Supor Properties Devon LLC (6357); Shore Properties Associates North LLC (6707); Supor Properties 600 Urban Renewal, LLC (8604); JS Realty Properties, LLC (2497); and Supor Properties Harrison Avenue, LLC (1728).

## DECLARATION OF JESSE DAVID EISENBERG, ESQ. IN RESPONSE TO JOSEPH SUPOR III'S OPPOSITION TO DEFENDANTS' REQUEST FOR ADJOURNMENT OF ORDER TO SHOW CAUSE

I, Jesse David Eisenberg, Esq. of full age, hereby certifies and declares pursuant to Title 28 of the United States Code, Section 1746, as follows:

1. I am the principal of JDE Law Firm, PLLC.

2. The circumstances surrounding my involvement in this matter necessitate additional time to ensure proper representation for my clients.

3. Initially, I was retained to defend Supor MT LLC solely in a foreclosure action, with engagement limited to that specific scope.

4. However, I have now been retained in the adverse proceeding in bankruptcy, wherein I am tasked with defending a total of ten companies.

5. Given the expansion of my responsibilities, I require sufficient time to familiarize myself with the intricacies of each case and adequately prepare a defense.

6. Upon being retained for the bankruptcy proceeding, my office promptly initiated contact with Debtor's attorney on Monday.

7. Subsequent communication occurred on Tuesday, during which Debtor's attorney declined to grant an adjournment despite my request.

8. It is important to note that I have not previously appeared in the New Jersey Bankruptcy Court, further adding to the complexity of the situation.

9. Throughout Wednesday, my efforts were directed towards determining the appropriate procedure for requesting an adjournment.

10. On Thursday, I diligently submitted the application for adjournment. I have since been working tirelessly to secure the necessary postponement to allow for adequate preparation.

11. Additionally, it is evident from the 123-page document contained in Exhibit B of Joseph Gentile Jr.'s Declaration that Debtors and their attorneys were well-aware of the facts and

circumstances surrounding the agreement preceding the filing of this action. Debtors and their attorneys arguably spent weeks drafting and negotiating said agreement, indicating a thorough understanding of their version of events.

12. Despite this extensive preparation on the part of Debtors and their counsel, they expect me to swiftly familiarize myself with the facts and circumstances of ten of my clients and draft appropriate responses within a matter of days. Such expectations are unreasonable given the complexity and volume of the cases at hand.

13. In light of these circumstances, I respectfully request an adjournment to adequately prepare for the proceedings and ensure the proper representation of my clients' interests. Failure to grant this adjournment would jeopardize the integrity of the proceedings and could potentially result in irreparable harm to my clients and subject me to legal malpractice.

I hereby certify that the foregoing statements made by me are true and that this Declaration is executed under penalty of perjury. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated this 26th day of April, 2024

/s/ Jesse David Eisenberg, Esq.
Jesse David Eienberg, Esq.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

---

Caption in Compliance with D.N.J. LBR 9004-1(b)

JDE Law Firm, PLLC
710 Tennent Road Suite 301
Manalapan, New Jersey 07726
Telephone: (732) 490-7120
Jesse David Eisenberg, Esq.
(Bar No. 039242013)

Proposed Special Counsel for the Defendants

In re:

Supor Properties Enterprises LLC, *et al.*[1],

                    Debtors.

---

Supor Properties Enterprises LLC: J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; Supor Family LLC; Supor Properties-400 Limited Liability Company; and the Marital Trust under the Last Will and Testament of Joseph Supor, Jr.,

                    Plaintiffs,

                    v.

American Dream Resorts, Ltd., RDA1: Supor Properties Enterprises LLC; RDA 2&3: Supor Properties Enterprises LLC; RDA 4: J Supor 136-1Realty LLC; RDA 5: Supor 172 Realty LLC; RDA 6: Supor Properties 600 Urban Renewal, LLC; Supor Studio City 2 LLC, Supor Studio City 3 LLC; Supor Studio City 4 LLC and Supor MT, LLC

                    Defendants.

---

Case No. 24-13427 (SLM)
Judge: Stacey L. Meisel
Chapter 11

(Jointly Administered)

Adv. Pro. No. 24-01174 (SLM)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Supor Properties Enterprises LLC (5580); J Supor 136-1 Realty LLC (3205); Supor-172 Realty LLC (EIN No. 5662); Supor Properties Breiderhoft LLC (7258); Supor Properties Devon LLC (6357); Shore Properties Associates North LLC (6707); Supor Properties 600 Urban Renewal, LLC (8604); JS Realty Properties, LLC (2497); and Supor Properties Harrison Avenue, LLC (1728).

**DECLARATION OF JOSEPH GENTILE JR. IN RESPONSE TO JOSEPH
SUPOR III'S OPPOSITION TO DEFENDANTS' REQUEST FOR ADJOURNMENT OF
ORDER TO SHOW CAUSE**

I, Joseph Gentile Jr., of full age, hereby certifies and declares pursuant to Title 28 of the

United States Code, Section 1746, as follows:

1. I am the President and Chairman of American Dream Resorts, Ltd ("ADR").

2. ADR, a Defendant to this instant action, is the managing member of the remaining nine
   (9) Defendants.

3. I retained Jesse David Eisenberg of JDE Law Firm PLLC on behalf of Supor MT LLC to
   defend the same in the action entitled, Crown Bank v. Joseph Supor III, Trustee of the
   Marital Trust under the Last Will and Testament of Joseph Supor, Jr., et al Docket No. F-
   010652-23 ("Related Action").

4. Mr. Eisenberg's scope of representation was limited to defending Supor MT LLC in the
   above-mentioned foreclosure.

5. I retained Mr. Eisenberg to represent all ten (10) Defendants in this adverse proceeding
   on April 22, 2024.

6. Mr. Eisenberg has not been familiarized with any dealings related to this adverse
   proceeding until his recent retention.

7. Firstly, it is patently false that Debtor Plaintiff JS Realty Properties LLC ("JS Realty") is
   the owner of the real property located at  500 Supor Boulevard (a/k/a 401 Supor
   Boulevard) Harrison, New Jersey (the "Property").

8. JS Realty transferred deed ownership via a deed in lieu on January 12, 2024.  The Deed
   dated January 12, 2024 is attached hereto and made a part thereof as Exhibit A.

9.  Secondly, the new holder of the deed is 401 Supor Blvd Owner LLC as evidenced by the Restructuring Support Agreement. See Restructuring Support Agreement attached hereto and made a part thereof as Exhibit B.

10. Page 1 (ii) states, "1000 Frank E. Rodgers Blvd Owner LLC; 12 Breiderhoft Rd Owner LLC; 201 Devon Terr Owner LLC; 401 Supor Blvd Owner LLC; and 600 Guyon Drive Owner LLC (collectively, the "DILF Holders" and each such entity, a "DILF Holder")" See Exhibit B.

11. The Fourth "Whereas" Clause under "Recitals" on Page 2 states, WHEREAS, between January 26, 2024, and January 31, 2024, Lenders recorded deeds (collectively, the "DILFs") transferring ownership of certain of the Debtor Properties from certain of the Debtors to a DILF Holder though such properties remain subject to the Lenders' Mortgage. The DILFs are listed on Schedule C hereto. See Exhibit B.

12. Item 7 under Schedule C states, "401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222) recorded with the Hudson County Register of Deeds on January 29. 2024 as Instrument 20240125010005970 for stated consideration of $12,500,000." See Exhibit B.

13. The foregoing emphasizes the mere fact that if there is a valid cause of action for ejectment, it is 401 Supor Blvd Owner LLC's Responsibility as deed holder to bring the ejectment action.

14. As such, it is my understanding that since the Debtors are not the listed deed holders of the Property, they lack standing to bring this ejection action.

15. The assertion by Joseph Supor III that any of the Defendants occupy the Subject Property without authorization is completely disingenuous.

16. The current tenants at the Subject Property are there pursuant to a Lease which will be provided to the Court in the Opposition Papers to Debtors' Order to Show Cause.

17. I personally handed Joseph Supor III copies of said Lease.

18. The Lease lists the master tenant as Team Dream Inc.

19. Moreover, Debtors specifically name Team Dream Inc. and ADR as additional insurers on this and all the Debtor Properties. Again, the assertion that ADR and related companies are unauthorized to occupy the Subject Property is without merit. See Exhibit C attached hereto and made a part thereof.

20. In Response to Paragraph 28 of Joseph Supor III's Declaration, ADR has never demanded rent from any other tenant in the Red Brick Building. Any assertion of same is patently false.

21. Even if Debtors had standing to bring an ejectment action, they have failed to include Team Dream Inc. as a necessary party.

22. Assuming the Court grants Defendants' Adjournment Request until June 21, 2024, there would be no irreparable harm to Debtors and their bankruptcy estates because (1) they do not have standing to eject Defendants; (2) they failed to include a necessary party; and (3) if, arguendo, the Court finds Debtors had standing to eject Defendants, pursuant to their Motion in the Bankruptcy Proceeding to set the auction and bidding guidelines for the sale of the properties, no sale will occur until the end of July/beginning of August. Thus, the Court would be able to order the ejection of Defendants prior to any sale.

I hereby certify that the foregoing statements made by me are true and that this Declaration is executed under penalty of perjury. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated this 26th day of April, 2024

_____
Joseph Gentile Jr.

Sworn to me on the  26th day of April, 2024

Jesse David Eisenberg, ESQ.
An Attorney duly admitted
under the laws of the
State of New Jersey

# EXHIBIT A

A COPY OF THIS DEED HAS BEEN
SENT TO ASSESSOR'S OFFICE

| Hudson County Recording Data Page<br>**Honorable Jeffrey Dublin**<br>**Hudson County Register** | *Official Use Only - Barcode*<br>20240125010005970 1/11<br>01/25/2024 02:36 PM DEED<br>Bk: 9798  Pg: 335<br>JEFFREY DUBLIN<br>Hudson County, Register of Deeds<br>Receipt No. 281294   20240125010005970<br>01/25/2024 02:36:48 pm<br>Consideration: $12500000.00<br>Exempt Code: Regular<br>County:$12500.00 State:$31250.00<br>NJAHTF:$18525.00 PHPF:$6250.00<br>EAA:$28350.00 General:$51850.00<br>Buyer's Fee: $0.00<br>Total RTF: $148725.00 |
|---|---|
| Record & Return To:<br>Royal Abstract of New York, LLC<br>125 Park Ave. Suite 1610<br>New York, NY 10017 | *Official Use Only - Reality Transfer Fee* |

| Date of Document:<br>**01/12/2024** | Type of Document:<br>**DEED** |
|---|---|
| First Party Name:<br>JS REALTY PROPERTIES LLC | Second Party Name:<br>401 SUPOR BLVD OWNER LLC |
| Additional Parties: | |

**THE FOLLOWING SECTION IS REQUIRED FOR DEEDS ONLY**

| Block: **222** | Lot: **1.02** |
|---|---|
| Municipality: **Harrison** | |
| Consideration: **$12500000.00** | |
| Mailing Address of Grantee:<br>**520 MADISON AVENUE, SUITE 3501, NEW YORK, NY 10022** | |

THE FOLLOWING SECTION IS FOR ORIGINAL MORTGAGE BOOKING & PAGING INFORMATION FOR
ASSIGNMENTS, RELEASES, SATISFACTIONS, DISCHARGES, AND OTHER ORIGINAL MORTGAGE AGREEMENTS ONLY

| Original Book:<br>Instrument No: | Original Page: |
|---|---|

**HUDSON COUNTY RECORDING DATA PAGE**

DO NOT DETACH THIS PAGE FROM THE ORIGINAL DOCUMENT AS IT
CONTAINS IMPORTANT RECORDING INFORMATION AND IS PART OF THE
PERMANENT RECORD.

PREPARED BY:

Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, New York 10017
Attn: Jerold C. Feuerstein, Esq.

## BARGAIN AND SALE DEED
## WITH COVENANT AGAINST GRANTOR'S ACTS

CAUTION: THIS AGREEMENT SHOULD BE PREPARED BY AN ATTORNEY AND
REVIEWED BY ATTORNEYS FOR SELLER AND PURCHASER BEFORE SIGNING.

**THIS INDENTURE**, made as of January 12, 2024,

**BETWEEN JS REALTY PROPERTIES LLC**, a Delaware limited liability company, having an
address at 433 Bergen Avenue, Kearny, New Jersey 07032,

party of the <u>first part</u>, and

**401 SUPOR BLVD OWNER LLC**, a Delaware limited liability company, having an address at
520 Madison Avenue, Suite 3501, New York, New York 10022

party of the <u>second part</u>;

**WITNESSETH,** that the party of the first part, for good and valuable consideration paid by
the party of the second part, does hereby grant and release unto the party of the second part, the
heirs or successors and assigns of the party of the second part forever;

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon
erected, situate, lying and being in the Town of Harrison, County of Hudson, and State of New
Jersey, known as: Block 222, Lot 1.02 at the property located at 401 Supor Boulevard a/k/a part
of 500 Supor Boulevard, and 608 Supor Boulevard, Harrison, New Jersey (the "*Property*") and,
as more particularly described in <u>Schedule A</u> attached hereto;

Being and hereby intending to convey the same premises as conveyed to the party of the first
part, which acquired title by the following deed:

By deed made by **J. SUPOR REALTY GROUP LLC** to **JS REALTY PROPERTIES**
**LLC**, dated May 15, 2020, and recorded on September 29, 2020, in Book 9511, Page 62,
in the Office of the Hudson County Register.

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof,

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

**TO HAVE AND TO HOLD** the Property herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND FURTHER** this deed is given in lieu of foreclosure of that certain Mortgage and Security Agreement, in the original principal amount of Seventy-Two Million Five Hundred Thousand and 00/100 Dollars ($72,500,000.00) dated December 31, 2020 (the "*Mortgage*") executed by **SUPOR PROPERTIES ENTERPRISES LLC**, a Delaware limited liability company, **J. SUPOR 136-1 REALTY LLC**, a Delaware limited liability company, **SUPOR-172 REALTY LLC**, a Delaware limited liability company, **SUPOR PROPERTIES BOONTON LLC**, a New Jersey limited liability company, **SUPOR PROPERTIES DEVON LLC**, a New Jersey limited liability company, **THE MARITAL TRUST UNDER THE LAST WILL AND TESTAMENT OF JOSEPH SUPOR, JR., DATED SEPTEMBER 13, 2002, AS AMENDED BY FIRST CODICIL DATED JUNE 14, 2007, JS REALTY PROPERTIES LLC**, a Delaware limited liability company, and **SUPOR PROPERTIES 600 URBAN RENEWAL LLC**, a New Jersey limited liability company (collectively, the "*Current Holder*"), in favor of **1000 FRANK E. RODGERS 1 LLC** (the "*Lender*"). The Mortgage was recorded on April 27, 2021, with the Office of the of the Hudson County Register in Book 19893, Page 903.

**AND FURTHER**, it is the intention of the party of the first part to transfer absolute fee simple legal and equitable title to the Property herein granted, being the same Property encumbered by the lien of the Mortgage. IT IS THE FURTHER INTENTION OF THE PARTY OF THE FIRST PART AND THE PARTY OF THE SECOND PART THAT THE MORTGAGE AND THE LIEN CREATED THEREBY WILL NOT MERGE INTO THE FEE-SIMPLE LEGAL AND EQUITABLE TITLE CONVEYED TO THE PARTY OF THE SECOND PART PURSUANT TO THIS DEED AND THAT THE OBLIGATIONS SECURED BY THE MORTGAGE WILL REMAIN OUTSTANDING AND UNRELEASED FOLLOWING THE RECORDATION OF THIS DEED, AND SHALL NOT BE DEEMED TO BE RELEASED, EXTINGUISHED OR SATISFIED UNLESS AND UNTIL SUCH TIME AS THE PARTY OF THE SECOND PART, IN ITS SOLE AND ABSOLUTE DISCRETION, SHALL CAUSE A FULL RELEASE THEREOF. This is a deed-in-lieu of foreclosure of the Mortgage by Current Holder as a result of a default thereunder by the party of the first part. This Deed is executed voluntarily by the party of the first part, and not pursuant to duress or threats of any kind. Furthermore, it is executed and delivered in mutual good faith between the party of the first part and Current Holder and the party of the second part, and is not given or intended to hinder, delay, or defraud any creditor, or to contravene any of the bankruptcy laws of the United States or any applicable laws.

**AND** the party of the first part, covenants that the party of the first part has not done or suffered anything whereby the said Property have been encumbered in any way whatever, except as aforesaid.



*AND* the party of the first part hereby acknowledges that this conveyance of the Property is absolute and there are no re-purchase agreements.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

*IN WITNESS WHEREOF*, the party of the first part has duly executed this deed the day and year first above written.

*IN PRESENCE OF:*

JS REALTY PROPERTIES LLC,
a Delaware limited liability company

By: _____
Name: Joseph Supor, III
Title: Authorized Signatory

STATE OF NEW JERSEY )
                    ) ss.:
COUNTY OF ~~HUDSON~~ Bergen )

On this 3ʳᵈ day of April, in the year 2023, before me, the undersigned, personally appeared Joseph Supor, III, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

_____
Notary Public

ANNA MARIE LOBUE
My Commission Expires
NOTARY
PUBLIC
August 15, 2025
STATE OF NEW JERSEY

A COPY OF THIS DEED HAS BEEN
SENT TO ASSESSOR'S OFFICE



SCHEDULE A
PROPERTY DESCRIPTION

All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Harrison, County of Hudson, State of New Jersey, being further described as follows:

BEGINNING at a point in the northeasterly line of Supor Boulevard (formerly known as Worthington Avenue, Kingsland Avenue, 60 foot wide right of way) where it is intersected by the line dividing Lots 1.02 and 1.01, said point being distant of South 16 degrees 08 minutes 24 seconds East, 1066.46 feet, along said northeasterly line of Supor Boulevard from where the same is intersected by the southeasterly line of Harrison Avenue (66 foot wide right of way), and from BEGINNING point running; thence along the dividing line between Lots 1.02 and 1.01, the following seven (7) courses:

1. North 73 degrees 51 minutes 36 seconds East, 86.11 feet to a point; thence

2. South 16 degrees 08 minutes 24 seconds East, 188.18 feet to a point; thence

3. North 73 degrees 51 minutes 36 seconds East, 733.49 feet to a point; thence

4. South 16 degrees 08 minutes 24 seconds West, 243.50 feet to a point; thence

5. South 73 degrees 51 minutes 36 seconds West, 683.08 feet to a point; thence

6. North 16 degrees 08 minutes 24 seconds West, 26.81 feet to a point; thence

7. South 73 degrees 51 minutes 36 seconds West, 136.52 feet to a point; thence

8. North 16 degrees 08 minutes 24 seconds West, 404.87 feet, along the aforesaid northeasterly line of Supor Boulevard to the point and place BEGINNING.

BEING also know as Lot 1.02 in Block 222, as shown on a certain map entitled, "Minor Subdivision Plat for Block 222, Lot 1 & 3.03, 500 Supor Boulevard, Town of Harrison, Hudson County, New Jersey" dated January 8, 2020 and duly filed in the Office of the Hudson County Register on April 22, 2020 as Instrument No. 20200422130000050.

FOR INFORMATION PURPOSES ONLY: BEING known as 401 Supor Boulevard, Harrison, NJ 07032, Tax Lot 1.02, Tax Block 222 on the Official Tax Map of Harrison, NJ.

GIT/REP-3
(11-23)
(Print or Type)

# State of New Jersey
## Seller's Residency Certification/Exemption

## Seller's Information

Name(s)
JS Realty Properties LLC

Current Street Address
433 Bergen Avenue

| City, Town, Post Office | State | ZIP Code |
|---|---|---|
| Kearny | NJ | 07032 |

## Property Information

| Block(s) | Lot(s) | Qualifier |
|---|---|---|
| 222 | 1.02 | |

Street Address
Part of 401 Supor Blvd a/k/a part of 500 Supor Blvd and 608 Supor Blvd

| City, Town, Post Office | State | ZIP Code |
|---|---|---|
| Harrison | NJ | 07029 |

| Seller's Percentage of Ownership | Total Consideration | Owner's Share of Consideration | Closing Date |
|---|---|---|---|
| 100% | $12,500,000.00 | $12,500,000.00 | 1/12/24 |

## Seller's Assurances (Check the Appropriate Box) (Boxes 2 through 16 apply to Residents and Nonresidents)

1. ☐ Seller is a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to the New Jersey Gross Income Tax Act, will file a resident Gross Income Tax return, and will pay any applicable taxes on any gain or income from the disposition of this property.

2. ☐ The real property sold or transferred is used exclusively as a principal residence as defined in 26 U.S. Code section 121.

3. ☒ Seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐ Seller, transferor, or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☒ Seller is not an individual, estate, or trust and is not required to make an estimated Gross Income Tax payment.

6. ☐ The total consideration for the property is $1,000 or less so the seller is not required to make an estimated Income Tax payment.

7. ☐ The gain from the sale is not recognized for federal income tax purposes under 26 U.S. Code section 721, 1031, or 1033 (CIRCLE THE APPLICABLE SECTION). If the indicated section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey Income Tax return for the year of the sale and report the recognized gain.

   ☐ Seller did not receive non-like kind property.

8. ☐ The real property is being transferred by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this State.

9. ☐ The real property being sold is subject to a short sale instituted by the mortgagee, whereby the seller agreed not to receive any proceeds from the sale and the mortgagee will receive all proceeds paying off an agreed amount of the mortgage.

10. ☐ The deed is dated prior to August 1, 2004, and was not previously recorded.

11. ☐ The real property is being transferred under a relocation company transaction where a trustee of the relocation company buys the property from the seller and then sells the house to a third party buyer for the same price.

12. ☐ The real property is being transferred between spouses or incident to a divorce decree or property settlement agreement under 26 U.S. Code section 1041.

13. ☐ The property transferred is a cemetery plot.

14. ☐ The seller is not receiving net proceeds from the sale. Net proceeds from the sale means the net amount due to the seller on the settlement sheet.

15. ☐ The seller is a retirement trust that received an acknowledgment letter from the Internal Revenue Service that the seller is a retirement trust, and is therefore not required to make the estimated Gross Income Tax payment.

16. ☐ The seller (and/or spouse/civil union partner) originally purchased the property while a resident of New Jersey as a member of the U.S. Armed Forces and is now selling the property as a result of being deployed on active duty outside of New Jersey. (Only check this box if applicable and neither boxes 1 nor 2 apply.)

## Seller's Declaration

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein may be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete. By checking this box ☐ I certify that a Power of Attorney to represent the seller(s) has been previously recorded or is being recorded simultaneously with the deed to which this form is attached.

| | | |
|---|---|---|
| 1/12/2024 | ***see attached*** | |
| Date | Signature (Seller) | Indicate if Power of Attorney or Attorney in Fact |

| | | |
|---|---|---|
| Date | Signature (Seller) | Indicate if Power of Attorney or Attorney in Fact |



**JS REALTY PROPERTIES LLC,**
a Delaware limited liability company

By:   1000 FRANK E. RODGERS 2 LLC,
a Delaware limited liability company

By: _____
Name:   Joshua Zegen
Title:   Authorized Signatory

Sworn to before me this
_11_ day of January, 2024

_____
Notary Public

[SEAL]

SIOBHAN S. O'SULLIVAN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 010S5045117
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES JUNE 12, 2027

Signature Page to Seller's Residency Certification/Exemption

RTF-1 (Rev. 3/2/22)
**MUST SUBMIT IN DUPLICATE**

**STATE OF NEW JERSEY**
**AFFIDAVIT OF CONSIDERATION FOR USE BY SELLER**
(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) (N.J.S.A. 46 15-5 et seq.)
**BEFORE COMPLETING THIS AFFIDAVIT, PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM.**

STATE OF  New York

COUNTY  Rockland  }SS. County Municipal Code  **0904**

| FOR RECORDER'S USE ONLY |
|---|
| Consideration      $ |
| RTF paid by seller   $ |
| Date_____  By_____ |

*Use symbol "C" to indicate that fee is exclusively for county use

MUNICIPALITY OF PROPERTY LOCATION  Harrison

**(1) PARTY OR LEGAL REPRESENTATIVE** *(See Instructions #3 and #4 on reverse side)*

Deponent, **Joshua Zegen**                          being  duly  sworn  according  to  law  upon  his/her  oath,
       (Name)

deposes and says that he/she is the **Authorized Signatory**   in a deed dated  **January 12, 2024**    transferring
(Grantor, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)

real property identified as Block number  **222**              Lot number      **1.02**          located at

Part of 401 Supor Blvd a/k/a part of 500 Supor Blvd and 608 Supor Blvd, Harrison, NJ 07029     and     annexed     thereto.
(Street Address, Town)

**(2) CONSIDERATION**  $ **12,500,000.00**   *(Instructions #1 and #5 on reverse side)* ☐ no prior mortgage to which property is subject.

**(3)** Property transferred is Class 4A   **4B**   4C  (circle one). If property transferred is Class 4A, calculation in Section 3A below is required.

**(3A) REQUIRED CALCULATION OF EQUALIZED VALUATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS:**
*(See Instructions #5A and #7 on reverse side)*

        Total Assessed Valuation ÷ Director's Ratio = Equalized Assessed Valuation

        $_____  ÷  _____% = $_____

If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed value.  If Director's Ratio is equal to or in excess of 100%, the assessed value will be equal to the equalized valuation.

**(4) FULL EXEMPTION FROM FEE** *(See Instruction #8 on reverse side)*
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through C. 66, P.L. 2004, for the following reason(s). Mere reference to exemption symbol is insufficient. Explain in detail.

**(5) PARTIAL EXEMPTION FROM FEE** *(Instruction #9 on reverse side)*
NOTE: All boxes below apply to grantor(s) only. ALL BOXES IN APPROPRIATE CATEGORY MUST BE CHECKED. Failure to do so will void claim for partial exemption. Deponent claims that this deed transaction is exempt from State portions of the Basic, Supplemental, and General Purpose Fees, as applicable, imposed by C. 176, P.L. 1975, C. 113, P.L. 2004, and C. 66, P.L. 2004 for the following reason(s):

| A. | SENIOR CITIZEN | Grantor(s) | ☐ 62 years of age or over. *    *(Instruction #9 on reverse side for A or B)* |
|---|---|---|---|
| B. | BLIND PERSON | Grantor(s) | ☐ legally blind or; * |
| | DISABLED PERSON | Grantor(s) | ☐ permanently and totally disabled ☐ receiving disability payments ☐ not gainfully employed* |

Senior citizens, blind persons, or disabled persons must also meet all of the following criteria:
☐ Owned and occupied by grantor(s) at time of sale.        ☐ Resident of State of New Jersey.
☐ One or two-family residential premises.               ☐ Owners as joint tenants must all qualify.

*IN CASE OF HUSBAND AND WIFE, PARTNERS IN A CIVIL UNION COUPLE, ONLY ONE GRANTOR NEED QUALIFY IF TENANTS BY THE ENTIRETY

C.   LOW AND MODERATE INCOME HOUSING *(Instruction #9 on reverse side)* IF APPLIES ALL BOXES MUST BE CHECKED.
☐ Affordable according to H.U.D. standards.       ☐ Reserved for occupancy.
☐ Meets income requirements of region.          ☐ Subject to resale controls.

**(6) NEW CONSTRUCTION** *(Instructions #2, #10 and #12 on reverse side)* IF APPLIES ALL BOXES MUST BE CHECKED.
☐ Entirely new improvement                 ☐ Not previously occupied
☐ Not previously used for any purpose.          ☐ "NEW CONSTRUCTION" printed clearly at top of first page of the deed.

**(7) RELATED LEGAL ENTITIES TO LEGAL ENTITIES** *(Instructions #5, #12, #14 on reverse side)* IF APPLIES ALL BOXES MUST BE CHECKED.
☐ No prior mortgage assumed or to which property is subject at time of sale.
☐ No contributions to capital by either grantor or grantee legal entity.
☐ No stock or money exchanged by or between grantor or grantee legal entities.

**(8) INTERCOMPANY TRANSFER** IF APPLIES ALL BOXES MUST BE CHECKED. *(Instruction #15 on reverse side)*
☐ Intercompany transfer between combined group members as part of the unitary business
☐ Combined group NU ID number (Required)

**(9)** Deponent makes this Affidavit to induce county clerk or register of deeds to record the deed and accept the fee submitted herewith in accordance with the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this _____ day of _____, 20 _____

***see attached signature and acknowledgment***

***see attached***
Signature of Deponent
520 Madison Avenue, Ste. 3501
New York, NY 10022
Deponent Address

XXX-XX-X
Last three digits in Grantor's Social Security Number

**JS Realty Properties LLC**
Grantor Name
433 Bergen Avenue
Kearny, NJ 07032
Grantor Address at Time of Sale

Name/Company of Settlement Officer

| FOR OFFICIAL USE ONLY | | |
|---|---|---|
| Instrument Number_____ | County_____ | |
| Deed Number_____ | Book_____ | Page_____ |
| Deed Dated_____ | Date Recorded_____ | |

County recording officers shall forward one copy of each RTF-1 form when Section 3A is completed to:   **STATE OF NEW JERSEY**
**PO BOX 251**
**TRENTON, NJ 08695-6251**
**ATTENTION: REALTY TRANSFER FEE UNIT**

The Director of the Division of Taxation in the Department of the Treasury has prescribed this form as required by law, and may not be altered or amended without prior approval of the Director. For information on the Realty Transfer Fee or to print a copy of this Affidavit, visit the Division of Taxation website at:
https://www.state.nj.us/treasury/taxation/lpt/localtax.shtml



**JS REALTY PROPERTIES LLC,**
a Delaware limited liability company

By:  1000 FRANK E. RODGERS 2 LLC,
a Delaware limited liability company

By: _____
Name:  Joshua Zegen
Title:  Authorized Signatory

Sworn to before me this
__11__ day of January, 2024

_____
Notary Public

[SEAL]

SIOBHAN S. O'SULLIVAN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 010S5045117
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES JUNE 12, 2027

Signature Page to Affidavit of Consideration

FILED
20240125010005970
01/25/2024 02:36 PM
DEED
NUMBER OF PAGES : 11
JCHAMBERS

RTF-1EE (Rev. 3/2/13)
MUST SUBMIT IN DUPLICATE

**STATE OF NEW JERSEY**
**AFFIDAVIT OF CONSIDERATION FOR USE BY BUYER**
(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) (N.J.S.A. 46:15-5 et seq.)
PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM BEFORE COMPLETING THIS AFFIDAVIT

STATE OF   New York

COUNTY   Rockland   } SS.  County Municipal Code   0904

MUNICIPALITY OF PROPERTY LOCATION   Harrison

| | FOR RECORDER'S USE ONLY |
|---|---|
| | Consideration $ |
| | RTF paid by buyer $ |
| | Date _____ By _____ |

**(1) PARTY OR LEGAL REPRESENTATIVE** (See Instructions #3 and #4 on reverse side)

Last three digits in grantee's Social Security Number   XXX-XX-X___

Deponent   Joshua Zegen   being duly sworn according to law upon his/her oath,
deposes and says that he/she is the   Signatory   in a deed dated   01/12/2024   transferring real property
(Grantee, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)

real property identified as Block number   222   Lot number   1.02   located at
Part of 401 Supor. Blvd a/k/a 500 Supor. Boulevard, Harrison, NJ 07029   and annexed thereto.
(Street Address, Town)

**(2) CONSIDERATION** $ 12,500,000.00   (See Instructions #1, #5, and #11 on reverse side)
Entire consideration is in excess of $1,000,000;

PROPERTY CLASSIFICATION CHECKED OR CIRCLED BELOW IS TAKEN FROM OFFICIAL ASSESSMENT LIST (A PUBLIC RECORD)
OF MUNICIPALITY WHERE THE REAL PROPERTY IS LOCATED IN THE YEAR OF TRANSFER. REFER TO N.J.A.C. 18:12-2.2 ET SEQ.

(A) Grantee required to remit the 1% fee, complete (A) by checking off appropriate box or boxes below.
☐ Class 2 - Residential
☐ Class 3A - Farm property (Regular) and any other real property transferred to same grantee in conjunction with transfer of Class 3A property
☐ Class 4A - Commercial properties (if checked, calculation in (E) required below)
☐ Cooperative unit (four families or less) (See C. 46.8D-3.) Cooperative units are Class 4C

(B) Grantee is **not** required to remit 1% fee (one or more of following classes being conveyed), complete (B) by checking off appropriate box or boxes below.
☒ Property class. Circle applicable class or classes.   1   3B   **4B**   4C   15
Property classes: 1-Vacant Land;3B- Farm property (Qualified);4B- Industrial properties;4C-Apartments;15-Public Property, etc. (N.J.A.C. 18.12-2.2 et seq.)
☐ Exempt organization determined by federal Internal Revenue Code of 1986. (28 U.S.C. # 501
☐ Incidental to corporate merger or acquisition, equalized assessed valuation less than 20% of total value of all assets exchanged in merger or acquisition. If checked, calculation in (E) required and MUST ATTACH COMPLETED RTF-4.
☐ Intercompany transfer between combined group members as part of the unitary business (See Instruction #13 on reverse side)
List the Combined group NU ID number (Required) _____

(C) When grantee transfers properties involving block(s) and lot(s) of two or more classes in one deed, one or more subject to the 1% fee (A), with one or more than one not subject to the 1% fee (B), pursuant to N.J.S.A. 46:15-7.2, complete (C) by checking off appropriate box or boxes and (D).
☐ Property class. Circle applicable class or classes:   1   3B   **4A**   4B   4C   15

(D) EQUALIZED VALUE CALCULATION FOR ALL PROPERTIES CONVEYED, WHETHER THE 1% FEE APPLIES OR DOES NOT APPLY
Total Assessed Valuation + Director's Ratio = Equalized Valuation

| | | | |
|---|---|---|---|
| Property Class _____ | $ _____ | ÷ _____ % = $ |
| Property Class _____ | $ _____ | ÷ _____ % = $ |
| Property Class _____ | $ _____ | ÷ _____ % = $ |
| Property Class _____ | $ _____ | ÷ _____ % = $ |

**(E) REQUIRED EQUALIZED VALUE CALCULATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS:** (See Instructions #6 and #7 on reverse side)
Total Assessed Valuation ÷ Director's Ratio =   Equalized Valuation

$ _____ ÷ _____ % = $ _____

If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed valuation. If Director's Ratio is equal to or exceeds 100%, the assessed valuation will be equal to the equalized value.

**(3) TOTAL EXEMPTION FROM FEE** (See Instruction #8 on reverse side)
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through Chapter 33, P.L. 2006, for the following reason(s). Mere reference to exemption symbol is insufficient. Explain in detail _____

**(4)** Deponent makes Affidavit of Consideration for Use by Buyer to induce county clerk or register of deeds to record the deed and accept the fee submitted herewith pursuant to the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this   11   day of   January , 20 24

_signature_
SIOBHAN S. O'SULLIVAN
Notary Public, State of New York
No. 01OS5045117
Qualified in Rockland County
Commission Expires June 12, 2027

Signature of Deponent
512 Madison Ave, Ste 3501
NY, NY 10022
Deponent Address

401 Supor Blvd. Owner, LLC
Grantee Name
512 Madison Ave, Ste 3501
NY, NY 10022
Grantee Address at Time of Sale

Name/Company of Settlement Officer

County recording officers: forward one copy of each RTF-1EE to

SIOBHAN S. O'SULLIVAN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01OS5045117
QUALIFIED IN ROCKLAND COUNTY
COMMISSION EXPIRES JUNE 12, 2027

STATE OF NJ - DIVISION OF TAXATION
PO BOX 251
TRENTON, NJ 08695-0251
ATTENTION: REALTY TRANSFER FEE UNIT

| FOR OFFICIAL USE ONLY |
|---|
| Instrument Number _____ County _____ |
| Deed Number _____ Book _____ Page _____ |
| Deed Dated _____ Date Recorded _____ |

The Director, Division of Taxation, Department of the Treasury has prescribed this form, as required by law. It may not be altered or amended without prior approval of the Director. For further information on the Realty Transfer Fee or to print a copy of this Affidavit or any other relevant forms, visit
www.state.nj.us/treasury/taxation/prtctax.shtml.

# EXHIBIT B

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS, IN EACH CASE, SUBJECT TO THE TERMS HEREOF.

## <u>RESTRUCTURING SUPPORT AGREEMENT</u>

This RESTRUCTURING SUPPORT AGREEMENT (including all schedules attached hereto, and as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>") is entered into as of **April 2, 2024,** by and among the following parties:

(i)     1000 Frank E. Rodgers 1, LLC and Frank E. Rodgers 2, LLC (collectively, the "<u>Lenders</u>" and each such entity, a "<u>Lender</u>");

(ii)     1000 Frank E. Rodgers Blvd Owner LLC; 12 Breiderhoft Rd Owner LLC; 201 Devon Terr Owner LLC; 401 Supor Blvd Owner LLC; and 600 Guyon Drive Owner LLC (collectively, the "<u>DILF Holders</u>" and each such entity, a "<u>DILF Holder</u>");

(iii)     Supor Properties Enterprises LLC; J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties Breiderhoft LLC; Supor Properties Devon LLC; Shore Properties Associates North LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; and Supor Properties Harrison Avenue LLC – (collectively, the "<u>Debtors</u>" and each such entity, a "<u>Debtor</u>");

(iv)     Joseph Supor III, individually; J. Supor & Son Trucking & Rigging Co., Inc.; and Subel Corporation D/B/A Harrison Warehousing Co. – (collectively, the "<u>Guarantors</u>" and each a "<u>Guarantor</u>");

(v)     Supor Properties Boonton Holding LLC; Supor Properties Boonton DE; J. Supor Realty LLC; Joseph Supor III as Trustee under the Marital Trust under the Last Will and Testament of Joseph Supor, Jr., dated September 13, 2002; Supor Manor Realty LLC, and the Estate of Roseann Supor (collectively, the "<u>Pledgors</u>" and each a "<u>Pledgor</u>); and

(vi)     Supor Family LLC.

The foregoing parties are collectively referred to herein as the "<u>Parties</u>".

The Lenders and DILF Holders are collectively referred to herein as the "<u>Lender Parties</u>".

The Debtors, Guarantors, Pledgors, and Supor Family LLC are collectively referred to herein as the "<u>Debtor Parties</u>".

## RECITALS

**WHEREAS**, certain of the Parties are parties to loan agreements, promissory notes, guaranties, security agreements, mortgages, forbearance agreements, and related documents entered into prior to the date hereof, including but not limited to those listed on **Schedule A** hereto (collectively, the "Loan Documents"), which document loans made to one or more Debtor Parties and are secured directly or indirectly by liens on property owned by the Debtor Parties (together, the "Loans").

**WHEREAS**, the Debtors and Supor Family LLC claim ownership of certain real estate listed on **Schedule B** hereto. The scheduled real estate owned by a Debtor are collectively referred to as the "Debtor Properties" and each such property is referred to as a "Debtor Property". The scheduled real estate owned by Supor Family LLC is the "Sanford Property". The Debtor Properties and Sanford Property are collectively, the "Properties".

**WHEREAS**, beginning on July 1, 2022, the Debtor Parties committed the Existing Events, which are Events of Default under the Loan Documents;

**WHEREAS**, between January 26, 2024, and January 31, 2024, Lenders recorded deeds (collectively, the "DILFs") transferring ownership of certain of the Debtor Properties from certain of the Debtors to a DILF Holder though such properties remain subject to the Lenders' Mortgage. The DILFs are listed on **Schedule C** hereto. The Debtors contend, among other things, that: (i) the fair market value of the Debtor Properties exceeds the outstanding amounts due Lenders, and (ii) the transfers of Debtor Properties subject to the DILFs are subject to avoidance under applicable Law ("Debtor Avoidance Claims").

**WHEREAS**, the Parties have negotiated resolution of the Debtor Avoidance Claims and certain transactions including a sale of some or all of the Debtor Properties on the terms set forth in this Agreement and/or as specified in the documents set forth below (such transactions, the "Transactions"):

i.   the agreement between Debtors and Lenders to market for sale the Debtor Properties pursuant to the terms of agreements with the broker(s) in the form(s) attached at **Schedule D** hereto (the "Broker Retention Agreement(s)");

ii.  the marketing process and bidding procedures for the Debtor Properties attached hereto as **Schedule E** (as amended, modified, waived or supplemented in accordance herewith, the "Bidding Procedures");

iii. the agreement between Debtors and Lenders regarding the Debtors' use of Lenders' cash collateral during the Bankruptcy Cases (defined below) reflected in the cash collateral order and budgets attached hereto as **Schedule F** (the "Cash Collateral Order"), inclusive of the Lenders' carve outs set forth in the Cash Collateral Order;

iv.  **Schedule G** Intentionally Deleted;

v.   an agreement between Supor Properties Harrison Avenue LLC, Joseph Supor III, and Lenders regarding the lease of real property owned by Supor Properties Harrison Avenue LLC to be negotiated and finalized between the parties subsequent to the filing of the Bankruptcy Cases hereto (the "Burger King Lease Agreement");

vi.  **Schedule H** Intentionally Deleted;

2

vii.    the agreement between Supor Family LLC and Lenders regarding the marketing and sale of real property owned by Supor Family LLC as set forth in **Schedule I** hereto (the "Sanford Property Agreement");

viii.    Debtors' prosecution of the ADR Complaint (defined below and attached as **Exhibit K**) and other causes of action of the bankruptcy estates (against parties other than Lenders);

ix.    the term sheet setting forth the Transactions, settlement of the Debtor Avoidance Claims and other terms of the Plan (defined below), substantially in the form attached hereto as **Schedule J** (including any exhibits and schedules thereto "Plan Term Sheet") and/or a motion to sell the Properties and approve bid procedures consistent with this agreement and the other agreements executed by the Parties in connection herewith, which shall include, among other things: (a) sale of some or all of the Debtor Properties pursuant to Section 363 of the Bankruptcy Code free and clear of all liens, claims and encumbrances and the confirmed Plan (the "Sale Transactions"), with the proceeds from the Sale Transactions being distributed pursuant to the terms of the Plan; (b) in the discretion of the Debtors, after consultation with the Lenders, substantive consolidation of some or all of the Debtors' Bankruptcy Estates and (c); and the right of the Lender Parties to credit bid and if such credit bid is the highest and best bid, close on such credit by the Lender Parties (or any designee(s), nominee(s) or assignee(s) thereof).

**WHEREAS**, other than the marketing and sale of the Sanford Property, the Debtors intend to implement the Transactions through the commencement of voluntary cases under chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") for each Debtor and through chapter 11 plan(s) of reorganization and/or liquidation consistent with this Agreement, which shall include a process to market and sell all or some of the Debtor Properties and resolve the Debtor Avoidance Claims (the "Plan").

**WHEREAS**, subsequent to the filing of the Bankruptcy Cases, certain Debtors intend to file an adversary complaint in the Bankruptcy Cases against American Dream Resorts, Ltd. substantially in the form set forth at **Exhibit K** hereto (the "ADR Complaint").

**WHEREAS**, the Parties desire to express their mutual support and commitment in respect of the matters discussed herein, including the Transactions and relief sought in the ADR Complaint.

**WHEREAS**, the Parties have engaged in arm's length, good faith discussions with the objective of reaching an agreement regarding the Transactions.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

1.      **Effectiveness of this Agreement.**

1.1     This Agreement shall become effective and binding upon each of the Parties on the "Agreement Effective Date", which is the last date on which each of the Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties.

1.2     This Agreement shall be effective from the Agreement Effective Date until validly terminated pursuant to the terms set forth in this Agreement, provided that any termination of this Agreement after the filing of the Bankruptcy Cases shall be subject to entry of a final order of the Bankruptcy Court authorizing such termination (such period, the "Agreement Effective Period").

1.3     To the extent that a Party to this Agreement holds, as of the date hereof or thereafter, multiple claims against or interests in the Debtors, such Party shall be deemed to have executed this Agreement in its capacity as a holder of all such claims and interests, and this Agreement shall apply severally to such Party with respect to each such claim and interest held by such Party.

2.      **Definitive Documents.**

2.1     The "Definitive Documents" governing the Transactions shall include the following: (a) this Agreement and the Schedules thereto including the Broker Retention Agreement(s), Bidding Procedures, Cash Collateral Order, Burger King Lease Agreement, and Sanford Property Agreement; (b) documents implementing and achieving the Transactions, including any substantive "first day" motions and orders; (c) purchase agreement(s) for any Successful Bidder; (d) the Plan; (e) the Confirmation Order; (f) the Disclosure Statement; (g) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (h) the Plan Supplement; (i) any motion seeking approval of the Bidding Procedures and/or a sale of some or all of the Debtor Properties and all agreements, documents, orders, and/or amendments in connection therewith (collectively, the "Sale Documents"); and (j) any exit financing agreements (as applicable).

2.2     Definitive Documents not executed or in a form attached to this Agreement remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Transactions, or any amendments thereto, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance herewith. The Definitive Documents shall be, to the extent permitted by law, consistent with this Agreement in all respects and otherwise reasonably acceptable in form and substance to the Debtors and Lenders.

3.      **The Standstill Agreement.** On or about April 12, 2023, FER 1 Lender and Pledgors entered into certain Ownership Interest Pledge and Security Agreements whereby Pledgors pledged to FER 1 Lender their ownership interests in J. Supor Realty Mezz LLC, Supor Properties Boonton LLC, Supor Manor Realty Mezz LLC, Supor Properties-400 limited liability company, and Supor Family, L.L.C., which own or control properties other than the Debtor Properties (the "UCC Properties"). On or about November 30, 2023, FER 1 Lender served a Notice of Sale scheduling a sale pursuant to the Uniform Commercial Code of the ownership interest of the Pledgors' interests in J. Supor Realty Mezz LLC, Supor Properties Boonton LLC, Supor Manor Realty Mezz LLC, Supor Properties-400 limited liability company, and Supor Family, L.L.C. which own or control the UCC Properties for January 17, 2024 at 3:00 PM (the "UCC Foreclosure"). Such UCC Foreclosure has been adjourned several times and the current sale date is April 2, 2024.

On or about February 22, 2024, the Debtor Parties and the Lender Parties entered into a Standstill Agreement as follows:

(a) For a period of no sooner than 10 days after any party terminates settlement discussions (the "Standstill Period"), the Lenders shall refrain from: (i) recording additional deeds in lieu of foreclosure on any of Lenders' collateral, (ii) transferring or encumbering any of the properties where Lenders have already recorded deeds in lieu, or contracting to do so; (iii) taking any action to possess or control the properties where Lenders recorded deeds in lieu or, other properties that serve as collateral for Lenders' loans, and/or (iv) conducting the UCC Foreclosure, subject to (c) below;

(b) Pending termination of settlement discussions by any party, no party in any litigations pending between the parties will file any pleading in those actions, other than administrative pleadings such as the substitutions or adjournment requests;

(c) Unless otherwise mutually extended by the parties, the UCC Foreclosure may be scheduled by Lenders for the later of (i) March 14, 2024, or (ii) the earliest that the auctioneer is available after March 14, 2023. Additional notice and publication shall be at Lenders' sole discretion; For the avoidance of doubt, conducting the sale if the Standstill Period is not extended shall not be a violation of (a) above.

(d) Lender Parties may make protective advances they deem necessary in accordance with the Loan Documents;

(e) With respect to the properties where Lender Parties have recorded deeds in lieu, Lender parties will have the right to make protective advances under the mortgages held by Lender on those properties; Lender Parties shall have the right to pay necessary property expenses;

(f) Lenders will not pay off senior mortgage liens on any Additional Collateral during the Standstill Period;

(g) Notwithstanding anything above, if there is an emergent need for Lender Parties to take possession of any of the real properties which are collateral for their loan, Lender Parties may do so pursuant to the relevant Loan Documents. Prior to taking possession, Lender Parties will provide reasonable written notice to the Debtor Parties and an opportunity for the Debtor Parties to cure the "emergent need"; and

(h) Debtor Parties will provide Lender Parties access to the collateral controlled by Debtor Parties upon reasonable notice from Lender Parties.

As of the date of this Agreement, the Standstill Agreement remains in effect and shall remain in effect until the occurrence of a Termination Event. Notwithstanding the Standstill Agreement and any provision of this Agreement and any other agreement executed in connection herewith, the Lenders are allowed to pledge the Loans as collateral or sell participations in the Loans, so long as the mortgage lien with respect to a property securing such Loan shall be released upon sale as provided herein, and provided any participant or pledgee is bound by the Standstill Agreement and this Agreement.

Lender Parties thereafter agreed to further adjourn the UCC Foreclosure to no earlier than **April 2, 2024,** and provided the Debtors file the Bankruptcy Cases by such date, the Lender Parties agree that they will further adjourn the UCC Foreclosure per the provisions of this Agreement.

**4.** **Milestones.** On and after the Agreement Effective Date, the Debtors shall use commercially reasonable efforts to implement the Transactions in accordance with the following milestones (the "Milestones"), as applicable, unless extended or waived in writing by the Debtors and the Lenders:[1]

(a)     no later than 11:59 p.m. (prevailing Eastern time) on **April 2, 2024** (the "Petition Date"), the Debtors shall have commenced the Bankruptcy Cases in the Bankruptcy Court;

(b)     no later than three (3) days[2] after the Petition Date, the Debtors shall file with the Bankruptcy Court required motions or applications for interim or final approval, as applicable, of the Broker Retention Agreement(s), Cash Collateral Order, and any other "first day" or "second day" applications/motions deemed appropriate by Debtors;

(c)     no later than five (5) days after the Petition Date, the Debtors shall file with the Bankruptcy Court the ADR Complaint as well as any related pleadings deemed appropriate by Debtors;

(d)     no later than fifteen (15) days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion for final approval of the Bidding Procedures as well as any related pleadings reasonably deemed appropriate by Debtors and Lenders;

(e)     no later than thirty (30) days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion to reject any master leases with any Debtor affiliate that occupies, controls or manages any of the Debtor Properties (an "Affiliated Tenant") and any subleases between a Debtor sublessor and any Debtor sublessee, with such rejection becoming effective on the closing of a sale of the applicable Debtor Property (the "Affiliate Rejection Motion"). The Affiliate Rejection Motion shall contain consent of the Affiliated Tenant(s) to the relief sought therein and their waiver of any and all rights they may have under Sections 108 and 365(h)(1)(A)(ii) of the Bankruptcy Code with respect to the termination and/or rejection of any master leases, as well as a waiver of any claim(s) for rejection damages in the event the Lender's allowed claims are not paid in full (a schedule of the affiliate leases and master leases to be rejected under this section is set forth at **Schedule L**, hereto);

(f)     no later than thirty (30) days after the Petition Date, the Debtors shall file with the Bankruptcy Court the Plan and Disclosure Statement, which Plan and Disclosure Statement shall be approved and supported by the Lenders, consistent with the Plan Term Sheet, as well as a motion seeking interim and final approval of the Disclosure Statement and confirmation of the Plan and any related pleadings deemed appropriate by Debtors; and

(g)     no later than fifteen (15) days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion to assume this Agreement.

**5.**     **Commitments of the Lender Parties - General Commitments and Forbearances.**

5.1     Except as set forth in Section 7, during the Agreement Effective Period, each Lender Party agrees (jointly and severally), in respect of all of its loans, interests, and claims as described herein, as follows:

(a)     to use its commercially reasonable efforts to support the Transactions and to act in good faith and take all reasonable actions necessary to implement, facilitate, and consummate the Transactions in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement, the Plan, and the Bidding Procedures, as applicable;

---

[1] For the avoidance of doubt, nothing in these Milestones shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

[2] The date of each Milestone shall be calculated in accordance with Rule 9006 of the Federal Rules of Bankruptcy Procedure.

(b)      to negotiate in good faith the applicable Definitive Documents and use its commercially reasonable efforts to agree to the form and substance of such Definitive Documents consistent with the terms of this Agreement;

(c)      to support the Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

(d)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e)      to use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Transactions from other stakeholders;

(f)      to use commercially reasonable efforts to cooperate with the Debtors in connection with fulfillment of any requirements by the Town of Harrison and/or the Harrison Redevelopment Authority so as to not jeopardize the Redevelopment Plan Agreement concerning certain of the Debtor Properties; and

(g)      to use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.2.

5.2      Except as set forth in Section 7, during the Agreement Effective Period, provided the Debtor Parties comply with the Transactions contemplated herein, each Lender Party agrees (jointly and severally), in respect of all of its loans, interests, and claims as described herein, that it shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(b)      propose, file, support, or vote for any alternative plan of reorganization or liquidation for the Debtors;

(c)      object to, delay, impede, or take any other action to terminate, shorten, or interfere with the Debtors' exclusivity rights under section 1121 of the Bankruptcy Code;

(d)      object to, the Debtors' (i) retention of professionals in connection with the Transactions, and/or (ii) allowance and/or payment of the reasonable and documented fees and expenses incurred by such professionals in connection with the Transactions, provided that such fees and expenses are incurred pursuant to and in accordance with the terms of the engagement letters between such professionals and the Debtors as approved by the Bankruptcy Court;

(e)      object to or challenge, in any way, any payments made by the Debtors prior to or during the pendency of the Agreement Effective Period pursuant to the terms of the engagement letters between such professionals and the Debtors;

(f)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(g)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Bankruptcy Cases, this Agreement, or the other Transactions contemplated herein against the Debtors or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(h)     exercise, or direct any other person to exercise, any right or remedy under the Loan Documents or otherwise for the enforcement, collection, or recovery of any of Claims against or Interests in any of the Guarantors, Pledgors, or Supor Family LLC or any property of any of the Guarantors, Pledgors, or Supor Family LLC;

(i)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery under the Loan Documents or otherwise of ownership interests in J. Supor Realty Mezz LLC, Supor Properties Boonton LLC, Supor Manor Realty Mezz LLC, Supor Properties-400 Limited Liability Company, and Supor Family, L.L.C, pursuant to the Pledge and Security Agreements, each dated as of April 12, 2023, executed and delivered by J. Supor Realty LLC, Supor Properties Boonton Holding LLC, Supor Properties Boonton DE LLC, Supor Manor Realty LLC, Joseph Supor, III, Roseann Supor and The Marital Trust under the Last Will and Testament of Joseph Supor, JR., dated September 13,2002, as amended by First Codicil Dated June 14, 2007, including via the UCC Foreclosures;

(j)     object to, delay, impede, or take any other action to interfere with the Debtors' ownership and possession of their assets (except for the recorded DILF's), wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, except that Lender may make protective advances in accordance with the Loan Documents and may have access to the Debtor Properties as set forth in the Loan Documents or per agreement with the applicable Debtor; or

(k)     foreclose or enforce any rights or claims regarding any other property securing the Loan(s) subject to the Loan Documents  including the Mortgage and Security Agreement dated April 12, 2023 encumbering the real properties commonly known as 95 Fulton Street, Boonton, NJ (Lot 73 Block 69), 500 Supor Boulevard, Harrison, NJ (Lots 1 and 3.03, Block 222), 505 Manor Avenue Harrison NJ (Lot 1, Block 189), 129 Sanford Avenue, Kearny, NJ (Lot 14.01, Block 279), 400 Supor Boulevard, Harrison, NJ (Lot 1, Block 201).

**6.     Commitments of Lenders with Respect to Bankruptcy Cases.**

6.1     Except as set forth in Section 7, during the Agreement Effective Period, provided the Debtor Parties comply with the Transactions contemplated herein, each Lender agrees that it shall:

(a)     subject to receipt by such Lender of the Solicitation Materials approved by the Bankruptcy Court, vote each of its Claims to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(b)     support all of the debtor and third-party releases, injunctions, discharge, and exculpation provisions provided in the Plan, substantially consistent with those set forth in the Plan Term Sheet;

(c)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election;

(d)     to support any motion of the Debtors to extend the automatic stay in the Bankruptcy Cases to any of the Guarantors or Pledgors, or any property of any of the Guarantors or Pledgors;

(e)    to refrain from objecting to any application in the Bankruptcy Cases seeking authority for Debtors' to retain any of the Debtor Professionals;

(f)    consent and agree to the carve outs for Debtors' Professionals and the Office of the United States Trustee as set forth herein and in the Cash Collateral Order and the budgets thereto; and

(g)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a) through (c) above.

6.2    During the Agreement Effective Period, each Lender, in respect of each of its Claims, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Debtor in the Bankruptcy Court that is consistent with this Agreement or Transactions.

6.3    During the Agreement Effective Period, the Lenders will support the Transactions and will not object to, delay, impede, or take any other action to interfere with entry of any Sale Document and/or consummation of any Sale Transaction, provided that such Sale Transaction complies with the Plan and the Bidding Procedures.

6.4    During the Agreement Effective Period, the Lenders will not (a) propose, consider and/or respond to Alternative Proposals; (b) enter into Confidentiality Agreements or nondisclosure agreements with any Entity regarding an Alternate Proposal; (c) maintain or continue discussions or negotiations with respect to Alternative Proposals; or (d) otherwise cooperate with, assist or participate in any inquiries, proposals, discussions, or negotiation of Alternative Proposals.

**7.    Additional Provisions Regarding the Lenders' Commitments**. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Lender to consult with any other Lender, the Debtors, or any other party in interest in the Bankruptcy Cases (including any official committee and the United States Trustee), subject to all applicable Confidentiality Agreements; (b) impair or waive the rights of any Lender to assert or raise any objection permitted under this Agreement in connection with the Transactions; and (c) prevent any Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**8.    Commitments of the Debtors.**

8.1    Affirmative Commitments. Except as set forth in Section 9, during the Agreement Effective Period, the Debtors agree to:

(a)    use commercially reasonable efforts (i) to pursue the Transactions on the terms and in accordance with the Milestones set forth in this Agreement, including by negotiating the Definitive Documents in good faith, and (ii) cooperate with the Lenders to obtain necessary Bankruptcy Court approval of the Definitive Documents to consummate the Transactions;

(b)    not take any action, and not encourage any other person or entity to, take any action, directly or indirectly, that would reasonably be expected to, breach or be inconsistent with this Agreement, or take any other action, directly or indirectly, that would reasonably be expected to interfere with the acceptance or implementation of the Transactions, this Agreement, the Sale Transaction, or the Plan;

(c)    negotiate in good faith and use commercially reasonable efforts to execute and deliver any

appropriate additional or alternative agreements to address any legal, financial, or structural impediment to the Transactions that are necessary to effectuate the Transactions in accordance with the terms hereof;

(d)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement; and

(f)     use commercially reasonable efforts to seek additional support for the Transactions from their other material stakeholders to the extent reasonably prudent.

8.2     <u>Negative Commitments</u>. Except as set forth in Section 9, during the Agreement Effective Period, each of the Debtors shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Transactions described in, this Agreement or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**9.     Additional Provisions Regarding Debtors' Commitments.**

9.1     Notwithstanding anything to the contrary herein, nothing in this Agreement shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section shall not, and shall not be deemed to, constitute a breach of this Agreement. Notwithstanding anything to the contrary herein, each Lender reserves its right to challenge any action taken in the exercise of such fiduciary duties.

9.2     Notwithstanding anything to the contrary in this Agreement, but subject to the terms of this Section, each Debtor and their respective members, managers, directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider and respond to Alternative Proposals, which do not materially deviate from the Transactions contemplated by the Plan; (b) provide access to non-public information concerning any Debtor or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative

Proposals; (d) otherwise cooperate with, assist or participate in any inquiries, proposals, discussions, or negotiation of Alternative Proposals in good faith and consistent with applicable fiduciary obligations; and (e) enter into or continue discussions or negotiations with holders of Claims (including any Lender), any other party in interest in the Bankruptcy Cases (including any official committee and the United States Trustee), or any other Entity regarding the Transactions or Alternative Proposals. If any Debtor receives a written or oral proposal or expression of interest regarding any Alternative Proposal that any Debtor determines in good faith and following consultation with counsel is a bona fide committed proposal that represents higher or otherwise better economic recovery to the Debtors' stakeholders than the Transactions taken as a whole, within two (2) Business Days, the Debtor shall notify (with email being sufficient) the Lenders of any such proposal or expression of interest, with such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof. If the governing body of any of the Debtors decides (i) that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Proposal (a "Fiduciary Out"), the subject Debtors shall notify counsel to the Lenders within two (2) Business Days of such decision. Upon any determination by any Debtor to exercise a Fiduciary Out, the other Parties to this Agreement shall be immediately and automatically relieved of any obligation to comply with their respective covenants and agreements herein in accordance with the terms of this Agreement.

9.3     Notwithstanding anything to the contrary herein, nothing in this Agreement shall create or impose any additional fiduciary obligations upon any Debtor or any Lender, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party, that such entities did not have prior to the Agreement Effective Date. For the avoidance of doubt, the Lender Parties have no fiduciary duties to the Debtor Parties.

9.4     Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Transactions; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

9.5     The Debtor Parties acknowledge and admit that: (a) (x) the amount owed to Frank E Rodgers 1 LLC by the Debtors as of **April 2, 2024** is $94,999,584.17 (the "FER 1 Claim") and (y) the amount owed to Frank E Rodgers 2 LLC by the Debtors as of **April 2, 2024** is $2,212,058.70 (the "FER 2 Claim") plus with respect to each of the FER 1 Claim and the FER 2 Claim, interest, attorneys' fees, protective advances, and other costs that shall continue to accrue under the Loan Documents after the Petition Date (the "Indebtedness" or the "Lenders' Allowed Claim"), which amount is due and payable in full; (b) with respect to the Indebtedness and the Lenders' Allowed Claim, interest shall accrue upon the principal balance of the Loan and on all protective advances at the Default Rate (as defined in the Loan Documents (the "Default Rate"), which protective advances may include any out-of-pocket fees and costs advanced or incurred by Frank E. Rogers 1 LLC in connection with the Bankruptcy Case or otherwise including without limitation, the Sale Transaction Carveouts and administrative fees and costs, provided, however, that protective advances that may be made pursuant to Section 9.10 hereunder, if any, will accrue at the non-default interest rate (as defined in the Loan Documents); (c) except as specifically modified in this Agreement, all terms and conditions of those documents, instruments, and agreements that compose the Loan Documents shall remain in full force and effect; and (d) in favor of the Lender that a novation is expressly denied and not intended to be effected hereby, and except as amended or modified by this Agreement, the terms, provisions, conditions, rights, duties and obligations contained in the Loan Documents shall remain unchanged and unimpaired by this Agreement and are in full force and effect. To the extent Lenders are required to advance funds in connection with this Agreement or Bankruptcy Cases, any amounts shall be added to the Indebtedness.

9.6     The Debtor Parties shall not object to Lenders' Allowed Claim and/or the amount of any credit bid.

9.7     The Debtor Parties acknowledge and admit that, other than as set forth herein, Lender's execution of this Agreement and acceptance of payments in accordance herewith shall by no means be considered or construed as a reinstatement or de-acceleration of the notes set forth in the Loan Documents, an extension of the Loan, or a waiver of Lender's rights or remedies at law, in equity or under the Loan Documents.

9.8     Debtor Parties hereby acknowledge and agree that, by Lenders do not waive any of its respective rights or remedies with respect to the Existing Events, except as expressly provided herein. All rights and remedies of Lender with respect to the Existing Events are hereby preserved pending fulfillment of Debtor Parties obligations under this Agreement. The granting of the forbearance hereunder shall not, other than as expressly provided herein, be deemed a waiver of Lender's rights and remedies or constitute a course of conduct or dealing on behalf of Lender.  As set forth herein, only upon the occurrence and continuance of a Termination Event, Lender shall have the right to exercise one or more of its rights and remedies hereunder, pursuant to the Loan Documents, including, without limitation: (a) commencement of judicial foreclosure; (b) enforcement of its rights in and to all other collateral securing the Loan, in whole or in part, including the sale thereof or other disposition as provided in the Documents or applicable provisions of the Uniform Commercial Code in effect in the State of New Jersey and (c) all other remedies available to Lender hereunder, pursuant to the Loan Documents, as applicable, or at law or in equity.  Lenders' agreements contained herein are limited to the express terms of this Agreement, shall not impair any right or remedy of Lenders, or any of Debtor Parties obligations to Lenders, or Lenders' right to enforce full and strict performance of all of the terms of the Loan Documents.

9.9     Debtor Parties each hereby ratify, confirm, and reaffirm (i) all of the terms and conditions of the Loan Documents to which they are a party, inclusive of the Pledge Agreements, and (ii) the obligations secured by the Loan Documents, and any future modifications, amendments, substitutions or renewals thereof.  Debtor Parties agree that there are no defenses or offsets with respect to the Loan Documents and the loans in connection therewith, and the Debtor Parties waive  any defenses, claims, and/or affirmative defenses asserted in the New Jersey Foreclosure Action.

9.10    Debtors acknowledge and agree that Lender has the right under the Loan Documents to make certain protective advances potentially including rights to cure and reinstate obligations due to senior secured lenders with respect to properties owned by the Pledgors that are subject to existing mortgage(s) of Lenders and make protective advances with respect to such properties (*e.g.*, payment of property taxes on such property). The parties intend and agree to further negotiate in good faith regarding an agreement regarding the implementation and potential expansion of Lender's rights to make protective advances, provided no such agreement will need to be reached to permit Lenders to make a protective advance as permitted by the Loan Documents in accordance with this Section 9.10.  Upon any reinstatement of such an existing mortgage and discharge of any receiver with respect to such property, the parties agree to negotiate in good faith regarding the selection of a property manager for such property.

**10.     Agreements Regarding Debtor Properties.**

10.1    During the Agreement Effective Period, and pending Bankruptcy Court approved sale of such Debtor Properties: (a) title to 94 Mantoloking Road, Brick, NJ (the "Mantoloking Property") and 751 Harrison Avenue, Harrison, NJ  (the "751 Harrison Ave. Property") shall remain with Supor Properties Harrison Avenue LLC and Shore Properties Associates North LLC, respectively, subject to the existing mortgages, security interests and (unrecorded) deeds of Lenders, and (b) Lender Parties shall not record deeds for the Mantoloking Property or the 751 Harrison Ave Property or otherwise transfer such deeds or encumber such properties.

10.2     During the Agreement Effective Period and pending Bankruptcy Court approved sale of such Debtor Properties, title to the DILF Properties shall remain with respective DILF Holder, provided that the Lender Parties shall not transfer or encumber the DILF Properties. At closing of a Bankruptcy Court approved sale of any of the DILF Properties, DILF Holders shall convey title to the purchaser or convey title to the applicable Debtor for immediate conveyance to the purchaser, as directed by Bankruptcy Court order, and each Lender Party hereby consents to same.

10.3     After payment of each Lender's Allowed Claim in full, costs of sale, Allowed Claims of junior lienholders, Allowed Administrative Claims and allowed Unsecured Claims (if any), the applicable Debtors shall retain any excess proceeds from the sale of any of the Debtor Properties.

10.4     After full payment of each and all of Lender's Allowed Secured Claims, Lenders shall (a) release as satisfied all Claims against the Debtors, Guarantors, and Pledgors secured by such Claims, (b) release and discharge all mortgages and security interests on the Debtor Properties and Sanford Property as well as all other collateral for the Mortgage Loan and Mezzanine Loan, (c) dismiss the New Jersey Foreclosure Action and New York Action, with prejudice; and (d) release the Pledged Interests, return any membership certificates to the appropriate Parties and dismiss the UCC Foreclosures.

10.5     If Bankruptcy Court approved sale(s) of less than all of the Debtor Properties results in full payment of each and all of Lender's Allowed Claims, Lenders shall promptly deed back the remaining Debtor Properties that are also DILF Properties to the title owners prior to the recording of the DILFs and release and discharge all mortgages and security interests on those Debtor Properties.

10.6     If Bankruptcy Court approved sale(s) of less than all of the Debtor Properties results in full payment of each and all of Lender's Allowed Claims, Debtors, in their sole and absolute discretion shall have the right to discontinue the sale process of any of the Debtor Properties that have not been sold.

10.7     If after conclusion of the Agreement Effective Period and conclusion of the Bankruptcy Court approved sale(s) of Debtor Properties, Lenders receive less than full payment of Lenders' Allowed Claims, Lenders may then proceed to enforce all rights and remedies regarding Guarantors and Pledgors and any remaining collateral of Lenders owned by a non-Debtor party.

10.8     Pursuant to the terms of the Sale Order(s) and Plan, the Debtors and Lenders contemplate that at the closing of each sale of a Debtor Property, as approved by the Bankruptcy Court, the applicable Lender shall release and discharge all of its mortgage(s) and liens on such Debtor Property in exchange for payment of the net sale proceeds, up to the outstanding amount of the Lender's Allowed Class 2 or Class 3 Secured Claim on such Debtor Property, as applicable, after payment or deduction from such sale proceeds of the following, and in the following priority:

(a)     the outstanding amounts of any Allowed Secured Claim of Governmental Unit on the subject Debtor Property that is senior in priority to the Allowed Class 2 or Class 3 Secured Claim of Lender on such Debtor Property pursuant to applicable non-bankruptcy law, including real estate taxes and municipal assessments, if any; and

(b)     a voluntary carve-out by the applicable Lender (the "Sale Transaction Carveout") in the amount of:

(i)     the customary costs of sale of the applicable Debtor Property;

(ii)    any commission(s) payable by Debtor pursuant to the Broker Retention Agreement(s);

(iii)    all fees and charges assessed against the applicable Debtor Estates' pursuant to section 1930 of chapter 123 of title 28 of the United States Code attributable to the sale of such Debtor Property and all amounts due to the Office of the United States Trustee attributable to the sale of such Debtor Property;

(iv)    the amount of estimated accrued but unpaid Professional fees incurred by the legal counsel and other advisors to the Debtors and any statutory committees related primarily to the sale of such Debtor Property (the "Sale Related Professional Fees"); and

(v)    the amount of Bankruptcy Court approved, accrued but unpaid professional fees incurred by the legal counsel and other advisors to the Debtors and any statutory committees during the Bankruptcy Cases up to the date of the applicable sale, plus the amount necessary to fund a wind down budget as agreed by the parties in accordance with and as limited by, the terms of the Sale Transaction Documentation and Plan  not inclusive of the Sale Related Professional Fees (the "Wind-Down Reserve" and, together with the Sale Related Professional Fees, the "Sale Transaction Professional Fee Carve-out") .  The parties may choose to provide for the funding of the Wind Down Reserve by establishing a Wind Down Reserve Escrow Account

(c)    The Sale Transaction Professional Fee Carve-out as to each Debtor Property shall be the actual reasonable and necessary professional fees then incurred and approved by the Bankruptcy Court by the Debtors' duly retained professionals (exclusive of the real estate broker) in connection with or related to an actual or potential sale transaction of said Debtor Property subject to the following limits.

The amount of the Sale Transaction Professional Carve-out for professional fees shall be based on the net proceeds received by Lender, credited to Lender's claim, or otherwise allocated to said Debtor Property, before consideration of the Sale Transaction Professional Fee Carve-Out (the "Net Proceeds") and, in the absence of Lender's written consent, shall not exceed:

(i)    the lesser or 7.5% of the Net Proceeds or $150,000 for a Debtor Property (or Sanford Property) with Net Proceeds of less than $10 million, with a maximum of $100,000 for any property transferred to Lender or an affiliate pursuant to a credit bid;

(ii)    the lesser or 2.25% of the Net Proceeds or $350,000 of Net Proceeds for a Debtor Property (or Sanford Property) with Net Proceeds between $10- $20 million, with a maximum of $200,000 for any property transferred to Lender or an affiliate pursuant to a credit bid;

(iii)    the lesser or 2% of the Net Proceeds or $500,000 for a Debtor Property (or Sanford Property) with Net Proceeds between $20-30 million, with a maximum of $275,000 for any property transferred to Lender or an affiliate pursuant to a credit bid; and

(iv)    the lesser or 2% of the Net Proceeds or $525,000 for a Debtor Property (or Sanford Property) with Net Proceeds over $30-40 million, with a maximum of $325,000 for any property transferred to Lender or an affiliate pursuant to a credit bid; [3]

---

[3] The above parameters are applicable only to the Sale Transaction Professional Fee Carve-Out for the Debtors' retained professionals (exclusive of any real estate broker). Nothing in these limitations on the Sale Transaction Professional Fee Carve-outs shall reduce, compromise or modify the Line-Item carve outs provided for in the Debtors Cash collateral budget, nor shall it apply to sums otherwise

(d)    The Sale Transaction Carve-Out shall be payable by Lender in the event that Lender is the Purchaser of a Debtor Property, via credit bid or otherwise, in the discounted amounts set forth in subsection (c), above and based on the greater of (i) the Minimum Credit to the Amount of Lenders' Allowed Claim for each of the Debtor Properties as may be agreed to by Lenders and the Debtor Parties, or (ii) the amount of any actual credit bid.

(e)    The Sale Transaction Carve-Out amounts, and any carve-out of Lenders in the Cash Collateral Order, shall not reduce the amount of the Lenders' Allowed Claims.

(f)    Payment of the Sale Transaction Professional Fee Carve-Outs to the retained professionals from the respective bankruptcy estates shall be subject to award and approval of the United States Bankruptcy Court consistent with the professional fee procedures, if any, established by the Court in the Bankruptcy Cases. Payment of the Sale Transaction Professional Fee Carve-Out on the Sanford Property shall not be subject to Bankruptcy Court approval as the property owner is not a Debtor herein and any applicable carve-out shall be paid out as set forth in Schedule I to the professionals from the proceeds at closing.

**11.    Cooperation and Support.**  Each Party hereby covenants and agrees to cooperate with the other Parties in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) with respect to: (a) all matters relating to their rights hereunder; (b) all matters concerning the implementation of the Plan and the Transactions; and (c) the pursuit, approval and support of the Transactions (including confirmation of the Plan). Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, or to effectuate the solicitation of the Plan and/or the Transactions, including making and filing any required regulatory filings, executing and delivering any other necessary agreements or instruments, and voting any claims against or interests in the Debtors in favor of the Plan, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**12.    Representations and Warranties of Lenders.**  Each Lender severally, and not jointly, represents and warrants that, as of the date such Lender executes and delivers its signature page to this Agreement and as of the Plan Effective Date:

(a)    it is and shall be the beneficial and record owner of the Loan Documents and all Claims under the Loan Documents;

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning the Loan Documents and all Claims under the Loan Documents, including each Lender's Allowed Secured Claims;

(c)    each Lender's Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, right of participation, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Lender's ability to

---

carved out under Section 10.8(b) of the RSA including customary costs of sale, brokerage commission(s), and sums due to the Office of the United States Trustee or Clerk of the Bankruptcy Court.

The Sale Transaction Professional Fee Carve-Out limitations set forth herein are without prejudice to the ability and/or entitlement of the professionals to be paid from estate proceeds to the extent such proceeds may be available. These limitations shall likewise not apply to the transaction involving the last of the Debtor Properties to be sold, in which case the carve-out shall be sufficient to pay (i) the sale-transaction carve out from that transaction; and (ii) the amount necessary to fund the post-sale transaction Wind-Down Budget in the amount and manner as agreed by the parties."

perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)     it has the full power to vote, approve changes to, and transfer all of its Loan Documents and/or each Lender's Claims as contemplated by this Agreement subject to applicable Law.

**13.     Mutual Representations, Warranties, and Covenants.** Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Restructuring Effective Date:

(a)     other than Joseph Supor III, it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of each Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Confirmation Order, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**14.     Termination Events.**

14.1     <u>Consenting Term Lender Termination Events</u>. This Agreement may be terminated upon prior notice by the Lenders by the delivery to the Debtors Parties of a written notice in accordance with this Agreement upon the occurrence of the following events (each, a "<u>Termination Event</u>"):

(a)     the breach in any material respect by a Debtor Party of any of the representations, warranties, or covenants of the Debtor Parties set forth in this Agreement that (i) is materially adverse to the Lender seeking termination pursuant to this provision and (ii) remains uncured for a period of five (5) Business Days after the receipt by the Debtor Parties of notice of such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for fifteen (15) Business Days after such Lenders transmit a written notice in accordance with this Agreement detailing any such issuance; <u>provided</u> that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)     the Milestones have not been achieved, extended, or waived within three (3) business days after the date identified for completion of such Milestone (as such date may be extended or waived);

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(e)      entry of a final order that grants relief terminating, annulling, or materially modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset that, to the extent such relief were granted, would have a material adverse effect on the consummation of the Transactions;

(f)      if the Debtors withdraw the Plan or files any plan of reorganization or liquidation or disclosure statement that is not consistent in any material respect with this Agreement or the Plan Term Sheet;

(g)      if any Debtor files any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of and either Lender's Allowed Claim or credit bid;

(h)      the Debtors lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(i)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Lenders, not to be unreasonably withheld), (i) converting one or more of the chapter 11 Bankruptcy Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Bankruptcy Cases of a Debtor, or (iii) rejecting this Agreement; or

(j)      the occurrence of a termination event in Section 14.2 of this Agreement.

14.2      <u>Debtor Termination Events</u>. Any Debtor may terminate this Agreement upon prior written notice to all Parties in accordance with this Agreement upon the occurrence of any of the following events (each, a "<u>Termination Event</u>"):

(a)      the breach in any material respect by one of the Lender Parties of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days after the receipt by the Lenders of notice of such breach, including:

(i)      Any direct or indirect objection, delay, impediment, or other action taken by a Lender against any action in furtherance of any of the Transactions that otherwise complies with the terms of this Agreement;

(ii)      Any direct or indirect objection, delay, impediment, or other action taken by a Lender opposing entry of any Sale Document and/or consummation of any Sale Transaction; <u>provided</u> that such Sale Transaction is materially consistent with this Agreement, the Plan, and the Bidding Procedures; or

(iii)      The failure of the Lenders to support and/or implement a Sale Transaction.

(b)      the Milestones have not been achieved, extended, or waived within three (3) business days after the date identified for completion of such Milestone (as such date may be extended or waived);

(c)      the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel, to exercise a Fiduciary Out;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Debtor

transmits a written notice in accordance with this Agreement detailing any such issuance; provided that this termination right shall not apply to or be exercised by any Debtor that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

> (e)     the Bankruptcy Court enters an order denying (i) confirmation of the Plan or (ii) approval of the Sale Transaction.

14.3     <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the Parties.

14.4     <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

14.5     <u>Effect of Termination</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise; provided, however, that any Lender withdrawing or changing its vote pursuant to this Section 14.5 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Debtor or any of the Lenders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Lender, and (b) any right of any Lender, or the ability of any Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor. No purported termination of this Agreement shall be effective under this Section 14.5 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 14.2(c) or Section 14.2(e). Nothing in this Section 14.5 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 14.2(c).

14.6     The Debtors acknowledge that after the Petition Date, the giving of notice of termination by any Party pursuant to this Agreement shall not be considered a violation of the automatic stay of section 362 of the Bankruptcy Code; provided, that nothing herein shall prejudice any Party's right to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**15.     Amendments and Waivers.**

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section.

(b) This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing (email being sufficient) signed by each Party, solely with respect to any modification, amendment, waiver or supplement that materially and adversely affects the rights of such Parties and unless otherwise specified in this Agreement.

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## 16.  Miscellaneous.

16.01.  Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.  Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include all such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  Further Assurances. Each Party hereby covenants and agrees to cooperate with each other in good faith with respect to the pursuit, approval, implementation, and consummation of the Transactions, the Sale Transaction, and the Plan, as well as the negotiation, drafting, execution, and delivery of documents (including any related orders, agreements, instruments, schedules, or exhibits) described in this Agreement or the Definitive Documents or otherwise necessary or desirable to facilitate the Transactions in accordance with this Agreement and the Definitive Documents. Furthermore, subject to the terms hereof, each Party shall take such action as may be reasonably necessary or reasonably requested by another Party to carry out the purpose and intent of this Agreement, including facilitating any necessary regulatory filings, and shall refrain from taking any action that would frustrate the purpose and intent of this Agreement.

16.04.  Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES

THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.  <u>TRIAL BY JURY WAIVER</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08.  <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Debtor Parties and the Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Debtor Parties and the Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10.  <u>Survival</u>. Notwithstanding the termination of this Agreement, the agreements and obligations of the Parties in Section 14 shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.11.  <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

      (a)      if to a Debtors, to:

            Supor Properties Enterprises LLC;
            J Supor 136-1 Realty LLC;
            Supor-172 Realty LLC;
            Supor Properties Breiderhoft LLC;
            Supor Properties Devon LLC;
            Shore Properties Associates North LLC;
            Supor Properties 600 Urban Renewal, LLC;

JS Realty Properties, LLC; and
Supor Properties Harrison Avenue LLC
c/o Joseph Supor III
433 Bergen Avenue
Kearny, NJ 07032

with copies to:

Michael E. Holt, Esq.
Forman Holt
365 West Passaic Street, Suite 400
Rochelle Park, NJ 07662
Telephone: (201)845-1000
mholt@formanlaw.com

-and-

Daniel M. Eliades, Esq.
William Waldman, Esq.
K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel.Eliades@klgates.com
William.waldman@klgates.com

(b)     if to a Lenders, to:

Jerold C. Feuerstein, Esq.
Kriss & Feuerstein, LLP
360 Lexington Avenue, Suite 1200
New York, New York 10017
Telephone: (212)-661-2900
jfeuerstein@kandfllp.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.12.   Independent Due Diligence and Decision Making. Each Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

16.13.   Enforceability of Agreement. Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.14.   Waiver. If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.15.   Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

16.16.   Several, Not Joint, Claims. Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.17.   Captions and Headings. The captions of this Agreement are for convenience purposes only and shall not be used in construing the intent of Lenders and Debtors under this Agreement.

16.18.   Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.19.   Remedies Cumulative. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.20.   Email Consents. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

16.21.   Other Interpretive Matters.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) all exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein; (iii) words imparting the singular number only shall include the plural and vice versa; (iv) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (v) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters

22

immediately following it; (vi) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; (vii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified; and (viii) "Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

(b)      The Debtors and Lenders have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

16.21   Additional Definitions. The following terms shall have the following definitions:

"Agreement" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto.

"Alternative Proposal" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Debtors or the debt, equity, or other interests in any one or more Debtors which do not materially deviate from the Transactions contemplated by the Plan

"Auction" has the meaning given to such term in the Bidding Procedures.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court in which the Bankruptcy Cases are commenced.

"Bid Deadline" has the meaning given to such term in the Bidding Procedures.

"Bidding Procedures" has the meaning set forth in the recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New Jersey.
"Claim" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"Confidentiality Agreement" means an executed confidentiality agreement in connection with any proposed Transactions.

"Confirmation Order" means the confirmation order with respect to the Plan.

"Debtors' Professionals" means Forman Holt as proposed counsel, K&L Gates LLP as proposed special counsel, and Sean Raquet CPA, LLC as proposed accountants.

"Disclosure Statement" means the related disclosure statement with respect to the Plan.

"Disclosure Statement Motion" means the motion filed with the Bankruptcy Court seeking approval of the

adequacy of the Disclosure Statement.

"Disclosure Statement Order" means the order entered by the Bankruptcy Court approving the adequacy of information in the Disclosure Statement and authorizing the Debtors to solicit votes in connection with the Plan.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"Existing Events" means Events of Default (as such term is defined in the Loan Documents), including the failure to make interest payments due on July 1, 2022 and each month thereafter, the failure to pay real estate taxes due and payable February 1, 2023, the failure to pay off the Loans on the Maturity Date (as defined in the Loan Documents), and the failure to repay the Loans at the end of the Forbearance Period (as defined in the Forbearance Agreement) on September 15, 2023.

"First Day Pleadings" means the first-day pleadings that the Debtors determine are necessary or desirable to file.

"Forbearance Agreement" means the Forbearance Agreement identified on Schedule A.

"Interest" means common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests.

"Law" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"Lender's Allowed Secured Claim" means, with respect to each Lender, the allowed claim of such Lender, to the extent secured by property of the Debtor Parties.

"Petition Date" means the first date any of the Debtors commence a Bankruptcy Case.

"Plan" means the proposed plan of reorganization, as contemplated by the Plan Term Sheet.

"Plan Effective Date" means the occurrence of the effective date of the Plan according to its terms.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"Plan Term Sheet" has the meaning given to such term sheet in the recitals of this Agreement.

"Qualified Bid" has the meaning given to such term in the Bidding Procedures.

"Qualified Bidder" has the meaning given to such term in the Bidding Procedures.

"Restructuring Effective Date" means the Plan Effective Date.

"Sale Closing" means the date of closing of a Sale Transaction.

"Sale Transaction" means a sale of some or all of the Debtor Properties.

"Secured Claim" means a Claim secured by a lien, security interest, or other charge against or interest in collateral, or that is subject to setoff under Section 553 of the Code, to the extent of the value of the interest of the holder of such Claim in the Debtor's interest in such property, or to the extent of the amount subject to setoff, as the case may be.

"Avoidance Settlement" means the full and final settlement and resolution of any and all claims related to Debtor Avoidance Claims as contemplated in the Plan Term Sheet.

"Successful Bidder" has the meaning given to such term in the Bidding Procedures.

"Securities Act" means the Securities Act of 1933, as amended.

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement, or caused their duly authorized representatives to execute this Agreement, as of the day and year first above written.

*[Remainder of page intentionally left blank]*

**1000 FRANK E. RODGERS 1 LLC,**
A Delaware limited liability company

Name: Brian Shatz
Title: Authorized Signatory

**1000 FRANK E. RODGERS 2 LLC,**
A Delaware limited liability company

Name: Brian Shatz
Title: Authorized Signatory

**12 BREIDERHOFT RD OWNER LLC**
A Delaware limited liability company

Name: Brian Shatz
Title: Authorized Signatory

**201 DEVON TERR OWNER LLC**
A Delaware limited liability company

Name: Brian Shatz
Title: Authorized Signatory

**401 SUPOR BLVD OWNER LLC**
A Delaware limited liability company

Name: Brian Shatz
Title: Authorized Signatory

318234094.1

**600 GUYON DRIVE OWNER LLC**
A Delaware limited liability company

Name: Brian Shatz
Title:  Authorized Signatory


**1000 FRANK E. RODGERS BLVD OWNER LLC**
A Delaware limited liability company

Name: Brian Shatz
Title:  Authorized Signatory


**SUPOR PROPERTIES ENTERPRISES, LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


**J. SUPOR 136-1 REALTY LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


**SUPOR-172 REALTY LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**600 GUYON DRIVE OWNER LLC**
A Delaware limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

**1000 FRANK E. RODGERS BLVD OWNER LLC**
A Delaware limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES ENTERPRISES LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**J. SUPOR 136-1 REALTY LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR-172 REALTY LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES BREIDERHOFT LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


**SUPOR PROPERTIES DEVON LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


**SHORE PROPERTIES ASSOCIATES NORTH, LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


**SUPOR PROPERTIES 600 URBAN RENEWAL LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


**SUPOR PROPERTIES HARRISON AVENUE, LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory


318234094.1

**JS REALTY PROPERTIES LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**S&B REALTY PARTNERSHIP**
A New Jersey partnership

Name: Joseph Supor, III
Title: Authorized Signatory

**J. SUPOR 136-1 LIMITED LIABILITY COMPANY**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR-172 LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES BREIDERHOFT HOLDING LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES DEVON HOLDING LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SHORE PROPERTIES ASSOCIATES NORTH HOLDING LLC**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES 600 UR HOLDING LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES HARRISON AVENUE HOLDING LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**JL REALTY PROPERTIES LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

318234094.1

**J. SUPOR & SON TRUCKING & RIGGING CO., INC.**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUBEL CORPORATION**
**D/B/A HARRISON WAREHOUSING CO**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**JOSEPH SUPOR, III**
Individually

Name: Joseph Supor, III

**SUPOR MANOR REALTY GROUP, LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**J. SUPOR REALTY GROUP LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

318234094.1

**SUPOR PROPERTIES-400 LIMITED LIABILITY COMPANY**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR FAMILY, LLC.**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES BOONTON LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**J. SUPOR REALTY LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR MANOR REALTY LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES BOONTON HOLDING LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES BOONTON DE LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**MARITAL TRUST UNDER THE LAST WILL
AND TESTAMENT OF JOSEPH SUPOR, JR.
DATED SEPT. 13, 2002**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**ESTATE OF ROSEANN SUPOR**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**ACKNOWLEDGED AND AGREED** as to Section 4(e)

**J SUPOR REALTY LLC**
A Delaware limited liability company

318234094.1

Name: Joseph Supor, III
Title: Authorized Signatory

**J. SUPOR & SON TRUCKING & RIGGING CO., INC.**
A New Jersey limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SS REALTY PROPERTIES LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR DEVELOPMENT GROUP LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR STUDIOS PRODUCTIONS LLC**
A Delaware limited liability company

Name: Joseph Supor, III
Title: Authorized Signatory

# SCHEDULE A

## SCHEDULE A

## LOAN DOCUMENTS

1.  Land Loan Agreement dated as of December 31, 2020.

2.  Mortgage Note dated as of December 31, 2020.

3.  Mortgage and Security Agreement dated as of December 31, 2020 encumbering the real properties commonly known as 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149), 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136), 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172), 201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252), 600 Guyon Drive, Harrison NJ (lot 16.01 in block 150), and 401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222).

4.  Guaranty dated December 31, 2020 made by Joseph Supor III, individually, J. Supor & Son Trucking & Rigging Co. Inc., and Subel Corporation D/B/A Harrison Warehousing Co.

5.  Conditional Guaranty, dated December 31, 2020 made by Joseph Supor III, individually, J. Supor & Son Trucking & Rigging Co. Inc., and Subel Corporation D/B/A Harrison Warehousing Co.

6.  Guaranty of Debt Service and Carry Guaranty, dated December 31, 2020, made by Joseph Supor III, individually, J. Supor & Son Trucking & Rigging Co. Inc., and Subel Corporation D/B/A Harrison Warehousing Co.

7.  Environmental Indemnity Agreement, dated as of December 31, 2020.

8.  Cross-Collateralization Agreement and Omnibus Amendment to Mortgages dated January 8, 2021.

9.  Mortgage and Security Agreement dated as of January 8, 2021, encumbering the property commonly known as 94 Mantoloking Road, Brick, NJ (lots 7, 8 and 9 in block 68).

10.  Mortgage and Security Agreement dated as of May 17, 2021, encumbering the real property commonly known as 12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252).

11.  Mortgage and Security Agreement, dated as of May 17, 2021, encumbering the real property commonly known as 751 Harrison Avenue, Harrison, NJ (lot 9 in block 197).

12.  Joinder and Release Agreement dated May 17, 2021.

14.  Partial Release of Mortgage, Assignment of Leases and Rents and Cross Collateralization Agreement and Omnibus Agreement to Mortgages, dated as of June 2021.

15.  Forbearance Agreement dated April 12, 2023.

16.  Ownership Interest Pledge and Security Agreement dated April 12, 2023 pledging Membership Interests in Supor Properties Boonton, LLC.

20.  Ownership Interest Pledge and Security Agreement dated April 12, 2023 pledging Membership interests in J. Supor Realty Mezz LLC.

21.  Ownership Interest Pledge and Security Agreement dated April 12, 2023 pledging Membership interests in Supor Family LLC.

22.  Ownership Interest Pledge and Security Agreement dated April 12, 2023 pledging Membership interests in Supor Manor Realty Mezz, LLC.

23.  Ownership Interest Pledge and Security Agreement dated April 12, 2023 pledging Membership Interests in Supor Properties-400 Limited Liability Company.

24.  Deed In Lieu Agreement dated April 12, 2023 with the following deeds in lieu of foreclosure:

   a.  1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149);

   b.  1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136);

   c.  1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172);

   d.  12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252);

   e   201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252);

   f.  600 Guyon Drive, Harrison NJ (lot 16.01 in block 150);

   g.  401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222);

   h.  751 Harrison Avenue, Harrison, NJ (lot 9 in block 197);

   i.   94 Mantoloking Road, Brick, NJ (lots 7, 8 and 9 in block 68);

25.  Mortgage and Security Agreement dated April 12, 2023 securing $72,500,000 encumbering the real properties commonly known as 95 Fulton Street, Boonton, NJ (Lot 73 Block 69), 500 Supor Boulevard, Harrison, NJ (Lots 1 and 3.03, Block 222), 505 Manor Avenue Harrison NJ (Lot 1, Block 189), 129 Sanford Avenue, Kearny, NJ (Lot 14.01, Block 279), 400 Supor Boulevard, Harrison, NJ (Lot 1, Block 201);

26.  Forbearance Agreement dated as of April 12, 2023; and

27.  Deed in Lieu Agreement dated as of April 12, 2023.

## MEZZANINE LOAN DOCUMENTS

*All documents listed below are dated as of December 31, 2020 unless otherwise noted.*

1.      Mezzanine Loan Agreement

2.      Mezzanine Promissory Note

3.      Conditional Guaranty

4.      Debt Service and Carry Guaranty

5.      Guaranty

6.      Environmental Indemnity Agreement

<u>Pledge Documents of Supor Properties Enterprises LLC by S&B Realty Partnership</u>:

7.      Share Certificate #001 with Endorsement (in blank)

8.      Ownership Interests Pledge and Security Agreement

9.      Instruction to Register Pledge with Confirmation Statement

10.     UCC-1 Financing Statement

<u>Pledge Documents of J. Supor 136-1 Realty LLC by J. Supor 136-1 Limited Liability Company</u>:

11.     Share Certificate #001 with Endorsement (in blank)

12.     Ownership Interests Pledge and Security Agreement

13.     Instruction to Register Pledge with Confirmation Statement

14.     UCC-1 Financing Statement

<u>Pledge Documents of Supor-172 Realty LLC by Supor-172 LLC</u>:

15.     Share Certificate #001 with Endorsement (in blank)

16.     Ownership Interests Pledge and Security Agreement

17.     Instruction to Register Pledge with Confirmation Statement

18.     UCC-1 Financing Statement

<u>Pledge Documents of Supor Properties Boonton LLC by Supor Properties Boonton Holding LLC</u>:

19.     Share Certificate #001 with Endorsement (in blank)

20.     Ownership Interests Pledge and Security Agreement

21.     Instruction to Register Pledge with Confirmation Statement

22.   UCC-1 Financing Statement

<u>Pledge Documents of Supor Properties Devon LLC by Supor Properties Devon Holding LLC:</u>

23.   Share Certificate #001 with Endorsement (in blank)

24.   Ownership Interests Pledge and Security Agreement

25.   Instruction to Register Pledge with Confirmation Statement

26.   UCC-1 Financing Statement

<u>Pledge Documents of Shore Properties Associates North LLC by Shore Properties Associates North Holding LLC:</u>

27.   Share Certificate #001 with Endorsement (in blank)

28.   Ownership Interests Pledge and Security Agreement

29.   Instruction to Register Pledge with Confirmation Statement

30.   UCC-1 Financing Statement

<u>Pledge Documents of JS Realty Properties LLC by JL Realty Properties LLC:</u>

31.   Share Certificate #002 with Endorsement (in blank)

32.   Ownership Interests Pledge and Security Agreement

33.   Instruction to Register Pledge with Confirmation Statement

34.   UCC-1 Financing Statement

<u>Pledge Documents of Supor Properties 600 Urban Renewal LLC by Supor Properties 600 UR Holding LLC:</u>

35.   Share Certificate #001 with Endorsement (in blank)

36.   Ownership Interests Pledge and Security Agreement

37.   Instruction to Register Pledge with Confirmation Statement

38.   UCC-1 Financing Statement

<u>BREIDERHOFT CLOSING DOCUMENTS (DATED MAY 17, 2021):</u>

39.   Share Certificate #1 with Endorsement (in blank) of Breiderhoft Mortgage Borrower

40.   Ownership Interests Pledge and Security Agreement

41.   Instruction to Register Pledge with Confirmation Statement

42.   UCC-1 Financing Statement (Pledge)

43.   Fee Owner's Policy with Mezzanine Financing Endorsement

<u>HARRISON CLOSING DOCUMENTS (DATED MAY 17, 2021)</u>:

44.   Joinder Agreement (Supor Properties Harrison Avenue Holding LLC)

45.   Consent of Harrison Mezzanine Borrower

46.   Certificate of Harrison Mezzanine Borrower

47.   Share Certificate #1 with Endorsement (in blank) of New Harrison Mortgage Borrower

48.   Ownership Interests Pledge and Security Agreement

49.   Instruction to Register Pledge with Confirmation Statement

50.   UCC-1 Financing Statement (Pledge)

51.   W-9 of Harrison Mezzanine Borrower

52.   Opinion Letter of Platzer, Swergold, Goldberg, Katz & Jaslow, LLP

53.   Fee Owner's Policy with Mezzanine Financing Endorsement

# SCHEDULE B

## SCHEDULE B

### DEBTORS AND DEBTOR PROPERTIES

1.　Supor Properties Enterprises, LLC - 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149)

2　J Supor 136-1 Realty LLC - 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136) y.

3.　Supor-172 Realty LLC - 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172).

4.　Supor Properties Breiderhoft LLC - 12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252).

5　Supor Properties Devon LLC - 201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252) y.

6.　600 Urban Renewal, LLC - 600 Guyon Drive, Harrison NJ (lot 16.01 in block 150).

7.　JS Realty Properties, LLC - 401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222).

8.　Supor Properties Harrison Avenue LLC - 751 Harrison Avenue, Harrison, NJ (lot 9 in block 197).

9.　Shore Properties Associates North LLC- 94 Mantoloking Road, Brick, NJ (lots 7, 8 and 9 in block 68).

# SCHEDULE C

## SCHEDULE C

## DEBTOR PROPERTIES WHERE LENDER(S) RECORDED DEEDS

1.      1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149) recorded with the Hudson County Register of Deeds on January 29, 2024 as Instrument 20240129010006630 for stated consideration of $19,000,000;

2.      1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136) recorded with the Hudson County Register of Deeds on January 29, 2024 as Instrument 20240129010006640 for stated consideration of $500,000;

3.      1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172) recorded with the Hudson County Register of Deeds on January 29, 2024 as Instrument 20240129010006650 for stated consideration of $5,500,000;

4.      12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252) recorded with the Hudson County Register of Deeds on January 26, 2024 as Instrument 20240126010006280 for stated consideration of $10,500,000;

5.      201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252) recorded with the Hudson County Register of Deeds on January 29, 2024 as Instrument 20240129010006660 for stated consideration of $2,500,000;

6.      600 Guyon Drive, Harrison NJ (lot 16.01 in block 150) recorded with the Hudson County Register of Deeds on January 31, 2024 as Instrument 20240131010007310 for stated consideration of $10,000,000; and

7.      401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222) recorded with the Hudson County Register of Deeds on January 29, 2024 as Instrument 20240125010005970 for stated consideration of $12,500,000.

The foregoing are collectively referred to as the "DILF Properties".

# SCHEDULE D

# BROKER AGREEMENT

This Broker Agreement ("Agreement") dated April 2, 2024, is entered into by and between CBRE, Inc. ("Broker") and Supor Properties Enterprises LLC, J Supor 136-1 Realty LLC, Supor-172 Realty LLC, Supor Properties Breiderhoft LLC, Supor Properties Devon LLC, Shore Properties Associates North LLC, Supor Properties 600 Urban Renewal, LLC, JS Realty Properties, LLC, and Supor Properties Harrison Avenue LLC (the "Debtors" or individually a "Debtor") for the sale of the Properties set forth on Schedule A attached hereto. Broker and Debtor are collectively referred to herein as the "Parties."

## RECITALS

A. Debtors are each the owners of the respective Properties set forth by their names on Schedule A hereto.

B. Joseph Supor III is the authorized representative for each of the Debtors.

C. The Debtors are indebted to 1000 Frank E. Rodgers 1, LLC and Frank E. Rodgers 2, LLC (the "Lenders") which debt is secured by the Properties.

D. Between January 26, 2024, and January 31, 2024, Lenders recorded deeds transferring ownership of certain of the Properties from certain of the Debtors to 1000 Frank E. Rodgers Blvd Owner LLC; 12 Breiderhoft Rd Owner LLC; 201 Devon Terr Owner LLC; 401 Supor Blvd Owner LLC; and 600 Guyon Drive Owner LLC ("DILF Holders" and together with the Lenders, the "Lender Parties" and individually, a "Lender Party").

E. The Debtors dispute the validity of the deeds to the DILF Holders.

F. The Debtors and the Lender Parties have negotiated a Restructuring Support Agreement ("RSA") in connection with separate bankruptcy proceedings to be filed by the Debtors in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Actions").

G. Subject to approval, the Debtors and the Lenders have agreed to the retention of Broker to market and sell the Properties pursuant to the RSA.

## AGREEMENT

1. The above Recitals are incorporated by reference herein.

2. This Agreement shall commence on the date that the Bankruptcy Court approves the retention of Broker and shall end on the twelve (12) month anniversary of the date of commencement or such other date as required by the Bankruptcy Court (the "Termination Date").

3. The Debtors grant Broker during the term of this Agreement, the exclusive right to sell or otherwise dispose of the Properties on the terms and conditions set forth herein and Broker shall act as Debtors' exclusive broker in the performance thereof. Debtors shall fix the initial offering price for the Properties, after consultation with Broker, and Lenders in Debtors' sole and absolute discretion. One or more Broker brokers shall be designated to assist Debtors in the disposition of the Properties (the "Agency Team").

318219271.6

4.    Broker shall market the Properties using such advertising, canvassing, solicitation of outside brokers, including Broker brokers not part of the Agency Team (collectively, "Outside Brokers"), and other promotional and marketing activities as Debtors and Broker may agree upon, and Debtors shall reimburse Broker for actual out-of-pocket expenses incurred in connection therewith.

5.    Debtors and Lender Parties agree to refer to Broker all inquiries received relating to the Properties and to conduct all negotiations exclusively through Broker. Broker will present to Debtors all *bona fide* offers and conduct all negotiations under Debtors' supervision and direction, with such participation by Debtors and Debtors' counsel as Debtors direct. Broker will provide Debtors with appropriate analysis and comparison of each offer and counteroffer and recommend to Debtors which offer to accept; but all final business and legal decisions shall be made solely by Debtors; and all binding agreements shall be executed and delivered solely by Debtors.

6.    Fees

(a)  If, during the term of this Agreement, there is a Sale (as hereinafter defined) of all or any portion of the Properties, Debtor shall require that the buyer of the property pay Broker a commission at closing (i.e., upon the passing of title (or equivalent final and binding documents)) calculated by multiplying the Gross Sales Price (as hereinafter defined) by one percent (1%). In the event an Outside Broker procures a purchaser, Debtors and Broker will jointly require the Outside Broker to obtain its compensation solely from its own client, not from Broker. Notwithstanding the above, in the event a purchaser refuses to pay Broker its commission, and Debtor, Lenders and/or Bankruptcy Courts wishes to proceed with the sale, Debtors shall pay Broker its commission.

(b)  Lender Parties and their assignees or designees have the right to submit one or more credit bids of its outstanding debt due from Debtors in connection with the sale of any of the Properties (hereinafter the "Credit Bids" or individually a "Credit Bid"). In the event there is a Credit Bid by Lender Parties on one or more of the Properties, and Lender Parties are the successful purchaser for the property or properties being sold based on such Credit Bid(s), in lieu of the fees provided in Paragraph 6a above, Lender Parties shall pay Broker a commission at closing calculated by multiplying the Credit Bid(s) by one-half percent (.5%). Lender Parties agree that its Credit Bids on each Property may be up to the amounts set forth on a separate confidential schedule to be provided and agreed upon by and between Lenders, Debtors and Broker. If Lender Parties choose to Credit Bid beyond the agreed amount set forth on the confidential schedule, Lender Parties will pay the full Buyer's Premium to Broker of one percent (1%) of the Gross Sale Price at closing.  Further in connection with this reduced commission, Lender Parties shall only have the right to credit bid once. If Lender Parties credit bid and a third-party bidder then submits a bid which is higher than the bid of the Lender Parties and Lender Parties then credit bid again, then Lender Parties will be required to pay Broker the full 1% commission of the Gross Sale Price at closing. For the avoidance of doubt, the initial bid by the Lender Parties may be the final bid at the auction. Notwithstanding the above, if the Lender Party refuses to pay

Broker the commission, all Parties reserve all rights and claims.. The confidential schedule of Lender Parties' maximum Credit Bids hereunder shall not be disclosed by Broker, Debtors or Lender Parties to any other party except as required by law or court order.

7. "Gross Sales Price" shall include any and all consideration received or receivable, in whatever form, including but not limited to the assumption of any mortgage or loan by purchaser, purchaser's taking title to the Properties subject to any such mortgage or loan, any other rights, value or assets conferred with the sale, such as real estate development rights and building equipment and fixtures, and any other items for which consideration is received or receivable.

8. "Sale" shall also include, in addition to a conventional sale of a fee simple interest, joint ventures, swaps, and any other transaction, however characterized, by which Debtors' equity in the Properties is transferred to a third party for consideration.

9. Debtors shall be free to reject any proposed transaction for any reason and no compensation for Broker's services hereunder (other than the expenses as noted in paragraph 4, above) shall be due for any portion of the Properties for which no transaction is effected.

10. If, by the first anniversary of the Termination Date, Debtors enter into a transaction with a purchaser to whom the Properties had been submitted or shown during the term of this Agreement, the purchaser will pay Broker the commission(s) outlined in this Agreement as if it had not ended. If, at the expiration of such period, the transactional documents are out for signature or a transaction is being actively negotiated, this Agreement shall govern such transaction if, as, and when consummated.

11. In the event of a default in any payment of the commission(s) herein, all outstanding commissions due and owing shall be automatically accelerated and Broker shall be entitled to be reimbursed for all costs of collection, including reasonable attorneys' fees and disbursements incurred, in preparation for and prosecution of litigation and all outstanding commissions due and owing shall bear interest at twelve percent (12%) per annum.

12. When a potential purchaser for the Properties is represented by an Outside Broker, other than a CBRE Outside Broker, Debtors agree that Debtors will not permit contract of sale drafts to issue until the Outside Broker has agreed on a commission amount or has otherwise agreed in writing to look to its potential purchaser for a commission.

13. (a) Because of the substantial number of brokers and salespersons employed by Broker, a CBRE Outside Broker may, on occasion, represent a prospective purchaser seeking to acquire the Properties, which representation is independent of Debtors representation by the Agency Team. In such cases, Broker will disclose its dual role in the potential transaction to both Debtors and to the prospective purchaser and will implement Broker's usual internal safeguards to assure confidentiality to both Debtors and prospective purchaser in Debtors and the prospective purchasers' respective dealings with and through Broker. Debtors agree that such occasional dual representation may occur, subject to appropriate disclosure.

3

(b)     Debtors also acknowledge that Broker and its affiliates provide a wide range of real estate services and certain Broker affiliates (including employees), may: (a) assist with the sale of the Properties; (b) represent clients who have competing interests in such transaction(s), including assisting prospective purchasers with the financing or valuation of the Properties, and (c) pay and/or receive referral fees and other compensation relating to the foregoing, including to and from Broker.

14.     Broker shall have the right to enter the Properties, upon appointment, at any time during regular business hours for the purpose of inspection and showing the Properties to prospective purchasers. Debtors shall cooperate with us to effect a sale of the Properties as contemplated hereby including, but not limited to, providing us promptly on request with relevant documents, information and materials concerning the Properties, the improvements thereon, leases, financing and other matters, as well as a plat or survey showing the boundaries of the Properties and locations of all existing easements, rights of way and improvements on the Properties, and current evidence of your good and marketable title to the Properties.

15.     Debtors acknowledge that Broker is not obligated to and has made no independent investigation of the physical conditions of the Properties including, but not limited to, the condition of all structures (exterior and interior) on the Properties, the electrical and mechanical systems thereof, the fixtures, personal property and equipment therein, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "Physical Conditions"). All documents and materials, investigations, reports, and information with respect to the Physical Conditions shall be prepared by or for Debtors and Debtors agree to disclose any such information in your possession to Broker and prospective purchasers. Broker is authorized to furnish such information to prospective purchasers on Debtors behalf, and Debtors (as between Debtors and Broker) shall be solely responsible for same. Debtors agree to indemnify and hold Broker harmless from and against all claims, costs, liabilities, settlements, and judgments (collectively, "claims"), and all costs of defense against such claims (including attorneys' fees and disbursements), suffered or incurred by Broker which arise out of or relate to the Physical Conditions, your title, and/or the marketability thereof.

16.     Debtors represent and warrant that subject to Bankruptcy Court approval; they have the full authority to enter into this Agreement without violating any other agreement or contractual obligation.

17.     This Agreement: (i) expresses the Parties' entire agreement on the matters covered hereinabove; (ii) supersedes all prior understandings between them on such matters, oral or written; (iii) shall be governed by New Jersey law (without regard to its conflict of laws principles); (iv) shall be binding on their lawful representatives, successors, designees, and assigns; and (v) shall not be altered, or terminated except in a writing signed by each. This Agreement may be executed in one or more counterparts, which shall be deemed effective and binding on both sides when completed and exchanged. Digital and other electronic signatures and copies of electronic and manual signatures of this Agreement transmitted by portable document format (PDF) or email shall be binding and fully effective as provided by New Jersey law.

318219271.6

18. <u>Notices</u>. All notice shall be in writing and, unless otherwise provided herein, shall be effective when delivered by overnight courier or facsimile addressed as stated below. In the event that any address shall change, such change shall be deemed effective on all Parties provided that notice of such change is given, in writing, and such change shall be binding upon written confirmation acknowledging such change. In providing such written confirmation the Parties shall act promptly. Notice shall be at the addresses provided as follows:

Broker:

CBRE, Inc.
250 Pehle Avenue
Suite 600
Saddle Brook, NJ 07663
Attention: Jeff Hipschman,
Senior Managing Director

With a copy to:

Debtors:

Supor Properties Enterprises LLC,
J Supor 136-1 Realty LLC,
Supor-172 Realty LLC,
Supor Properties Breiderhoft LLC,
Supor Properties Devon LLC,
Shore Properties Associates North LLC,
Supor Properties 600 Urban Renewal, LLC,
JS Realty Properties, LLC, and
Supor Properties Harrison Avenue LLC
433 Bergen Avenue
Kearny, NJ
Attention: Joseph Supor, III

With copies to:

Forman Holt
365 West Passaic Street
Suite 400
Rochelle Park, NJ 07662
Attention: Michael Holt, Esq.

And

K&L Gates LLP
One Newark Center
10th Floor
Newark, NJ 07102
Attention: William L. Waldman, Esq.

19. **This Agreement is subject to and conditioned upon Bankruptcy Court approval in connection with the Bankruptcy Actions that have been or will be filed by the Debtors in the United States Bankruptcy Court for the District of New Jersey and may be modified or supplemented as required by the Bankruptcy Court.**

318219271.6

Broker:

**CBRE, INC.**


By: _____
Name: _____
Title: _____
Date: _____




**Debtors:**

**SUPOR PROPERTIES ENTERPRISES, LLC**
A Delaware limited liability company


_____

Name: Joseph Supor, III
Title: Authorized Signatory


**J. SUPOR 136-1 REALTY LLC**
A Delaware limited liability company


_____

Name: Joseph Supor, III
Title: Authorized Signatory


**SUPOR-172 REALTY LLC**
A Delaware limited liability company


_____

Name: Joseph Supor, III
Title: Authorized Signatory


**SUPOR PROPERTIES BREIDERHOFT LLC**
A New Jersey limited liability company


_____

6

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES DEVON LLC**
A New Jersey limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

**SHORE PROPERTIES ASSOCIATES NORTH, LLC**
A New Jersey limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES 600 URBAN RENEWAL LLC**
A Delaware limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

**SUPOR PROPERTIES HARRISON AVENUE, LLC**
A Delaware limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

**JS REALTY PROPERTIES LLC**
A Delaware limited liability company

_____

Name: Joseph Supor, III
Title: Authorized Signatory

7

The Terms of this Agreement are acknowledged and consented to by the following Lenders:

**1000 FRANK E. RODGERS 1 LLC,**
A Delaware limited liability company

_____

Name:
Title:

**1000 FRANK E. RODGERS 2 LLC,**
A Delaware limited liability company

_____

Name:
Title:

**12 Breiderhoft Rd Owner LLC**
A Delaware limited liability company

_____

Name:
Title:

**201 Devon Terr Owner LLC**
A Delaware limited liability company

_____

8

Name:
Title:

**401 Supor Blvd Owner LLC**
A Delaware limited liability company

_____

Name:
Title:

**600 Guyon Drive Owner LLC**
A Delaware limited liability company

_____

Name:
Title:

**1000 Frank E. Rodgers Blvd Owner LLC**
A Delaware limited liability company

_____

Name:
Title:

9

318219271.6

## Schedule A

1.     1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149), owned by Supor Enterprises;

2.     1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136), owned by Supor 136;

3.     1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172), owned by Supor 172; and

4.     600 Guyon Drive, Harrison NJ (lot 16.01 in block 150), owned by Supor 600.

5.     12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252), owned by Supor Breiderhoft;

6.     201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252), owned by Supor Devon;;

7.     401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222), owned by JS Realty;

8.     751 Harrison Avenue, Harrison, NJ (lot 9 in block 197), owned by Supor Harrison Avenue; and

9.     94 Mantoloking Road, Brick, NJ (lots 7, 8 and 9 in block 68), owned by Shore Properties, (the "Shore Property").

318219271.6

# SCHEDULE E

**SCHEDULE E**

TBD AFTER SELECTION OF BROKER(S)

PROCEDURES BELOW ARE FOR DISCUSSION PURPOSES ONLY

**MARKETING PROCESS AND BIDDING PROCEDURES FOR THE
SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS
IN CONNECTION WITH THE SALE OF DEBTOR PROPERTIES**

**I.    Debtor Properties.**

The Debtors are seeking to sell all of their assets, or any portion thereof, including, but not limited to: (i) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149); (ii) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136); (iii) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172); (iv) 12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252); (v) 201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252); (vi) 600 Guyon Drive, Harrison NJ (lot 16.01 in block 150); (vii) 401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222); (vii) 751 Harrison Avenue, Harrison, NJ (lot 9 in block 197); and (ix) 94 Mantoloking Road, Brick, NJ (lots 7, 8 and 9 in block 68), in each case, free and clear of all liens, claims, interests, or other encumbrances (each, "Debtor Property" collectively, the "Debtor Properties").

The Debtors seek to sell the Debtor Properties to the highest bidder(s) to maximize value for their estates. To provide the most competitive and flexible process, the Debtors seek to establish standardized procedures leading to and culminating in auctions that create an open and level playing field that permits potential purchasers the flexibility to propose an acquisition of the RDA Properties (*defined below*) or a one of Non-RDA Properties (*defined below*). To accomplish this end, the Debtors will first engage in a sale process for the RDA Properties, and then will engage in a sale process for the Non-RDA Properties. The processes for each will have nearly identical procedures.

**The RDA Properties.**

The RDA Properties consist of the following properties: (i) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 5.02 in block 151, lot 17.02 in block 137 and lot 1.02 in block 149); (ii) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1.07 in block 136) (iii) 1000 Frank E Rodgers Boulevard, Harrison NJ (lot 1 in block 172); and (iv) 600 Guyon Drive, Harrison NJ (lot 16.01 in block 150) (collectively, and, together with any causes of action or other rights of the Debtor that run with or directly relate to these properties, including tax abatements and the Harrison RDA (defined below), the "RDA Properties").

The RDA Properties are the subject of an approved Redevelopment Agreement with the Town of Harrison (the "Harrison RDA") which gives the Debtors the right to redevelop the RDA Properties and construct 1500 residential units, a 200-room hotel, 151,960 square feet of retail space, 1,000,000 square feet of office space and 4,570 parking spaces. The Harrison RDA was approved by the Town of Harrison on June 1, 2019, and recorded on December 11, 2019.

The RDA Properties must be purchased in one transaction.

The Marketing Period (*as defined below*) for the RDA Properties will commence on X.

The Stalking Horse Deadline (*as defined below*) – if applicable— **X, at 5:00 p.m. (prevailing Eastern Time)**

The Bid Deadline (*as defined below*) for the Non-RDA Properties will be **X, at 5:00 p.m. (prevailing Eastern Time)**.

The Auction for the RDA Properties will commence on X.

### The Non-RDA Properties.

The Non-RDA Properties consist of the following properties: (i) 12 Breiderhoft Road, Kearny, NJ (lot 8.02 in block 252); (ii) 201 Devon Terrace, Kearny, NJ (lot 4.02 in block 252); (iii) 401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222); (iv) 751 Harrison Avenue, Harrison, NJ (lot 9 in block 197); and (v) 94 Mantoloking Road, Brick, NJ (lots 7, 8 and 9 in block 68) (collectively, and, together with any causes of action or other rights of the Debtor that run with or directly relate to these properties, including tax abatements, the "Non-RDA Properties").

The Non-RDA properties can be purchased in together or independently; provided, however, that the 12 Breiderhoft Road Non-RDA Property and the 201 Devon Terrace Non-RDA Property must be at least made available to be purchased together.

The Marketing Period (*as defined below*) for the Non-RDA Properties will commence on X.

The Stalking Horse Deadline (*as defined below*) – if applicable— **X, at 5:00 p.m. (prevailing Eastern Time)**

The Bid Deadline (*as defined below*) for the Non-RDA Properties will be **X, at 5:00 p.m. (prevailing Eastern Time)**.

The Auction for the Non-RDA Properties will commence on X.

**II.     Marketing Period/Process**

*TO BE DETERMINED SUBJECT TO CONSULTATION WITH LENDER AND BROKER*

(The marketing period for the RDA Properties and the Non-RDA Properties shall be collectively referred to as the "Marketing Period")

**III.     Public Announcement of Auction.**

At the conclusion of Marketing Period, except as otherwise agreed to by Debtors and 1000 Frank E. Rodgers 1, LLC and Frank E. Rodgers 2, LLC (collectively, and together with their designee(s), assignee(s) or nominee(s), the "Lenders" and each such entity, a "Lender"), the

Debtors shall (i) serve on all parties, a notice (A) setting forth (I) the date, time, and place of the (a) Auction and (b) the Sale Hearing (as defined below) and (II) the deadlines and procedures for objecting to the proposed Sale Transaction(s), and (B) the Bidding Procedures, and (ii) publish a auction notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times or Wall Street Journal* to provide notice to any other potential interested parties (the "Auction Notice"). The Auction Notice shall include a complete list and general description of the Debtor Properties for sale.

## IV.     Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Debtor Properties or part of the Debtor Properties (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.      an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors; and

b.      sufficient information that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtor Properties, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties.

c.      a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

The Debtors, in consultation with their advisors, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (such Potential Bidder, an "Acceptable Bidder").

## V.     Stalking Horse Reimbursement.

Upon entry of the Bid Procedures Order, the Debtors shall be authorized, but not obligated, in an exercise of their business judgment to (a) select one or more Qualified Bidders to act as a stalking horse bidder (a "Stalking Horse Bidder") in connection with an Auction and (b) in connection with any stalking horse agreement with a Stalking Horse Bidder, the Debtors may seek approval from the Court for Stalking Horse reimbursement of actual and necessary due diligence expenses up to a maximum of $100,000, provided that any overbid must be sufficient to satisfy any Stalking Horse reimbursement approved by the Court .

## VI.    Qualified Bid Requirements.

To participate in the Auction, an Acceptable Bidder must deliver to the Debtors and their advisors an irrevocable offer for the purchase of some or all of the Debtor Properties (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined below):

a.    **Purchased Debtor Property and Assumed Liabilities**: Each Bid must clearly state the following: (a) Debtor Properties, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; and (b) the liabilities and obligations to be assumed, (including any executory contracts or unexpired leases to be assumed and assigned), including any debt and cure costs to be assumed.

b.    **Good Faith Deposit**: Except with respect to any credit bid (each a "Credit Bid"), the Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate purchase price of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals 10% of the increased aggregate purchase price promptly and in no event later than one (1) business day following the conclusion of the Auction. Lenders shall not be obligated to submit a Credit Bid until ___ days prior to the Auction.

c.    **Purchase Price**: Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Debtor Properties and any assumption of liabilities (the "Purchase Price"), (b) identify separately the cash and non-cash components of the Purchase Price, and (c) indicate the allocation of the Purchase Price among the applicable Debtor Properties; *provided* that, for the avoidance of doubt, such allocation shall not prejudice the rights of any party in interest to contest such allocation. The Purchase Price should be a single point value in U.S. Dollars for the applicable Debtor Properties on a cash-free, debt-free basis. Any Bid for substantially all of the Debtor Properties must also include a statement as to whether the Bid is conditioned on purchasing all Debtor Properties or whether the Qualified Bid should be viewed as separate Bid for one or more real properties in the Debtor Properties.

d.    **Same or Better Terms; Bid Documents**: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include: (a) a redline copy of the form of purchase agreement that will be provided by the Debtors that such bidder is willing to execute, (b) a schedule of contracts and leases to be assumed to the extent applicable to the Bid, (c) with respect to the purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the form purchase

agreement, no later than five (5) days after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "<u>Bid Deadline</u>")) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or next highest or otherwise best Bid (the "<u>Back-Up Bid</u>") until the consummation of the Sale Transaction.

e. **No Qualified Bidder Bid Protections**: A Qualified Bid must include a statement that the Bid does not entitle such bidder to any Break-Up Fee, termination fee, Expense Reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for the applicable Debtor Properties.

f. **Sources of Financing**: To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Sale Transaction set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Sale Transaction and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

g. **Contingencies; No Financing or Diligence Outs**: The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline. Purchase of the RDA Properties may require assumption and assignment of the Harrison RDA.

h. **Identity**: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Debtor Properties or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom K&L Gates LLP or Forman Holt can contact regarding such Bid.

i. **As-Is, Where-Is**: Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or

the Debtor Properties in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Acceptable Bidder's proposed purchase agreement.

j.    **Authorization**: Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

k.    **Joint Bids**: The Debtors will be authorized to approve joint Bids in their reasonable business judgment, on a case-by-case basis, so long as a joint Bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with these Bidding Procedures.

l.    **Adequate Assurance of Future Performance**: Each Bid must (i) identify any executory contracts (the "Executory Contracts") and any unexpired leases (the "Unexpired Leases") to be assumed or assumed and assigned in connection with the proposed Sale Transaction, (ii) provide for the payment of all cure amounts (the "Cure Amounts") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of sections 365(b)(3) and 365(f)(2)(B) of the Bankruptcy Code, and (iv) provide the following documentation:

    (i)    The legal name of the proposed assignee of Unexpired Leases and/or Executory Contracts (the "Proposed Assignee") and any guarantors, as applicable;

    (ii)    Financial statements for the calendar or fiscal years ended 2021, 2022 and, 2023 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

    (iii)    Summary documentation regarding the Proposed Assignee's and any guarantor's, as applicable, retail experience and present retail operations.

m.    **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law**: Each Bid must acknowledge its compliance in all respects with these Bidding Procedures, the Bidding Procedures Order, Bankruptcy Code and any applicable non-bankruptcy law.

n.    **No Collusion**: The Acceptable Bidder must acknowledge in writing (a) that it has not engaged in any collusion with respect to any Bids or the Sale Transaction, specifying that it did not agree with any Acceptable Bidders or Potential Bidders to

control price; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Sale Transaction. For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice), in consultation with the Consultation Parties.

o.    **Good Faith Offer**: The Bid must constitute a good faith, *bona fide* offer to consummate the Sale Transaction.

p.    **Irrevocable**: Each Bid must state that in the event such Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Sale Transaction.

q.    **Back-Up Bid**: Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined below) if the Acceptable Bidder's Bid is the next highest or otherwise best bid.

r.    **Regulatory Approvals and Covenants**: A Bid must set forth each regulatory and third-party approval required for the Acceptable Bidder to consummate the applicable Sale Transaction, if any, and the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty days following execution and delivery of the applicable purchase agreement and/or confirmation of the Plan, those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible).

s.    **Expected Closing Date**: Each Bid must state the Acceptable Bidder's expected date of closing of the Sale Transaction.

t.    **Time Frame for Closing**: A Bid by an Acceptable Bidder must be reasonably likely to be consummated, if selected as the Successful Bid (as defined herein), within a time frame acceptable to the Debtors.

u.    **No Fees**: Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive a fee analogous to a Break-Up Fee, Expense Reimbursement, termination fee, or other similar form of compensation; *provided*, *however*, that parties entitled to payment or reimbursement of expenses under any DIP Order shall be entitled to payment or reimbursement of expenses incurred in connection with these Bidding Procedures and the matters contemplated hereby.

For the avoidance of doubt, each Acceptable Bidder by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

v.     **Adherence to Bidding Procedures**: By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

w.     **Consent to Jurisdiction**: The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Sale, the Sale Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Sale Transaction, and the closing of the Sale Transaction, as applicable; and

x.     **Conditions to Closing**: Each Bid must identify with particularity each and every condition to closing, including the Executory Contracts and Unexpired Leases for which assumption and assignment is required.

Only Bids fulfilling all of the preceding requirements contained in this section may, or otherwise in the Debtors' reasonable business judgment will be deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable business judgment be deemed to be "Qualified Bidders"; *provided* that, notwithstanding anything to the contrary herein, any Bid submitted by any Agent or any Lender or their respective designees, shall be a Qualified Bid.

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Debtor Properties, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Debtor Properties with governmental laws, the truth, accuracy, or completeness of any documents related to the Debtor Properties, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Debtor Properties. All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Debtor Properties, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale Transaction. Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Debtor Properties or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale Transaction.

Within one (1) business day after the Bid Deadline, the Debtors shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the

requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction.

The Debtors' obligations as to each Sale Transaction is contingent upon obtaining Court approval for each such Sale Transaction.

## VII. Right to Credit Bid.

The Lenders are allowed to credit bid up to their allowed claim, their respective designees, nominees and/or assignees and any other Qualified Bidder who has a valid and perfected lien on any Debtor Properties (each a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided that the Lenders and other Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured.*

Any Credit Bid made by a Secured Creditor will be evaluated by the Debtors as a cash Bid solely for purposes of evaluating Bids (including evaluating Qualified Bids and subsequent Bids). Notwithstanding anything to the contrary contained herein or the Bidding Procedures Order, neither the Lenders, nor any of their respective assignees, nominees, or designees, as applicable, shall be subject to the requirements of Section VI hereof including the Good Faith Deposit requirement (whether for a Credit Bid or otherwise), are hereby deemed Qualified Bidders, and their Bids (including, for the avoidance of doubt, any Credit Bids) are hereby deemed Qualified Bids with respect to the Debtor Properties.

## VIII. Obtaining Due Diligence Access.

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. *No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement.* Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request. The Debtors shall promptly consult with their advisors (a) with respect to any due diligence disputes that arise concerning any Acceptable Bidder and (b) prior to revoking due diligence access to any such entity. The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room for the benefit of all Acceptable Bidders. To the extent the Debtors provide any material written information to an Acceptable Bidder that the Debtors had not previously provided to a Consultation Party, the Debtors shall make such information available to such Consultation Party.

Acceptable Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Sale Transaction.

### A.    Communications with Acceptable Bidders (including Qualified Bidders).

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Debtors' counsel or the Broker.

### B.    Due Diligence from Acceptable Bidders (including Qualified Bidders).

Each Acceptable Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors, regarding the ability of such Acceptable Bidder to consummate its contemplated transaction. Failure by an Acceptable Bidder to comply with such reasonable requests for additional information may be a basis for the Debtors, to determine that such bidder is no longer an Acceptable Bidder or that a Bid made by such bidder is not a Qualified Bid.

## IX.    Bid Deadline.

Binding Bids must be submitted in writing to the following parties (the "Bid Notice Parties") so as to be **actually received** no later than 5:00 p.m. (prevailing Eastern Time) on X for the RDA Properties (the "RDA Bid Deadline"), and no later than 5:00 p.m. (prevailing Eastern Time) on X for the Non-RDA Properties (the "Non-RDA Bid Deadline"):

(i)    proposed counsel to the Debtors, Forman Holt, 365 West Passaic Street, Suite 400, Rochelle Park, NJ, 07662, Attn: Michael Holt (mholt@formanlaw.com).

(ii)    proposed special counsel to the Debtors, K&L Gates LLP, 1085 Raymond Boulevard, 10th Floor, Newark, NJ 07102, Attn: Daniel M. Eliades (daniel.eliades@klgates.com).

(iii)    counsel for Lenders, Jerold C. Feuerstein, Esq. Kriss & Feuerstein, LLP, 360 Lexington Avenue, Suite 1200, New York, New York 10017 jfeuerstein@kandfllp.com

(iv)     the broker

The Debtors may extend the RDA Bid Deadline or Non-RDA Bid Deadline for any reason whatsoever, in their reasonable business judgment for all or certain Acceptable Bidders.

## X.     Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' business judgment, and in consultation with the Consultation Parties,[1] the highest or otherwise best Qualified Bid or combination of Qualified Bids for any Debtor Property (the "Starting Bid"). The Debtors shall promptly provide to the Consultation Parties copies of all Bids received by the Debtors, including the Starting Bid, but in no event later than the next business day following receipt; *provided* that the Consultation Parties must treat such Bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors, in addition to any other factors that the Debtors, in consultation with the Consultation Parties, deem appropriate: (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents including any cure costs associated with any assumption(s) of liabilities, executory contracts or unexpired leases; and (d) the tax consequences of such Qualified Bid. Prior to commencing the Auction, the Debtors shall notify all Qualified Bidders as to which Qualified Bid is the Starting Bid for the Auction with respect to the applicable Debtor Property. At such time, the Debtors shall also distribute copies of the Starting Bid to the Consultation Parties and each Qualified Bidder.

## XI.     Auctions.

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Debtor Properties by the RDA Bid Deadline or Non-RDA Deadline, the Debtors shall conduct the Auction to determine the Successful Bidder in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Debtor Property or portion of Debtor Properties. If the Debtors do not receive a Qualified Bid for any particular Debtor Properties by the RDA Bid Deadline or Non-RDA Bid Deadline, other than a credit bid, the Debtors will not conduct the Auction with respect to such Asset. If more than one Qualified Bid is received by the Bid Deadline with respect to the applicable Debtor Properties,

---

[1] The term "Consultation Parties" shall mean the Lenders and any official committee of unsecured creditors appointed, if any, in these cases; *provided, however*, that to the extent any Lender submits a Bid for any Assets, such Lender shall not be a Consultation Party with respect to the evaluation and qualification of competing Bids for the Debtor Property included in the Lender's Bid or with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in these Bidding Procedures.

then the Debtors shall conduct the Auction with respect to such Debtor Property(ies) in accordance with the Auction Procedures (as defined below).

The Auction for the RDA Properties shall commence on X, 2024, at 10:00 a.m. (prevailing Eastern Time), or such later time or other place as the Debtors determine in consultation with the Consultation Parties.

The Auction for the Non-RDA Properties shall commence on X, 2024, at 10:00 a.m. (prevailing Eastern Time), or such later time or other place as the Debtors determine in consultation with the Consultation Parties.

The Auctions will be conducted in accordance with the following procedures (the "Auction Procedures"):

a. the Auction will be conducted openly;

b. except as otherwise provided herein, only Qualified Bidders shall be entitled to bid at the Auctions;

c. the Qualified Bidders must appear in person or through duly-authorized representatives at the Auctions with authority to bind such Qualified Bidder as to any amount bid by such person or representative;;

d. bidding shall begin with the Starting Bid;

e. subsequent Bids (each, an "Overbid") may only be made at the Auction and shall be at least a $X increase in cash, cash equivalents, or other such consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of a Secured Creditor to credit bid any remaining amount of its secured claims) over the previous Bid. The Debtors may, in their reasonable business judgment, in consultation with the Consultation Parties, announce increases or reductions to the Minimum Overbid at any time during the Auction. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at the Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of a Secured Creditor to credit bid any remaining amount of its secured claims) that exceeds the then existing highest Bid by at least the amount of the Minimum Overbid;

f. at the commencement of each Auction, the Debtors, in consultation with the Consultation Parties, may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s);

g. each Qualified Bidder will be permitted a reasonable time to respond to previous Bids at the Auction, as determined by the Debtors in consultation with the Consultation Parties;

h.    during the course of each Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of the previous Bids and inform each Qualified Bidder which Overbid(s) reflect, in the Debtors' view, in consultation with the Consultation Parties, the highest or otherwise best bid(s) for the applicable Debtor Property;

i.    i.    The Debtor(s) may, in their reasonable discretion, change the order of which Property(ies) are auctioned to facilitate comparison of bids for the entire Non-RDA Properties versus bids for less than all of the Non-RDA Properties.

j.    each Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

k.    each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Sale Transaction. For the avoidance of doubt, (a) this requirement does not restrict Qualified Bidder(s) from working with other Qualified Bidder(s) with the Debtors' prior written consent;

l.    each Qualified Bidder will be required to confirm that its Bid is a good faith, *bona fide* offer and it intends to consummate the Sale Transaction if selected as the Successful Bid or the Back-up Bidder in accordance with these Bidding Procedures (as may be modified in accordance herewith at each Auction);

m.    the Court and the Debtors will not consider Bids made after each Auction has been closed;

n.    the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale Transaction, or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders;

o.    the Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

p.    the Debtors reserve the right, in their reasonable business judgment, and in consultation with the Consultation Parties, to adjourn each Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment,

and in consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

q.  notwithstanding anything herein to the contrary, the Debtors may, in consultation with the Consultation Parties, at any time choose to adjourn either Auction by announcement at the Auction. The Debtors shall promptly file notice of such adjournment with the Court.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors, in consultation with counsel).

Except as otherwise determined by the Debtors, in consultation with the Consultation Parties, only (i) the Debtors, (ii) the Consultation Parties, (iii) the Office of the United States Trustee, (iv) any statutory committee appointed in these Chapter 11 Cases, (v) any other Qualified Bidders, and (vi) the respective representatives and professionals of the foregoing parties shall be entitled to attend the Auction.

## XII.  Acceptance of the Successful Bid.

Each Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, and in consultation with the Consultation Parties, is the highest or otherwise best Bid to purchase the applicable Debtor Property (each, a "Successful Bid"), and (ii) the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, each Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Consultation Parties, may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, cure payments), and the amount of Executory Contracts and leased locations being assumed; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; and (d) the tax consequences of such Qualified Bid; and (e) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a "Successful Bidder" with respect to the Debtor Properties contemplated for the purchase pursuant to such Successful Bid. The Debtors shall promptly file notice of the Successful Bid and the Successful Bidder with the Court. Following conclusion of each Auction and selection of a Successful Bidder, the Debtors shall present the results of each Auction at a hearing (the "Sale Hearings") and shall seek Court

approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Definitive Purchase Agreement Order"). For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and /or accept any further Bids or offers to submit a Bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one (1) business day of the selection of the Successful Bidder, such Successful Bidder shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and reasonable escrow agreement. Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

In the event a Lender is the Successful Bidder, Lender may assign its bid to its nominee, assignee or designee, at its sole discretion.

## XIII.  Designation of Back-Up Bidder.

The Back-Up Bid to purchase any applicable Debtor Property (the "Back-Up Bidder") will be determined by the Debtors at the conclusion of the Auction, in consultation with the Consultation Parties, and will be announced at that time to all the Qualified Bidders participating in the Auction. Following consultation with the Consultation Parties, the Debtors' selection of a Back-Up Bid shall be deemed final and the Debtors shall not accept any further Bids or offers to submit a Bid after such selection. The Debtors will be authorized, but not required, to consummate the Sale Transaction with the Backup Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such Debtor Property within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such Debtor Property, and the Back-Up Bidder shall be deemed a Successful Bidder for such Debtor Property and shall be required to consummate any Sale Transaction with the Debtors as soon as is reasonably practicable without further order of the Court, upon 24 hours advance notice filed with the Court.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) forty-five (45) days after completion of the Auction, (ii) consummation of a Sale Transaction with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "Back-Up Termination Date"). The Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date.

If both the Successful Bidder and the Back-up Bidder fail to close on the purchase of a Property(ies), and if neither the Successful Bidder nor the Back-up Bidder are a Lender making a credit-bid, then, in the absence of an alternative transaction that would satisfy Lenders' Allowed Claim, the Debtors shall close a sale to the Lender on a credit-bid and each applicable order approving a Sale Transaction shall so provide.

## XIV. Approval of the Sale Transaction.

A hearing to consider approval of each Sale Transaction (the "Sale Hearing"),will be conducted before the bankruptcy court. At the Sale Hearing certain findings will be sought from the Court regarding the Auction, including, among other things, that: (1) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (2) the Auction was fair in substance and procedure; (3) the Successful Bid was a Qualified Bid as defined in these Bidding Procedures; and (4) consummation of any Sale Transaction as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the applicable Debtor Property and is in the best interests of the Debtors and their estates.

Each Successful Bidder and Back-up Bidder shall take reasonable steps to support the Debtors in obtaining approval of the respective Sale Transaction, including by filing an affidavit, affirmation or declaration (as appropriate) to satisfy the requirements of 11 U.S.C. § 363(m) and (n) including asserting its good faith and lack of collusion with respect to the sale of such Property, and the bidding and auction related thereto, within three (3) business days of the conclusion of the respective Auction.

## XV. Reservation of Rights.

Debtors shall have the right, with the consent of the Consultation Parties, to alter the Sale Procedures based upon the exigencies of a given situation. Debtors reserve the right to: (i) determine which bids are Qualifying Bids; (ii) determine which Qualifying Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iii) reject any bid that is (a) inadequate or insufficient, (b) not in conformity with these sales procedures, or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtor; (iv) waive terms and conditions set forth herein with respect to Qualified Bids; and (v) to select a Qualifying Bid before the RDA Bid Deadline or Non-RDA Bid Deadline and move forward with a sale transaction.

# SCHEDULE F

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

Forman Holt
365 West Passaic Street, Suite 400
Rochelle Park, NJ 07662
Telephone: (201)845-1000
Facsimile: (201)655-6650
Michael E. Holt
mholt@formanlaw.com
*Proposed Counsel for the Debtors*

K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel M. Eliades, Esq. (DME-6203)
David S. Catuogno, Esq (DSC-1397)
William Waldman, Esq. (WLW-1452)
Daniel.Eliades@klgates.com
David.Catuogno@klgates.com
William.Waldman@klgates.com
*Proposed Special Counsel for the Debtors*

| | |
|---|---|
| In re:<br><br>Supor Properties Enterprises LLC, *et al.*,[1]<br><br>              Debtors. | Chapter 11<br><br>Case No.<br><br>(Jointly Administered)<br><br>Judge:<br><br>Hearing Date: |

## FINAL ORDER AUTHORIZING AND DIRECTING USE OF CASH COLLATERAL

    The relief set forth on the following pages, numbered two through fifteen is hereby **ORDERED**.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification numbers are Supor Properties Enterprises (5580), J Supor 136-1 Realty LLC (3205), Supor-172 Realty LLC (5662), Supor Properties Breiderhoft LLC (7258), Supor Properties Devon LLC (6357), Shore Properties Associates North LLC (6707), Supor Properties 600 Urban Renewal, LLC (8604), JS Realty Properties, LLC (2497) and Supor Properties Harrison Avenue LLC (1728).

Page 2
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

THIS MATTER, having been brought before the Court upon the motion ("Motion") of Supor Properties Enterprises LLC, *et al.*, the debtors and debtors in possession herein (collectively, the "Debtors") in the above referenced bankruptcy case (the "Bankruptcy Case" or "Case"), through their proposed attorneys, Forman Holt, for the entry of an order authorizing the Debtors to use the Cash Collateral (as defined below) of 1000 Frank E. Rodgers 1, LLC and Frank E. Rodgers 2, LLC (collectively the "Lenders" and each a "Lender"); and it appearing that the relief requested is in the best interest of the Debtors' estates; and on the basis of the record established,

This Court hereby finds that:

A.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding as that term is defined in 28 U.S.C. § 157(b). Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

B.      The Debtors are obligated to Lenders in connection with a commercial loan (the "Loan") pursuant to certain loan agreements, promissory notes, guaranties, security agreements, mortgages, forbearance agreements, and related documents (the "Loan Documents") entered prior to the commencement of the Debtors' chapter 11 cases as set forth in the Motion.

C.      Subject to the resolution of the Debtor Avoidance Claims (defined below), the Debtors acknowledge and admit that the amount owed to Frank E. Rodgers 1 LLC by the Debtors as of April 2, 2024 (the "Petition Date"), is $94,999,584.17 (the "FER 1 Claim") and the amount owed to Frank E. Rodgers 2, LLC as of the Petition Date is $2,212,058.70 (the "FER 2 Claim"), plus interest, attorneys' fees, protective advances made on account of the Lenders' Collateral, and other costs on both the FER 1 Claim and the FER 2 Claim that shall continue to the accrue under the Loan Documents (the "Pre-Petition Indebtedness"), which amount is due and payable in full.

Page 3
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

     D.     The Debtors' Pre-Petition Indebtedness to Lenders pursuant to the Loan Documents are secured by perfected, first-priority mortgages and security interests (the "Pre-Petition Liens") against the Debtors' real properties (collectively, the "Debtor Properties" and each a "Debtor Property") as set forth in the Motion, together with the rents, income and proceeds from the Debtor Properties (the "Cash Collateral") (the Debtor Properties and the Cash Collateral collectively are the "Lenders' Collateral").

     E.     Between January 26, 2024, and January 31, 2024, Lenders recorded deeds (collectively, the "DILF's") transferring ownership of certain of the Debtor Properties from certain of the Debtors to Lenders or their affiliates. The Debtors have previously contended, among other things, that: (i) the fair market value of the Debtor Properties exceeds the outstanding amounts due Lenders, and (ii) the transfers of Debtor Properties subject to the DILF's are subject to avoidance under applicable law ("Debtor Avoidance Claims"). The Lenders have disputed the foregoing allegations of the Debtors. In connection with the Restructuring Support Agreement and related documents (collectively the "RSA"), the Debtor and the Lenders have agreed to resolve the Debtor Avoidance Claims under the terms and conditions set forth in the RSA.

     F.     Each Debtor acknowledges the extent, validity, and priority of the Pre-Petition Liens against the Lenders' Collateral and the amount of the Pre-Petition Indebtedness, subject to the resolution of the Debtor Avoidance claims as provided in the RSA.

     G.     The need exists for the Debtors to use the Cash Collateral in order to assure the continued operation of the Debtors' business and without such use of Cash Collateral, the Debtor will be unable to pay, among other things, the operating expenses, salaries, capital expenditures and general overhead.

Page 4
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

H.    The Debtor has demonstrated a sufficient basis and legitimate business reasons for its use of the Cash Collateral.

I.    The protections afforded to Lenders for the use of the Cash Collateral are adequate and reasonable.

J.    Notice of the Motion was served in accordance with the Court's Order Shortening Time [Doc. No. ____], which is good and sufficient notice under the circumstances presented.

Therefore, it is **ORDERED** as follows:

1.    The Motion is Granted to the extent provided herein.  Any objections to the Motion which were not withdrawn or settled are hereby overruled.  All capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion, as applicable.

2.    The Debtors are hereby authorized to use the Cash Collateral for the purposes of and in the amounts set forth on the Cash Collateral Budgets attached to the Motion as Exhibits    , (the "Cash Collateral Budgets") subject to the Carve-Out as provided below, including, but not limited to, (i) the allowed fees and expenses of professionals retained by the Debtors under 11 U.S.C. §§ 327, 328 or 363, and (ii) all fees required to be paid by the Debtors to the Clerk of the Bankruptcy Court or the United States Trustee's Office under 28 U.S.C. § 1930(a), plus applicable interest, if any.  Except for consenting to the use of Cash Collateral consistent with the Cash Collateral Budget, nothing in this order shall obligate the Lenders to satisfy any fees or expenses incurred by the Debtors.

3.    To further secure the Pre-Petition Indebtedness, and as adequate protection for any diminution in the value of Lenders' Collateral from the Debtors' use thereof, or other decline, if

Debtor:       Supor Properties Enterprises LLC, *et al.*
Case No.:     24-
Caption:      Final Order Authorizing and Directing Use of Cash Collateral

any, in value arising out of the automatic stay or from the Debtors' use, sale, depreciation, or disposition of the Lenders' Collateral, the Debtors:

(a)     are directed to make monthly adequate protection payments to Lenders as set forth in the Cash Collateral Budgets beginning on May 1, 2024 and continuing through the first day of each month until the subject Debtor Property is sold, unless otherwise directed by this Court;

(b)     are authorized to and hereby grant to Lenders: (i) a superpriority administrative expense claim under Bankruptcy Code §364(c)(1); and (ii) a security interest in all the Lenders' Collateral and continuing, replacement post-petition liens and security interests in and against all the Lenders' Collateral together with all rents, products and proceeds thereof created and/or acquired prior or subsequent to the Petition Date (the "Post-Petition Collateral");

(c)     Acknowledge and this Court finds and concludes that: (i) the Post-Petition Collateral shall not be construed as a reduction of the indebtedness under the Loan Documents; and (ii) any payments do not constitute a waiver that the Debtor is obligated pre-petition and/or post-petition to pay Lenders the principal, default rate of interest and any other charges, penalties, attorneys' fees and expenses and costs required to be paid under the Loan Documents and/or subject to section 506 of the Bankruptcy Code.

(d)     Nothing in this Order, including any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Lenders are or will be adequately protected.

4.     In the event Debtors ending cash balance for a monthly period exceeds 10% of the anticipated balance, the Debtor shall remit the excess to the Lenders.

Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

5.        Notwithstanding the foregoing, Lenders shall have no liens on or security interests against any avoidance actions, preference recoveries, or other similar assets recovered by the Debtors during the chapter 11 cases or the proceeds therefrom. However, no portion of the indebtedness due to the Lenders or the liens and security interests granted to the Lenders is subject to avoidance, subordination (whether equitable, contractual or otherwise), recharacterization, recovery, attack, offset, counterclaim, cross-claims, deduction, disallowance, impairment, recoupment, defense, challenge, objection, reduction, disgorgement, or claim (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law. Debtors acknowledge the Pre-Petition Liens are valid in all respects.

6.        The security interests in the Post-Petition Collateral created and granted herein pursuant to Bankruptcy Code Sections 361 and 363 are first, prior, perfected, and superior to any security or collateral interest or lien or any other claim to the assets or goods in which the security interests and liens are granted, including the security interest in Lenders' Collateral granted to Lenders under the Loan Documents.

7.        This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of Lenders' security interests and liens upon the Post-Petition Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Lenders' liens in and to the Post-Petition Collateral or to entitle Lenders to the priorities granted herein. However, the Debtors may execute, at Lenders' request, and Lenders may file or record financing statements or other documents and instruments to evidence and to perfect the security interests and liens authorized and granted hereby, although

Page 7
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

no such filing or recordation shall be necessary or required in order to create or perfect any such liens, and Lenders may at their sole discretion, but shall not be required to, file proofs of claim in the case with respect to any obligations under the Loan Documents or any other claims or liens granted hereunder or created hereby.

8.      The Debtors shall be authorized to use the Cash Collateral in the ordinary course of business for the expenses set forth in the Cash Collateral Budgets.  Except as expressly permitted by this Final Order, consented to by Lenders, or approved by this Court, the Debtors are prohibited from use of any of the Cash Collateral for any other purpose whatsoever.  Without limiting the generality of the foregoing, Lenders do not consent to the use of any of the Cash Collateral to:

(a)      prepare, prosecute or seek approval of any motion, application or plan of reorganization or liquidation that would, if so approved, investigate, assert, commence, prosecute or otherwise take any action with respect to any lien, claim or alleged lien or claim against Lenders, including but not limited to, claims arising under §§ 542 through and including 553 of the Bankruptcy Code;

(b)      challenge the amount, validity, priority or enforceability of the Loan Documents or the security interests and liens of Lenders or assert any defense, claim, counterclaim or offset with respect to the Loan Documents or the security interests and liens of Lenders;

(c)      change, amend or modify in any manner whatsoever any of the Loan Documents; or

(d)      seek the modification, amendment or vacatur of this Order, without the consent of Lenders.

Page 8
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

     9.    <u>Carve Out.</u> Each of the Lenders' liens and claims, shall be subject only to a carve-out (the "Carve-Out") from the Lender's Collateral, including, without limitation, all assets of the Debtors for the following, and in the following priority:

    (i)    <u>first</u>, to be paid from Cash Collateral as and when available, all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee Administrator pursuant to 28 U.S.C. § 1930(a) as and when due to be paid; and

    (ii)    <u>second</u>, to be paid from Cash Collateral as and when available, the allowed fees and expenses of professionals retained by the Debtors under 11 U.S.C. §§ 327, 328 or 363, including but not limited to counsel, special counsel, accountants and financial advisors, for the payment of allowed and unpaid fees, costs and expenses of said professionals consistent with and not to exceed the amounts set forth in the Cash Collateral Budgets, to the extent and in the manner authorized and allowed by the Court (the "<u>Line Item Carve-Out</u>");

    (iii)    <u>third</u>, from the proceeds of sale or transfer of any Debtor Property(ies), upon presentation of an appropriate invoice, calculation or statement or Court Order, (a) any fees due to the Office of the United States Trustee as a result of the subject sale(s); (b) all brokerage commission(s), if any, fees, expenses and compensation incurred or otherwise dues as a result of the consummation of the sale(s)/transfer(s); (c) all fees, costs and expenses of the professionals retained by the Debtors under 11 U.S.C. §§ 327, 328 or 363, including but not limited to counsel, special counsel, and accountants incurred in connection with the applicable sale/transfer transaction(s) in the manner and maximum amounts set forth in the RSA; and (d) any then outstanding and unpaid sums due under the Line Item Carve-Out (the "<u>Sale Transaction Carve-Outs</u>") in the manner and maximum amounts set forth in the RSA. Lender shall be obligated to fund and pay the Sale Transaction Carve-Outs at the time of the closing of the transaction whether the transaction consists of a sale to a third party or acquisition of the subject property by Lender pursuant to a credit bid.

    (iv)    <u>fourth</u>, the amount of Bankruptcy Court approved, accrued but unpaid professional fees incurred by the legal counsel and other advisors to the Debtors and any statutory committees during the Bankruptcy Cases up to the date of the applicable sale, plus the amount necessary to fund a wind down budget as agreed by the parties in accordance with and as limited by,

Page 9
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

the terms of the Sale Transaction Documentation and Plan not inclusive of the Sale Related Professional Fees (the "Wind-Down Reserve" and, together with the Sale Related Professional Fees, the "Sale Transaction Professional Fee Carve-out"), in the manner and maximum amounts set forth in the RSA.

(a)     Notwithstanding anything herein to the contrary, the Debtors shall, in accordance with the Cash Collateral Budget(s) and subject to the terms of this Order and/or any other relevant orders of the Court, be permitted to pay compensation and reimbursement of expenses to professionals allowed and payable under 11 U.S.C. §§ 330 and 331 and such orders of the Court authorizing the payment of compensation and reimbursement of expenses incurred, up to the amount(s) as set forth in the Cash Collateral Budget(s) and consistent with the RSA.

(b)     Nothing herein shall constitute a cap on the amount of professional fees and expenses that may be incurred or allowed in the Cases; provided that no payments of such fees and expenses comprising the Line-Item Carve-Outs shall be made from Cash Collateral (other than sale proceeds) in excess of the amounts set forth in the Cash Collateral Budget(s) or any amendments thereto, unless otherwise agreed to in writing by Lenders.

10.     The Debtors shall, at all times, maintain its operating account in compliance with 11 U.S.C. § 345, and the Debtors shall deposit all Cash Collateral into a debtor-in-possession bank account, established for its post-petition operations. For purposes of this Order, notwithstanding the foregoing, no Cash Collateral held or deposited in any reserve or escrow accounts for taxes, capital expenditures, insurance or similar items shall be used for any purpose other than the purpose for which such accounts (collectively, the "Reserves") are dedicated.

11.     Notwithstanding anything to the contrary contained herein, the Debtors' right to use and the use of the Cash Collateral under this Final Order, the Debtors shall immediately cease on

Debtor:          Supor Properties Enterprises LLC, *et al.*
Case No.:        24-
Caption:         Final Order Authorizing and Directing Use of Cash Collateral

the first business day after five (5) days following an Event of Default.  For the purposes of this

Final Order an "Event of Default" is defined as follows:

(a)     <u>Improper Use of Cash Collateral</u>. The Debtors shall fail to use the Cash Collateral

in accordance with the Cash Collateral Budget and this Final Order, including, but not limited to,

failing to pay when due any non-insider wages or the fees due under 28 U.S.C. § 1930.

(b)     <u>Conversion</u>. The entry of an order by the Court converting the Case to a case under

chapter 7 of the Bankruptcy Code

(c)     <u>Dismissal</u>. The entry of an order by the Court dismissing the Case pursuant to §§

1112(b) or 305 of the Bankruptcy Code or otherwise.

(d)     <u>Non-Compliance</u>. The Debtors failure to comply with any other provision of this

Order.

(e)     <u>Sale of Assets</u>.  The Debtors' consummation of the sale or transfer of assets outside

of the ordinary course of its business without an order of this Court authorizing the same.

(f)     <u>Liens</u>.   The Debtors grant of any lien, claim or other encumbrance upon the

Debtors' Property without the consent of the Lenders or suffer any lien to exist that has not been

disclosed to the Lenders on or prior to the date of the RSA without challenge within thirty (30)

days.

(g)     <u>Vacatur of Order</u>. The entry of an order by this Court or any other court vacating

this Final Order.

(h)     <u>Stay Relief</u>. The entry by this Court of an order granting Lenders relief from the

automatic stay pursuant to 11 U.S.C. § 362.

Page 11
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

    (i)    <u>Trustee, Receiver or Examiner</u>. The appointment of a trustee, receiver, examiner or other representative with expanded powers for the Debtors.

    (j)    <u>Taxes, Rent and Insurance</u>. The failure to pay any taxes, rent, or insurance relating to the Debtors' business and/or Debtors' Property.

    (k)    <u>Unauthorized Leases</u>. The entering into any leases and/or permitting a tenancy relating to the Debtors' Property without the consent of Lenders.

    (l)    <u>Unauthorized Agreement</u>. The entering into any Agreement outside of the ordinary course of business without the consent of Lenders.

    (m)    <u>Business Operations</u>. The Debtors cease operations of their present business as such existed on the Petition Date or takes any material action for the purpose of effecting the foregoing without the prior written consent of Lenders, except to the extent contemplated by the Cash Collateral Budget.

    (n)    Failure of the Debtors to comply with the RSA annexed to the Motion as Exhibit "__".

12.    Upon the occurrence of an Event of Default: (i) the automatic stay under Section 362 of the Bankruptcy Code (or under any other Bankruptcy Code section or applicable law or rule) shall terminate, without further order from the Bankruptcy Court after Lenders submits an affirmation of non-compliance with a proposed order on not less than five (5) days' written notice to the Debtors, the Debtors' retained professionals, the United States Trustee's Office, and any committee or committees appointed in the Debtors' chapter 11 cases, in order to permit Lenders to take immediate action to protect the Lenders' Collateral from harm, theft and/or dissipation and

Page 12
Debtor:     Supor Properties Enterprises LLC, *et al.*
Case No.:   24-
Caption:    Final Order Authorizing and Directing Use of Cash Collateral

to exercise all of its contractual, legal and equitable rights and remedies as to all or such part

without further notice to Debtors; and (ii) this Final Order shall terminate.

13.     Nothing in this Order shall prejudice Lenders rights under the Bankruptcy Code

and applicable non-bankruptcy law, including, without limitation, Lenders' rights to:

(a)     Seek further adequate protection.

(b)     Request conversion or dismissal of the Case.

(c)     Seek relief from the automatic stay under § 362 of the Bankruptcy Code.

(d)     Request appointment of a trustee or examiner in the Case.

(e)     Object to or otherwise oppose any relief sought by any entity or party in this

Bankruptcy Case, including without limitation, to object to any application filed by Debtors'

attorney or any professional in this case seeking compensation and reimbursement of expenses

under §§ 330 or 331 of the Bankruptcy Code.

(f)     Assert that the Debtors are obligated pre-petition and/or post-petition to pay

Lenders the default rate of interest and any other charges, penalties, attorneys' fees and expenses

and costs required to be paid under the Loan Documents and/or subject to section 506 of the

Bankruptcy Code.

(g)     Any and all rights, remedies, claims and causes of action which Lenders have or

may have against any party who may be liable with the Debtors for the Loan and otherwise under

the Loan Documents or any part thereof.

14.     The automatic stay imposed by Section 362 of the Bankruptcy Code shall be, and

hereby is, modified to the extent necessary to implement and effectuate the terms and conditions

of this Order.

Page 13
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

15.    Nothing herein shall be deemed to constitute the Lenders' consent to the charging or assessment, pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise, against its collateral of any expenses of administration of Debtors' chapter 11 case or any future proceeding which may result from such cases, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code and no such consent shall ever be implied from any other action, inaction or acquiescence by the Lenders. Debtors waives their right to surcharge Cash Collateral under 11 U.S.C. § 506(c).

16.    The provisions of this Final Order shall inure to the benefit of Debtor and Lenders and shall be binding upon the Debtor and Lenders, along with their successors and assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors with respect to property of the estate of any such Debtors, whether under Chapter 11 of the Bankruptcy Code or in any subsequent Chapter 7 case, upon the United States Trustee and all creditors and parties in interest in the Bankruptcy Case.

17.    Notwithstanding the foregoing, this Order and authorization to use Final Cash Collateral hereunder shall terminate on the earlier to occur of (a) ___ ___, 2024 or such later date upon which the Court fixes on notice (the "Termination Date") or (b) the occurrence of an Event of Default hereunder that is not cured within any time period permitted herein. Absent an Event of Default, the Termination Date may be extended from time to time upon (a) the written agreement of the Debtor and the Lenders, which parties shall be permitted to submit a Consent Order to the Court, without further notice or hearing, extending the Termination Date or (b) upon further order of this Court on notice. In addition, upon the occurrence of consummation of a plan of reorganization for the Debtors, this Final Order shall be terminated.

Page 14
Debtor:          Supor Properties Enterprises LLC, *et al.*
Case No.:        24-
Caption:         Final Order Authorizing and Directing Use of Cash Collateral

18.     The Debtor shall timely furnish to Lenders: (i) all such reports and other information reasonably requested and required to be provided to Lenders under the Loan Documents no later than thirty (30) days after such request; (ii) a monthly statement of operating results and sources and uses of cash with respect to the Property no later than twenty (20) days after the end of each calendar month which may be in the form of the monthly operating reports required to be filed by the Debtor with the Court; (iii) any and all documentation, reports, schedules, and insurance policies which Lenders may reasonably request with respect to the Debtor and consistent with the terms of this Order; and (iv) upon request from Lenders, the Office of the United States Trustee or this Court, the Debtor shall provide evidence that the Property are properly insured against all loss, peril and hazard, and that Lenders, and/or its successors and/or assigns, continues to be named as the mortgagee, additional insured, and loss payee as its interests may appear under such policies and shall maintain such policies or comparable policies during the term of this Order.

19.     In not objecting to the Debtors' use of Cash Collateral under the terms set forth herein or in taking any other actions related to this Final Order, Lender: (a) shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute), and (b) shall not owe any fiduciary duty to the Debtors, its creditors or its estate. The Lenders' relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership with the Debtors.

Page 15
Debtor:        Supor Properties Enterprises LLC, *et al.*
Case No.:      24-
Caption:       Final Order Authorizing and Directing Use of Cash Collateral

20.     This Order shall be construed as if the Lenders and Debtors jointly prepared it and any uncertainty or ambiguity shall not be interpreted against Debtors or Lenders.

21.     The automatic stay imposed by Section 362(a) of the Bankruptcy Code is hereby modified to permit the Debtors and Lenders to carry out the terms and conditions of this Final Order.

22.     The Debtors and Lenders may agree to non-material modifications or amendments to this Final Order without further Order of the Bankruptcy Court.

23.     This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

24.     The Debtors shall serve a copy of this Final Order upon all parties that received notice of the Motion within seven days of the entry of this Final Order.

25.     This Final Order shall remain in full force and effect until a Termination Event under the RSA.

PB16480-11

**Super Real Estate**
Combined
Cash Flow Budget
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

| | 4/4/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 5/3/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | 273,344 | | | | 273,344 | | | | | 273,344 | | | | 273,344 | 273,344 | 273,344 | 273,344 | 273,344 | 273,344 | 273,344 | 273,344 | 273,344 | 3,280,122 |
| Other | 166,300 | | | | 166,300 | | | | | 166,300 | | | | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 1,663,000 |
| **A** **Total Cash Collections** | 439,644 | | | | 439,644 | | | | | 439,644 | | | | 439,644 | 439,644 | 439,644 | 439,644 | 439,644 | 439,644 | 439,644 | 439,644 | 439,644 | 4,943,122 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | 278 | 216,150 | | | | | | | | 216,150 | | | | 216,090 | | 216,090 | | 216,090 | | 216,090 | | 216,090 | 864,370 |
| Water/Sewer | 10,656 | | | | | | | | | | | | | | | | | | | | | | 10,656 |
| Electricity | | 166,300 | | | 166,300 | | | | 166,300 | | | | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 166,300 | 1,663,000 |
| Insurance | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 44,000 | 539,000 |
| Repairs/Maintenance | 11,000 | 177,300 | 177,300 | 177,300 | 177,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 240,060 | 240,060 | 1,077,304 |
| Security | 21,344 | 21,344 | 21,344 | 21,344 | 21,344 | 21,344 | 21,344 | 21,344 | 21,344 | | | | | | | | | | |
| **8** **Total Cash Disbursements** | 21,934 | 273,344 | | | 273,344 | | 273,344 | 262,344 | 262,344 | 423,827 | 426,380 | 419,644 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 210,300 | 5,865,818 |
| **C4-8** **Cash Flow from Operations** | 251,410 | (11,000) | (11,000) | (11,000) | 46,334 | (11,000) | (11,000) | 46,334 | 46,334 | 262,344 | 262,344 | 229,344 | 229,344 | 229,344 | 229,344 | 229,344 | 229,344 | 229,344 | 1,865,818 |
| **Reorganization Expenses:** | | | | | | | | | | | | | | | | | | | | | | | |
| **Debtor Professionals:** | | | | | | | | | | | | | | | | | | | | | | | |
| Forman/Holt | | | | | | | 19,025 | | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 209,275 |
| K&L Gates | | | | | | | 19,025 | | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 19,025 | 209,275 |
| Sean Raquet, CPA, LLC | | | | | | | 10,675 | | 10,675 | 10,675 | 10,675 | 10,675 | 10,675 | 10,675 | 10,675 | 10,675 | 117,425 |
| UST Fees | | | | | | | | | 4,404 | 4,753 | 4,753 | 250 | 250 | 250 | 250 | 250 | 14,106 |
| Management Consultants | | | | | | | | | | | | | | | | | | 750 |
| **D** **Total Reorganization Costs** | 48,725 | | | | 48,725 | | 48,725 | 53,179 | 53,528 | 48,725 | 53,728 | 48,725 | 48,725 | 48,725 | 48,725 | 48,725 | 550,831 |
| **E** **Intercompany Funding** | | | | | | | | | | | | | | | | | | | | | | | |
| **F** **Net Cash Flow** | 251,410 | (11,000) | (11,000) | (11,000) | 46,334 | (11,000) | (59,725) | 262,344 | 175,565 | 175,615 | 180,619 | 175,615 | (35,461) | 180,619 | (35,461) | 175,420 | (35,461) | 180,619 | 1,314,987 |
| **F+C8+E** | | | | | | | | | | | | | | | | | | | | | | | |
| **G** **Cash Beginning** | 10,585 | 261,995 | 256,995 | 258,995 | 258,995 | 229,995 | 191,483 | 181,483 | 444,827 | 422,827 | 361,102 | 539,066 | 503,605 | 684,223 | 859,839 | 824,177 | 1,004,996 | 1,180,415 | 10,585 |
| **H+F+G** **Cash Ending** | 261,995 | 250,995 | 258,995 | 258,995 | 229,995 | 264,208 | 191,483 | 444,827 | 419,827 | 422,827 | 539,066 | 503,605 | 684,223 | 859,839 | 824,177 | 1,004,996 | 1,180,415 | 1,144,954 | 1,315,577 | 1,315,577 |
| **Adequate Protection** | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | 323,572 |

Debtor cash after adequate protection payments

Debtor Professionals:
Other cash receipts includes funding from a related party
to pay the monthly insurance premium. Historically, the related
party has paid the insurance premiums in the ordinary course of business

Intercompany funding includes monies transferred from positive flowing
properties to cover projected cash flow deficits

The Debtor anticipates selling the property no later than August 2024.
The proceeds will be disbursed in accordance with bankruptcy priority
rules.

Adequate protection is pursuant to the proposed cash collateral budget

Super Real Estate
RDA Properties Combined
Cash Flow Budget
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

(0026450-1)

| | | W/E | | | | | | | | | | | | | | Jun. 2024 | Aug. 2024 | Sep. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/3/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/6/2024 | 6/12/2024 | 6/19/2024 | 6/26/2024 | July 2024 | | | | | | | | | |
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | | 120,820 | 120,820 | | | 120,820 | | | | 120,820 | | | | | 120,820 | 120,820 | 120,820 | 120,820 | 120,820 | 120,820 | 120,820 | 120,820 | 120,820 | 1,449,840 |
| Other | | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | | | | | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 38,169 | 385,690 |
| **A** | **Total Cash Collections** | 120,820 | | 38,169 | | 120,820 | | 38,169 | | 120,820 | | | | | 158,989 | 158,989 | 158,989 | 158,989 | 158,989 | 158,989 | 158,989 | 158,989 | 120,820 | 1,835,530 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | 139 | | | | | | | | | | | | | | | | | | | | | | | 139 |
| Water/Sewer | | 5,238 | | | 38,169 | | | 38,169 | | | 38,169 | | | 38,169 | 98,945 | 98,945 | | 98,945 | | 98,945 | | 98,945 | | 395,780 |
| Electricity/Internet | | | | | | | | | | | | | | | | | | | | | | | | | 5,238 |
| Insurance | | | | | | | | | | | | | | | | | | | | | | | | | 385,690 |
| Repairs/Maintenance | | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 269,500 |
| Security | | | | | | | | | | | | | | | | | | | | | | | | | |
| **B** | **Total Cash Disbursements** | 10,967 | 5,500 | 43,669 | 43,669 | 5,500 | 5,500 | 43,669 | 5,500 | 43,669 | 43,669 | 5,500 | 5,500 | 43,669 | 159,114 | 159,114 | 60,169 | 159,114 | 60,169 | 159,114 | 60,169 | 140,945 | 120,945 | 1,052,427 |
| **C=A-B** | **Cash Flow from Operations** | 109,853 | (5,500) | (5,500) | (5,500) | 115,320 | (5,500) | (5,500) | (5,500) | 16,375 | (5,500) | (5,500) | (5,500) | 115,320 | (9,801) | (76,621) | 98,820 | (9,792) | 98,820 | (9,792) | 98,820 | (16,861) | (125) | 779,093 |
| **Reorganization Expense:** | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Debtor Professionals:** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Fennemore | | | | | | | | | | 8,750 | | | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 96,250 |
| K&L Gates | | | | | | | | | | 8,750 | | | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 8,750 | 96,250 |
| Sean Reaqan, CPA, LLC | | | | | | | | | 4,000 | | | | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 44,000 |
| UST Fees | | | | | | | | | | | | 1,339 | 1,339 | (125) | (125) | 1,396 | (125) | 1,397 | (125) | 4,132 |
| Management consultants | | | | | | | | | | | | | | | | | | | | | | | | | |
| **D** | **Total Reorganization Costs** | | | | | 23,500 | | | 21,500 | | | | 22,839 | 22,839 | 21,500 | 21,500 | 22,896 | 21,500 | 22,897 | 21,500 | 240,692 |
| **E** | **Intercompany Funding** | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | | | | | | | | | | (203,599) |
| **F=C-D-E** | **Net Cash Flow** | 107,603 | (7,750) | (7,750) | (7,750) | (7,750) | (13,736) | (7,750) | (7,750) | (29,250) | (7,750) | (7,750) | (7,750) | (7,750) | 64,180 | (98,246) | 56,128 | 56,132 | 66,132 | 66,132 | 64,180 | 56,568 | 66,132 | 234,862 |
| | **Cash Beginning** | 2,197 | 109,800 | 102,050 | 94,300 | 86,550 | 72,814 | 65,064 | 57,314 | 28,064 | 20,314 | 133,384 | 125,634 | 117,884 | 88,634 | 154,814 | 56,568 | 85,128 | 151,260 | 92,774 | 161,094 | 227,225 | 168,739 | 2,197 |
| **H=F+G** | **Cash Ending** | 109,800 | 102,050 | 94,300 | 86,550 | 72,814 | 65,064 | 57,314 | 28,064 | 20,314 | 133,384 | 125,634 | 117,884 | 88,634 | 154,814 | 56,568 | 85,128 | 151,260 | 92,774 | 161,094 | 227,225 | 168,739 | 237,059 | 237,059 |
| | **Adequate Protection** | | | | | | 20,000 | | | | | | | | 11,000 | 11,000 | 43,000 | 11,000 | 54,000 | 11,000 | 54,000 | 31,000 | 235,000 |

Debtor cash after adequate protection payments    2,059

**Note:**
Intercompany funding includes monies transferred from positive flowing
properties to cover projected cash flow deficits

The Debtor anticipates selling the property no later than August 2024.
The proceeds will be disbursed in accordance with bankruptcy priority
rules.

Adequate protection is pursuant to the proposed cash collateral budget

J. Super 136-1 Realty LLC
Cash Flow Budget
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

| W/E | 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/7/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/5/2024 | 6/12/2024 | 6/19/2024 | 6/26/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | | | 9,542 | | | 9,542 | | | | | | 9,542 | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 95,420 |
| Other | | | | | | | | | | | | | | | | | | | | | | | |
| Total Cash Collections | A | | 9,542 | | | 9,542 | | | | | | 9,542 | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 95,420 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | | 11,676 | | | | | | | | | 11,676 | | | 11,676 | | | | | 46,704 |
| Water/Sewer | | | 9,542 | | | | | | | | | 9,542 | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 95,420 |
| Electricity/Internet | | | | | | 11,676 | | | | | | | | | 11,676 | | | 11,676 | | | | | 46,704 |
| Insurance | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs/Maintenance | | | | | | | | | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | | | | | | | | | | |
| Attorney | | | | | | | | | | | | | | | | | | | | | | | |
| Accountant, CPA, LLC | | | | | | | | | | | | | | | | | | | | | | | |
| Management consultants | | | | | | | | | | | | | | | | | | | | | | | |
| Total Reorganization Costs | B | | 9,542 | | | 11,676 | | | | | | 9,542 | | 9,542 | 21,218 | 9,542 | 9,542 | 21,218 | 9,542 | 9,542 | | | 142,124 |
| Cash Flow from Operations | C=A-B | | | | | (11,676) | | | | | | | | | (11,676) | | | (11,676) | | | | | (46,704) |
| Total Cash Disbursements | | | | | | | | | | | | | | | | | | | | | | | |

Explanation Expenses:

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | | | | | | | | | | | | | | | | | | | | | | | |
| Debtor/Company funding | E | | | | | 11,676 | | | | | | | | | 11,676 | | | 11,676 | | | | 11,676 | 46,704 |
| Net Cash Flow | F=C-D+E | | | | | | | | | | | | | | | | | | | | | | |
| Company funding | G | | | | | | | | | | | | | | | | | | | | | | |
| | H=F+G | | | | | | | | | | | | | | | | | | | | | | |
| Adequate Protection | | | | | | | | | | | | | | | | | | | | | | | |

D — cash receipts includes funding from a related party

E — Company funding includes monies transferred from positive flowing properties to cover projected cash flow deficit

F — Company funding includes funding from a related party; the monthly insurance premium. Historically, the related has paid the insurance premiums in the ordinary course of business

G — The Debtor anticipates selling the property no later than August 2024. The proceeds will be disbursed in accordance with bankruptcy priority rules.

H — Adequate protection is pursuant to the proposed cash collateral budget

Jujaor Properties Enterprise LLC
Cash Flow Budget
for the 13 weeks ending June 26, 2024
and for the 12 months ending March 31, 2025

| | | 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/3/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/4/2024 | 6/12/2024 | 6/19/2024 | 6/26/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | | 98,320 | 98,320 | 98,320 | 98,320 | | 98,320 | | | | 98,320 | | 98,320 | | 98,320 | 98,320 | 98,320 | 98,320 | 98,320 | 98,320 | 98,320 | 98,320 | 98,320 | 1,279,860 |
| Real Estate Taxes | | | | | | | | | | | | | | | | | | | | | | | | 190,860 |
| Water/Sewer | | | | | | | | | | | | | | | | | | | | | | | | 5,328 |
| Electricity/Internet | | 139 | | | | | | | | | | | | | | | | | | | | | | 139 |
| | | 5,328 | 19,085 | 19,085 | 19,085 | | 19,085 | 19,085 | | | 19,085 | | 19,085 | | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 261,712 |
| **A** Total Cash Collections | | 98,320 | 19,085 | 19,085 | 19,085 | | 98,320 | 19,085 | | | 98,320 | | 98,320 | | 117,405 | 117,405 | 117,405 | 117,405 | 117,405 | 117,405 | 117,405 | 117,405 | 98,320 | 3,370,690 |
| **Loan Disbursement:** | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | 65,428 | | | | | | | | | 65,428 | 65,428 | | | 65,428 | | | | | 261,712 |
| **B** Total Cash Disbursements | | | | | | | | | | | | | | | | | | | | | | | | |
| Water/Sewer | | 5,500 | 5,500 | 5,500 | 5,500 | | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 269,500 |
| Repairs/Maintenance | | 5,500 | 5,500 | 5,500 | 5,500 | | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 727,529 |
| | | | | | | | | | | | | | | | | | | | | | | | | 732,529 |
| **Cash B** Cash Flow from Operations | | 87,353 | | 24,585 | | 27,392 | 24,585 | | | 70,928 | | 24,585 | | 92,820 | 76,320 | 10,892 | 76,320 | 76,320 | 10,892 | 76,320 | 10,892 | 76,320 | 76,320 | 643,161 |
| **Reorganization Expenses:** | | | | | | | | | | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | | | | | | | | | | | |
| Counsel | | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | (5,500) | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 55,000 |
| | | | | | | | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 55,000 |
| Accountant, CPA, LLC | | | | | | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 22,000 |
| | | | | | | | | | | 2,000 | 2,000 | 2,000 | 2,000 | 1,089 | 1,146 | 1,147 | 3,382 | | | | | | |
| **D** Reorganization consultants | | | | | | | 12,000 | | | 12,000 | | 12,000 | 13,089 | 13,089 | 13,146 | 13,146 | 13,147 | 13,147 | | | | | 135,382 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| Reorganization Costs | | (5,500) | (7,750) | (7,750) | (7,750) | (14,395) | (41,787) | (7,750) | (19,750) | (7,750) | (19,750) | (2,350) | (9,801) | (48,287) | (48,760) | (9,792) | (48,537) | (48,537) | (9,792) | (48,537) | (9,000) | (350,903) |
| **E** Company funding | | (2,250) | (2,250) | (2,250) | (2,250) | (41,787) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 157,476 |
| **FoC-D+E** Company funding | | (2,250) | (7,750) | (7,750) | (7,750) | (14,395) | (41,787) | (7,750) | (19,750) | (7,750) | (19,750) | | 53,430 | 53,382 | (89,405) | 15,560 | 53,382 | 94,942 | (49,645) | 53,320 | (9,000) | |
| | | 85,103 | | | | | | | | | 90,570 | | 63,678 | 53,430 | (88,405) | 15,560 | 53,382 | 94,942 | (49,645) | 55,320 | | |
| **G** Net Cash Flow | | 2,197 | 87,300 | 71,800 | 64,050 | 49,655 | 34,155 | 14,405 | 6,655 | 97,225 | 89,475 | 61,975 | 115,405 | 106,513 | (88,405) | (9,792) | (9,792) | 45,297 | (48,537) | 45,297 | (9,000) | 2,197 |
| **Net+G** | | 87,300 | 79,550 | 64,050 | 49,655 | | 34,155 | 14,405 | 6,655 | 97,225 | | 61,975 | 115,405 | 10,892 | 10,892 | 76,320 | 76,320 | 100,617 | 153,998 | 100,617 | 153,998 | 104,353 | |
| Debtor cash after adequate protection | | 87,300 | 71,800 | 64,050 | 41,905 | 41,905 | 34,155 | | | 97,225 | 89,475 | 61,975 | | 10,892 | 76,320 | 76,320 | 94,942 | 94,942 | 45,797 | 45,797 | 100,617 | 159,673 | |
| | | | | | | | | | | | | | | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 43,000 | 31,000 | 160,000 | |
| | | | | | | | | | | | | | | | | | | | | | | | (827) |

Debtor cash after adequate protection payments

Notes
1. Debtor anticipates selling the property no later than August 2024.
2. The proceeds will be disbursed in accordance with bankruptcy priority rules.
3. Company funding includes monies transferred from positive flowing months to cover projected cash flow deficits.
4. Company funding includes the insurance premium. Historically, the related expenses paid the insurance premiums in the ordinary course of business
5. Adequate protection is pursuant to the proposed cash collateral budget

Super 172 Realty LLC
Cash Flow Budget
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

| | 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/6/2024 | 5/13/2024 | 5/20/2024 | 5/27/2024 | 6/3/2024 | 6/5/2024 | 6/12/2024 | 6/19/2024 | 6/26/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Cash receipts | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 270,000.00 |
| | | | | | | | | | | | | | | | | | | | | | | | 95,420.00 |
| **A   Total Cash Collections** | 22,500.00 | 22,500.00 | | | 22,500.00 | | | | | 22,500.00 | | | | 22,500.00 | | | | | | | | | 365,420.00 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | | | 9,542 | | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 87,364.00 |
| Water/Sewer | | | 9,542 | | | 9,542 | 9,542 | | | 9,542 | | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 95,420.00 |
| Electricity/Internet | | | | | | | | | | | | | | | | | | | | | | | |
| Insurance | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs/Maintenance | | | | | | | | | | | | | | | | | | | | | | | |
| Depreciation | | | | | 21,841.00 | | | | | | | | | 21,841.00 | 21,841.00 | | | 21,841.00 | | | 21,841.00 | | |
| **B   Total Cash Disbursements** | | | 9,542.00 | | 21,841.00 | | | | 9,542.00 | 22,500.00 | | | 9,542.00 | 32,042.00 | 31,383.00 | 22,500.00 | 43,568.00 | 31,383.00 | 22,500.00 | 9,542.00 | 21,841.00 | 22,500.00 | 182,784.00 |
| Cash Flow from operations | | | | | 659.00 | | | 659.00 | | | | | 659.00 | | 659.00 | | 659.00 | 659.00 | | 659.00 | | | |
| **Non-Reorganization Expense:** | | | | | | | | | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | | | | | | | | | | |
| Trustee | | | | | | 3,750.00 | | | | 3,750.00 | | | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 41,250.00 |
| Counsel | | | | | | 3,750.00 | | | | 3,750.00 | | | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 3,750.00 | 41,250.00 |
| Hauxhurst, CPA, LLC | | | | | | 2,000.00 | | | | 2,000.00 | | | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 41,250.00 |
| | | | | | | | | | | | | | | | | 250.00 | | | | 250.00 | | | 750.00 |
| **C   Valuation Professionals** | | | | | | | | | | | | | | | | | | | | | | | |
| **D   Total Reorganization Costs** | | | | | 9,500.00 | | | | 9,500.00 | | | | 9,500.00 | 9,750.00 | 9,500.00 | 9,500.00 | 9,750.00 | 9,500.00 | 9,500.00 | 9,750.00 | 9,500.00 | 9,500.00 | 105,250.00 |
| **E   Net Cash Flow** | | | | | (9,500.00) | | | | (9,500.00) | | | | (9,500.00) | 12,750.00 | (8,841.00) | 13,000.00 | 12,750.00 | (8,841.00) | 13,000.00 | 12,750.00 | (8,841.00) | 13,000.00 | 77,386.00 |
| **F+C-D+E** | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 23,159.00 | 23,159.00 | 23,159.00 | 23,159.00 | 36,159.00 | 36,159.00 | 36,159.00 | 26,659.00 | 39,409.00 | 30,568.00 | 43,568.00 | 56,318.00 | 47,477.00 | 60,477.00 | 73,227.00 | 64,386.00 | 77,386.00 | | 77,386.00 |
| **H+F+G** | 22,500.00 | 22,500.00 | 22,500.00 | 22,500.00 | 23,159.00 | 23,159.00 | 23,159.00 | 23,159.00 | 36,159.00 | 36,159.00 | 36,159.00 | 26,659.00 | 39,409.00 | 30,568.00 | 43,568.00 | 56,318.00 | 47,477.00 | 60,477.00 | 73,227.00 | 64,386.00 | 77,386.00 | | 77,386.00 |
| Adequate Protection | | | | | | | | | | | | | | | | | | | | | | | |
| Adequate protection funding | | | | | 20,000 | | | | | | | | | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | | 11,000 | 11,000 | | 75,000.00 |
| Debtor cash after adequate protection payments | | | | | | | | | | | | | | | | | | | | | | 2,386.00 | 2,386.00 |

Cash receipts include funding from a related party.

Debtor pays the monthly insurance premium. Historically, the related
properties to cover projected cash flow deficits.

Intercompany funding includes monies transferred from positive flowing
properties to cover projected cash flow deficits.

The Debtor anticipates selling the property no later than August 2024.

The proceeds will be disbursed in accordance with bankruptcy priority
rules.

Adequate protection is pursuant to the proposed cash collateral budget.

Sgro Properties 600 Urban Renewal, LLC
Cash Flow Budget
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

| | 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/6/2024 | 5/13/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/12/2024 | 6/24/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Total Cash Collections | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 473,150 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | 27,661 | | | | | | 27,661 | | | | 27,661 | | | 27,661 | | | 27,661 | | 138,444 |
| Water/Sewer | | | | | | | | | | | | | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | | | 473,150 |
| Electric/Gas/Internet | | | | | | | | | | | | | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 108,250 |
| Insurance | | 47,715 | | 49,965 | 50,111 | 49,965 | | | | 49,965 | | | 56,715 | 84,576 | 56,715 | 56,715 | 84,576 | 56,715 | | | | 698,984 |
| Property/Maintenance | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | | | | | | | | | | |
| Total Cash Disbursements | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | | | | | | | | | | |
| Cash B | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (2,250) | (9,000) | (36,861) | (9,000) | (9,000) | (36,861) | (9,000) | (9,000) | (36,861) | (9,000) | (221,694) |
| Net operations | | | | | | | | | | | | | | 27,661 | | | 27,661 | | | 27,661 | | |
| **Accumulation Expenses:** | | | | | | | | | | | | | | | | | | | | | | |
| Legal/Professional: | | | | | | | | | | | | | | | | | | | | | | |
| Attorney | | | | | | | | | | | | | | | | | | | | | | |
| Accountant, CPA, LLC | | | | | | | | | | | | | | | | | | | | | | 2,385 |
| Accountant consultants | | | | | | | | | | | | | 800 | | | | | | | | | 750 |
| Reorganization Costs | 2,250 | 2,250 | 2,250 | 50,111 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 9,801 | 76,621 | 48,760 | 9,792 | 36,861 | 9,000 | 9,792 | 36,861 | 9,000 | 303,199 | | | |
| FdC+E | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 801 | | | | | | | | | | | | |
| E | 2,250 | 2,250 | 50,111 | 2,250 | 2,250 | 2,250 | 801 | | | | | | | | | | | | | | | |
| D | | | | | | | | 800 | | 792 | | 792 | | 792 | | | | | | | | |
| G | | | | | | | | | | | | | | | | | | | | | | |
| FdC+E+G | | | | | | | | | | | | | | | | | | | | | | |
| H+F+G | | | | | | | | | | | | | | | | | | | | | | |

**Scott Properties Brecknell, LLC**
**13 Week Cash Flow Budget**
for the 13 weeks ending June 26, 2024
for the 12 months ending March 31, 2025

| | W/E 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 5/3/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | July 2024 | Aug 2024 | Sept 2024 | Oct 2024 | Nov 2024 | Dec 2024 | Jan 2025 | Feb 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Rent | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 1,180,476 |
| Other | | | | | | | | | | | | | | | | | | | | | | | 139 |
| **Total Cash Collections** (A) | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 98,373 | 1,371,265 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | 139 | | | | | | | | | | | | | | | | | | | | | | 238,708 |
| | 5,328 | | | | | | | | | | | | | | | | | | | | | | 5,328 |
| Water/Sewer | 19,085 | | | 19,085 | | | 19,085 | | | | | 19,085 | | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 19,085 | 159,850 |
| Electric/Internet | | | | | | 59,677 | | | | | | | | | 59,677 | | | | 59,677 | | | 59,677 | 110,250 |
| Insurance | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 545,275 |
| Repairs/Maintenance | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 2,250 | 28,065 | 28,065 | 28,065 | 28,065 | 28,065 | 28,065 | 28,065 | 28,065 | 28,065 | |
| Security | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Cash Disbursements** (B) | 7,717 | 2,250 | 2,250 | 21,335 | 2,250 | 61,927 | 2,250 | 21,335 | 2,250 | 2,250 | 2,250 | 21,335 | 2,250 | 117,458 | 117,458 | 117,458 | 117,458 | 117,458 | 117,458 | 117,458 | 117,458 | 117,458 | 836,051 |
| **Net cash from operations** (C=A-B) | 90,656 | | | | 36,446 | | | | 36,446 | | | | | 89,373 | 89,373 | 89,373 | 89,373 | 89,373 | 89,373 | 89,373 | 89,373 | 89,373 | 826,051 |
| **Reorganization Expenses:** | | | | | | | | | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | | | | | | | | | | |
| Attorney | | | | | | | | 5,000 | | 5,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 55,000 |
| Accountant | | | | | | | | 2,000 | | 2,000 | | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 55,000 |
| Security | | | | | | | | | | | | | | | | | | | | | | 22,000 |
| ...CPA, LLC | | | | | | | | | | | 1,033 | 1,459 | 1,268 | 1,459 | | | | | | | | 22,000 |
| | | | | | | | | | | | | | | | | | | | | | | 3,759 |
| **Total management consultants** (D) | | | | | | | | 12,000 | | 12,000 | 13,033 | 13,459 | 13,268 | 13,459 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 155,759 |
| **Total Reorganization Costs** (E) | | | | | | | | | | | | | | | | | | | | | | |
| **Net cash flow** (F=C-D-E) | 90,656 | (2,250) | (2,250) | (2,250) | 36,446 | (2,250) | (2,250) | (14,250) | 96,123 | (2,250) | (2,250) | (14,250) | 76,340 | 77,373 | 77,373 | 76,105 | 77,373 | 75,914 | 77,373 | 77,373 | 690,292 |
| Beginning cash | 5,360 | 95,916 | 93,666 | 91,416 | 89,166 | 135,612 | 133,362 | 131,112 | 106,862 | 104,612 | 200,735 | 198,485 | 181,985 | 258,325 | 276,021 | 353,394 | 429,499 | 447,195 | 524,568 | 600,483 | 618,179 | 5,360 |
| Ending cash (G) | 95,916 | 93,666 | 91,416 | 89,166 | 135,612 | 133,362 | 131,112 | 106,862 | 104,612 | 200,735 | 198,485 | 196,235 | 258,325 | 276,021 | 353,394 | 429,499 | 447,195 | 524,568 | 600,483 | 618,179 | 695,552 | 695,552 |
| Adequate Protection (HH) | | | | | | | 88,000 | | | | | | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 70,000 | 550,000 |
| | | | | | | | | | | | | | 12,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| **Debtor Cash Protection** | | | | | | | | | | | | | | | | | | | | | 145,552 |

Debtor cash after adequate protection payments 145,552

A - Debtor's cash receipts include funding from a related party

B - Debtor anticipates funding transferred from positive flowing properties to cover projected cash flow deficits

C - The monthly insurance premium, historically, the related party has paid the insurance premiums in the ordinary course of business

D - Debtor anticipates selling the property no later than August 2024. Proceeds will be disbursed in accordance with bankruptcy priority

Adequate protection is pursuant to the proposed cash collateral budget

**Sugar Properties Devon**
**13 Week Cash Flow Budget**
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

| | W/E 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/6/2024 | 5/13/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/5/2024 | 6/12/2024 | 6/19/2024 | 6/26/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | | | | 4,500 | 4,500 | 4,500 | | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 4,500 | 54,000 |
| Other | | | | | | | | | | | | | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 95,420 |
| **A** Total Cash Collections | 4,500 | | 9,542 | 9,542 | 4,500 | | 9,542 | | | | 10,472 | 10,472 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 4,500 | 4,500 | 149,420 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | | | | | | | | | | | | | | | |
| Water/Sewer | | | | | | | | | | | | | | | | | | | | | | | |
| Electricity/Internet | | | | | | 3,931 | | | | | | | | 3,931 | 3,931 | | | 3,931 | | 3,931 | | 3,931 | 15,724 |
| Insurance | | | | | | | | | | | | | | | | | | | | | | | |
| Security/Maintenance | | | 9,542 | | | | 9,542 | | | | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | 9,542 | | | 95,420 |
| **B** Total Cash Disbursements | | | 9,542 | | | 3,931 | 9,542 | | | | 9,542 | 9,542 | 9,542 | 13,473 | 13,473 | 13,473 | 13,473 | 13,473 | 13,473 | 13,473 | | | 131,144 |
| **C+A-B** Net cash flow from operations | 4,500 | | | | 4,500 | 569 | | | | 4,500 | 4,500 | | 4,500 | 569 | 569 | 4,500 | 569 | 569 | 4,500 | 569 | 4,500 | | 18,276 |
| **Reorganization Expenses:** | | | | | | | | | | | | | | | | | | | | | | | |
| Legal/Professional: | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | 500 | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | | 5,500 |
| | | | | | | | | | | 500 | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | | 5,500 |
| Subtotal, CPA, LLC | | | | | 3,931 | | | | | 1,225 | | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | | 13,475 |
| Retirement consultants | | | | | | | | | | | | | 250 | | | 250 | | | 250 | | | | 750 |
| **D** Total Reorganization Costs | | | | | | 569 | | | | 2,225 | | 2,225 | 2,225 | 2,475 | 2,225 | 2,225 | 2,475 | 2,225 | 2,225 | 2,475 | 2,225 | 2,225 | 25,225 |
| **E** Net Cash Flow | 4,500 | | | | 569 | | | | (2,235) | | | | (2,235) | 2,035 | (1,656) | 2,275 | 2,035 | (1,656) | 2,275 | 2,035 | (1,656) | 2,275 | 13,051 |
| Intercompany Funding | | | | | | | | | 2,225 | | | | 2,225 | 2,475 | 2,225 | 2,225 | 2,475 | 2,225 | 2,225 | 2,475 | 2,225 | 2,225 | |
| **F+C-D+E** Beginning | 3,128 | 7,628 | 7,628 | 7,628 | 7,628 | 8,197 | 8,197 | 8,197 | 8,197 | 5,972 | 5,972 | 5,972 | 5,972 | 8,247 | 8,616 | 10,272 | 10,891 | 12,916 | 11,260 | 13,535 | 15,560 | 13,904 | 3,128 |
| **G** Ending | 7,628 | 7,628 | 7,628 | 7,628 | 8,197 | 8,197 | 8,197 | 8,197 | 5,972 | 5,972 | 5,972 | 10,672 | 8,247 | 8,616 | 10,272 | 10,891 | 12,916 | 11,260 | 13,535 | 15,560 | 13,904 | 16,179 | 16,179 |

Cash receipts includes funding from a related party

...the monthly insurance premium. Historically, the related
...paid the insurance premiums in the ordinary course of business

Intercompany funding includes monies transferred from positive flowing
properties to cover projected cash flow defects

The Debtor anticipates selling the property no later than August 2024.
The proceeds will be disbursed in accordance with bankruptcy priority

Adequate protection is pursuant to the proposed cash collateral budget

**Shore Properties Association North**
13 Week Cash Flow Budget
For the 13 weeks ending June 26, 2024
and the 12 months ending March 31, 2025

| W/E | 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/3/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/19/2024 | 6/28/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 13,673 | 164,076 |
| Other | | | 257 | | | | 257 | | | | 257 | | 257 | 257 | 257 | 257 | 257 | 257 | 257 | 257 | | | 2,570 |
| **Total Cash Collections** | 13,673 | 13,673 | 13,930 | 13,673 | 13,673 | 13,673 | 13,930 | 13,673 | 13,673 | 13,673 | 13,930 | 13,673 | 13,930 | 13,930 | 13,930 | 13,930 | 13,930 | 13,930 | 13,930 | 13,930 | 13,673 | 13,673 | 166,646 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | 3,632 | | | | | | | | | 3,632 | 3,632 | | | 3,632 | | | 3,632 | | 14,528 |
| Water/Sewer | | | 257 | | | | 257 | | | | 257 | | 257 | 257 | 257 | 257 | 257 | 257 | 257 | 257 | | | 2,570 |
| Electricity/Internet | | | | | | | | | | | | | | | | | | | | | | | |
| Insurance | | | | | | | | | | | | | | | | | | | | | | | |
| Security | | | | | | | | | | | | | | | | | | | | | | | 17,098 |
| Repairs/Maintenance | | | | | | | | | | | | | | | | | | | | | | | |
| **Cash Disbursements for operations** | 13,673 | 13,673 | | | 10,041 | | | | 13,673 | | 13,673 | | 13,673 | 13,673 | 10,041 | 13,673 | 10,041 | 13,673 | 10,041 | 13,673 | 10,041 | 13,673 | 149,548 |
| **Reorganization Expenses:** | | | | | | | | | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | | | | | | | | | | |
| UST Fees | | | | | | | | | 900 | | 900 | | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 9,900 |
| Sauget, CPA, LLC | | | | | | | | | 900 | | 900 | | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 9,900 |
| RE Advisors | | | | | | | | | 1,225 | | 1,225 | | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 13,475 |
| Management consultants | | | | | | | | | | | | | | 250 | | | 250 | | | 250 | | | 750 |
| **Total Reorganization Costs** | | | | | | | | | 3,025 | | 3,025 | | 3,025 | 3,275 | 3,025 | 3,025 | 3,275 | 3,025 | 3,025 | 3,275 | 3,025 | 3,025 | 34,025 |
| **Company funding** | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | |
| **Net Cash Flow** | | | | | 3,632 | | | (3,025) | 10,041 | | (3,025) | | 13,673 | 7,016 | 7,016 | 10,648 | 10,398 | 7,016 | 10,648 | 10,398 | 7,016 | 10,648 | 115,523 |
| **Cumulative Cash Flow** | | | | | 23,714 | 23,714 | 23,714 | 20,689 | 34,362 | 34,362 | 31,337 | 41,735 | 48,751 | 59,399 | 69,797 | 76,813 | 87,461 | 97,859 | 104,875 | 115,523 | | | |
| | | | | | | | | | | | | | | | | | | | | | | | |
| **Cash available after adequate protection payments** | | | | | 12,000 | | | | 6,000 | | | | 9,000 | 9,000 | 9,000 | 6,000 | 9,000 | 6,000 | 9,000 | 9,000 | 9,000 | 84,000 | 31,523 |

Notes:
- Cash receipts include funding from a related party.
- The Company funding includes monies transferred from positive flowing operations.
- The Debtor has paid the insurance premiums in the ordinary course of business. The Debtor anticipates selling the property no later than August 2024, proceeds will be disbursed in accordance with bankruptcy priority.
- Adequate protection is pursuant to the proposed cash collateral budget.

**JS Realty Properties LLC**
**Cash Flow Budget**
For the 13 weeks ending June 28, 2024
For the 12 months ending March 31, 2025

| | 4/5/2024 | 4/12/2024 | 4/19/2024 | 4/26/2024 | 5/3/2024 | 5/10/2024 | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Rents | 20,755 | | | 20,755 | 20,755 | | 20,755 | | 20,755 | 20,755 | | | 20,755 | 20,755 | 20,755 | 20,755 | 20,755 | 20,755 | 20,755 | 20,755 | 20,755 | 20,755 | 249,060 |
| Other | | | | | | | | | | | | | | | | | | | | | | | 471,150 |
| **A   Total Cash Collections** | 20,755 | | | 47,715 | 20,755 | | 47,715 | | 20,755 | 47,715 | | | 20,755 | 68,470 | 68,470 | 68,470 | 68,470 | 68,470 | 68,470 | 68,470 | 68,470 | 20,755 | 736,210 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | | | | | | | 11,208 | | | 11,208 | | | 11,208 | | 44,832 |
| Water/Sewer | | | 47,715 | | | 11,208 | | | 47,715 | | | 47,715 | | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | 47,715 | | 471,150 |
| Electricity/Internet | | | | | | | | | | | | | | | | | | | | | | | |
| Insurance | | | | | | | | | | | | | | | | | | | | | | | |
| Security | | | | | | | | | | | | | | | | | | | | | | | |
| Repairs/Maintenance | | | | | | | | | | | | | | | | | | | | | | | |
| **B   Total from operations** | 20,755 | | 47,715 | | | 9,547 | | 47,715 | | | 20,755 | | 47,715 | 58,923 | 58,923 | 47,715 | 47,715 | 58,923 | 47,715 | 47,715 | 11,208 | 20,755 | 531,982 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | | | | | | | | |
| **Col=B** | 20,755 | | | | | 9,547 | | | | 20,755 | | | 20,755 | 20,755 | 9,547 | 20,755 | 20,755 | 9,547 | 20,755 | 20,755 | 9,547 | 20,755 | 204,228 |
| **Administration Expenses:** | | | | | | | | | | | | | | | | | | | | | | | |
| Professionals: | | | | | | | | | | | | | | | | | | | | | | | |
| Attorney | | | | | | | | 750 | | 750 | | | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 8,250 |
| Accountant, CPA, LLC | | | | | | | | 750 | | 750 | | | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 8,250 |
| | | | | | | | | 1,225 | | 1,225 | | | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 1,225 | 13,475 |
| | | | | | | | | | | | | | | 731 | 797 | | | | | 801 | | | 2,330 |
| **D   Reorganization Costs** | | | | | | | | | | | 2,725 | | 2,725 | 3,456 | 2,725 | 2,725 | 3,522 | 2,725 | 2,725 | 3,526 | 2,725 | 2,725 | 32,305 |
| **E   Debtor in Possession Company Funding** | | | | | | | | | | | | | | | | | | | | | | | |
| **F=C-D+E   Net Cash Flow** | 20,755 | | | | | 9,547 | | | | (2,725) | | | 20,755 | 17,299 | 6,822 | 18,000 | 17,233 | 6,822 | 18,000 | 17,229 | 6,822 | 18,000 | 171,923 |
| **G   Beginning** | | | | | | | | | | | | | | 45,607 | 62,906 | 69,728 | 87,728 | 104,991 | 111,813 | 129,843 | 147,071 | 153,893 | |
| **H=F+G   Ending** | 20,755 | | | | | 30,302 | | | | 27,577 | | | 27,577 | 48,332 | 69,728 | 87,728 | 104,991 | 111,813 | 129,843 | 147,071 | 153,893 | 171,923 | |
| **Adequate Protection** | | | | | | 18,000 | | | | 5,000 | | | 5,000 | 16,000 | 15,000 | 5,000 | 16,000 | 16,000 | 5,000 | 16,000 | 16,000 | 5,000 | 133,000 |
| Cash available after adequate protection payments | | | | | | | | | | | | | | | | | | | | | | | 38,923 |

[Left margin notes:]
The cash receipts include funding from a related party
Historically, the related party paid the monthly insurance premiums in the ordinary course of business
The Debtors' funding includes monies transferred from positive flowing
The Debtor anticipates selling the property no later than August 2024
funds to cover projected cash flow deficits
The need will be disbursed in accordance with bankruptcy priority
Adequate protection is pursuant to the proposed cash collateral budget

**Sugar Property Harrison Ave, LLC**
Monthly Budget 4/24 to 3/24
15223

| | W/E 4/8/2024 | 4/15/2024 | 4/22/2024 | 4/29/2024 | 5/6/2024 | 5/13/2024 | 5/20/2024 | 5/24/2024 | 6/3/2024 | 6/10/2024 | 6/17/2024 | 6/24/2024 | July 2024 | Aug. 2024 | Sept. 2024 | Oct. 2024 | Nov. 2024 | Dec. 2024 | Jan. 2025 | Feb. 2025 | March 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash collections:** | | | | | | | | | | | | | | | | | | | | | | |
| Rents | 15,223 | | | | 15,223 | | | | 15,223 | | | | 15,223 | 15,223 | 15,223 | 15,223 | 15,223 | 15,223 | 15,223 | 15,223 | 15,223 | 182,670 |
| Other | | | 3,817 | | | | 3,817 | | | | 3,817 | | 3,817 | 3,817 | 3,817 | 3,817 | 3,817 | 3,817 | 3,817 | | | 38,170 |
| **Total Cash Collections: (A)** | 15,223 | | 3,817 | | 15,223 | | 3,817 | | 15,223 | | 3,817 | | 19,040 | 19,040 | 19,040 | 19,040 | 19,040 | 19,040 | 19,040 | 15,223 | 15,223 | 220,840 |
| **Cash Disbursements:** | | | | | | | | | | | | | | | | | | | | | | |
| Loan Disbursements | | | | | | 10,876 | | | | | | | | 10,826 | | | 10,826 | | | 10,826 | | 43,354 |
| Real Estate Taxes | | | 3,817 | | | | | 3,817 | | | | | 3,817 | 3,817 | 3,817 | 3,817 | 3,817 | 3,817 | 3,817 | | | 38,170 |
| Water/Sewer | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 49,000 |
| Electricity/Internet | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | |
| Insurance | | | | | | | | | | | | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,524 |
| Repairs/Maintenance | | | | | | | | | | | | | 250 | | | 250 | | | 250 | | | 750 |
| **Total Cash Disbursements (B)** | 1,000 | 1,000 | 4,817 | 1,000 | 1,000 | 11,876 | 1,000 | 4,817 | 1,000 | 1,000 | 4,817 | 1,000 | 7,817 | 18,643 | 7,817 | 7,817 | 18,643 | 7,817 | 7,817 | 14,826 | 4,000 | 190,524 |
| **Cash flow from operations (C=A-B)** | 14,223 | (1,000) | (1,000) | (1,000) | 3,347 | (1,000) | (1,000) | (8,250) | 4,319 | (1,000) | (1,000) | (1,000) | 11,223 | 397 | 11,223 | 11,223 | 397 | 11,223 | 11,223 | 397 | 11,223 | 90,316 |
| **Operation Expenses:** | | | | | | | | | | | | | | | | | | | | | | |
| **Professionals:** | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 34,375 |
| Robert, CPA, LLC | | | | | | | | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 3,125 | 34,375 |
| management consultants | | | | | | | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 11,000 |
| US Trustee fees | | | | | | | | | 250 | | | | 250 | | | 250 | | | 250 | | | 750 |
| **Total Reorganization Costs (D)** | | | | | | | | 7,250 | 7,500 | 7,250 | 7,250 | 7,250 | 7,500 | 7,250 | 7,250 | 7,500 | 7,250 | 7,250 | 7,500 | 7,250 | 7,250 | 80,500 |
| **(E)** | | | | | | | | | | | | | | | | | | | | | | |
| **Net Cash Flow (F=C-D-E)** | 14,223 | (1,000) | (1,000) | (1,000) | 3,347 | (1,000) | (1,000) | (8,250) | 4,319 | (1,000) | (1,000) | (1,000) | 7,292 | (6,853) | 3,973 | 3,723 | (6,853) | 3,973 | 3,723 | (6,853) | 3,973 | 9,816 |
| Beginning | | | | | | | | | | | | | | | | | | | | | | |
| Funding | | | | | | | | | | | | | | | | | | | | | | |
| **(G)** | 14,223 | 13,223 | 12,223 | 11,223 | 14,569 | 13,569 | 12,569 | 4,319 | 3,319 | 17,542 | 16,542 | 15,542 | 17,542 | 16,542 | 15,542 | 11,856 | 5,002 | 8,975 | 12,697 | 5,844 | 9,816 | 9,816 |
| **H=F+G** | 14,223 | 13,223 | 12,223 | 11,223 | 14,569 | 13,569 | 12,569 | 4,319 | 3,319 | 17,542 | 16,542 | 15,542 | 7,292 | 11,014 | 4,161 | 8,133 | 11,856 | 5,002 | 8,975 | 12,697 | 5,844 | 9,816 |

Adequate Protection

(PROJ4460-1)

A — Cash receipts includes funding from a related party

B — The monthly insurance premiums are paid and the insurance premiums in the ordinary course of business

C — The Debtor anticipates selling the property no later than August 2024.

D — Primary funding include monies transferred from positive flowing properties to cover projected cash flow deficits

E — Any proceeds will be disbursed in accordance with bankruptcy priority rules.

Adequate protection is pursuant to the proposed cash collateral budget

# SCHEDULE G

## (Intentionally Deleted)

# SCHEDULE H

## (Intentionally Deleted)

# SCHEDULE I

**SCHEDULE I**

**SANFORD PROPERTY AGREEMENT**

Supor Family LLC is the owner of real property commonly known as 129 Sanford Street, Kearny, New Jersey (the "Sanford Property").

The Sanford Property is subject to the following mortgages:

1. Mortgage to 129 Sanford Lender LLC in the original principal amount of $4,000,000 (the "Sanford Lender Mortgage");
2. Mortgage to Crown Bank in the original principal amount of $1,882,767 (the "Crown Mortgage"); and
3. Mortgage to 1000 FER Lender 1, LLC in the original principal amount of $72,500,000 (the "FER Mortgage").

The Sanford Property is subject to the following foreclosure action: 129 Sanford Lender LLC v. Supor Family, L.L.C., J. Supor Realty LLC, Supor Manor Realty LLC, Bunge Oils, Inc. Crown Bank, and Unknown Tenants and/or Occupants 1-10, Docket No. SWC-F-004818-23 pending in Hudson County (the "Sanford Foreclosure Action").

129 Sanford Lender LLC has also filed the following law division action: Law Division: 129 Sanford Lender LLC v. Supor Family, LLC, J. Supor Realty LLC and Joseph Supor, III - Docket No. HUD-L-1417-23 (the "Sanford Law Division Action").

The Sanford Foreclosure Action and Law Division Action are pending.

In consideration of the covenants and agreements contained in the Agreement, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Supor Family LLC and Lenders, intending to be legally bound hereby, agree as follows:

Supor Family LLC intends to list the Sanford Property for sale with CBRE ("Broker") pursuant to a listing agreement disclosed to Lenders (the "Listing Agreement"). Supor Family shall disclose the Listing Agreement to Lenders, and confer with Lenders regarding same, prior to executing the Listing Agreement. Supor Family LLC agrees to market the Sanford Property for sale through Broker per the Listing Agreement.

Lenders have no objection to the marketing of the Sanford Property for sale through Broker per the Listing Agreement.

Lenders hereby agree to release and discharge the FER Mortgage in exchange for and upon receipt of payment of the net proceeds of any sale of the Sanford Property, up to the outstanding amount of the indebtedness secured by the FER Mortgage, after payment of amounts sufficient to pay in full:

(i)      the outstanding amount of the indebtedness secured by the Sanford Lender Mortgage;

(ii)     the outstanding amount of the indebtedness secured by the Crown Mortgage;

(iii)    the outstanding amounts of any liens or encumbrances on the Sanford Property senior in priority to the FER Mortgage, including real estate taxes and municipal assessments, if any;

(iv)    the customary costs of sale of the Sanford Property, including transfer or other taxes and the Broker commission pursuant to the listing agreement;

(v)     all fees and expenses of any professionals retained by Supor Family LLC in connection with negotiations with secured creditors, the marketing and sale of the Sanford Property, the Sanford Foreclosure Action, and/or Sanford Law Division Action; and

(vi)    in the event of the sale of the Sanford Property in a bankruptcy case filed by Supor Family LLC, all fees and expenses of any professionals retained by Supor Family LLC in connection with such bankruptcy case after bankruptcy court approval as well as all allowed fees to the Office of the United States Trustee in such bankruptcy case.

The amounts and expenses set forth in paragraphs (i) – (vi) above are collectively referred to as the "Priority Payments".

1000 FER Lender 1, LLC shall be entitled, but not obligated, to submit an offer to purchase the Sanford Property (a "Lender Offer"). Any Lender Offer shall be in an amount at least sufficient to pay in full the Priority Payments in cash at closing. In addition to the amounts sufficient to pay in full the Priority Payments in cash at closing, a Lender Offer may include as part of the purchase price a credit against any outstanding amounts due under the FER Mortgage. Supor Family LLC shall be entitled, but not obligated, to accept a Lender Offer.

Lenders hereby agree to take no action to hinder, delay or interfere with the marketing and sale of the Sanford Property as contemplated above.

Lenders hereby agree that should the outstanding amount of the indebtedness secured by the FER Mortgage be fully satisfied other than by sale of the Sanford Property (such as from the sale of some or all of the Debtor Properties), Lenders shall promptly release and discharge the FER Mortgage at their sole cost and expense.

Supor Family LLC is not a debtor in the Bankruptcy Cases. Should Supor Family LLC become a debtor in the Bankruptcy Cases, or otherwise file a chapter 11 bankruptcy proceeding, the terms of this agreement shall apply and be binding upon Supor Family LLC and Lenders.

# SCHEDULE J

### SCHEDULE J

### PLAN TERM SHEET

THIS TERM SHEET (THE "<u>PLAN TERM SHEET</u>") IS BEING ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT (THE "<u>RESTRUCTURING SUPPORT AGREEMENT</u>") AND SETS FORTH THE PRINCIPAL TERMS OF A PROPOSED RESTRUCTURING OR LIQUIDATION OF SUPOR PROPERTIES ENTERPRISES LLC; J SUPOR 136-1 REALTY LLC; SUPOR-172 REALTY LLC; SUPOR PROPERTIES BREIDERHOFT LLC; SUPOR PROPERTIES DEVON LLC; SHORE PROPERTIES ASSOCIATES NORTH LLC; SUPOR PROPERTIES 600 URBAN RENEWAL, LLC; JS REALTY PROPERTIES, LLC; AND SUPOR PROPERTIES HARRISON AVENUE LLC – (COLLECTIVELY, THE "<u>DEBTORS</u>" AND EACH SUCH ENTITY, A "<u>DEBTOR</u>").

THIS PLAN TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, PROVISIONS OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE LAWS.

THIS PLAN TERM SHEET IS NOT BINDING AND NO PARTY SHALL BE BOUND WITH RESPECT TO ANY TRANSACTION CONTEMPLATED HEREUNDER UNTIL THE EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION ACCEPTABLE IN FORM AND SUBSTANCE TO THE DEBTORS AND THE LENDERS, DILF HOLDERS, GUARANTORS, PLEDGORS, AND SUPOR FAMILY LLC (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT) AFTER OBTAINING ALL NECESSARY INTERNAL APPROVALS.

THIS PLAN TERM SHEET IS FOR SETTLEMENT DISCUSSION PURPOSES ONLY, IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

| Preliminary Non-Binding Summary Term Sheet[1] | |
|---|---|
| **Summary of Key Terms** | |
| **Implementation** | In exchange for support of the Plan by Lenders and DILF Holders, and other material terms set forth in the Restructuring Support Agreement (the "<u>Agreement</u>"), the Debtors agree to implement a chapter 11 process in accordance with the Milestones. |
| | This Plan Term Sheet contemplates resolution of the Debtor Avoidance Claims and implementation of the Plan pursuant to certain transactions, |

---

[1] Capitalized terms used but not defined in the body of this Plan Term Sheet shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

including a sale of some or all of the Debtor Properties on the terms set forth in the Agreement and as specified in the following documents (such transactions, the "Transactions"), which are subject to Bankruptcy Court approval, as applicable:

    i.    the agreement between Debtors and Lenders to market for sale the Debtor Properties pursuant to the terms of agreements with the broker(s) in the form(s) attached at **Schedule D** hereto (the "Broker Retention Agreement(s)");

    ii.    the marketing process and bidding procedures for the Debtor Properties attached hereto as **Schedule E** (as amended, modified, waived or supplemented in accordance herewith, the "Bidding Procedures");

    iii.    the agreement between Debtors and Lenders regarding the Debtors' use of Lenders' cash collateral during the Bankruptcy Cases reflected in the cash collateral order and budgets attached hereto as **Schedule F** (the "Cash Collateral Order"), inclusive of the Lenders' carve outs set forth in the Cash Collateral Order;

    iv.    an agreement between Supor Properties Harrison Avenue LLC, Joseph Supor III, and Lenders regarding the lease of real property owned by Supor Properties Harrison Avenue LLC to be negotiated by the parties subsequent to the Filing of the Bankruptcy Cases (the "Burger King Lease Agreement");

    v.    the agreement between Supor Family LLC and Lenders regarding the marketing and sale of real property owned by Supor Family LLC as set forth in **Schedule I** hereto (the "Sanford Property Agreement");

2

|  | vi. | Debtors' prosecution of the ADR Complaint (defined below and attached as Exhibit K) and other causes of action of the bankruptcy estates (against parties other than Lenders); and |
|---|---|---|
|  | vii. | (a) sale of some or all of the Debtor Properties pursuant to Section 363 of the Bankruptcy Code free and clear of all liens, claims and encumbrances by way of Motion and/or the confirmed Plan (the "Sale Transactions"), with the proceeds from the Sale Transactions being distributed pursuant to the terms of the Plan; (b) in the discretion of the Debtors, after consultation with the Lenders, substantive consolidation of some or all of the Debtors' Bankruptcy Estates and (c); and the right of the Lender Parties to credit bid and if such credit bid is the highest and best bid, close on such credit by the Lender Parties (or any designee(s), nominee(s) or assignee(s) thereof)During the pendency of the Bankruptcy Cases, Lenders and DILF Holders shall forbear from certain collection and enforcement action against Debtors, Guarantors, Pledgors, Supor Family LLC and property of each of the foregoing Parties, as detailed in the Plan. |
|  | No later than thirty (30) days after the Petition Date, the Debtors shall file with the Bankruptcy Court motion to reject any master leases and subleases with any Debtor affiliate that occupies, controls or manages any of the Debtor Properties (an "Affiliated Tenant") as listed on Schedule L, hereo, with such rejection becoming effective on the closing of a sale of the applicable Debtor Property (the "Affiliate Rejection Motion"). The Affiliate Rejection Motion shall contain consent of the Affiliated Tenant(s) to the relief sought therein and their waiver of any and all rights they may have under Sections 108 and 365(h)(1)(A)(ii) of the Bankruptcy Code with respect to the termination and/or rejection of any master leases. |  |
|  | The Debtor Avoidance Claims shall be resolved via the confirmed Plan. |  |

3

| | Certain key terms of the Plan are outlined in this Plan Term Sheet. |
|---|---|
| **Sale Process** | The Debtors will commence a third-party marketing process for the Sale Transactions which shall include seeking Bankruptcy Court approval for the Broker Retention Agreement(s), Bidding Procedures, and Sale Order(s) (and such process, the "<u>Sale Process</u>") on the timeline contemplated by the Milestones and otherwise in accordance with the Bidding Procedures. |

Pursuant to the terms of the Sale Order(s) and Plan, the Debtors and Lenders contemplate that at the closing of each sale of a Debtor Property, as approved by the Bankruptcy Court, the applicable Lender shall release and discharge all of its mortgage(s) and liens on such Debtor Property in exchange for payment of the net sale proceeds, up to the outstanding amount of the Allowed Class 2 or Class 3 Secured Claim on such Debtor Property, as applicable, after payment or deduction from such sale proceeds of the following, and in the following priority:

(a) the outstanding amounts of any Allowed Secured Claim of Governmental Unit on the subject Debtor Property that is senior in priority to the Allowed Class 2 or Class 3 Secured Claim of Lender on such Debtor Property pursuant to applicable non-bankruptcy law, including real estate taxes and municipal assessments, if any;

(b) a voluntary carve out by the applicable Lender (the "<u>Sale Transaction Carveout</u>") in the amount of:

(i) the customary costs of sale of the applicable Debtor Property;

(ii) any commission(s) payable by Debtor pursuant to the Broker Retention Agreement(s);

(iii) all fees and charges assessed against the applicable Debtor Estates' pursuant to section 1930 of chapter 123 of title 28 of the United States Code attributable to the sale of such Debtor Property and all amounts due to the Office of the United States Trustee attributable to the sale of such Debtor Property;

(iv) consistent with the parameters set forth in the Agreement, the amount of estimated accrued but unpaid Professional fees incurred by the legal counsel and other advisors to the Debtors and any statutory committees related primarily to the sale of such Debtor Property; and

4

|  |  |  |
|---|---|---|
|  | (v) | as may be limited by the Agreement, the amount of allowed but unpaid professional fees incurred by the legal counsel and other advisors to the Debtors and any statutory committees during the Bankruptcy Cases up to the date of the applicable sale, plus the amount necessary to fund a wind down budget as agreed by the parties in accordance with, and as limited by, the terms of the Sale Transaction Documentation and Plan, which may be effectuated by establishing an Escrow Account if determined to be necessary by the parties.

The Sale Transaction Carveout shall be calculated and payable by Lender in the event that Lender is the Purchaser of a Debtor Property, via credit bid or otherwise in accordance with the parameters set forth in the Agreement and/or other agreement between Lenders and the Debtor Parties.

The Sale Transaction Carveout amounts shall not reduce the amount of the Lenders' Allowed Claims. |

## Classification and Treatment of Claims

| Type of Claim | Treatment | Impairment/Voting |
|---|---|---|
| Administrative Claim | Except with respect to Professional Fee Claims or as otherwise set forth herein, subject to the provisions of sections 327, 330(a), and 331 of the Bankruptcy Code, and except to the extent that a Holder of an Allowed Administrative Claim and, as applicable, the Debtors, agree to less favorable treatment or such Holder has been paid by any applicable Debtor prior to the Effective Date, the Debtors shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash, which payment shall be made (a) in the ordinary course of business, or (b) on the later of (i) the Effective Date and (ii) the date on which such Administrative Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as | N/A |

| | | |
|---|---|---|
| | reasonably practicable thereafter) with a Cash distribution; *provided that* any Allowed Administrative Claim that has been expressly assumed by a Purchaser under a Sale Transaction shall not be an obligation of the Debtors as of or after the late of the Effective Date and the closing of such sale transaction. | |
| **Professional Fee Claims** | Except to the extent that a Holder of an Allowed Professional Fee and, as applicable, the Debtors, agree to less favorable treatment or such Holder has been paid by any applicable Debtor prior to the Effective Date, Professionals shall receive Cash in the amount of the Professional Fees allowed and awarded by the Bankruptcy Court to such Professionals, pursuant to Sections 330(a) and 503(b) of the Code, upon the latter of (a) the Effective Date or (b) as soon as practicable after a Final Order is entered by the Bankruptcy Court approving such Professional Fees, unless any such Professional consents to other treatment. All such payments shall be made (a) first, from any retainers held by such Professionals, and (b) thereafter, from unencumbered proceeds of Property of the Estate, from the carve out(s) in the Cash Collateral Order(s), and/or from the Sale Transactions Carve Out or otherwise provided in the Agreement, as applicable. | N/A |
| **United States Trustee Fees** | All U.S. Trustee Fees payable through the Effective Date shall be paid in full on the Effective Date. All such payments shall be made from the carve out(s) in the Cash Collateral Order(s), and/or from the Sale Transactions Carve Out, as applicable | N/A |
| **Priority Tax Claims** | Except to the extent that a Holder of an Allowed Priority Tax Claim and, as applicable, the Debtors agree to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, pursuant to section 1129(a)(9)(C) of | N/A |

6

| | the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors either (i) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (ii) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date; *provided that* any Allowed Priority Tax Claim that has been expressly assumed by a Purchaser under a Sale Transaction shall not be an obligation of the Debtors as of or after the late of the Effective Date and the closing of such sale transaction. | |
|---|---|---|
| **Class 1**<br>**Secured Claims of Govern-mental Units** | Except to the extent that a Holder of an Allowed Secured Claim of Governmental Unit agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, discharge and release of and in exchange for each such Allowed Claim, each Holder of an Allowed Secured Claim of Governmental Unit shall receive at the election of the Debtors, in consultation with the Lenders, and in each case, (a) payment in full in Cash from the proceeds of the sale of the Debtor Property that secures such Allowed Claim; (b) delivery of the collateral securing any such Allowed Claim; (c) Reinstatement of such Claim; or (d) other treatment rendering such claim Unimpaired.<br><br>Upon satisfaction in full of the Allowed Secured Claim of Governmental Unit, at the sole cost and expense each such Holder, the Holder shall file (or cause to be filed) with the appropriate | Unimpaired; deemed to accept |

| | | |
|---|---|---|
| | governmental authorities such UCC-3 termination statements, control agreement termination notices, lien releases, mortgage releases/discharges, cancellations, satisfactions, re-assignments, and other similar discharge or release documents (if applicable, in recordable form) reasonably necessary to evidence or effect of record the termination and release of the security interests and other liens of the Holder of such Allowed Secured Claim of Governmental Unit. | |
| **Class 2** **Allowed Secured Claims of 1000 Frank E. Rodgers 1, LLC** | Except to the extent that a Holder of an Allowed Class 2 Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, discharge and release of and in exchange for each such Allowed Claim, each Holder of an Allowed Class 2 Secured Claim shall receive, (a) payment in full in Cash from the proceeds of the sale of the Debtor Property that secures such Allowed Claim; or (b) delivery of the deed to the Debtor Property securing any such Allowed Claim if its Credit Bid is the Successful Bid.  Upon satisfaction in full of the Allowed Class 2 Secured Claim Unit, at the sole cost and expense each such Holder, the Holder shall file (or cause to be filed) with the appropriate governmental authorities such UCC-3 termination statements, control agreement termination notices, lien releases, mortgage releases/discharges, cancellations, satisfactions, re-assignments, and other similar discharge or release documents (if applicable, in recordable form) reasonably necessary to evidence or effect of record the termination and release of the security interests and other liens of the Holder of such Allowed Class 2 Secured Claim. | Impaired.  Deemed to accept per RSA.  Entitled to vote. |
| **Class 3** | Except to the extent that a Holder of an | Impaired. |

| Allowed Secured Claims of 1000 Frank E. Rodgers 1, LLC | Allowed Class 3 Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, discharge and release of and in exchange for each such Allowed Claim, each Holder of an Allowed Class 3 Secured Claim shall receive, (a) payment in full in Cash from the proceeds of the sale of the Debtor Property that secures such Allowed Claim; or (b) delivery of the deed to the Debtor Property securing any such Allowed Claim if its Credit Bid is the Successful Bid. | Deemed to accept per RSA. Entitled to vote. |
|---|---|---|
| | Upon satisfaction in full of the Allowed Class 3 Secured Claim Unit, at the sole cost and expense each such Holder, the Holder shall file (or cause to be filed) with the appropriate governmental authorities such UCC-3 termination statements, control agreement termination notices, lien releases, mortgage releases/discharges, cancellations, satisfactions, re-assignments, and other similar discharge or release documents (if applicable, in recordable form) reasonably necessary to evidence or effect of record the termination and release of the security interests and other liens of the Holder of such Allowed Class 3 Secured Claim. | |
| Class 4 Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtors, in consultation with the Lenders, and in each case, on the Effective Date: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim; (c) reinstatement of such Claim; or (d) other treatment rendering such claim Unimpaired. | Unimpaired; deemed to accept. |

9

| | Upon satisfaction in full of the Allowed Class 4 Secured Claim Unit, at the sole cost and expense each such Holder, the Holder shall file (or cause to be filed) with the appropriate governmental authorities such UCC-3 termination statements, control agreement termination notices, lien releases, mortgage releases/discharges, cancellations, satisfactions, re-assignments, and other similar discharge or release documents (if applicable, in recordable form) reasonably necessary to evidence or effect of record the termination and release of the security interests and other liens of the Holder of such Allowed Class 4 Secured Claim. | |
| --- | --- | --- |
| **Class 5**<br><br>**Other Priority Claims** | Except to the extent that a Holder of an Allowed Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired, in each case on the Effective Date. | Unimpaired; deemed to accept. |
| **Class 6**<br><br>**General Unsecured Claims**<br><br>**(Assumes Substantive Consolidation)** | In full and final satisfaction, compromise, settlement, release, and discharge of its Claim (unless the applicable Holder agrees to a less favorable treatment), Holders of Allowed General Unsecured Claims that are not assumed by a Purchaser will receive, after payment in full of Allowed Administrative Claims (including Professional Fee Claims), Priority Tax Claims, and Allowed Class 1-5 Claims, Pro Rata Distributions up to the full amount their Allowed Claims, plus interest at the greater of (a) any contract rate of interest applicable to such Allowed Claim pursuant any contractual agreements applicable to such Allowed Claim, or (b) the Federal Judgment Rate; | Impaired; entitled to vote. |

10

| | | |
|---|---|---|
| | provided, however, that any portion of the Secured Creditor's Allowed Secured Claim which is an Unsecured Claim pursuant to Section 506 of the Code shall be an Allowed Unsecured Claim, will bear interest pursuant to the Loan Documents, and will not be deemed satisfied, settled, or released until repaid in full in immediately available funds.<br><br>If after conclusion of the Bankruptcy Court approved sale(s) of Debtor Properties, Lenders receive less than full payment of Lenders' Allowed Claims, Lenders may then proceed to enforce all rights and remedies regarding Guarantors and Pledgors and any remaining collateral of Lenders owned by a non-Debtor party. In the event that a Lender has an Allowed Unsecured Claim, the Lender shall retain, and shall have, all of its rights and remedies under the Loan Documents.<br><br>Such Pro Rata Distributions shall be made:<br><br>(i)    on the later of: (A) a date within ten (10) days after such Claim becomes Allowed by Final Order; or (B) a dated within (90) days from the closing of the final Sale Transaction; or<br><br>(ii)    upon such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Allowed Class 6 Claim and the Plan Administrator. | |
| **Class 7**<br><br>**Intercompany Claims** | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated, distributed, contributed, set off, settled, cancelled and released or otherwise addressed at the option of the Debtors; provided, that no distributions shall be made on account of any such Intercompany Claims until after | Unimpaired; deemed to accept / Impaired; deemed to reject. |

11

|  | payment in full of Allowed Administrative Claims (including Professional Fee Claims), Allowed Priority Tax Claims, and Allowed Class 1-6 Claims, |  |
|---|---|---|
| **Class 8**<br>**Equity Interests** | On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of its Claim, Holders of all Class<br><br>8 Equity Interests shall either (a) retain such Interests (in the event that all of the Assets of the Debtor are not liquidated under the Plan); or (b) have such Interests extinguished (in the event that all of the Assets of the Debtor are not liquidated under the Plan). In either cases, Holders of Class 8 Equity Interests shall receive a pro-rata distribution from any and all Sale Transaction(s) after full satisfaction of Allowed Administrative Claims (including Professional Fee Claims), Allowed Priority Tax Claims, and Allowed Class 1-7 Claims. | Unimpaired; deemed to accept / Impaired; deemed to reject. |

| Other Key Terms |  |
|---|---|
| **Lender Release** | The Plan shall include a release provision in favor of Lenders substantially similar to the provision set forth below, to the maximum extent permitted under applicable law or the Bankruptcy Court.<br><br>*Effective as of the Effective Date, for good and valuable consideration, including, without limitation, the agreements in favor of the Debtors set forth in the RSA to facilitate the implementation of this Plan and the expeditious liquidation of the Plan Assets, the Debtors and the Estates shall be deemed to have unconditionally released the Lenders and the partners and employees of its counsel from any and all Claims, obligations, rights, suits, remedies, liabilities, crossclaims, counterclaims, debts, obligations, damages, losses, fees, defenses, remedies, setoff, recoupment or other offset rights, and other rights of disgorgement or recovery, whatsoever, including, without limitation, any Claims that could be asserted by or on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right, based in whole or in part upon* |

| | *any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, without limitation, claims concerning the formulation, negotiation, and/or pursuit of confirmation of this Plan, the consummation of this Plan, the administration of this Plan, and/or the property to be distributed under this Plan), except for cases of gross negligence, willful misconduct, or fraud in each case as determined by Final Order of a court of competent jurisdiction.* |
|---|---|
| **Conditions Precedent to Transactions** | The following shall be conditions to the Effective Date of the Plan (the "Conditions Precedent"): |
| | (a) The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code; |
| | (b) The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order that has not been stayed or modified or vacated and shall: |
| | (i) authorize the Debtors and the Reorganized Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, and other agreements or documents created in connection with the Plan; |
| | (ii) decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; |
| | (iii) authorize the implementation of the Plan in accordance with its terms; and |
| | (iv) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; |
| | (c) The Bankruptcy Court shall have entered the Sale Order(s); |
| | (d) The occurrence of the Closing(s) (as such term is defined and described in the Sale Transaction Documentation); |
| | (e) There shall not be in effect any (i) order, opinion, ruling, or other decision entered by any court or other governmental unit or (ii) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the |

13

implementation of any of the transactions contemplated by the Plan;

All governmental and material third party approvals and consents, including Bankruptcy Court approval, that are necessary to implement the Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods (including all applicable waiting periods under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended) shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(g) The Restructuring Support Agreement shall not have terminated as to all parties thereto and shall remain in full force and effect and the Debtors and other parties then party thereto shall be in compliance therewith;

(h) The Debtors shall have implemented the Restructuring Transactions, and all transactions contemplated by the Restructuring Support Agreement, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan;

(i) Each document or agreement constituting the Definitive Documents (as defined in the Restructuring Support Agreement) shall have been executed and/or effectuated and shall be in form and substance consistent with the Restructuring Support Agreement, including, without limitation, any consent rights included therein;

(j) With respect to all actions, documents and agreements necessary to implement the Plan: (a) all conditions precedent to such documents and agreements (other than any conditions precedent related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements; (b) such documents and agreements shall have been tendered for delivery to the required parties and been approved by any required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (c) such documents and agreements shall have been effected or executed, and in each case all such actions, documents and agreements shall be consistent with the Restructuring Support Agreement, including, without limitation, any consent rights included therein;

(k) All material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and the transactions contemplated in the Plan

14

| | |
|---|---|
| | shall have been obtained; |
| | (l)  The Wind-Down Reserve and any other agreed carve-outs have been adequately funded as agreed between the parties and in accordance with, and as limited by, the terms of the Agreement and/or the Sale Transaction Documentation, which to the extent necessary and agreed by the parties may be effectuated by way of the establishment of an Escrow Account; and |
| | Such other conditions precedent to the Effective Date, as are customary and otherwise reasonably acceptable to the Debtors and Lenders. |
| **Additional Plan Provisions and Documentation** | The Plan shall contain other customary provisions for chapter 11 plans of this type, which provisions, in each case, shall be in form and substance reasonably acceptable to the Debtors and Lenders. |

# SCHEDULE K
# (Exhibit K)
# To be Filed

# EXHIBIT C

POLICY NUMBER: GL-000003-03

**COMMERCIAL GENERAL LIABILITY**
**CG 20 26 04 13**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Name Of Additional Insured Person(s) Or Organization(s): |
|---|
| TeamDream, Inc., as Manager & American Dream Resorts, Ltd, as Managing Member, as respect to their interest in RDA1: Supor Properties Enterprises; RDA 2&3: Supor Properties Enterprises LLC; RDA 4: J Supor 136-1 Realty LLC; RDA5: Supor 172 Realty LLC; RDA 6: Supor Properties 600 Urban Renewal, LLC; Supor MT, LLC; Supor Studio 3 LLC; Supor Studio 4 LLC; Supor Studios 2 LLC and the following locations: 1000 Frank E Rodgers Blvd, Harrison NJ 07029; 600 Guyon Drive, Harrison NJ 07029; 310-314 Manor Ave, Harrison NJ 07029; 400 Supor Blvd, Harrison NJ 07029; 401 Supor Blvd, Harrison NJ 07029; 125-129 Sanford Avenue, Kearny NJ 07032 |

| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. |
|---|

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

**1.** In the performance of your ongoing operations; or

**2.** In connection with your premises owned by or rented to you.

However:

**1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

**2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

**1.** Required by the contract or agreement; or

**2.** Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.