UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel M. Eliades, Esq. (DME-6203)
David S. Catuogno, Esq (DSC-1397)
Caitlin C. Conklin, Esq. (CCC-5117)
*Special Counsel for the Debtors and counsel to non-Debtor Plaintiffs*

| | |
|---|---|
| In re:<br><br>Supor Properties Enterprises LLC, *et al.*[1],<br><br>       Debtors. | Case No. 24-13427 (SLM)<br><br>Judge: Stacey L. Meisel<br><br>Chapter 11<br><br>(Jointly Administered) |
| Supor Properties Enterprises LLC: J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; Supor Family LLC; Supor Properties-400 Limited Liability Company; and the Marital Trust under the Last Will and Testament of Joseph Supor, Jr.,<br><br>      Plaintiffs,<br>        v.<br><br>American Dream Resorts, Ltd., RDA1: Supor Properties Enterprises LLC; RDA 2&3: Supor Properties Enterprises LLC; RDA 4: J Supor 136-1Realty LLC; RDA 5: Supor 172 Realty LLC; RDA 6: Supor Properties 600 Urban Renewal, LLC; Supor Studio City 2 LLC, Supor Studio City 3 LLC; Supor Studio City 4 LLC and Supor MT, LLC<br><br>      Defendants. | Adv. Pro. No. 24-01174 (SLM)<br><br><br>Hearing Date: May 20, 2024<br><br><br>Hearing Time: 10:00 a.m. |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Supor Properties Enterprises LLC (5580); J Supor 136-1 Realty LLC (3205); Supor-172 Realty LLC (EIN No. 5662); Supor Properties Breiderhoft LLC (7258); Supor Properties Devon LLC (6357); Shore Properties Associates North LLC (6707); Supor Properties 600 Urban Renewal, LLC (8604); JS Realty Properties, LLC (2497); and Supor Properties Harrison Avenue, LLC (1728).

318717323.4

**PLAINTIFFS' REPLY TO OPPOSITION TO ITS APPLICATION FOR PRELIMINARY INJUNCTION AND TURNOVER OF PROPERTY OF BANKRUPTCY ESTATE**

The above-captioned plaintiffs (each a "Plaintiff" and collectively, the "Plaintiffs"), submit this pleading and the Declarations of Joseph Supor III (the "Supor 5/13 Declaration")[2] and Andrea Dobin filed herewith (i) in reply to *Defendants' Memorandum of Law in Opposition to Plaintiffs' Application by Order to Show Cause for Preliminary Injunction and Turnover of Estate Property* (ECF No. 16) (the "Defendants' Opposition"); and (ii) in further support of Plaintiffs' Application for Preliminary Injunction and Turnover of Estate Property (ECF No. 2) (the "Plaintiffs' Application").  Plaintiffs also rely upon the *Affidavit of Shoshana Carmel in Support of Order to Show Cause* filed at ECF No. 21.[3]

**PRELIMINARY STATEMENT**

Plaintiffs" Application seeks emergent relief:

(i) enjoining Defendants from any further transfer, assignment, encumbrance, recording or other disposition of any of the Contributed Deeds[4] and/or the underlying OA Deeded Properties, including the Manor Avenue Property;

(ii) declaring that the automatic stay of 11 U.S.C. § 362 is in effect as to the interests of all Debtor Plaintiffs as to the Contributed Deeds by each Debtor and the corresponding OA Deeded Properties;

(iii) requiring the turnover and/or accounting for all Contributed Deeds; and

---

[2] Mr. Supor has previously submitted declarations in this Adversary Proceeding and in the main Bankruptcy Cases. *See,* ECF No. 2-2 and 12, and Case No 24- 13427 ECF No. 7.

[3] Ms. Carmel is a director of 1000 Frank E. Rodgers 1, LLC and 1000 Frank E. Rodgers 2, LLC (collectively, the "Lenders" and each such entity a "Lender").

[4] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Plaintiffs' Application and Verified Complaint.

2

(iv) requiring turnover of possession of the JS Realty Property and otherwise ejecting and removing ADR and/or any other Defendant(s) from use, possession and/or occupancy of the JS Realty Property – including removing Joseph Gentile Sr. ("Gentile Sr."), his family and any other individuals, who are residing at the JS Realty Property, from that warehouse/office building.

Defendants' Opposition is curious in terms of what Defendants say and what Defendants do not say. What they do say is, in large measure, is irrelevant, factually inaccurate, and legally insufficient. What they do not say underscores the gaping holes in Defendants' factual narrative and the deficiencies in their legal arguments. The inadequacies in Defendants' Opposition compels the conclusion, that Defendants have no legitimate defenses to the relief requested by Plaintiffs.

Paramount in these inadequacies is Defendant's position as to the ownership of the JS Realty Property [5] In fact, not only do Defendants not claim an ownership interest in this property, but they also go out of their way to repeatedly state that Plaintiffs have no standing to bring an ejectment action because they assert that that the JS Realty Property is owned by 401 Supor Boulevard Owner LLC - an affiliate of Lender – pursuant to a recorded deed in lieu of foreclosure ("DILF").

Defendants' primary defense to Plaintiff's Application is that their affiliate Team Dream, Inc. ("Team Dream") was granted a lease (the "Purported TD Lease") to the property by Defendant Supor Studio City 4. Defendants do not, however, produce any evidence or foundation for the idea that Supor Studio City 4 had any right or ability to lease this property as landlord under a lease. There is no claim that it owns the property – to the contrary, there are repeated admissions by Defendants that they believe that 401 Supor Blvd. Owner owns the JS Realty Property. Because

---

[5] This property is also known as the Red Brick Building and may be referred to as such in certain of the pleadings filed in this matter.

there is no articulated entitlement for Supor Studio City 4 to be in possession of the JS Realty Property, Defendants may as well be leasing itself the Brooklyn Bridge.

This glaring and fundamental defect is dispositive even before we consider the fact that the Purported TD "Lease (i) was executed by Joseph Gentile, Jr. for both the "landlord" and the "tenant"; and (ii) conveys an immediate right to occupancy with a 100% deferred rental obligation, contingent on services to be provided by Debtor JS Realty. Incredibly, JS Realty is charged with responsibility to perform services, but is not even a party to the Purported TD Lease. Taking this dynamic to its illogical conclusion, if JS Realty performed and triggered Team Dream's obligation to pay rent, Team Dream would be paying rent to Supor Studio City 4 … essentially itself, even though it takes the position that some other party owns the property. And, of course, there is no mechanism for Supor Studio City to pay the lawful owner. As a practical matter, the Purported TD "Lease" is a self-serving absurdity. As a legal matter, it is a nullity.

Defendants likewise do not really deny that Gentile, Sr. and/or others have established an illegal residential occupancy at the JS Realty Property. Technically, the Opposition states that Defendants deny a residential occupancy but then says to the extent there is such an occupancy Team Dream must be named as a party. Plaintiffs are mystified as to what that means but JS Realty will provide evidence at the hearing establishing that Joseph Gentile, Sr. and his daughter are in full-time residential occupancy at the JS Realty Property. Further, Defendants do not deny that they have prevented a third-party leasing company from accessing the property to retrieve its personal property (a copy machine) or that they have ignored repeated requests to allow this party to retrieve the copy machine in which Defendants have absolutely no interest.

In terms of what Defendants do say, Gentile, Jr. swears to the fact that Defendants did not receive a copy of the Forbearance Agreement between Plaintiffs and Lender until September of

2023, and did not know about the deeds in lieu of foreclosure ("<u>DILFs</u>") previously given by Plaintiffs to Lender until December 2023. Both statements are palpably false. Plaintiffs will produce testimony at the hearing establishing that the DILFs were disclosed to ADR and the Gentiles prior to the execution of the Operating Agreement and specifically discussed in the context of the execution of the Operating Agreements, Moreover, in terms of corroboration, the Supor Declaration submitted herewith establishes that Defendants received a copy of the Forbearance Agreement - which Forbearance Agreement specifically references the DILF arrangement– no later than by email dated May 25, 2023, which is only nine (9) days after the Defendants and Plaintiffs executed the Operating Agreements, and prior to Defendants' illicit and improper attempts to record the Contributed Deeds. This is consistent with para. 14 of the Gentile Jr. Declaration admitting that he knew about the Forbearance Agreement ***<u>prior to</u>*** executing the joint venture Operating Agreements.

The evidence here will establish that ADR was aware that the Debtor/Plaintiffs had already given DILFs to the OA Deeded Properties to Lender prior the execution of the Operating Agreements, and, therefore, could not have reasonably believed that they were receiving a present transfer of title to the same properties. Certainly, Plaintiffs did not intend for the Contributed Deeds to manifest actual contemporaneous transfers as the Contributed Deeds were all given, not to ADR but to a Title Company and all Contributed Deeds recited a stated consideration of $0. Because there was not intent to convey, there was no effective "delivery" of the Contributed Deeds and therefore, no effective transfers.

Indeed, that only makes sense. When stripped down to its essence, Defendants' position translates to an assertion that the Debtor/Plaintiffs made an immediate and effective transfer of over $100 million in real estate without receiving a penny or any other contemporaneous tangible

consideration in return. This is patently absurd and this is precisely why these transactions are either void *ab initio* or avoidable as fraudulent transfers as alleged under the Verified Complaint.

Defendants also state that they tried to record all the Contributed Deeds and all but the deed to the Manor Avenue Property in favor of Supor MT were rejected as defective and returned by the Hudson County Register of Deeds. Plaintiffs submit that this rejection is further confirmation that the Contributed Deeds were neither proper nor valid, and therefore there was no effective conveyance.

In sum, Defendants never received an actual present interest in any of the OA Deeded Properties, but rather, via the Operating Agreements, had a potential future interest based upon future performance. Defendants failed to perform. In fact, Defendants failed to provide any consideration. The Operating Agreements were validly terminated, and Defendants therefore, have no rights as to the OA Deeded Properties.

Defendants' continued retention of the Contributed Deeds as to these properties is akin to a Sword of Damacles dangling over the Debtors' Sale Process, creating potential complications that will chill bidding, depress value and cause irreparable harm to the Debtor estates. Additionally, Defendants' continued unauthorized, uncompensated rogue occupancy of the JS Realty Property is likewise an obstacle to the realization of value on that property for the benefit of Debtor JS Realty's creditors.

It is therefore necessary for the Court to grant the emergent relief sought by Plaintiffs so that the Sale Process can proceed, and the interests of all stakeholders can be protected pending Court order approving the sale of the OA Deeded Properties under 11 U.S.C. §363. As will be demonstrated herein, the Defendants have offered no cogent or legally supportable reasons why

Plaintiffs are not entitled to the relief sought. Accordingly, Plaintiffs submit that the Order to Show

Cause should be granted.

<h3 style="text-align:center">COUNTER STATEMENT OF FACTS [6]</h3>

The Statement of Facts incorporated into Defendants' Opposition is so infirm that it would

be impossible to address the myriad misstatements and, frankly, gibberish, in the context of a

narrative argument. Accordingly, Plaintiffs submit that the best way to illustrate the deficiencies

in Defendants' submission is to methodically refute same in counter-statement of facts to illustrate

to the Court how very insubstantial the opposition truly is.

1.      Defendants' narrative of the circumstances of its involvement with the Debtors -

beginning with an invitation from Mr. Supor's since deceased mother is pure fiction. More

importantly to Plaintiffs' Application however, falsity aside, it is utterly and completely irrelevant

to the issues before the Court.

2.      Defendants' assertion of 40 years experience and achievement in the construction

industry is likewise irrelevant, and likewise false. Plaintiffs do not question how long the Gentiles

may have been involved in construction, but there are very real impediments to Defendants' claims

of success and expertise. A review of local court dockets reflect that the Gentiles have littered the

legal landscape with lawsuits by aggrieved former partners who claimed to have been scammed

by the Gentiles in connection with proposed real estate deals.

3.      While Defendants describe a deal where they gratuitously received over $100

million in real estate value in exchange for nothing, that is not realistic, and it is not what happened.

As set forth in the Supor Declarations and the Verified Complaint, there was an agreement and

---

[6] In addition to the Counter-Statement, Plaintiffs also rely on the Declarations of Joseph Supor, III and Andrea Dobin submitted herewith, as well as the Declaration of Joseph Supor, III submitted along with Plaintiff's Application.

understanding that the Contributed Deeds would not and could not be recorded until after the refinancing due to the prior delivery of the DILFs and the contingent/subsequent nature of the anticipated refinancings.  That was certainly the understanding and intent of Plaintiffs.

4.      Paragraph 1 of the Gentile Jr. Declaration is surprisingly accurate.  His company's contribution to the joint venture was "funding by refinancing" to "cover the monies owed through the forbearance agreement."  At least it was supposed to be. Conspicuously absent from the Gentile Jr. Declaration, however, is the fact that Defendants utterly and completely failed to make this required contribution. In the nine months from execution of the Operating Agreements to the Initial Termination Letter, Defendants did not accomplish a refinance, did not present even **one** proposal for re-finance, did not identify even **one** lender with whom it was discussing a potential refinance. Plaintiffs, via Mr. Supor and/or its consultant Global International Advisors, LLC repeatedly requested updates on ADR's efforts to re-finance and never once got a substantive response.

5.      The assertions in paragraphs 17-25 straddle the boundary between irrelevance and nonsense. Leaving aside, as we should, the non-factual name calling, characterizations and personal attacks, the accusations regarding Mr. Supor's alleged lack of cooperation and creditworthiness are of no moment as the re-finance was supposed to be based on Defendants' credit. Incredulously, paragraph 19 asserts that Gentile, Jr. engaged with multiple brokers as to a re-financing. Plaintiffs have doubts that this is accurate but if it is, there is no explanation why Mr. Gentile kept these engagements a closely guarded secret as he never identified even one potential broker to Plaintiffs.

6.      Paragraph 26 asserts that Mr. Gentile, Jr. did not receive a copy of the Forbearance Agreement until September 13, 2023. This is provably false. As set forth in the Supor Declaration

submitted herewith, ADR/Gentile received the Forbearance Agreement four (4) months earlier on May 25, 2023 – mere days after executing the joint venture Operating Agreements.

Plaintiffs are also constrained to note that the "forbearance agreement" attached to the Gentile Jr. Declaration at Exhibit 3 is not the Forbearance Agreement at all, but rather an earlier Term Sheet from February of 2023, presumably exchanged as part of the negotiations between Lender and Plaintiffs. Plaintiffs note there is no corroboration as to when Gentile, Jr. received this Term Sheet, who he received it from, or the context in which it was given. Also, contrary to the suggestion in the Gentile Jr Declaration, the Forbearance Agreement that was provided in May 2023 did specifically reference the DILF arrangement. *See* Supor Declaration at Sections 7(vii), 8(a),8 (c), 8(d), 8(f), 9(c), 9(g) 10(b), 11 (f), 12, 13, 19, 21, 22, and 24. Hence, Defendants were on actual notice of the DILFs seven (7) months earlier than the December 2023 date asserted at paragraph 28 of the Gentile, Jr. Declaration.

7.      Paragraph 31 of the Gentile, Jr. Declaration asserts that Supor Studio City 4, executed the Purported TD Lease in favor of Team Dream. Conspicuously absent from the recitation is any support for the proposition that Supor Studio City 4 had any authority to grant a lease.

8.      Contrary to the statement at paragraph 32 of the Gentile, Jr. Declaration, Mr. Gentile never handed a copy of the Purported TD Lease to Mr. Supor, III in August 2023, or ever for that matter. This statement is false. Mr. Supor III did not see the alleged lease until it was filed with the Gentile Jr Declaration a week ago on May 6, 2024.

9.      Gentile, Jr.'s assertion at paragraph 35 that the Purported TD Lease is validated by the addition of Defendants and Team Dream to a Supor insurance policy as additional insureds is not well-founded. As noted in the Supor Declaration submitted herewith, Team Dream was party

to a lease with a Supor related entity for the premises located at 433 Bergen Avenue, Kearny, New Jersey, and the other Defendants were joint venture partners pursuant to executed Operating Agreements. That is why these parties were added to the policy. Moreover, while the Insurance Declaration page at is offered in a vacuum without the policy or other context, a Review of Exhibit 6 to the Gentile Jr. Declaration establishes that any addition of Team Dream was not as lessee or "Master Tenant," but rather was specifically limited to its role as manager for ADR with respect to the joint venture ***entities.*** Thus, any insurance coverage was limited to Team Dream's role with the Plaintiffs' joint venture partner entities and ***not any occupancy*** of any property.

10.     For the avoidance of doubt, Gentile, Jr.'s assertion at paragraph 36 that Mr. Supor was well aware that Team Dream is the Master Tenant at the JS Realty Property is false.  Mr. Supor had ***zero*** awareness of the purported TD Lease.

11.     Plaintiffs fail to see the relevance as to whether the parties presently residing at the JS Realty Property are NY state residents with "multiple residences of luxury" as asserted in paragraph 37 of the Gentile Jr. Declaration. If that is the case, those parties are not availing themselves of their luxurious alternative accommodations, choosing instead to maintain an unlawful residential occupancy in an industrial building in Harrison, NJ. Notably, Defendants do not deny that any residential occupancy of the JS Realty Property is contrary to the zoning laws of the Town of Harrison.

## LEGAL ARGUMENT

### A.    Plaintiffs have Satisfied the Standards for Injunctive Relief

Plaintiffs rely upon the arguments set forth in their Memorandum of Law filed in support of the Order to Show Cause (ECF No.2-1). Plaintiffs submit that arguments advanced in that initial

filing demonstrate Plaintiffs entitlement to the requested emergent relief and that Defendants have not effectively countered any of those arguments.

Defendants' "arguments" relative to the injunctive standards are not arguments at all and do not provide any basis to deny Plaintiffs' Application. In fact, Defendants do not cite any case law in their "arguments" relative to the injunctive standards. Rather most of the Defendants Opposition is composed of unsupported conclusions and misstatements of fact that are consistently misapplied to the facts of this case.

For instance, Defendants assert that Plaintiffs cannot satisfy the injunctive standard because they submit that 401 Supor Blvd Owner is the record title owner of the JS Realty Property. Defendants offer no argument or case law to connect these two concepts. They merely assert same in a vacuum and hope the Court will accept it as true.

Defendants further submit that Team Dream has a lawful lease for the JS Realty Property, which further militates against emergent relief. Defendants do not suggest how or why this is true, but that omission is merely window dressing for the essential reality that *there is no lawful lease.* Indeed, Defendants repeatedly insist that 401 Supor Blvd Owner is the lawful owner of the JS Realty Property but do not establish or even suggest that it has a lease or authorization for occupancy from that lawful owner.

Plaintiffs submit that the Purported TD Lease is a sham. Even if it was not, however, to the extent that Defendants submit that the JS Realty Property is owned by 401 Supor Blvd Owner, they cannot have a right to occupancy unless they have agreement with that entity. There is no such agreement.  There is no right to occupancy.

(i)      *Plaintiffs are Likely to Succeed on their Ultimate Claims*

(a)  *Turnover of Possession of the JS Realty Property*

There is no question that the JS Realty Property is property of the JS Realty bankruptcy

estate.  Pursuant to 11 U.S.C. §541:

> (a)      The commencement of a case under section 301, 302, or 303 of this title creates
> an estate. Such estate is comprised of all the following property, wherever located
> and by whomever held:
>
> > (1)  Except as provided in subsections (b) and (c)(2) of this section, all legal or
> > equitable interests of the debtor in property as of the commencement of the
> > case.

Congress intended Section 541 to be inclusive and broad. *In re WDH Howell LLC*  294

B.R. 613, 615  Bankr. D. N,J 2003, citing *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct.

2309, 76 L.Ed.2d 515 (1983). Debtor JS Realty specifically listed an equitable interest in the JS

Realty Property on its Schedule A which was filed on April 29, 2024 under penalty of perjury.

(Case No. 24 – 13434 ECF No. 14).

Prior to January 2024, JS Realty was the record title owner of the JS Realty Property. On

January 25, 2024, 401 Supor Blvd Owner LLC – an affiliate of the Lender, recorded a DILF for

the JS Realty Property.  Upon learning of the recording of the DILF, JS Realty indicated to Lender

that it was likely to file for bankruptcy protection and challenge the recording of the DILFs as

fraudulent transfers. The parties thereafter engaged in negotiations that culminated in a

Restructuring Support Agreement ("RSA") that was filed as Exhibit A to the First Day Declaration

of Joseph Supor, III (Case No 24-13427 ECF No. 2).  In the RSA, the Lender acknowledged the

Debtors' avoidance claims and entered into an agreement whereby the Debtor would remain in

possession and control of the JS Realty Property and that the Debtor would be permitted to sell the

JS Realty Property pursuant to a Court approved Sale Process. Lender and Debtor agreed that title

to the DILF Properties shall be transferred back into the name of the applicable Debtor in order to facilitate a third-party sale.

Since the filing of the JS Realty Bankruptcy case, the JS Realty Property has been treated and administered as property of the JS Realty Bankruptcy estate, as conceded and agreed by Lender and validated by the Court. On April 30, 2024, the Court entered a Final Order approving the Debtors' use of Cash Collateral (the "Cash Collateral Order") (Case No 24-13427 ECF No. 82) which Order incorporated rental income attributable to the JS Realty Property as property of the JS Realty bankruptcy estate and cash collateral of Lender. *See* Cash Collateral Order at Exhibit A. Since that time, the Debtor has been operating the JS Realty Property, collecting rent from all legitimate tenants, and paying expenses attributable to the property. In other words, consistently exercising all rights and obligations attendant to ownership.

The Debtor also obtained a court Order approving the retention of CBRE Inc. to facilitate a court the Sale Process **on behalf of the Debtor.** The Debtor also filed a motion to approve bidding and sale procedures and, on April 29, 2024, obtained a Court Order approving Bidding and Sale Procedures (Case No 24-13427 ECF No 80) which *inter alia*, authorized **the Debtor** to sell the JS Realty Property. The Debtor has also filed a proposed plan of reorganization (Case No 24-13427 ECF No 91) that authorizes it to pursue an exit transaction resulting in the sale of the JS Realty Property or, in the event Lender's claims are otherwise satisfied, revesting title to the JS Realty Property in JS Realty.

These arguments apply with equal force to the OA Deeded Properties subject to the Contributed Deeds, which properties, to the extent possessed by Debtors, are likewise property of the respective bankruptcy estates. And while the foregoing is plainly sufficient to establish that each of the Debtors has a property interest in its respective real property subject to the Contributed

Deeds, there is now even further support for this proposition. Specifically, on May 13, 2024, Lender filed the Affidavit of Shoshana Carmel in Support of Plaintiffs Order to Show Cause (the "Lender Affidavit") (ECF No. 21). In that Affidavit, Lender specifically avers:

- The Lenders reaffirm and support the Debtors' present rights to possess and control the Debtor Properties as set forth in the Final Order Authorizing Directing Use of Cash Collateral [ECF No. 82] (the "Cash Collateral Order"), entered by this Court on or about April 30, 2024. (Lender Affidavit at paragraph 26).

- The Lenders reaffirm and support the process set forth in Combined Disclosure Statement and Plan of Reorganization and/or Liquidation for Debtors [ECF No. 91] (the "Plan"), including as to the Debtor's control over the Properties and the remittance of the DILFs (Lender Affidavit at paragraph 27).

- Pursuant to the agreements between the Lenders and the Debtors, among other parties, the Lenders specifically consent and agree that Debtor JS Realty has a property interest subject to the DILF recorded by 401 Supor Blvd Owner LLC and that Debtor JS Realty is vested with possessory and managerial authority over the JS Realty Property (Lender Affidavit at paragraph 31).

All of these things, conclusively establish that the JS Realty Property is property of the JS Realty bankruptcy estate and the properties subject to the Contributed Deeds are property of the bankruptcy estates of the applicable Debtors. Notably, Defendants' Opposition does not refute any of these facts.

Inasmuch as the JS Realty Property is property of the JS Realty Bankruptcy estate, in order to maintain an action for turnover under section 542, JS Realty must establish that: "(1) the property is in the possession, custody or control of another entity; (2) the property can be used in accordance with the provisions of section 363; and (3) the property has more than inconsequential value to the debtor's estate." *Zazzali v. Minert*, 468 B.R. 663, 669 (Bankr. D. Del. 2011).

Debtor JS Realty easily satisfies all the above standards. It is undeniable that a portion of the JS Realty Property is in possession of and control of another entity – whether that entity is

called ADR or Team Dream asDefendants admit being in possession, albeit under the Purported

TD Lease. Defendants likewise have exercised control over same in, among other ways, preventing

access to a third party to allow that party to retrieve its personal property. Moreover, the JS Realty

Property can certainly be used pursuant to Section 363. Indeed, it is the subject of a Section 363

Sale Process that has already been approved by the Court. Finally, the JS Realty Property has more

than inconsequential value to the estate as the scheduled value of the Debtor's interest in the

property is in excess of $18 million. *See* Case No. 24-13434 (ECF No. 14).

As noted in Plaintiffs' Application, "likelihood of success" does not necessarily mean a

standard of "more likely than not" but rather that the plaintiff "can win on the merits (which

requires a showing of significantly better than negligible…." *Reilly v. City of Harrisburg,* 858 F.3d

173, 179 (3d Cir. 2017). Here, Debtor JS Realty submits that not only are its chances of success

"better than neglible," it has already conclusively established each element required for turnover

under §542. Additionally, Defendants have not advanced any valid argument contesting JS

Realty's right to compel the turnover of estate property.

Defendants continue to proffer the sham Purported TD Lease as a reason why Debtor will

not succeed on the merits. No matter how many times the Defendants say they have a valid lease

it does not make it so. No amount of repetition will change the fact that Purported TD Lease is a

self-interested nullity where a party with no entitlement to occupy a property, leases that property

to itself wearing another hat, with no obligation to pay rent.

Debtor therefore submits that it has demonstrated a likelihood of success on the merits

sufficient to justify the requested emergent relief. Accordingly, that relief should be granted, and

Defendants should be compelled to turnover possession of the JS Realty Property as same is

property of the bankruptcy estate.

(b)      The Avoidance of the Contributed Deeds and the Operating Agreements

Defendants seem to suggest that the DILF recorded by 401 Supor Blvd Owner defeats Plaintiffs' claims to avoid the alleged fraudulent transfers to Defendants. This argument is not logical and not valid. Any transfer of the JS Realty Property by way of DILF has nothing to do with the transactions between Plaintiffs and Defendants.

Additionally, Defendants fail to appreciate the reality that the Contributed Deed and unlawful occupancy of the JS Realty Property is only one part of Plaintiffs request for emergent relief. Plaintiffs also seek relief to enjoin any disposition of all Contributed Deeds and the underlying properties. Defendants do not address the likelihood of success concept as to the emergent relief requested regarding the other Contributed Deeds, particularly that any conveyance purportedly effectuated by the Contributed Deeds is avoidable as a fraudulent transfer. Because Defendants do not address the likelihood of success on the merits as to such claims, Plaintiffs submit that Defendants have essentially conceded Plaintiff's likelihood of success.

Additionally, to the extent Defendants assert the DILFs as an impediment to the relief sought this argument fails as Plaintiffs have resolved their issues with Lender regarding the DILF transfers. As noted above, the Debtors alleged potential avoidance claims regarding the DILFs and the parties came to a resolution of those claims as set forth in the RSA, and as further validated in the Cash Collateral Order, the Bidding and Sale Procedures Order and proposed plan of reorganization. Pertinently, part of that resolution was (i) a conditional settlement of the potential avoidance claims (*See* RSA at WHEREAS clauses 4 and 5; Cash Collateral Order at ¶E,; (ii) an acknowledgement by Lender that the Debtor/Plaintiffs have property rights to, and possession of, the OA Deeded Properties (*See* RSA at section 3 (a)); and (iii) Lender's consent to a Sale Process

16

that will involve re-conveyance of the OA Deeded Properties to the Debtors to effectuate transfers to third party purchasers. *See* RSA at section 10.

Additionally, in addition to validating the property rights of the respective Debtors in the subject properties, the Lender Affidavit also professes Lenders full and unqualified support for the Sale Process being undertaken by the Debtors (Lender Affidavit at para. 25) and specifically authorizes, and to the extent necessary, empowers Debtor JS Realty to eject Defendants from occupancy of the JS Realty Property and otherwise recover possession of same as property of the JS Realty bankruptcy estate.  (Lender Affidavit at paras.32, 34 & 35).

While the Plaintiffs are pleased that they have resolved these issues with Lender and enjoy Lender's support, neither those issues nor the resolution thereof have anything to do with the validity of the transactions between Defendants and Plaintiffs. Plaintiffs assert that those transactions are avoidable for a variety of reasons.

In the first instance, Plaintiffs dispute that there was any actual transfer of the OA Deeded Properties. Any transfer of a real property interest by deed is effective and complete ***only*** "upon execution and delivery of the deed by the grantor, and acceptance of the deed by the grantee." *H.K. v. State, Dept. of Human Services, Div. of Medical, 184 N.J. 367, 382 (2005)*. Stated otherwise, a deed transfers a property interest "upon delivery." *Id.*, quoting *Tobar Constr. Co. v. R.C.P. Assocs.,* 293 *N.J.Super.* 409, 413, 680 *A.*2d 1121 (App.Div.1996). the critical distinction, however, is that "[w]hether delivery and acceptance have taken place ... is a matter of intention." *Dautel Builders v. Borough of Franklin,* 11 *N.J. Tax* 353, 357 (1990). "If there is physical delivery without the requisite intent that the deed be presently effective as a conveyance of the grantor's title, there is, in legal contemplation, no delivery." *H.K. v. State, Dept. of Human Services, Div. of Medical, 184 N.J. 367, 382 (2005)*, quoting Dautel Builders at 11 N.J.Tax 357.)

17

Here, the evidence will plainly demonstrate that the Debtor/Plaintiffs did not intend to transfer over $100 million worth of property for no consideration. That is, the evidence will establish that (i) Debtor/Plaintiffs (and Defendants) were aware of the outstanding DILFs and knew they could not effectuate a contemporaneous transfer; (ii) the stated consideration on each of the Contributed Deeds was $0; (iii) the Contributed Deeds were not given to ADR but rather were given to a representative of a Title Company with the understanding that they be held; and (iv) the Debtor/Plaintiffs specific understanding at the time is that the transfers would be effective in connection with a successful refinancing and not before. Because there was no intent to convey, there was no effective "delivery" of the Contributed Deeds. Therefore, there were no actual conveyances.

Plaintiffs submit that they have a substantially "more than negligible" chance of convincing the fact-finder that it did not intend to transfer over $100 million in real property in exchange for $0 and unperformed future promises.

Additionally, Plaintiffs submit that even if the Contributed Deeds manifested actual transfers, same would be avoidable as fraudulent transfers under the Bankruptcy Code and applicable state law. As set forth in Plaintiffs Application, Plaintiffs did not receive reasonably equivalent value, or even any value, in exchange for the purported transfers. Again, Defendants Opposition does not address the merits of Plaintiffs' claims in this regard - at all. There is no proof, or mention, of any actual value provided by Defendants to Plaintiffs. Indeed, to this day, Defendants cannot point to any actual deliverable provided by them to Plaintiffs.

Contrary to the position asserted in Defendants' Opposition, the existence or non-existence of the Purported TD Lease does not change the analysis of whether the Contributed Deeds or Operating Agreements were supported by adequate consideration and value. That being the case,

there is no question that Plaintiffs received less that reasonably equivalent value in exchange for any transfer(s). Also, because the purported transfers were of substantially all of the applicable Plaintiffs' assets with nothing but debt left behind - particularly the Madison Indebtedness - there is likewise no question that the Plaintiffs were, or became insolvent at the time of the purported transfers.

Accordingly, Plaintiffs submit that they have a significantly better than negligible likelihood of success to avoid the Contributed Deeds by way of their fraudulent transfer claims or otherwise.

Additionally, the Operating Agreements drafted by Defendants are hopelessly ambiguous and, according to Defendants, operated to immediately grant Defendants an interest in a real estate portfolio worth hundreds of millions of dollars, without requiring Defendants to pay anything or provide any actual contemporaneous value. As set forth in the Verified Complaint, a contract with those terms is avoidable as unconscionable under the Uniform Commercial Code as enacted in the state of New Jersey. Defendants' Opposition does address Plaintiffs' claims in this regard.

Further to the point of ambiguity, Plaintiffs submit that the ambiguity and internal conflicts embodied in the Operating Agreements are fatal to these agreements … to the extent that they still exist.  That is, Plaintiffs terminated all Operating Agreements by way of two separate letters dated February 15, 2024, and March 22, 2024. As far as the Plaintiffs are concerned, the Operating Agreements are terminated.  To the extent the Court disagrees, or finds that the agreements have some lingering existence, Plaintiffs submit that the ambiguities therein render same unenforceable and avoidable.

At the hearing, Plaintiffs will introduce evidence regarding the ambiguities in the Operating Agreements. Much of this evidence necessarily will be admissible parol evidence. Applying New York law as set forth in the Operating Agreements, where an "agreement's terms may be ambiguous, indefinite or uncertain, it is well settled that extrinsic or parol evidence is admissible to determine their meaning. '[W]here words used in a written contract are susceptible of more than one interpretation, the courts will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties and the subject matter of the instrument and parol evidence may be admissible to clear up any ambiguity in the language employed. Such oral evidence does not vary the terms of the written instrument.'" *Korff v. Corbett*, 18 A.D.3d 248, 251, 794 N.Y.S.2d 374, 377 (2005).

Here, the Operating Agreement contracts are meandering, circular and some instances, nonsensical. They suggest an ultimate transaction where ADR was supposed to deliver a refinancing transaction and, in exchange for that deliverable, would receive an ownership interest in several real estate owning entities. The idea that ADR would receive the benefit of an actual contemporaneous transfer of real properties before providing any value is not only patently unreasonable, it is not at all clear from the poorly drafted Operating Agreements. "If the language of the. . . contract is ambiguous. . . the parties may submit extrinsic evidence as an aid in construction . . . and any ambiguity must be construed against the … drafter." *Essex Ins. Co. v. Laruccia Const., Inc.*, 71 A.D.3d 818, 819, 898 N.Y.S.2d 558, 559 (2010) (internal citations omitted); ("It is basic that a contract's terms are interpreted against the drafter." *1152 First Ave., LLC v. MNY Holdings Assocs., LLC*, 4 Misc. 3d 925, 929, 782 N.Y.S.2d 512, 515 (Civ. Ct. 2003), aff'd, 5 Misc. 3d 131(A), 798 N.Y.S.2d 714 (App. Term 2004)). Here, the Operating Agreements

were drafted by or on behalf of Defendant ADR alone.  As such, under applicable law, the myriad

ambiguities inherent therein must be construed against ADR.

Moreover, the best evidence of the intent of parties to a contract is their conduct **after** the

contract is formed." *Casolaro v. Armstrong*, No. 10-CV-4276 PKC, 2014 WL 7370025, at \*7

(E.D.N.Y. Dec. 29, 2014), *aff'd*, 639 F. App'x 680 (2d Cir. 2016) (quoting *Waverly Corp. v. City of

New York*, 48 A.D.3d 261, 265 (1st Dep't 2008)) (emphasis in original); *see also T.L.C. W., LLC v.

Fashion Outlets of Niagara, LLC*, 60 A.D.3d 1422, 1424-25 (4th Dep't 2009). Here, when the

Court reviews what happened after the Operating Agreements were signed, it is clear that Plaintiffs

continued to act with all indicia of ownership as to the OA Deeded Properties. They collected all

the rent from tenants. They paid all the bills. Nothing changed and Defendants assumed no

responsibility or role in the management or operations of any of the Properties.

In light of the foregoing, Plaintiffs submit that they have a better than negligible chance to

establish that, to the extent the Court doesn't find that the Operating Agreements have already been

lawfully terminated, those agreements should be avoided as fraudulent transfers or otherwise

terminated as unconscionable.

> *(ii)*    *Plaintiffs are Likely to Suffer Irreparable Harm if Emergent Relief is not Granted*

Defendants continued possession of the Contributed Deeds imperils the sale process and

threatens the Debtors' lawful efforts to attempt to reorganize in chapter 11. The ADR Parties

continued hijacking of a portion of the JS Realty Property likewise imperils that Debtor's efforts

to sell the JS Realty Property and jeopardizes its legitimate reorganization efforts.  Plaintiffs are

likely to continue to suffer irreparable harm absent injunctive relief.

In Defendants' Opposition, they blithely claim: "Plaintiffs face no irreparable

harm." Defendants' Opposition at p 14.  Defendants then spend the balance of their Opposition

Case 24-01174-SLM    Doc 22    Filed 05/13/24    Entered 05/13/24 21:53:44    Desc Main
Document    Page 22 of 28

on this point arguing, without support of any caselaw, that " . . . any non-compliance with laws or regulations can be addressed through legal means, and the potential impact on the sale process can be mitigated through the appropriate legal action." Defendants' Opposition at p 15. Defendants' word-salad position is without legal support and flies in the face of compelling authority.

Defendants' position completely ignores the arguments presented in Plaintiffs' Application regarding irreparable harm. As noted in Plaintiffs' Application, damages to real property are generally unique, and that injuries to real property interests frequently warrant equitable relief. *See K-Mart v. Oriental Plaza Inc.,* 875 F.2d 907, 915-16 (1st Cir.1989) ("Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor."); *J.C. Penney Co. v. Giant Eagle, Inc.,* 813 F.Supp. 360, 369 (W.D.Pa.1992) ("damage to interests in real estate are generally viewed as unique"), *aff'd,* 955 F.2d 217 (3d Cir.1993). Plaintiffs' demonstration of irreparable harm to the OA Deeded Properties is set forth in pages 10-12 of Plaintiffs' Application and is not seriously challenged by Defendants.

If Plaintiffs are not granted emergent relief and Defendants specious and fraudulent claims are allowed to contaminate the Sale Process, bidding will be chilled, value will be depressed, and the properties may be lost. The course of action suggested by Defendants will take time that the Debtors and their creditors do not have. The parties here are on a clock. Interest is accruing at a rapid rate, eroding equity every day. The Lender's patience is not limitless as to a loan that has been in default for over a year. The sale process is pegged to an aggressive schedule for valid reasons and that schedule needs to be maintained. If the Defendants believe they have been aggrieved, they can always attempt to establish such claim and assert same against the proceeds from the sale of the Debtor Properties. Without the emergent relief to removing the Contributed Deeds as an obstacle to the sale process, however, there may well be no sale proceeds.

The sale process will be compromised, and the Debtor Properties may be irretrievably lost, thereby causing irreparable damage.

Defendants also fail to address Debtor/Plaintiffs arguments, including JS Realty, regarding irreparable harm to their likely reorganization efforts absent the requested injunctive relief.  Courts considering the propriety of an injunction under Section 105(a) typically apply the traditional four-pronged test for injunctions. See, e.g., *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Circuit 1986). The four elements, as tailored to a bankruptcy case, are: (i) the debtor's reasonable likelihood of a successful reorganization; (ii)  the imminent risk of irreparable harm to the debtor's estate in the absence of an injunction; (iii) the balance of harms between the debtor and its creditors; and (iv) whether the public interest weighs in favor of an injunction. *Unsecured Creditors' Comm. v. DeLorean*, 755 F.2d 1223, 1228 (6th Cir. 1985); *Solidus Networks, Inc. v. Excel Innovations, Inc.*, 502 F.3d 1086, 1095–1100 (9th Cir. 2007). Plaintiffs' Application shows that Debtor/Plaintiffs', including JS Realty, meet the standard.

**Debtor/Plaintiffs are Entitled to the Protections of the Automatic Stay**

In terms of the automatic stay, Defendants again limit their argument to the JS Realty Property and again assert merely that the asserted record owner of the property is 401 Supor Blvd Owner and the automatic stay therefore does not apply. This position ignores the established property interest of the JS Realty Debtor in the JS Realty Property as recognized by Lender and the Court.

Additionally, by focusing solely on the JS Realty Property, Defendants fail to appreciate or address that the Plaintiffs' request for emergent relief involves more than just the JS Realty Property, but also seeks relief regarding the Contributed Deeds as to all other OA Deeded Properties. The property interests in these other properties has likewise been recognized and

acknowledged by Lender and the Court and those property interests are undeniably property of the respective Debtor bankruptcy estates. Accordingly, the automatic stay, by definition, applies to these interests.

The automatic stay applicable to these property interests prevents Defendants from taking any action with respect to the Contributed Deeds and/or the underlying properties. Defendants offer no argument to the contrary. Accordingly, the Court should enter an order confirming that the automatic stay prevents Defendants from taking any action as to any Contributed Deeds and any Debtor Property, as same are all property of the respective bankruptcy estates.

**Plaintiffs are Entitled to Eject Defendants from the JS Realty Property**

Defendants have opposed Plaintiffs attempts to remove them from occupancy of the JS Realty Property and the idea that Debtor JS Realty cannot eject Defendants because they assert that the record owner of the property is 401 Supor Blvd Owner.

Defendants' oppose Plaintiffs' ejectment claims by focusing on the sham Purported TD Lease and claiming that that Plaintiffs lack standing due to Defendants assertion that 401 Supor Blvd Owner is the record owner of the JS Realty Property. As Plaintiffs have stated repeatedly, Defendants are ignoring the undeniable, acknowledged and repeatedly validated property interest of JS Realty. Defendants also completely ignore the primary theory of relief advanced by Plaintiffs for dispossessing Defendants; namely the turnover of property the estate pursuant to 11 U.S.C. §542.

IN terms of ejectment, Defendants curiously proceed to cite New York law setting forth the proposition that an ejecting party need not be an owner but need only have a superior right to possession. Suffice to say that, as compared to the sham Purported TD Lease where Defendants attempt to lease property – that they do not own - to itself for no rent, JS Realty's acknowledged

24

and recognized property interest together with the specific establishment of its continuing rights to possess and manage the property manifest a superior right to possession. This is especially true when the Court considers that the Purported TD Lease was kept secret until just a week ago and where any arguable connection Defendants have to the JS Realty Property is overwhelmingly likely to be avoided as a fraudulent conveyance.

In terms of New Jersey law on ejectment, an action for ejectment is typically "brought by one out of possession of land against one who either is in possession thereof or who makes claim thereto, if the land be vacant." *Funkhouser v. City of Newark*, 182 F.Supp. 15, 17 (D.N.J. 1960) (citing Toth v. Bigelow, 1 N.J. 399, 406 (1949)). New Jersey affords a statutory remedy under N.J.S.A. 2A:35-1, entitling "[a]ny person claiming the right of possession of real property in the possession of another, or claiming title to such real property ... to have his rights determined in an action in the Superior Court." *PennyMac Holdings, LLC v. Barbour Ests., LLC*, No. A-1815-21, 2023 WL 3991745, at *5 (N.J. Super. Ct. App. Div. June 9, 2023).  Notably, the *Pennymac* holding case recognize the rights of a party claiming a right of possession ***or*** a claim of title.  This is written in the disjunctive.  Hence, a claimed right to possession is a sufficient basis for an ejectment claim. Here, JS Realty has asserted a property interest in and a right to possession to the JS Realty Property, as agreed and acknowledged by the very party Defendants claim to be the lawful owner. Thus, there is no question that JS Realty has standing to pursue an ejectment claim.

Defendants also make the farcical argument that removing ADR from occupancy at the JS Realty Property will somehow negatively impact other legitimate tenants of the property. Defendants offer no explanation for this position. Defendants also fail to appreciate the irony that they have recognized these third-party leases as "legitimate" when those parties' leases are with JS Realty and those parties pay rent to JS Realty. Regardless of whether Defendants are removed,

there is no reason why those tenants would not continue in their uninterrupted quiet enjoyment of the JS Realty Property and continue paying their rent to JS Realty as they did before Defendants established their encampment. Suffice it to say, there is nothing in the record to suggest that removal of non-paying squatters without a legal right to occupy the premises would have any impact whatsoever on the other lawful, paying tenants.

**Team Dream Is Not a Necessary Party**

Defendants' Opposition concludes with two brief points asserting that Defendants are entitled to continued lawful occupancy, and that Team Dream is a necessary and indispensable party to be added in these proceedings. Neither one of these arguments is valid.

With apologies for redundancy, there is absolutely nothing lawful about Defendants' occupancy pursuant to the Purported TD "Lease." Defendants make the tone-deaf assertion that "the partnership agreement between ADR and the Supor family businesses, spearheaded by Joseph Gentile, Jr., stands as a testament to legitimacy and lawful nature of ADR's occupancy." *See* Defendants' Opposition at p. 12. Plaintiffs will take this opportunity to remind Defendants that there are no partnership agreements as same were terminated months ago because ADR completely failed to perform and provided no value to Plaintiffs.

Under Rules 19(a) and 7019(a), a party is necessary if "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R.Civ.P. 19(a). If a necessary party has not been joined, then the Court can order that the necessary party

be made a party to the lawsuit. *Id.* However, if a necessary party cannot be made a party, the Court "shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed. R.Civ.P. 19(b); Fed. R. Bankr. P. 7019(b). "The purpose of joinder rules is to promote both the public and judicial interest in trial convenience, expeditious settlement of controversies, and prevent duplicative as well as inconsistent judgments." *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2013 WL 6048836, at *50 (Bankr. D.N.J. Nov. 8, 2013).

A party is "indispensable" under Rules 19(b) and 7019(b) if "a judgment rendered in the person's absence might be prejudicial to the person or those already parties;" "protective provisions in the judgment, by the shaping of relief or other measures, ... can [not] ... lessen [] or avoid[]" the prejudice; "a judgment rendered in the person's absence will [not] be adequate"; and "the plaintiff will have an adequate remedy if the action is dismissed for non-joinder." *See Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 725 (2d Cir.), *cert. denied,* 531 U.S. 1051 (2000).

Here, Team Dream is clearly **not** a necessary party because, in its absence, complete relief can be accorded among the parties.

## CONCLUSION

The Court should grant Plaintiffs' application for emergent relief pursuant to the Order to SHOW Cause and enter an order: (i) enjoining  Defendants from any further transfer, assignment, encumbrance, recording, hypothecation or other disposition of any of the Contributed Deeds and/or underlying OA Deeded Properties, (ii) declaring that the automatic stay of 11 U.S.C. § 362 is in effect as to the interests of all Debtor Plaintiffs as to the OA Deeded Properties; (iii) requiring the turnover and/or accounting for all Contributed Deeds; and (iv) requiring turnover of possession

of the JS Realty Property and otherwise ejecting and removing ADR and/or any other Defendant(s)

or party(ies) from use, possession and/or occupancy of the JS Realty Property.

Respectfully submitted,

K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel M. Eliades, Esq. (DME-6203)
David S. Catuogno, Esq (DSC-1397)
Caitlin C. Conklin, Esq. (CCC-5117)
*Attorneys for Plaintiffs*

By: /s/ David S. Catuogno
    David S. Catuogno

Dated:  May 13, 2024