UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel M. Eliades, Esq. (DME-6203)
David S. Catuogno, Esq (DSC-1397)
Caitlin C. Conklin, Esq. (CCC-5117)
*Special Counsel for the Debtors and Counsel for non-Debtor Plaintiffs*

| | |
|---|---|
| In re:<br><br>Supor Properties Enterprises LLC, *et al.*[1],<br><br>Debtors. | Case No. 24-13427 (SLM)<br>Judge: Stacey L. Meisel<br>Chapter 11<br>(Jointly Administered) |
| Supor Properties Enterprises LLC: J Supor 136-1 Realty LLC; Supor-172 Realty LLC; Supor Properties 600 Urban Renewal, LLC; JS Realty Properties, LLC; Supor Family LLC; Supor Properties-400 Limited Liability Company; and the Marital Trust under the Last Will and Testament of Joseph Supor, Jr.,<br><br>Plaintiffs,<br><br>v.<br><br>American Dream Resorts, Ltd., RDA1: Supor Properties Enterprises LLC; RDA 2&3: Supor Properties Enterprises LLC; RDA 4: J Supor 136-1Realty LLC; RDA 5: Supor 172 Realty LLC; RDA 6: Supor Properties 600 Urban Renewal, LLC; Supor Studio City 2 LLC, Supor Studio City 3 LLC; Supor Studio City 4 LLC and Supor MT, LLC<br><br>Defendants. | Adv. Pro. 24-01174 (SLM)<br>Hearing Date: May 20, 2024<br>Hearing Time: 10:00 a.m. |

---

[1] The Debtors in these related chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Supor Properties Enterprises LLC (5580); J Supor 136-1 Realty LLC (3205); Supor-172 Realty LLC (EIN No. 5662); Supor Properties Breiderhoft LLC (7258); Supor Properties Devon LLC (6357); Shore Properties Associates North LLC (6707); Supor Properties 600 Urban Renewal, LLC (8604); JS Realty Properties, LLC (2497); and Supor Properties Harrison Avenue, LLC (1728).

**DECLARATION OF JOSEPH SUPOR III IN FURTHER SUPPORT OF ORDER TO SHOW CAUSE**

I, Joseph Supor III, of full age, hereby certifies and declares pursuant to Title 28 of the United States Code, Section 1746, as follows:

1.      I make this Declaration (i) in reply to *Defendants' Memorandum of Law in Opposition to Plaintiffs' Application by Order to Show Cause for Preliminary Injunction and Turnover of Estate Property* (ECF No. 16) (the "Defendants' Opposition"); and (ii) in further support of Plaintiffs' Application for Preliminary Injunction and Turnover of Estate Property (ECF No. 2) (the "Plaintiffs' Application").[2]

2.      I make this Declaration based on my personal knowledge, a review of records of the Plaintiffs and of other entities that I own and/or control that are referenced herein, a review of documents publicly filed, and information available through employees and/or representatives of the Plaintiffs and/or my personal representatives.

**A.      The Declaration of Joseph Gentile Jr.**

3.      I reviewed the Declaration of Joseph Gentile Jr. ("Gentile Jr.") filed with the Defendants' Opposition (ECF No. 16-1) (the "Gentile Jr. Declaration"). I believe that many of the statements contained the Gentile Jr. Declaration are false or misleading.  For instance:

(i)      I believe that paragraphs 6 and 7 of the Gentile Jr. Declaration are false. My mother did not contact Gentile Jr. in or around December 2022.  Gentile Jr. never met my mother. The alleged meeting never occurred.

(ii)      Gentile Jr.'s statement that: *"Members of my family have known the Supor family since at least 1985"* (Gentile Jr. Declaration at ¶5) is, at best, overstated by decades. I did not

_____

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Verified Complaint and/or Plaintiffs' Application.

meet Gentile Jr. or Gentile Sr. until around April of 2023. I was introduced to Joseph Gentile Sr.

("Gentile Sr.") by two (2) business acquaintances around April of 2023. I am not aware that any

member of my family knew any member of the Gentile family prior to April of 2023.

(iii)    Gentile Jr. claims that the Operating Agreements were finalized on May 16, 2023.

Gentile Jr. Declaration at ¶9. Gentile Jr. also claims that: *"Prior to signing the agreements, I

was not shown a copy of the forbearance agreement and the terms of what it contained . . . "*

Gentile Jr. Declaration at ¶15.[3] Gentile Jr. goes on to claim that: *"On or about **September 13,

2023**, I finally received a copy of the forbearance agreement that Supor III had signed to the

loan at issue."* Gentile Jr. Declaration at ¶26 (emphasis added). That statement is false. Gentile

Jr. received the Forbearance Agreement by e-mail dated **May 25, 2023**. A true copy of the e-

mail dated May 25, 2023, and the fully executed Forbearance Agreement attached to that e-mail,

are attached at **Exhibit "A"** hereto. There is no question that Gentile Jr. received the

Forbearance Agreement nearly four (4) months <u>before</u> he swore that he received it in the Gentile

Jr. Declaration.

In addition, Gentile Jr. states: *"The copy of the forbearance agreement I received is

attached hereto and made a part hereof as Exhibit 3."* Gentile Jr. Declaration at ¶26. However,

Exhibit 3 to the Gentile Jr. Declaration is <u>not</u> the Forbearance Agreement dated April 12. 2023.

Exhibit 3 to the Gentile Jr. Declaration is a Term Sheet dated February 8, 2023. See Gentile Jr.

Declaration at Exhibit 3. The Term Sheet led to the execution of the Forbearance Agreement

some two (2) months later. The Term Sheet preceded the execution of the Operating Agreements

---

[3] As noted in the Verified Complaint, many of the Debtor Properties are the subject of Deeds in
Lieu of Foreclosure (collectively, the "<u>DILFs</u>") recorded by 1000 Frank E Rodgers 1 LLC
("<u>Lender</u>") or its nominee(s) pursuant to a Forbearance Agreement and DILF Agreement between,
among others, Lender and Debtors dated April 12, 2023 (the "<u>Forbearance Agreement</u>").

by more than (3) months. The Term Sheet produced by Gentile Jr. contains the following

provision:

> 3.    Each Mortgage Borrower shall deliver, in escrow, a deed in lieu of
> foreclosure (or other type of deed required by Senior Lender) for its respective
> Property (collectively, the "Deeds") to Senior Lender or an entity(s) designated by
> Senior Lender (the "Conveyance"), all other customary conveyance documents, and
> all documents required by a title insurance company to insure the Conveyance
> (collectively, the "Conveyance Documents"). The Conveyance Documents shall be
> in blank with respect to the grantee, with a power of attorney, coupled with an
> interest, granted to Senior Lender by Borrower to populate the grantee. Upon any
> breach or default under the terms of the Workout Documentation, including without
> limitation, failure to repay the Loan in full by the Forbearance Termination Date
> (or any extension thereof), Senior Lender shall be permitted to release the Deeds
> (to any of the Properties or all of the Properties, in Senior Lender's sole discretion)
> from escrow and cause the same to be recorded in the applicable recording office
> at date no earlier than sixty (60) days from the date of the breach or default under
> the Workout Documentation. In the event the Deeds are released from escrow, it is
> hereby agreed that Borrower and Guarantor shall be responsible for all closing costs
> in connection with the recording of the Deeds, including, but not limited to state
> and city transfer taxes.

Gentile Jr. Declaration at Exhibit 3, ¶3.

The Term Sheet dated February 8, 2023 lays the ground work for the deeds in lieu of

foreclosure provided by Plaintiffs to Lender in April of 2023.

(iv)    Gentile Jr. claims that: *"As the Court can see, the forbearance agreement I

received did not contain the deeds in lieu that were signed by Supor III to the lender."* Gentile

Jr. Declaration at ¶26. The Forbearance Agreement includes nearly twenty (20) references to the

"DIL Agreement", "DIL Documents" or the Lender DILFs. Gentile Jr. goes on to claim that:

*"In fact, I did not receive the terms and the information contained within the deeds in lieu until

in or around December 2023."* Gentile Jr. Declaration at ¶28. As demonstrated by Exhibit "A",

Gentile Jr. received the Forbearance Agreement, containing numerous references to the Lender

DILFs, DIL Documents and the DIL Agreement, on May 25, 2023.

(v)      Gentile Jr. claims that: *"I then engaged with multiple brokers to work with me to get financing from lenders."* Gentile Jr. Declaration at ¶19. This alleged effort to obtain financing was presumably to satisfy ADR's obligations under the Operating Agreements. When this alleged effort began is not described in the Gentile Jr. Declaration. From the context of ¶18 of the Gentile Jr. Declaration, it appears that his efforts to "obtain financing" began after July of 2023, long after the Operating Agreements were entered. Nevertheless, despite many requests from me and my representatives, neither ADR, Gentile Sr., nor Gentile Jr. provided me with any documents evidencing their efforts to obtain financing. Neither ADR, Gentile Sr., nor Gentile Jr. provided any documentation reflecting that they had procured any commitment for the funding required from ADR under the Operating Agreements.

(vi)     Gentile Jr. claims that: *"The brokers came back multiple times asking for specific financial information . . . "* Gentile Jr. Declaration at ¶22. Gentile Jr. goes on to allege that because I did not *"provide the necessary information, the lenders were not willing to proceed with any financing."* Gentile Jr. Declaration at ¶25. Gentile Jr. does <u>not</u> identify the alleged "brokers" or "lenders" that he refers to. Gentile Jr. does <u>not</u> identify what information I supposedly failed to provide. Gentile Jr. does <u>not</u> provide any evidence that I was asked for specific information. Moreover, Gentile Jr. does <u>not</u> point to any agreement requiring me to provide specific information to him.

(vii)    Gentile Jr. claims that: *"In or around Junes 2023, Supor Studio City 4 LLC signed a lease with TeamDream Inc. [for space at the JS Realty Property]."* Gentile Jr. Declaration at ¶31. (Gentile Jr. omits the fact that he signed the lease on behalf of purported landlord and tenant). Gentile Jr. asserts that: *"I personally handed Supor III a copy of this lease in August*

*2023."* Gentile Jr. Declaration at ¶32. That is untrue. I did not see the alleged lease until it was

attached to the Gentile Jr. Declaration last week.

(viii)   The statements in at ¶36 of the Gentile Jr. Declaration regarding my alleged

knowledge of the "tenancy" of TeamDream Inc. are also incorrect. Again, I did not see the

alleged lease until it was filed with the Defendant's Opposition.

(ix)   ¶37 of the Gentile Jr. Declaration does <u>not</u> deny that Gentile Sr. and his daughter

are living at the JS Realty Property.

**B.   <u>The Contributed Deeds.</u>**

4.   As set forth in the Verified Complaint, approximately a month ***after*** the execution

of the Forbearance Agreement, Defendant ADR entered into separate Operating Agreements with

each of the Plaintiffs, whereby each Plaintiff was to contribute a deed to real property owned by it

to a newly formed joint venture entity, which entity was to be owned equally by ADR and the

applicable Plaintiff. ADR was to contribute alleged expertise and ultimately secure a refinancing

of the indebtedness to Lender.  The Contributed Deeds were not to be recorded unless and until

the Madison Indebtedness was satisfied, and Lender released the mortgages and DILFs that it was

holding on the properties.

5.   Among other things, the Verified Complaint says:

*51.   Prior to May of 2023, ADR, through its agent(s), principal(s) and representative(s) Joesph Gentile Sr. and Joseph Gentile, Jr. approached the Plaintiffs and proposed a joint venture relative to the real properties owned by the Plaintiffs.*

*52.   In particular, Joesph Gentile Sr. and Joseph Gentile, Jr. proposed a joint venture whereby ADR would contribute knowledge, experience and relationships to refinance the Mortgaged Premises to satisfy all amounts due to Lenders (the "<u>Madison Indebtedness</u>").*

*53.   Pursuant to the proposed joint venture, the proceeds of the refinance would be sufficient to satisfy the Madison Indebtedness in full and provide a return of equity to the Plaintiffs in the amount of at least $117 million.*

*54.   To accomplish the proposed joint venture, ADR and each Plaintiff would enter into an operating agreement to create a new entity to be jointly and equally owned by ADR and the*

*respective Plaintiff. Pursuant to that operating agreement, the applicable Plaintiff would contribute a deed to the real property owned by it to the new joint venture entity (each such property, an "OA Deeded Property"). Upon the successful closing of a refinancing, the contributed deed to the OA Deeded Property(ies) would be recorded in the name of the applicable joint venture entity, which recording would not be occur until the closing of the promised refinancing to satisfy the Madison Indebtedness and discharge the Lenders' Mortgages.*

*55.    Pursuant to the Operating Agreements executed between ADR and the Plaintiffs (defined below) ADR specifically agreed "to obtain, replace, modify, refinance and effectuate the presently defaulted Madison Collateralized and encumbering mortgages and liens . . ."*

6.    I hereby affirm each of the foregoing allegations.

7.    The Operating Agreements were prepared by or on behalf of ADR. I received a draft Operating Agreement and a draft Contributed Deed from Gentile Jr. by e-mail dated May 8, 2023. A copy of that e-mail and the attachments are attached hereto at **Exhibit "B"**.

8.    That Gentile Jr. e-mail of May 8, 2023, describes the Operating Agreements as "90% typical, but adapted to our needs standard mostly boilerplate LLC operating agreements …" I later learned that the Operation Agreements were not "typical".

9.    Plaintiffs were not represented by counsel regarding entry of the Operating Agreements or conveyance of the Contributed Deeds.

10.    Plaintiffs were not involved in drafting the Operating Agreements or the Contributed Deeds.

11.    To the best of my recollection, Plaintiffs did not negotiate or modify the terms of the Operating Agreements or the Contributed Deeds that were provided by representatives of ADR.

12.    I did not agree that any of the Contributed Deeds would be recorded unless and until the Madison Indebtedness was fully satisfied, and Lender released the Mortgages and DILFs that it was holding on the properties.

13.     In fact, it was my intent (and Plaintiffs' intent) that the Contributed Deeds would <u>not</u> be recorded unless and until the Madison Indebtedness was fully satisfied, and Lender released the Mortgages and DILFs that it was holding on the properties.

14.     No representative of ADR advised me, verbally or in writing, that any of the Contributed Deeds would be recorded regardless of whether the Madison Indebtedness was satisfied, and Lender released the Mortgages and DILFs that it was holding on the properties.

15.     The Contributed Deeds were given to a representative of Horizon Land Services[4] (the "Title Company"). My understanding was that the Title Company would hold - and not release – the Contributed Deeds until such time as the Madison Indebtedness was satisfied by action of ADR as contemplated in the Operating Agreements.

16.     On May 16, 2023, I was told by Gentile Sr., Joseph Vozza, Esq. and a representative of the Title Company that the Contributed Deeds would not be released or recorded until such time as the Madison Indebtedness was satisfied.  Mr. Vozza told me that is "how it is always done."

17.     Each of the Contributed Deeds list the stated consideration for the transaction as zero dollars ("$0").

18.     At the time the Contributed Deeds were given to the Title Company, Debtor/Plaintiffs had already provided the DILFs on the Debtor Properties to Lender pursuant to the Forbearance Agreement and DILF Agreement.  Per those agreements, the Lender was to hold those DILFs pending compliance of the Debtor/Plaintiffs with the terms of the Forbearance Agreement.

19.     Gentile, Jr. and Gentile Sr. were specifically advised that the Debtor/Plaintiffs had given DILFs to Lender.

---

[4] Correspondence attached as Exhibit 2 to the Gentile Jr. Declaration lists the title co as H Land Services and in one case, Kingston Vangurad [sic] National Land Services, all with the same address.

20.    At the time it executed the Operating Agreements, (i) the Lender Mortgages were of record, (ii) ADR was aware of the Forbearance Agreement, and (iii) ADR was aware that the Debtor/Plaintiffs had already delivered the DILFs to Lender.

21.    The pre-existing recorded Mortgages and the DILFs held by the Lender are precisely why the Contributed Deeds were not be recorded unless and until the Madison Indebtedness was fully satisfied, and Lender released the Mortgages and DILFs that it was holding on the properties.

22.    Delivery of the Contributed Deeds was not intended to manifest any actual contemporaneous transfer of title to any OA Deeded Property.

23.    Any transfer of title to any OA Deeded Property was contingent and dependent upon satisfaction of the Madison Indebtedness by action of ADR as contemplated in the Operating Agreements.

**C.    ADR's Improper Actions Regarding the Contributed Deeds.**

24.    Neither I, nor anyone acting on my behalf or on behalf of the Debtor/Plaintiffs, ever authorized the Title Company to release or record the Contributed Deeds.

25.    Although the Contributed Deeds were intended to be held, and no one authorized the release or record of any Contributed Deed, it appears that on or about June 5, 2023, a Contributed Deed allegedly conveying real property previously owned by the Marital Trust, as grantor, to Defendant Supor MT, LLC as grantee, was submitted to the Hudson County Register of Deeds for recording (the "Supor MT Deed"). A copy of that recorded deed is annexed Exhibit "R" to the Verified Complaint.

26.    The Supor MT Deed was recorded with the Hudson County Register of Deeds on June 5, 2023 – ten (10) days after ADR was provided with a copy of the Forbearance Agreement and unquestionably on notice of the DILF arrangement with Lender.

27.     It is apparent from the face of the Supor MT Deed that the stated consideration for this Contributed Deed was originally set at $0 and thereafter manually changed from to one dollar ($1). I did not make or authorize that change, nor did anyone authorize that change on behalf of the Marital Trust. There are no initials or any other marking(s) on the Supor MT Deed indicating who made that change and when that change was made.

28.     The Supor MT Deed indicates that same was assertedly prepared by Joseph Vozza, Esq. and the deed, as submitted to the Hudson County Register, contains instructions to record and return same to Joseph Vozza, Esq. Additionally, the grantee address on the cover page of the submitted deed lists the business address for Joseph Vozza, Esq.

29.     On February 29, 2024, I received correspondence from Joseph Vozza, Esq. which, among other things, categorically stated that neither Joseph Vozza, Esq. nor his law firm had anything to do with recording a deed for the Manor Avenue Property. A copy of that letter is annexed as **Exhibit "C"** hereto.

30.     Based on the Gentile Jr. Declaration, ADR attempted to record all the Contributed Deeds. I was never advised by ADR, Gentile Jr., Gentile Sr. or the Title Company that any of the Contributed Deeds had been released for recording. I first learned of this when I reviewed the Defendants' Opposition. All Contributed Deeds but for the Supor MT deed were rejected by the Hudson County Register of Deeds as defective or otherwise infirm.

**E.      The December 2023 Meeting.**

31.     As of December of 2023, ADR failed to deliver on its obligation to refinance the properties and satisfy the Madison Indebtedness. In fact, ADR never provided any written proposal, term sheet or commitment letter for a specific refinancing transaction.

32.     On the evening of December 21, 2023, I was summoned to a meeting with ADR by Gentile Sr. In attendance at that meeting for ADR were Gentile, Sr., Gentile, Jr. Joseph Vozza, Esq. and Jesse Eisenberg, Esq. I attended along with Kevin Cassidy and Lou Pontoriero. I called Daniel Eliades, Esq. to the meeting at approximately 10:00 p.m.

33.     At this meeting, Gentile Sr. claimed that he was unable to secure financing for any of the OA Deeded Properties because of my personal "creditworthiness". Supposedly, to satisfy unspecified "underwriting purposes" of undisclosed lender, Gentile Sr. demanded that I sign over an additional 41% of the Debtor/Plaintiffs' 50% interests in the joint venture entities to ADR. The result of this demanded transfer would be that the ownership interest associated with me was less than 10% and ADR would own over 90% of the joint venture entities. Gentile Sr. did not offer any additional payment or consideration for this transfer. Rather, he just demanded that I effectuate the transfer of ownership interests.

34.     In connection with his demand, at the meeting Gentile, Sr. presented me with documents titled "Assignment of Membership Interests". Copies of these "Assignment of Membership Interests" are attached hereto as **Exhibit "D"**. Mr. Gentile, Sr. demanded that I sign the proposed amended operating agreements at that meeting.

35.     The proposition that the properties could not be refinanced because of my credit was surprising because ADR had always represented that they would obtain the refinancing based on their credit. In fact, Gentile Jr.'s email attached as Exhibit B specifically states that ADR "will shield you guys from the liabilities and any out-of-pocket costs or further investment all on our credit enhancement, added value and refinance/construction loans with our trade credit..." That email was sent prior to my execution of the Operating Agreements and was a critical inducement to the decision to execute the Operating Agreements.

32.     The December 21, 2023, meeting lasted until approximately 1:00 a.m. on December 22. Despite coercion from Gentile Sr., I declined to execute the proposed Assignment of Membership Interests.

**F.     Similar Allegations Against the Gentiles.**

33.     By December of 2023, ADR (i) had produced no results under the Operating Agreements, (ii) had provided me with no information about its efforts to satisfy the Madison Indebtedness, and (iii) at the meeting of December 21, 2023, attempted to coerce me into handing over nearly all of the balance of Plaintiffs' interests in the joint venture entities and OA Deeded Properties for nothing. I began to suspect the methods and motives of the Gentiles.

34.     I came to learn that the Gentiles were sued for fraud in the New York state courts with respect to a real estate joint venture gone bad. That case, styled *Sedona Group LLC v Moriary-Gentile, Cathy*, Index No. 0115605/2006 (the "<u>Sedona Group Case</u>") was eerily similar to my experiences with ADR in that it was alleged that the Gentile Sr. used an operating agreement to create a joint venture for the development of a real estate business condominium. Real property was contributed to the newly formed entity. The plaintiff in that case funded a $525,0000 capital contribution and alleges that the Gentile Sr., thereafter, used a serious of sham transactions and sham corporations to divert funds intended for the project to his own purposes. According to the filed pleadings, this transaction spawned four (4) separate lawsuits against Gentile related parties. A copy of the various dockets and verified complaints--- are attached hereto as **Exhibit "E"**.

35.     Attached is a court decision in the Sedona Group Case from April 7, 2007, disqualifying Christopher Thompson from acting as the attorney for Joseph Gentile. The decision states:

> ***This case alleges at bottom a fraudulent scheme whereby various defendants used sham transactions and sham corporations to siphon off money from a***

*construction project. The defendants were supposed to have used loan money and capital contributions to build a residential condominium in  Chelsea.*

*This motion (seq. no. 2) is to disqualify Christopher Thompson and his finn as counsel for defendants Cathy-Moriarty-Gentile, Joseph Gentile; The Gallery at Chelsea, LLC, The Gallery Development Group, LLC and CJA Gallery, LLC (collectively the "Gentile Defendants"). Christopher Thompson and his firm Christopher Thompson and Associates (collectively "Thompson') arc also defendants in this action. In addition, plaintiff requests the court to consolidate discovery in this case with certain other related cases that are now on my docket. For the following reasons, the court grants plaintiffs motion.*

*On August 5, 2003, The Sedona Group LLC, ("Sedona"), Sedona's partner JMA and Gallery Development Group (Gallery Group), (an entity that plaintiff claims defendants Stanley Perelman, Joseph Gentile and Cathy Moriarity-Gentile own indirectly), executed an agreement (the "Operating Agreement") to create The Gallery at Chelsea, LLC ("The Gallery LLC"). The Gallery was to hold ownership of a project to develop a residential condominium at 559 West 23rd street ("The Project"). Sedona alleges it contributed $525,000 as a capital contribution.*

*In its complaint, plaintiff asserts that Christopher Thompson, along with the other defendants, stole funds from the Project. Apparently, Christopher Thompson was counsel for the Gentile defendants at the inception of the Project and, as a result of the Gentile defendants' control over the project, became counsel for the project. In that role, Mr. Thompson apparently exercised at least some managerial control. For example, he signed the Operating Agreement on behalf of Gallery Group, the managing member. (See Complaint Ex. A). Christopher Thompson was also a corporate officer of The Gallery LLC with authority to write checks for that entity. (Affirmation of David Frydman dated January 25, 2007, Ex D). Indeed, Christopher*

*Thompson's control went so far that, on August 31, 2004, he directed Perelman, the person who plaintiff believed was the day to day manager of the project, not to hire construction professionals to continue the project. Christopher Thompson told Perelman that he (Thompson) himself was going to place additional funding for the project. (Frydman Aff. Ex. E). It also would appear that Mr. Thompson was possibly involved in diverting loan funds. Annexed to the Sedona Complaint as Exhibit D are construction loan draw requests, one of which Thompson signed on behalf of the general contractor (FI 03579) and others on which Thompson notarizes the signature of defendant Joseph Vozza ("Vozza") (See, e.g., Complaint Ex D at FI 03634). **Plaintiff claims that Vozza was "to be a shill that Thompson and Gentile put in charge of the general contractor entity."** (Frydman Aff. ,r 13). Mr. Thompson does not deny that he endorsed checks representing over $100,000 of construction funds or that he was an officer of The Gallery LLC with check signing power that he exercised.*

*That part of its motion to disqualify Thompson plaintiff brings pursuant to DR 5-101- 105; 108; and Comi Rules§§ 1200.20-24, and 27. DR 5-101 prohibits a lawyer from representing a client where: "the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest."*

*Nor may a lawyer represent a client in a case where it is obvious that the lawyer ought to testify on a significant issue on behalf of the client and that testimony might be adverse to that client. (DR 5-102). Nor should a lawyer represent a client with whom he or she has a conflict of interest. (DR 5-105).*

*Given his level of involvement in the underlying events giving rise to this lawsuit, the court must disqualify Thompson and his firm from their representation of the Gentile defendants. Plaintiff has named Thompson and his fim1 as defendants and has accused Mr. Thompson, as well as the other defendants, of siphoning money from the Project and stalling the inception of the Project. Therefore, there exists the potential for the various defendants to point fingers at each other as the case progresses. In this respect, Thompson's interests are such that they could be, or may already be, adverse to those of his own clients. In addition, Thompson's financial and other involvement in this case may affect his professional judgment. At the very least, there is a substantial likelihood that he would be called as a witness to testify about where the allegedly misappropriated funds went. This testimony has the potential to damage the Gentile defendants. These reasons alone are sufficient to disqualify Mr. Thompson and his firm. (See Chang v. Chang, 190 AD2d 311, 318-320 [court disqualified attorney from representing defendant shareholders of closely-held family corporation where attorney had represented the corporation in the transaction giving rise to the lawsuit and where the attorney himself allegedly had defrauded and looted the corporation]).*

*The court also grants that part of plaintiffs motion seeking coordinated discovery. The underlying transaction in this case has spawned at least four other lawsuits, all of which are now before me. These other lawsuits are:*

1.    *The Gallery Development Group LLC v. The Sedona Group, 604425/2004;*

2.    *JMA Auto Tech v. The Gallery at Chelsea, 100707/2005;*

3.    *Gene Kaufman Architect PC v. The Gallery at Chelsea, 101897/2005*

4.    *Gene Kaufman Architect PC v. M&T Bank 602944/2006*

318708209.4

*It would be a waste of client and judicial resources not to proceed with discovery on a consolidated basis. Although plaintiff has asked only for consolidation for discovery purposes with the first two lawsuits, the court, sua sponte, consolidates all of them for discovery. The facts underlying all the lawsuits are the same and each case could only benefit from shared discovery. Discovery is underway in the first two actions already, but not so much as to cause prejudice. The parties have exchanged documents and there has only been one deposition. Indeed, the prejudice from not consolidating outweighs the prejudice to the two earlier-filed cases that will only have to wait until the other cases catch up to their document production. The court also orders discovery to go forward while various dispositive motions are sub judice.*

**G.    The Request to Enjoin Further Action(s) as to the Debtor Properties.**

36.    For the reasons set forth in my Declaration filed on April 8, 2024, at ECF No. 2-2 (the "Supor OTSC Declaration") there is an emergent and compelling need to enjoin and restrain Defendants from any further action(s) as to the Contributed Deeds. Debtors and Lender have agreed to resolve any disputes as to the Detor Properties by way of a Restructuring Support Agreement ("RSA") filed with the Court as an Exhibit to the Supor First Day Declaration, which RSA provides, *inter alia*, for an expedited and consensual sale process for all of the Debtor Properties.

37.    On April 22, 2024, The Debtors filed a *Motion for Entry of an Order (I)(A) Approving Auction and Bidding Procedures, (B) Scheduling Bid Deadlines and an Auction, and (C) Approving the Form and Manner of Notice Thereof, and (II) (A) Authorizing the Sale of Assets and (B) Granting Related Relief (*ECF No. 7 in Case No. 24-13427) (the "Sale Procedures Motion"). The Sale Procedures Motion, among other things, set forth a schedule for the marketing, auction and sale of the Debtor Properties.  The Sale Procedures Motion was granted by order dated April 29, 2024. (ECF No. 80 in Case No. 24-13427)

38.    The marketing campaign for the Debtor Properties is already underway, data rooms are being populated and potential bidders are submitting non-disclosure agreements so they can

participate in the sale process. For some Debtor Properties, the deadline for selecting a Stalking Horse Bidder is as early as June 25, 2024.

39.    It is critical to resolve and dispose of all issues relative to the Contributed Deeds and any corresponding complications *vis a vis* the Debtor Properties sooner rather than later, so that potential bidders can perform their due diligence and make informed decisions about the Debtor Properties and any potential interest therein. Any lingering issues with Defendants and the Contributed Deeds causes market confusion to the detriment of the respective bankruptcy estates.

40.    Additionally, several of properties that are the subject of the Contributed Deeds are subject to the Redevelopment Development Agreement ("RDA") between the applicable Debtor(s) and the Town of Harrison. If Defendants were to take any further action to transfer, assign encumber or hypothecate the Contributed Deeds and/or the underlying properties that are subject to the RDA, such action would jeopardize the RDA and cause irreparable harm to the Debtors' bankruptcy estates.

**H.    Certain Defendants Are Interfering with the Sale Process, Property of the Estate and the Administration of these Bankruptcy Cases.**

41.    Debtor, JS Realty Properties, LLC ("JS Realty") is a Delaware limited liability company formed on May 7, 2020. JL Realty Properties LLC owns 100% of the membership interests in JS Realty. I own 90% of the membership interests in JS Realty Properties LLC and The Supor Family Grantor Trust owns 10% of the membership interests in JL Realty Properties LLC.

42.    Subject to the DILF with Lender, JS Realty owns 401 Supor Blvd a/k/a part of 500 Supor Blvd a/k/a 608 Supor Blvd, Harrison NJ (lot 1.02 in block 222), owned by JS Realty Properties, LLC, (the "JS Realty Property"). The JS Realty Property consists of approximately 1 acre of land improved with a 70,000 Square foot building used for office and studio space (the

"Red Brick Building"). The Red Brick Building is leased to tenants that are not related to the Defendants, as identified in the Supor First Day Declaration.

43.     Via the Order to Show Cause, Plaintiffs seek to compel turnover of, and/or remove and eject Defendants and/or other affiliated entities and individuals (collectively, the "ADR Parties") from the Red Brick Building.

44.     I understand that Gentile Sr. and other ADR Parties are **living** in the Red Brick Building.

45.     I also understand that Gentile Sr. and other ADR Parties are utilizing the Red Brick Building from which to conduct some undisclosed business activities.

46.     The ADR Parties have not paid JS Realty any rent or provided any consideration in connection with this unauthorized occupancy.

47.     The ADR Parties residential occupancy of the Red Brick Building is prohibited by applicable law.  See Exhibit "A" hereto.

48.     Apart from the Verified Complaint, JS Realty has demanded that the ADR Parties vacate, surrender possession and quit occupancy of the property many times.  See **Exhibit "F"** hereto.  The ADR Parties have refused to vacate the premises.

49.     Post-petition, certain Defendants have interfered with tours of the Red Brick Building with prospective bidders/purchasers. Moreover, the unauthorized (and unlawful) presence of the ADR Parties at the Red Brick Building hinders the Debtor's sale efforts and is harmful to the JS Realty bankruptcy estate.

50.      Defendants are also interfering with JS Realty's operation of the Red Brick

Building by, among other things, installing "security" at the Red Brick Buildin and denying access

to the Red Brick Building.  See **Exhibit "G"** hereto.

51.      Defendants continue to interfere with the sale process, exert control over property

of the estate in violation of the automatic stay and other applicable law, disrupt the administration

of these bankruptcy cases.

52.      Pursuant to the Gentile Jr. Declaration, ADR has asserted that JS Realty is not

authorized to eject ADR or its affiliates from the Red Brick Building because it does not own the

property, rather the property is owned by 401 Supor Blvd Owner LLC, an affiliate of Lender,

pursuant to a recorded DILF.

53.      Pursuant to the RSA and as reaffirmed in the filed proposed plan of reorganization

(ECF No. 91 – Case No. 24-13427) Lender has acknowledged that the Debtors (and their

respective bankruptcy estates) have a property interest in the Debtor Properties subject to the

DILFs.  The RSA and proposed plan together provide that (i) all ownership disputes between the

Debtors (including JS Realty) and Lender regarding the Debtor Properties have been consensually

resolved with title to the properties to be re-vested in the applicable Debtors to facilitate third party

sales of the Debtor Properties to the extent necessary to satisfy the Debtors' obligations to Lender;

and (ii) the Debtors (including JS Realty) have been vested with possession, dominion and control

over the Debtor properties during the pendency of these bankruptcy cases regardless of the

recorded DILFs. Additionally, Lender (inclusive of 401 Supor Blvd Owner LLC) has specifically

supported, and to the extent necessary, authorized JS Realty to take any and all action necessary

to remove ADR, Gentile, Sr. and any related party from occupancy of the Red Brick Building.

54.     The Gentile, Jr. Declaration does not claim or suggest that ADR or Defendant Supor Studio City 4 own the Red Brick Building or that either entity ever owned the Red Brick Building.

55.     The Gentile Jr. Declaration asserts that Team Dream, an affiliate of ADR, has a lease to occupy the Red Brick Building. That "lease" is attached to the Gentile Jr. Declaration at Exhibit 4.

56.     The "lease" is executed by Supor Studio City 4 as landlord, despite the fact that Supor Studio City 4 has no ownership or leasehold rights in the Red Brick Building. There is no explanation as to how Supor Studio City 4 can validly lease a property in which it has no ownership or leasehold rights and where Defendants have suggested that the actual owner of the Red Brick Building is 401 Supor Blvd Owner LLC.

57.     The "lease" is also executed by Gentile Jr. on both ends of the transaction – that is, Gentile Jr. signed the "lease" on behalf of the lessor Supor Studio City 4 and also signed the same lease on behalf of the lessee, Team Dream.

58.     The "lease" provides for a monthly rental of $20,000 at Paragraph 3 but also provides for a 100% rent concession until such time as Debtor JS Realty effectuates certain deliverables. Notably, JS Realty is not a party to the "lease."

59.     Moreover, although the Gentile Jr. Declaration alleges that Gentile Jr. handed me a copy of the "lease" and that I acknowledged the "lease"; none of that is true. I saw this alleged "lease" for the first time when it was attached to the Gentile Jr. Declaration that was filed on May 6, 2024.

**I.     The Supor Properties Bergen Avenue LLC Bankruptcy Case and TeamDream's Lease of a Related Property.**

60.     On July 5, 2023, Supor Properties Bergen Avenue LLC ("Supor Bergen Avenue") filed a voluntary case under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of New Jersey, Case No. 23-15785 (SLM) (the "Supor Bergen Avenue Proceeding").

61.    I own and/or control Supor Bergen Avenue. Supor Bergen Avenue is an affiliate of the Debtors.

62.    At no time has Gentile Sr. or Gentile Jr. owned any membership interest in Supor Bergen Avenue.

63.    The Supor Bergen Avenue Proceeding was commenced when on or about June 14, 2022, BEB Credit Group II, LLC ("BEB") commenced a foreclosure action in the Superior Court of New Jersey – Chancery Division, Hudson County against Supor Bergen Avenue and other parties commencing the case captioned *BEB Credit Group II, LLC v. Supor Properties Bergen Avenue LLC*, No. SWC- F-006021-22 (the "BEB Foreclosure Case"). At that time, the ADR refinancing was supposed to pay off the BEB loan. ADR was in discussions with BEB about refinancing and a forbearance agreement. When ADR's negotiations failed, Joseph Gentile Sr. recommended and paid for Jay Meyers and Jeffrey Tomei to represent Super Bergen Avenue. Jay Meyers and Jeffrey Tomei had previously represented the Gentiles.

64.    As of July 5, 2023: (i) Supor Bergen Avenue owned 433 Bergen Avenue, Kearny, New Jersey (the "Bergen Avenue Property"); and (ii) **a portion of the Bergen Avenue Property was leased to TeamDream**.[5]

65.    Supor Properties Bergen Ave, LLC (as landlord) and TeamDream Inc. (as tenant) are parties to a Lease Agreement, made as of January 1, 2023, for warehouse and office space at the Bergen Avenue Property. The parties executed two near identical leases in July of 2023, shortly

---

[5] *See* Third Amended Disclosure Statement in Support of Proposed Third Amended Plan of Reorganization, dated January 29, 2024, ECF No. 179 in Case No. 23-15758, and Proposed Third Amended Joint Plan of Reorganization or Liquidation, dated January 29, 2024, ECF No. 175 in Case No. 23-15758

thereto. The Lease Agreement provided by BEB Bergen is identical to the Lease Agreement that I attach at Exhibit "I" hereto.

70.    By letter dated December 27, 2023 (the "TD Termination Notice"), the Trustee noticed TeamDream of termination of its lease and demanded that TeamDream vacate the premises. See Dobin Declaration at ¶5 and Exhibit "B" thereto.

71.    In response to the Termination Notice, the Trustee received from Jesse David Eisenberg, Esq. two (2) Lease Agreements made as of January 1, 2023, between Supor Properties Bergen Ave, LLC and TeamDream Inc. (the "Purported TD Leases"). See Dobin Declaration at ¶6 and Exhibits "C" and "D" thereto. The Purported TD Leases each contain a "Lease Agreement Addendum A" (the "Addendums").

71.    The Addendums are not contained in the Lease Agreement that BEB Bergen provided to the Trustee.  See Dobin Declaration at Exhibit "A".

72.    The Addendums are not contained in the Lease Agreements that I attach at Exhibits "H " and "I".

73.    The Addendums purport to relieve or defer TeamDream's rent obligations under the Lease Agreement.

74.    The Addendums also purport to grant TeamDream an option to purchase the Supor Bergen Avenue Property.

75.    I believe that the Addendums are void, ineffective and may not be genuine.

76.    I did not sign either of the Addendums.

77.     The Addendums purport to contain the signatures of Kevin Cassidy of Global International Advisors LLC on behalf of Supor Bergen Avenue.

78.     I did not authorize Kevin Cassidy or Global International Advisors LLC to agree to or sign the Addendums on behalf of Supor Bergen Avenue.

79.     I understand that Mr. Cassidy contends that he did not sign the Addendums.

80.     The Addendums purport to be signed on May 15, 2023 – six weeks **before** the Lease Agreements were signed.

81.     The Trustee refused a TeamDream request for a release of claims from the Supor Bergen Avenue estate. See Dobin Declaration at ¶7. Supor Bergen Avenue reserves all rights and claims against TeamDream and all parties acting in concert with it.

82.     On February 7, 2024, this Court entered an order confirming the third amended plan of reorganization or liquidation for Supor Bergen Avenue (Docket No. 189 in Supor Bergen Avenue Proceeding). The third amended plan of reorganization or liquidation for Supor Bergen Avenue provides: "All Executory Contracts are expressly rejected upon Confirmation of this Plan. Among the rejected Executory Contracts are all Leases, other than the Specified Leases." ECF No. 175.

I hereby certify that the foregoing statements made by me are true and that this Declaration is executed under penalty of perjury. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated this 13ᵗʰ day of May, 2024

/s/ Joseph Supor III
Joseph Supor, III

318708209.4