# **EXHIBIT B**

**From: J R <jr@teamdreaminc.com>**
**Date: Mon, May 8, 2023 at 11:55 AM**
Subject: PRIVILEGED PRIVATE AND CONFIDENTIAL FOR INTENDED NAMED PARTIES
ONLY
To: Kevin Cassidy <kcassidy@globalintadvisors.com>, Joe Supor
<owner24@jsupor.com>

 Joseph Supor, Joseph Supor as Trustee in c/o The Marital Trust, et al, and Kevin,

Good Morning Gentlemen!

Attached Please find a complete latest typical Agreement with the required
schedules that we now have in place, gathered and prepared between both of us.
There will be a total of nine separate company agreements which as you can see are
approximately 90% typical, but adapted to our needs standard mostly boilerplate LLC
operating agreements that reflects what is needed to let the money flow and make it
happen on a real spirit of a 50/50 partnership with us doing all that is required turn
key with our strengths and team to make this a super profitable reality and
renowned must see destination location for a world audience that will reach far
beyond the actual site. We Love it and have it all queued up once we
sign it all up which is hopefully today or tomorrow. I would like
to come in this afternoon as discussed and go over it all
personally and make sure you are happy with it. Our turn key
professional operation member, but a managing member will
shield you guys from the liabilities and any out of pocket costs
or further investment all on our credit enhancement, added
value and refinance/construction loans with our trade credit
and an eventual takeout. If you get a chance to review it that
would be great, I should be there by 3:30PM, the latest 4PM
and can stay as long as needed to get this done and make sure
you are happy as we are with it ready to go and once reviewed
we can easily adapt the other Agreements which are 98% done
just needs some fill ins. Also find the Confidentiality Agreement
which covers all Agreements and Parties and the Deed and

filing Documents for all of the Company and Property Deeds. All ready to go for all the Company Agreements and Properties.

Best Regards,

"JR", President

---

 Virus-free.www.avast.com

# OPERATING AGREEMENT

## Of

## *RDA 1: SUPOR PROPERTIES ENTERPRISES, LLC*
### *(hereinafter "Company")*

This Operating Agreement dated as of *May _____, 2023,* is entered into by and *between SUPOR PROPERTIES ENTERPRISES LLC, a represented Delaware* limited liability company with its principal office at 433 Bergen Avenue, Kearny, New Jersey 07032 (*hereinafter "SPE"* or "Supor" , AND American Dream Resorts, Ltd. or their hereby permitted designee or assign, (hereinafter "ADR" or "Managing Member" or "The Managing Member"( of the "Company" as such terms are defined above and herein, a New York State Corporation, with their principal office at 135 Pinelawn Rd., North 125, Melville, New York 11747, ATTN: Legal Department, Joseph C, Vozza;Esq., General Counsel, hereinafter such parties shall be collectively defined and referred to as the "Members."

## W I T N E S S E T H :

WHEREAS, the Members hereto desire to form a limited liability company pursuant to the New York Limited Liability Company Law to be known *as RDA 1: SUPOR PROPERTIES ENTERPRISES, LLC* (or if stated name is not available; a similar name to be chosen by Managing Member); and

WHEREAS, the Members hereto desire to establish their respective rights and obligations in connection with forming and operating a limited liability company, specifically the "Company". The Members have agreed to operate a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement and the Act.

**NOW THEREFORE,** in consideration of the mutual promises hereinafter contained and for ten dollars and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members hereto agree to be legally bound as follows:

## ARTICLE I

## Additional Definitions

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

NOTE: Other terms are defined in the text and throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

Section 1.1 Basic Definitions. For purposes of this Agreement, the following underlined terms used but not otherwise defined shall have the following meanings:

(a)   "Act" means the New York Limited Liability Company Law and all amendments to the Act, as amended from time to time.

(b)   "Additional Capital Contribution" means an additional Capital Contribution payable by the Managing Member to the Company pursuant to Article VI.

(c)   "Affiliate" means with respect to any Person, any other Person, directly or indirectly controlling, controlled by, or under common control, with such other Person.

(d)  "Agreement" means this Operating Agreement as may be expressly: amended, restated, or  supplemented from time to time if so agreed upon by all of the duly authorized Members as required and in accordance with such terms and conditions as set forth in this Agreement.

(e)   "Articles" means the Articles of Organization of the Company, and any and all amendments thereto and restatements herein filed on behalf of the Company, and filed with the Department of State of New York pursuant to the Act by and at the sole discretion and responsibility of the Managing Member.

(f)  "Capital Account" means the account maintained by the Company for a Member or transferee determined in accordance with Article VI.

(g)  "Capital Contribution" means any contribution of property or services made by or on behalf of a Member including a Member's Initial Capital Contribution and any Additional Capital Contributions of the Managing Member.

(h) "Code" means the Internal Revenue Code of 1986, or any corresponding provision of any applicable succeeding law.

(i) "Commitment" means the Capital Contributions that a Member is obligated to make.

(j) *"Company"* **RDA 1: SUPOR PROPERTIES ENTERPRISES, LLC**, or if stated name is not available; a similar name to be chosen by Managing Member);

(k) "Default Rate" means the prime rate of interest as announced in the Wall Street Journal and existing on the date the Default Rate applies hereunder as adjusted from time to time plus five hundred (500) basis points but in no event higher than the maximum interest rate provided by law.

(l) "Dissolution Event" means an event, the occurrence of which will result in the dissolution of the Company under Article X hereof.

(m) "Distributions" means a transfer of cash or other property distributed by the Company to the Members in accordance with Article VII hereof.

(n) "Fiscal Year" means, unless the Managing Member determines otherwise, the fiscal and taxable year of the Company which shall be the year ending December 31st.

(o) "Initial Capital Contribution" means the Capital Contribution agreed to be made by the Members as described in Section 6.1 hereof.

(p) "Involuntary Withdrawal" means with respect to any Member, the occurrence of any of the following events:

(i) the Member makes an assignment for the benefit of creditors for itself.

(ii) the Member files a voluntary petition of bankruptcy for itself.

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v)  the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receives for, or liquidation of the Member or of any substantial part of the Member's properties;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegation of a petition filed against the Member in any proceeding described in Subsections (i)through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during
 which period the appointment is not vacated;

(viii) if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the  Member's person or property;

(ix) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x) if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter;

(xii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the Company; or

(xiii) Any Breach of Schedule D.

(q)  "Managing Member" means American Dream Resorts, Ltd. ("ADR"), by their hereby irrevocable appointment,  or their (Managing Member's)  hereby permitted designee or assign.

4

(r)  "<u>Member</u>" means a Person executing the Agreement as a Member or as a permitted Substitute Member, under the Agreement.

(s) "<u>Membership Interest</u>" means a Member's entire interest in the Company including the rights of a Member in the Company to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and to the extent permitted by this Agreement: to possess and exercise the right to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

(t) "<u>Net Cash Flow</u>" means with respect to any fiscal period of the Company, all revenues of the Company during that period decreased by (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) reserves for contingencies and working capital, established in such amounts as the Managing Member may determine, (d) repayment of principal and interest on any financing, (e) taxes and (f) priority distributions made as set forth below.

 (u)  "<u>Permitted Expenses</u>" means any expenses (capital, operating, and otherwise) of the Company during any period or portion thereof, determined on the basis of sound cash basis accounting practices applied on a consistent basis including reserves reasonably determined to be necessary by the Managing Manager, but specifically <u>excluding</u> depreciation, amortization and any other non-cash deductions of the Company for income tax purposes.

(v)  "<u>Permitted Transferee</u>" means any Person who is an Affiliate of a Member at the time of the execution of this Agreement.

(w)   "<u>Person</u>" means an individual, corporation, limited liability company, partnership, trust, estate, entity or any organization, permitted to be a member of a limited liability company under the laws of the State of New York.

(x)   "<u>Substitute Member</u>" means a permitted transferee of a Membership Interest who has been admitted to all of the rights of membership pursuant to Section 9.3 of the Agreement.

(y)   "<u>Transfer</u>" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment or other transfer, and, when used as a verb, means voluntarily to sell, hypothecate, pledge, assign or otherwise transfer.

(z)     "<u>Unreturned Capital Contributions</u>" shall mean all Capital Contributions made by a Member less the aggregate of all Distributions to all Members, including priority distributions made in accordance with Section 7.6 below.

(aa)     "<u>Voluntary Withdrawal</u>" means a Member's dissociation with the written consent of the Managing Member by means other than by a Transfer or an Involuntary Withdrawal.

(ab) "<u>The Real Property</u>" or "<u>Real Property</u>" means : any and all real estate, real property, rights, title, interest associated with, available to,  arising from , included within,  related to (whether  properly denoted, stated, defined,  or fully identified correctly herein by this Agreement or not, all of  which may require corrective adjustment if so discovered and then determined by the Managing Member to require corrective action after surveying the represented definition of the Real Property concerning and contemplated in this Agreement. The Company specifically  hereby  permits the  Managing Member  to cause the correction of the same in all respects. at their discretion as may be required, with the full expedient Time is of the Essence manner cooperation from any and all relevant required Supor family members, Affiliates,  and of course, "Supor". If applicable,  any new corrected deed or property description resulting from such correction would then become the actual Real Property as defined herein).   The Real Property defined herein, is and independent property of an approximate combined assemblage of *approximately 1.25 acres informally known as part of 1000 Frank E. Rodgers Blvd. Harrison, NJ aka part of Frank E. Rodgers Blvd. South, Harrison, NJ ,*  New Jersey,  more accurately and fully described by the deed(s) and other property descriptions including block, lot, and qualifier designated reference numbers , as stated *and collectively attached hereto in Schedule C* of and to this Agreement. For the purpose of this Agreement, the ordinarily real estate and real property defined in its usual context  shall be expanded for identification simplicity purposes to include beyond its usual definition to include but not limited to all enjoyed, associated, related, options, licenses,  tangible and intangible property and all property rights,title, and interests -of all kinds - related to the same with all full and complete entitlements hereby simultaneously existing and related or entitled to all of the real property, real estate, personal property, intellectual property, and legal property hereby conveyed and  delivered (by documentation or otherwise) along with all legal possession of the same and rights thereto. This shall include but not be limited to  leaseholds, licenses / franchises,/ building systems / materials / equipment and  all related mineral / subsoil / subgrade / grade / land / air / naming / licensing / intellectual property / websites /social media /  signage / personal property / permit / keys / codes / passwords / unlimited  24/7 access / infrastructure / easements / rights of way / utility accounts / municipal or governmental application rights / prepaid expenses / policies of any kind / claims of any kind / deposits / escrows / transfer rights / assignment rights / lien rights / legal and business

affairs rights and any form of development rights (that exist or have any potential to exist ) "Supor" work product and that of all their professionals regarding the Real Property, including but not limited to those associated and hereby retained "RDA" and Master Planning - Architectural - Engineering designs/ analyticals / and municipal approval rights and assets, which "Supor" represents are renewable, intact, and remain in good standing whether recorded or not. This shall include and not be limited to those related to or effecting any presently negotiated leasehold or purchase or rental or option or lease with the right to purchase or redevelopment or development of any portion of the real property or real estate *associated with The RDA* at or effecting or could be beneficial to any portion of the Real Property *such granted and renewable rights more fully described in the attached development agreement annexed to this Agreement as Schedule_E_, titled and hereby defined as "Amended and Restated Redevelopment Agreement " by and between The Harrison Redevelopment Agency and The Town of Harrison AND Supor 136-1 Realty LLC, Supor Properties Enterprises LLC and Supor-172-Realty LLC with all rights for or relative in any way to the same or any component or portion of the same. All of which whether specifically stated or otherwise, are hereby acknowledged by the Members and their members named or executing herein or otherwise, by the duly authorized parties signing on their respective behalf below to be relatively transferred- conveyed for the adequate consideration of $1.00 US and other valuable consideration hereby acknowledged and received, in full exclusively, irrevocably, and instantly retained and fully granted from the currently recorded relative Deed and Entitlement Parties to the Company, effective immediately and simultaneously conveyed with the execution of this Agreement along with the relatively transferred deed(s) corrections to be immediately but within the next calendar week fully executed, addressed as above, filed, and recorded as a relative transfer convey Real Property recorded deed transaction(s) by Managing Member with the full cooperation of all the Members. The same for all other Property ownership whether required instruments and recordings are actually fully executed, completed, yet recorded, approved by third parties as may be required, or yet filed which the Members hereby agree to abide by, execute, re- execute if necessary at the discretion of Managing Member who hereby authorize the Managing Member to act and arrange for on behalf of each Member of the Company for the Company as well as the Grantor parties and their interested parties.*

Section 1.2   Tax Definitions For purposes of this Agreement, the following identified terms used but not otherwise defined shall have the following meanings:

(a)                Adjusted Capital Account Deficit shall mean, with respect to any Member, the

deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)  Credit to such Capital Account the minimum gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.7042(g)(1) and 1.704-2(i)(5) of the Tax Regulations; and

 (ii)  Debit to such Capital Account the items described in Sections 1.7041(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5),  and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.7041(b)(2)(ii)(d) of the Tax Regulations and shall be interpreted consistently therewith.

(b)   Code shall mean the Internal Revenue Code of 1986, or any corresponding provision of any succeeding law.

(c)   Nonrecourse Deductions has the meaning set forth in  Section 1.7042(b)(1) of the Tax Regulations.

(d)    Nonrecourse Liability has the meaning set forth in Section 1.7042 (b)(3) of the Tax Regulations.

(e)    Partner Nonrecourse Debt  has the meaning set forth in Section 1.704-2(b)(4) of the Tax Regulations.

 (f)     Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.7042(i)(3) of the Tax Regulations.

(g)    Partner Nonrecourse Deductions has the meaning set forth in Sections 1.7042(i)(1) and 1.704.2(i)(2) of the Tax Regulations.

(h)    Partnership Minimum Gain has the meaning set forth in Sections 1.704-2(b)(2) and 1.704.2(d) of the Tax Regulations.

(i)    <u>Profits and Losses</u> shall mean, for each Fiscal Year, amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with generally accepted accounting principles applied consistently by the Company.

(i)  Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(iii) Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Section 7.3 or 7.4 shall not be taken into account in computing Profits or Losses.  The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Sections 7.3 or 7.4 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j)    <u>Tax Regulations</u> shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time.  All references herein to a specific Section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulation.

## ARTICLE I

### Formation.

Section 2.1    <u>Organization and Authority</u>.  Effective upon execution of this Agreement, ("Effective Date")  The Members hereby agree to have the Managing Member  exclusively cause and carry out all that is required to  organize the Company on behalf of the Company and all of its Members as a New York Limited Liability Company pursuant to the proposed filing of the Articles of Organization and the provisions of this Agreement and with the Secretary of State of the State of New York. The Members agree that the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise specified herein or otherwise mutually agreed in writing.

Authorization is hereby provided to the Managing Member to organize the Company as a Foreign or similar designation Limited Liability Company or alternative Person or entity structure or Form in New Jersey, Delaware, or any other jurisdiction pursuant to the same or as similar terms possible as set forth in this Agreement and as may be allowable in such jurisdiction , as  the terms stated above,  if Managing Member elects to do so IN THE BEST INTEREST OF THE COMPANY but at their discretion.   The Managing Member shall retain such authority to act on behalf of and execute all:  documents, legal actions, protective measures, and instruments required of the Company (i.e. organizational, tax filings, corporate resolutions, or other legal documents or instruments) and employ - install - contract - license- hire - fire- cancel , suspend, stay, take legal action, budget, pay, not pay, delay, limit, expand, modify, amend, fine, or otherwise act in their discretion concerning any business and or legal or design , build, contract, termination, representation, development or related affair or action it believes is in the best interest of the Company at their discretion in all matters including but not limited to the day to day operations and all plans,  strategies, and operations of the Company and its interests, finances rights, title. This includes all latitude concerning the Company's Executives, Managers, Officers, Agents, Attorneys, Consultants, Interns, Faculty, Training Programs, Licensing Matters, Governmental Affairs, Elections, Lobbyists, Professionals, Finance Matters, Banking, Credit, Collections,   Expediters, Development, Purchasing, Solicitation, Marketing, Management, Construction, Production, Distribution, Technology, IT, Record Keeping, Accounting, Auditing, Design, Transportation, Parking, Infrastructure, Utilities, Maintenance,Security, Intermodal On/off site-traffic transportation and traffic, Third Party Persons, Ventures, merges, Acquisitions, Public Offerings, Governmental   Affairs-Relations; Affiliates, and anything else that requires the Company to  perform, act, arrange, provide, pursue, partition, decentralize, centralize, arrange for financing, manage, market, advertise,       create-authorize-manage-market-acquire-merge:       parents,       joint ventures,subsidiaries, divisions, affiliates, and make expenditures - take actions and or inactions  IN THE BEST INTEREST OF THE COMPANY at their discretion for the Company and its interests.

Section 2.2      Agreement. For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Agreement hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended. To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act. This Agreement may only be modified in writing, by the unanimous decision of all "Members."

Section 2.3    Name. The name of the Company is the name set forth at the beginning of this Operating Agreement, and all business of the Company shall be conducted under that name.  The Company may do business under that name and/but may and intends to do business with other independent companies as well as the Company under any name or names that the Managing Member selects from time to time, including but not limited to divisions, parents, subsidiaries, management affiliates, joint ventures, contractors, etc.  If the Company does business under a name other than set forth in its Article of Organization, then the Company shall file a registration of alternate and or trade name as may be required by law in certain jurisdictions or otherwise.

Section 2.4    Term. The Company shall be dissolved and its affairs wound up in accordance with the Act and the Agreement on December 31, 2122,, unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.

Section 2.5  Registered Agent and Office.  The registered agent for the service of process and the registered office shall be that person and location reflected in the Articles. The Managing Member may, from time to time change the registered agent or office through appropriate filings with the Department of State of New York or any applicable State. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Member shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

Section 2.6 Principal Office.  The Principal office of the Company shall be located at 135 Pinelawn Rd., North 125, Melville, New York  11747,  and a mailing address of 123 North Sea Rd., Unit 516, Southampton, New York 11968.  The Managing Member may elect to change the Principal office and in addition, name and designate alternate and or additional physical offices and mailing  addresses within the State of New York as well as other states  and or jurisdictions including but not limited to maintaining local operating, management, contracting, agent, offices, studio , executive offices, construction, sale, garage, warehouse, back lot, staging areas, equipment storage, artist and or executive employed/contracted residences/lounges,work-live   service offices, security offices, trailers, makeup/hair/beauty areas rooms, cafeterias, food services, security, workshops, classes-educational support, showrooms, exhibits, themed entertainment centers, tour areas, parking, place of public assembly, conference areas, or any other such  service providing or self / contractor user support to allow up to 24/7 access and designated exclusive use spaces for a better supported business , legal, or development use and accommodation areas, facilities, offices, for temporary and or permanent use at no cost (as

part of operations support) or for specific rental , as deemed  required or beneficial by and at the discretion of the Managing Member. Unless notified otherwise, in advance and in writing by the Managing Member of a change of Principal Office location or an alternative address for notices,   only the registered Principal Office shall be an acceptable Principal Business Office and Notice Office for the Company.

  Section 2.7 <u>Publication.</u>   Within 120 days after the date of this Agreement, the Management Member shall cause, if necessary, a notice containing the substance of the Articles, in the form required by the Act, to be published once in each week for six successive weeks in two newspapers of the county in which its principal office is located at the time of the publication as required by the Act.

  Section 2.8 <u>Purpose: Nature of Business</u>. The business purposes of the Company are to do the following:

  (a) With respect to the "Real Property" defined above, to hereby partially and or wholly use the part of the Real Property in relation to an individual or as part of the larger master planning deemed in the best interest of the Managing Member in their best commercial effort to among any other legal business venture and recycling of any such venture , product, service, experience, or compnent element or content that is family oriented in its nature and or intent to : provide, arrange, acquire, partner, joint venture, entitle, purchase, merge, license, franchise,  own, demolish, master plan,  adapt, redesign, reconfigure, subdivide, alter  or modify the property lines, develop, redevelop, construct, restore, remediate, remedy, retrofit, repurpose, lease, license, franchise, rent, use, provide wide menus of available ancillary development - entertainment - hospitality - production products /   services / experienced / tours / admission priced themed attraction and entertainment and tourism based integrated and independent family oriented content and attraction components, intermodal integration, infrastructure, parking, and even residential, incubator, parking, and advertisement-branding , partially or wholly produced shows, content,  and co venture for and related to the same  and or create/source  component elements *in accordance with some version or some aspect of the approved nature of the hereby represented existing (in good standing)  already approved "ready to go" with the <u>Town of Harrison "RDA" Plan and Agreement  found and generally defined but adaptable in and as Schedule E  </u>(hereinafter defined herein as "RDA Plan" or "RDA") otherwise adapted or amended from the latest approved and or applicable approved version of a full service mixed use mega live audience downtown and Hollywood East Styled meets Universal North - Downtown Disney Town Square Type and multiple themed production set full of live audience mostly production driven attraction, retail, hospitality, dining, tourism, family oriented - arts & entertainment "must see-destination location"*

*encouraging all year visitor and production attraction. A part of an overall economic driven live-work-play-visit-film-broadcast family oriented live audience interactive entertainment themed mega themed Town Square and other set designed campus home to corresponding Art of Placemaking content interactions and tailored broadcast programming. All to be custom tailored and retrofitted on an on going component basis at the discretion of and by the Managing Member concerning this Company's and this Real Property's piece (s) and contributions to the overall synergistic interaction of a larger master plan involved other properties if so desired and hereby intended but certainly only as the same serves as a partial piece of the larger development as independent real estate but principally strategically designed to earn its income from real estate business based revenue streams and its self using capacities alike and to use such independent third party tenants, licensees, and on site franchises who whether related to any Member or not shall maintain their own company interests accordingly. The Company as it pertains to the Real Property addressed herein only, shall use , re-design, develop and operate the Real Property as defined by this Agreement for that partial purpose of the larger master plan described above and an adaptable version hereby permitted in advance at the discretion of the Managing Member to that based on some adaptable version or redesigned version shown in Schedules E and Schedule F attached hereto, like all Schedules, are part of this Agreement as if they were incorporated within the text and context of the written portion of this Agreement. "Supor" hereby* represents they are wholly owned and controlled by the by "Supor" Members signing and disclosed by "Supor" in this Agreement and such parties signing are fully authorized to bind their respective parties and any other party, Person, Affiliate, or unnamed Person or party who may have an interest in the Deed Grantor or any portion of the Real Property as defined herein. To reiterate the above, the Authorized Representative(s) of "Supor" signing below hereby represents that they are collectively and as stated the 100%:  Owner, duly authorized representative of the Real Property and "Supor" or any other Person who may claim and guarantee and agree to indemnify "ADR" from any dispute or claim otherwise including reasonable attorney fees, costs, and possibly required protective  bonding  procurement at their expense if so required and likewise guarantee not to cause the delay of development in the process if such an unlikely event was to occur or be claimed by a third/ derivative / relative party not named herein.

The Authorized Representatives signing below for "Supor" hereby  convey The Real Property in its entirety and agree to fully  act  and serve as a good Member as required by this Agreement in their best commercial efforts to act in the  Best Interest of the Company but in a passive Member capacity only, "Supor" hereby represents that until up until the execution of this agreement, they were the sole   Possession Holder  and operator of the Real Property and "Supor" until now when at the time of the execution of this Agreement fully and wholly convey and transfer all such exclusive rights, title, and interests  related

13

to the Real Property  irrevocably and uncontested, without any duress or undue influence of any kind and by its own free will and choice as a business decision made after advised by counsel, professionals, and seasoned advisors and executives of their choosing.  of any kind, to the Company as part of  Supor's  Capital Contribution . The Company which will be irrevocably managed and directed by Managing Member who will be solely responsible but/and empowered to maintain the Company's best interests first on behalf of the Members of the Company and no Member shall do anything to conflict, interfere, interrupt, delay, or circumvent the Company's Best Interest First in their best commercial efforts which benefits all of the Members.


(b) To develop such Real Property in their sole discretion is the highest and best use as allowable by law at the discretion of  Managing Member who will among other uses that conform to the partial uses as stated herein seek to establish and or  reserve its right to continue to utilize the Site for Aviation Purposes  and Intermodal Transportation Accessible (i.e. Helicopter Port, etc...) to the extent allowable by applicable law.

(c) To sell, use, develop, finance,  lease, any portion of the Real Property and or improvements hereon in accordance with all applicable law, codes, ordinances and regulations;

(d) To otherwise hold, maintain, lease, demolish, alter, repair, rehabilitate, construct, manage, sell, market, exchange, publicize, dispose of, or otherwise take any legal action or inaction  with respect to the Real Property or the Company's property or any portion thereof as Managing Member determines in their sole discretion is in the best interest of the Company;

(e) To borrow money and issue evidence of indebtedness or guaranties in the name of the Company in furtherance of any or all of the objectives of its business, and to secure the same by mortgage pledges, credit, trade/contractor credit,  or other liens and instruments with respect to any portion of the Real Property or Company's property or any portion thereof;

(f) To enter, perform and carry out contracts or take action of any kind necessary to, in connection with, or incident to, the accomplishment of the foregoing purposes;

(g) From time to time do one or more of the things or acts set forth in this Agreement; and

(h) To engage in any and all business activities permitted under the laws of the State of New York and the State of New Jersey where the Company intends to develop the Real Property identified herein.

The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate and expand its business as described in this Article II at the discretion of the Managing Member.

Section 2.9   <u>Membership</u> <u>Certificates</u>.   The Company may or may not issue certificates representing the Membership Interest subscribed for by the Members and reserves its rights to do so. Unless, the Pre Agreed "Supor" Membership Buy Out Option is exercised by the Managing Member at their election, discretion and option as stated within this Agreement below and available only on the RDA side properties and corresponding Companies versus the Supor Studio City sided properties (Non RDA sided properties and corresponding Companies which there is no pre-agreed buyout option) , at all other times, the **Managing Member and "Supor" shall be 50/50 Members of the Company without exception, under any circumstance for all RDA Sided and Supor Studio City Sided Real Property and corresponding Companies. Unless agreed upon otherwise and by the unanimous written modification or amendment to this Agreement, if and when the RDA Side "Supor" Membership Buy Out Option is exercised as stated above, "Supor" shall nevertheless always retain a 9.99% Membership Interest or percentage interest of the Company, without exception.**

**This Company and the Real Property associated with the same is an RDA Sided Company and Property in terms of reference throughout this Agreement and arising from the same including but not limited to being part of the *RDA* Sided Pre agreed upon Supor Member Buyout agreement in place as described herein.** Whether an RDA side property or not, these terms have been included and will be included and applicable to for the same price, terms, conditions and consideration stated below and herein including Real Property such as the Port Authority Properties and Neighboring Real Property that may or may not be obtained, secured, purchased, leased, controlled, optioned managed, maintained, licensed, or otherwise utilized by any related or affiliated Supor or ADC and Supor related party in such an RDA sided future or pending Party Co ventured Companies with required same terms and condition as set forth herein but property adapted and by Party mutual consent and participation as required. … is hereby stated in every agreement related to both of the sided developments and or Real Property corresponding Company agreements since all of the same fall into either one side or the other except for the purposes of the Parties agreements, the Companies relative to the PSEG (Supor MT. LLC) which is a stand alone Company and independent from either side.

The Pre agreed Buy Out on any of the Companies established on the RDA side shall be at the Managing Member's discretion and shall be   a lump sum buyout of Six Hundred Million Dollars ($600,000,000.00) for all RDA sided Real Property for all such RDA sided companies , Real Property as defined herein, and any all tenanted, licensed, franchised, content, IP, concessions, shows, productions, libraries, content, equipment, personal property, licensing and programming rights, trademarks, copyrights that have or could be made that are co ventured to the various direct and indirect Affiliate or related parties, products, experiences, or other assets without exception whether made on the RDA Side, Supor City Studios Side, offsite, or otherwise but shall not include the actual real estate associated with the production campus properties themselves located and to be developed by separate independent companies but by mutual independent parties related to but apart from one another and anything on the RDA side whether utilized or some how used for either side's other than real estate development related aspects of or surrounding such real estate for the Supor Studio City Side developments.   There is no pre-agreed upon buyout arrangement for the Supor Studio City Side developments. The RDA sided pre-agreed upon buyout described herein above shall be available at the buyout cost for that price for the first ten years at the Managing Member's  election to exercise and is contingent upon its closing with no penalty to Managing Member if not fully realized then or at all but shall be extended throughout the full Term of this Agreement, without exception or any circumstance, in favor of the Managing Member's continued option ,for the same terms  as described above, after ten years  but at a buyout price of the original amount plus a cost of living adjustment and escalation rate of that year's Consumer Price Index (CPI) index increase or decrease difference  from the prior year compounded or reduced annually and adjusted accordingly up until the year suh buyout occurs. Should such a buyout require public offering or sale cooperation in the best interest of the buyout fruition , Supor shall fully maintain their best commercial effort to cooperate and do and participate in all applications and efforts to help the same succeed at the request and absolute direction and speedy full compliance that may be necessary without detriment to the Company or Managing Member at the request of the Managing Member who shall under any circumstance be entitled to such buyout arrangement to be exercised at any time at Managing Member's sole discretion, election, and option.

## ARTICLE III

### Accounting and Records

Section 3.1  <u>Records to be Maintained</u>. The Company shall maintain the following records at its principal office or the office of its accountant or counsel:

(a)  with respect to each Member the information set forth in Schedule "A" annexed hereto;

(b)   a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any such amendments has been executed;

(c)   a copy of the Company's federal, state and local income or information tax returns and reports for the two  most recent Fiscal Years;

(d)   a copy of this Agreement including all amendments thereto; and

(e)   the Company's books and records, including financial statements of the Company, which shall be open to inspection by the Members at reasonable times during regular business hours. This shall include copies (including electronic format) of all documents, architectural plans, receipts, invoices, contracts, schedules, checks, books and records of the Company with respect to the development of the Real Property.

Section 3.2  <u>Tax Returns and Reports.</u>   The Managing Member, at Company expense, shall prepare or cause to be prepared and timely filed income tax returns of the Company in all jurisdictions where such filings are required, and the Managing Member shall prepare or cause to be prepared and delivered to each Member, within ninety (90) days after the expiration of each Fiscal Year, and at Company expense, all information, returns and reports required by the Code and Tax Regulations and Company information necessary for the preparation of the Members' federal income tax returns. Any expenses incurred for the special purposes of individual members concerning tax compliance (or otherwise) preparation of filing outside of New York or New Jersey, if applicable, shall be borne by each individual Member.

# ARTICLE IV

## Members.

17

Section 4.1  <u>Names and Addresses of Members</u>.  The names and addresses of all of the Members of the Company are as stated on Schedule "A" each of whom is admitted to the Company as a Member effective contemporaneously with the execution of this Agreement subject to satisfaction of such Member's Commitment, hereby received in full satisfaction and accord for all Members.

Section 4.2  <u>Management Rights</u>.  Management of the Company shall be vested in the Managing Member.  Only the Managing Member shall have authority to bind the Company and to make all decisions concerning the business affairs of the Company except that the following events shall require the unanimous written consent of the Membership Interest unless stated otherwise elsewhere,

(a) To amend the Agreement or the Articles;

(b) To sell  the Company's property other than in the ordinary course of business which is to develop, sell, use, operate  and/or lease the Real Property or any portion thereof;

(c) To merge or consolidate the Company with any other Person;

(d) To continue the Company after a Dissolution Event except as otherwise set forth in Article X;

(e) To pay any Member any remuneration except to the extent expressly permitted under the terms of this Agreement .  It is agreed that Managing Member intends to on behalf of the Company  utilize and engage  certain professional, design, planning, finance, executive, entertainment, educational, employment,  construction and operating  contractors and sub-contractors which are separate entities from Managing Member (but may have related principals and interested parties ) in an effort to reduce and mitigate  the construction - design - operating -  finance - business - legal affairs and concerns budget as Managing Member deems necessary, in their sole discretion, to increase potential profits, limited investment,  and cash flows for the Company, it being  understood that if such an event occurs, said savings shall benefit the Company's members as a whole.  The subject construction companies shall not be obligated to perform as a loss, in any way;

(f) To admit any new Members except if as a result of a Member failing to meet a Commitment or otherwise provided in this Agreement, in which case that failing member's consent shall not be required.

18

Section 4.3  <u>Liability of Members</u>.  No Member shall be liable as such for the liabilities of the Company unless such Member consents in writing to personally assume such liability on their own.

Section 4.4   <u>Conflicts of Interest</u>.

(a) A Member, including the Managing Member, shall be entitled to enter into transactions that may be considered to be competitive with the Company, it being expressly understood that Members, including the Managing Member may enter into transactions that are similar to the transactions into which the Company may enter.

(b) A Member, including the Managing Member, does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company.  The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law.  No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company.

Section 4.5  <u>Members Meetings</u>.

 (a) <u>Time and Place of Meetings</u>.  All meetings of Members shall be held at such time and place, within the State of New York or unless unanimously agreed to otherwise, as shall be designed from time to time by the Managing Member and stated in the notice of the meeting or in a duly executed waiver of notice thereof.

(b) <u>Annual Meetings.</u>  There is no requirement that the Company hold annual meetings.

(c) <u>Special Meetings.</u>  Special meetings of Members, for any purpose or purposes, unless otherwise prescribed by statute or by the Articles of Organization, may be called by the Managing Member or at the written request of any one or more Members.  Such a request shall state the purpose or purposes of the proposed meeting.  Business transacted at any special meeting of Members shall be limited to the purposes stated in the notice.

(d) <u>Notice of Member Meeting</u>.  Written notice of each meeting of Members stating the place, date and hour thereof, and, in the case of a special meeting, stating the purpose or purposes for which the meeting is called and the person or persons by whom or at whose

direction such meeting has been called, shall be given, personally or by certified mail, return receipt requested or U.S. Certificate of Mailing or U.S. Express Mail, not less than five (5) business days nor more than sixty (60) days prior to the meeting, with evidence of delivery of such notice AND by duplicative email to the Members at the email addresses or other unanimously agreed to electronic means of communication that will be utilized in the future but in the interim, to those  identified email addresses stated  elsewhere in this Agreement  or  may  be  amended  from  time  to  time   by  proper  and  adequate  notice requirements as set forth within the agreement.

(e) <u>Waiver of Notice</u>.  Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.  The attendance of any Member at a meeting of Members, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice of such Member.

(f) <u>Quorum</u>.  Except as otherwise provided by the Articles of Organization, the holders of record of not less than a fifty-one percent (51%) Membership Interest and entitled to vote thereat, present in person or by proxy, shall constitute a quorum for the transaction of any business at each meeting of Members.

(g) <u>Voting</u>.  At any meeting of Members at which a quorum is present, the affirmative vote in person or by proxy by the holders of fifty-one percent (51%) Membership Interest entitled to vote thereat shall, except as otherwise required by express provision of law or of the Articles of Organization or this Agreement, be valid and binding.

(h) <u>Voting Rights.</u>  Each Member shall vote based on the Membership Interest held by such Member.

(i) <u>Proxies</u>.  Each Member entitled to vote at a meeting of Members to express consent or dissent without a meeting may authorize another person or persons to act for such Member by proxy.  Each proxy must be signed by the Member or such Member's attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from its date unless otherwise provided in the proxy.

(j) <u>Written Consent</u>.  Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, if a consent in writing, setting forth

the action so taken, shall be signed by all of the Members.   Every written consent shall bear the date of signature of each Member who signs the Agreement.

(k) <u>Telephonic Participation</u>.   Any one or more of the Members may participate in a meeting of such members by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time.   Participation by such means shall constitute presence in person at a meeting. However, oral modifications shall have no force or effect concerning this Agreement or any matter arising from the same.


Section 4.6 <u>Personal Guaranties.</u>  Notwithstanding anything to the contrary, by signing below in the capacities indicated, a principal for each Member shall agree and covenant that each will sign a personal guaranty of any financing (refinance, construction-development, acquisition, or permanent financing) obtained and arranged for  by the Company; if delivery of such guaranty is required as a condition of the loan by the lender. Managing Member shall maintain its best effort to avoid such personal guarantees ("p.g") but expects the lender to require at a minimum: a principal or a duly authorized credit worthy family relative or  senior executive  for each Member to personally guarantee the standard minimum "p.g" "Good Guy" carve-outs (i.e. No fraud, interim interest-construction bridge loan, debt service obligations, etc...) which will be reduced as a general rule when the Company seeks to either  place from loan proceeds or otherwise at the option, discretion, and election of the Managing Member to pay buy down points, escrow finance received pre paid debt service payments, offer more collateralization or pay slightly higher rates to minimize more "pg's" than necessary on that priority basis. Corporate, ReaL Property, asset based, Revenue based credit instruments, factoring, and other  secured and unsecured options are all Managing Member credit and finance tools that Managing Member may and shall from time to time entertain and utilize.


## ARTICLE V

## Managing Member.

Section 5.1 <u>Managing Member</u>.  Except as otherwise provided in the Agreement, the management of the Company and all decisions concerning the business affairs of the Company shall be made by the Managing Member.  The Managing Member is "ADR"and as further defined elsewhere in this Agreement.  The Managing Member agrees to do all things reasonably necessary to carry out the business and affairs of the Company and

covenants to perform its obligations hereunder in good faith and to their best commercial efforts,

Section 5.2 <u>Term of Office of Managing Member; Removal</u>.  The Managing Member shall continue to serve unless the Managing Member is removed for cause by a fully adjudicated  N.Y.S. court of competent jurisdiction  and having not exercised all their timely rights to contest or dispute the same by their right of all due process available to them has been exhausted if such an unlikely event ever should ever occur.

Section 5.3   <u>Authority of Managing Member to Bind the Company</u>.   Only the Managing Member shall have the authority to bind the Company.  Except to the extent limited by Section 4.2, the Managing Member has the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and legal affairs of the Company at the company's expense including, without limitation:

(a) To conduct the Company's business, to establish the Company's offices, and to exercise the powers of the Company except as specifically limited by this Agreement;

(b) To determine the design and layout of the Real Property ("Site") and its Development or any portion thereof in the consideration of the entire master plan of the Real Property to be redesigned at the election and discretion of the Managing Member  or in the accordance or similar to the approved or to be amended  "RDA" or proposed master plan not yet finally approved should amendments be required as generally demonstrated in *Schedule E*   and aesthetically or preliminary and general conceptually shown in *Schedule F* attached hereto to this Agreement but may be amended and or adapted at the discretion of The Managing Member subject to required approvals. .   It is the understanding of the Members that the final design and layout of the Site will be at the discretion of the Managing Member based upon the advice of the Company's experts and that the Managing Member shall have absolute discretion over every aspect of the Company's affairs including the designs, layouts, construction, development, redevelopment, theming, business, legal, tax, accounting, governmental compliance, promotion, branding, tenanting and other matters arising from or pertaining to the Company, the Real Property as defined herein, and of the site and any portion thereof.  The Managing Member shall maintain their best effort to give significant consideration to all Members of the Company, the Company's experts exclusively engaged by the Company at the discretion and the Managing Member's ultimate determinations, guided by  experts' recommendations subject to applicable law, and  tenants' desires, will, and sound value engineering and feasibility, naming, branding at the discretion of the Managing Member - linking all of the Supor Studio City sided integrations together in connection to the name Supor Studio City related destination or

campus for each Company's designated Supor Studio City or related side Companies, Properties, and Uses as well as the same for the RDA sided and identified in their respective Company Agreements as which if any side they may be designated as - as correlating to the name or Site to be known in interconnection to the brand name "American DreamLand or Dreamland or  Dreamland Studio City or a similar name as far as a site brand to be determined by the  Managing Member. Naturally its tenants and other naming rights licensees and site participants may also use their Company agreed to by its Managing Member names and approved branding techniques and fashions. Managing Member shall engage many management companies to perform contractor provided versus employee based management and services to be provided as independent contractors enjoying no right to employee status and or employee benefit or other rights other than as an independent contractor who are hires at will,  The Company by its Managing Member  and their independent third party managers who will be compensated as determined by the Managing Member will reserve it rights as to any instance of labor relations rights and unions, guilds, and or other coalitions of any kind.  The Company, the Supor related parties , their executives, professional, agents, employees etc. shall not interfere with or circumvent or otherwise communicate or act with any labor organization, press member, government official, regulatory or enforcement agency or body , contractor of Company, or its Managing Member, or any of their Executives, professionals,  or employees, related parties,   without advance written notarized authorized   permission directly from the President of the Managing Member including but not limited to any form of interference, circumvention, by statement, word, or deed, press conference - directly or indirectly by leak- including their Representative parties of the same without the written request to do so  and exactly as scripted possibly required media training at the discretion of the Managing Member for all such sanction event by event approved requirements to do so , from time to time. otherwise, the Managing Member  shall utilize authorized spokesperson trained to make such statements when, if, and how the Managing Member may at their sole discretion choose to do so.  The Company shall try to avoid doing business with third parties directly for liability purposes as possible at the discretion of the Managing Member. Independent hire at will contractors shall be hired to limit such liability and efficiently manage all operations with respect to services provided and otherwise.

(c) To select and engage all architects, contractors, experts, planners, engineers, surveyors, appraisers, attorneys, accountants, consultants, managers, brokers and other professionals to be engaged to carry out the "design build preferred method" development of the  Real Property or any portion thereof.

(d) To oversee and supervise the construction and development of the "Real Property";

(e) To oversee and supervise the marketing of the Real Property (sale and/or lease and/or use) of the Real Property or any portion thereof;

(f) To purchase insurance to protect the Company's business and property;

(g) To obtain, replace, modify, refinance and effectuate the presently defaulted Madison Collateralized and encumbering mortgages and liens (See Schedule B which identifies such terms and properties to be refinanced and repositioned / restructured as set forth below and/or at the Managing Member's discretion) as may be required concerning the existing from the blanket property and loan web of overbearing defaulted encumbrances that presently are in great danger of being lost because of such defaults caused by health hardship and bad third party actors and ill intent while such hardship festered beyond the since recovered medical capacity of "Supor" related interests now being rectified by this Agreement. A combination of methods including but not limited to replacing or modifying or purchasing such instruments and encumbrances by any combination of possible replacement, refinance, assignment, litigation, mitigation, credit enhancement, and related or not third party participation take out and or restructuring instruments arranged for by Managing Member at the Company's and the Real Property's securitization or secured debt, application, and guarantees provided mechanisms to replace with the least collateralization possible necessary to best feasibly possible eliminate and or reduce the presently overbearing blanket encumbrances spread out over now too many "Supor" related properties. The goal is to refinance or otherwise reduce and modify the restrictions over as many of those Madison encumbered properties as possible without losing any of them which are already in danger of being lost but will not. once we reduce the Madison encumbrances placing the overall debt and what will be needed to sustain all costs and expenses from now until the development goals are achieved from sources of funding to be obtained with as little encumbrance as overall possible at the discretion of the Managing Member which is as effectually and feasible possible.

What will be encumbered and unencumbered, at what cost, and how to reposition the lost fiscal health once better enjoyed will be challenges left to the strengths of the Managing Member to overcome in a plan that is in keeping with this goal. to reduce the blanket security encumbrance imposed by the overbearing and crippling Madison predatory scenario that already exists prior to this Agreement. The Managing Member shall act to avoid such dire consequences despite the current prime rate being almost five percentage points more than at the time when the Madison loans were made and the properties are already in forbearance foreclosure danger defaulted lis pendens status. Once better repositioned and less blanketed and saved, the Managing Member for the Company shall

arrange for or with the above, additional finance to close out as much Madison and other debt possible while including all carry to be necessary for the development and trade and either credit required to carry all costs anticipated during the development and operating period until the portion of the Real Property to be achieved under the amended master planning big picture as it pertains to the Real Property and this Company is substantially completed at which time a construction or development loan or refinance will reposition the debts and carry costs financed having by then created added value and setting the now improved Real property in a position of permanent c more conventional financing and a restored fiscal improved health.

The ultimate goal and objective is to secure permanent financing for the development or other indebtedness in the ordinary course of the Company's business, to deliver guaranties in connection thereto and to secure any of the Company's obligations by mortgage or pledge of any of the Company's property or income and to secure the same by mortgage pledge or other liens while fiscal health is restored , added value is achieved, and the Company can be in a position to enjoy prosperity. ;

(h) To conduct the sales, leasing, use, subdivision, consolidation, or conversion of all or any part of the Real Property.

(i) To institute, prosecute and defend any proceeding in the Company's name;

(j) To establish reserve funds in accordance with a budget to provide for future requirements for interim carry, operations, contingencies or any other reasonable purpose that the Managing Member deems necessary or appropriate;

(k) To sell, convey, mortgage, pledge, lease, exchange, and otherwise dispose of the Company's property in the ordinary course of business except as limited by this Agreement;

(l) To invest and reinvest the Company's funds;

(m) To open bank accounts and make financial   applications;   and

(n) To enter into all contracts, agreements, understandings and to undertake all acts to accomplish the matters, goals, and objectives  set forth  within this Agreement; and

(o) In connection with the Real Property and  to do all acts to the extent otherwise specifically provided herein in accordance with all applicable   law except at best

commercial efforts requirement to the extent unanimous consent is required under Section 4.2.

Section 5.4  Actions of the Managing Member. The Managing Member has the power to bind the Company as provided in this agreement.  No Person dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting on behalf of the Company, it is a material condition of this agreement that Managing Member is hereby recognized as an expert Team SPE created around a team of experts and personnel, contractors, and others who are acknowledged to be experts and their success and compensatory interests in the Agreement's investment requirements are solely based on the success of overcoming this embattled current fiscal conditions and to thwart that and those efforts in anyway will interfere and likely damage their expectations of success and return on their goals and objectives which is the inducement for them to partake in this Agreement to participate with the Company.

Section 5.5  Compensation of Managing Member. None, other than as specified in Section 7.5 and 7.6 herein.

Section 5.6  Full Time Not Required.  The Managing Member shall not be required to devote full time to the management of the Company business, but only so much time as shall be necessary or appropriate for the proper management of such business.

Section 5.7  Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, to the fullest extent permitted by applicable law from time to time, no Member shall have any liability to the Company or any Member by reason of being or having been a Member provided that this limitation of liability shall not affect such  Member's liability if an adverse judgment or other final adjudication establishes that (i) its acts or omission were in bad faith, were grossly negligent or involved intentional misconduct, (ii) it gained financial or other advantages to which it was not entitled, or (iii) it did not perform its duties as required under the Act with respect to distributions made in violation of the Act.

Section 5.8  Reliance on Information.  In discharging its duties, a Managing Member shall be fully protected in relying in good faith upon the records required to be maintained under Article III and upon such information, opinions, reports or statements by any disinterested Person as to matters the Managing Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the

Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

    Section 5.9   <u>Other Officers and Employees</u>.  The Managing Member may designate one or more individuals as officers of the Company, who shall have such titles assigned to them from time to time by the Managing Member provided, however, none shall receive a salary payable by the Company without the unanimous consent of the Members.

    Section 5.10   <u>Indemnification.</u>  To the fullest extent permitted by applicable law from time to time in effect but <u>subject</u> to the provisions of Section 5.7:

(a)   The Company shall indemnify and hold harmless the Members, Managing Member, officers, agents and employees of the Company and their respective directors, trustees, shareholders, officers,  employees, agents (an "Indemnitee") against  all costs, liabilities, claims, expenses, including reasonable attorney's fees, and damages (collectively, "Losses") paid or incurred by any such Indemnitee in connection with such Indemnitee's acts and omissions in the conduct of the Company's business provided such conduct was within the scope of such Indemnitee's authority.

(b)   The Company shall indemnify, defend and hold Indemnitee, harmless from and against, all losses arising from any demands, claims or lawsuits against any of the Indemnitees in connection with or resulting from his, her or its acts or omissions in his, her or its capacity as Managing Member, or as such an affiliate, agent, employee, consultant or other independent contractor of the Company or the Managing Member, or in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member.

(c)   Except for the costs of defending any pending, threatened or completed claim, action, suit, or proceeding against it for losses in connection with which it would be entitled to indemnification under this Section 5.10, provided, that such advances shall be repaid to the Company if the Indemnitee receiving such advance is found by a court of competent jurisdiction to be not entitled to indemnification hereunder.

(d)   All rights of an Indemnitee under this Section 5.10 shall survive the dissolution of the Company with respect to such Indemnitee, and shall inure to the benefit of his, her or its heirs, personal representatives, successors and assigns.

(e)  Notwithstanding anything contained herein to the contrary, any amount to which an Indemnitee may be entitled under this Section 5.10 shall be paid only out of the assets of the Company and any insurance proceeds available to the Company for such purposes.  No Member shall be personally liable for any amount payable pursuant to this Section 5.10, nor required to return any distribution made to it by the Company, nor required to restore any negative Capital Account balance to enable the Company to make any such payment.

(f)  Managing Member reserves the right to purchase any/all applicable insurance policies and binders at their sole discretion at the expense and benefit of /to the Company, including but not limited to errors and omission professional liability insurance, performance bonds, owner/contractor wrap policies , etc...

## ARTICLE VI

## Contributions and Capital Accounts.

Section 6.1   Capital Contributions.  Each Member shall make the following Capital Contribution upon execution hereof:

(a) Simultaneously with the execution of Supor, the 100% current owner of the "Real Property"  and "Property" shall cause the Real Property and Property to be contributed together with all improvements and rights thereon. Excluding the Mortgage Balance identified in Article 6.1(b) below, the Real Property shall be contributed free and clear of all liens and encumbrances.  Additionally, it is agreed that up until the time that the Madison encumbrances are refinanced and replaced with pre paid or escrow new replacement debt and carry budgets and major construction actually starts relative to the Real Property new master planning and corresponding approval collectively being in place , Supor" shall continue to utilize the Real Property alongside the Company's preliminary pre construction use and build up of the Company's plans and business/legal affairs and discretionary use at "Supor's " sole cost and expense and "Supor" during this interim transitional use period shall continue to enjoy its present partial use of the same and be entitled to receive all related income and utility and or use of the Real Property provided same does not delay or interfere with the Company's timely construction plan start dates and schedules or interfere with or encumber or damage the "Real Property" or its value and status , to be established and regulated by the Managing Member. This interim pre major new construction  construction will end once major construction permits are in place and

the new major construction substantially commences relative to the Real Property master planning.  Debt service and other Managing Member Pre Development Design Build and related development expenses may be established from refinance and other finance source of funding and barter or interim business opportunities of the Company or arising from the Real Property during this interim period may be collected and or otherwise enjoyed or realized by the company and or "ADR" to offset their expenses from the same but not rent or  compensation shall be due the Company and or "Supor" for the Company's use or benefit from their "Supor" carried but continually enjoyed consideration available to be received from the Real Property from "ADR" , its independent Affiliates, Officers, Principles, Professionals, Joint Venture Operators, Contractors  or Company during this interim period required to pre establish and create best ground floor up beneficial to the company's best interest and bartered business and development initial infrastructure natured start ups and positioning support activities to be determined necessary or beneficial to the Company 's long term plan at the discretion of the Managing Member.

(b) "ADR" shall contribute specific knowledge, expertise, and all resources, strengths of its development team, additional credit enhancements, and relationships required to restructure, refinance and or modify the existing blanket  Mortgage Balance which with all that will be required as stated herein prior to Design -Build responsibilities under and conforming to  this Agreement  shall be as much arranging for up to and fpr the Design Build and Operating budgets obviously as much as needed to realize the highest and best use for the Real Property and Company's business and legal affairs as determined by the Managing Member in the best interests of the Company with reference to the initial Madison and other restructuring, design, master planning and carry budgeting during the construction period alone an amount to be estimated  based upon current rates, market condition, inflation but subject to market fluctuations and actual time scheduling about One Hundred Seventeen Million Dollars ($117,000,000.) or whatever the minimum discretionary amount the Managing Member at its sole discretion determines how to cause or get to a best value engineered "add value balanced " commercial effort objective of equation but certainly stopping the presently dangerous pending foreclosure and acknowledged loan to own defaulted predatory on purpose  Madison Capital proceedings which are far along and : reduce the blanket collateral overbearing exposure, while seeking best rates, terms, conditions, no out of pocket but from loan proceeds closing, debt escrow reserves , carry budgets and initial expenditures and budgeting allowing from the same a hopeful two years of interim carry by the aforementioned or secondary or 2nd stage financing refinance measures while added value created by Marketing Manager decreases the construction and or take out financing and or investment LTV once added in the interim. Thus reducing the encumbrance of all the Madison blanket caused  encumbered properties by using their collective Company and preferred only or nearer to only 'ADR" sided

Companies and Real Property  encumbered related properties to the ease as much Supor City sided encumbrance as possible after the properties are first saved from foreclosure and mitigated loss. By employing security and credit and value  enhancements which will all add value to the Company and Real Property while freeing up the dangerous possibilities it currently is plagued with over numerous not affiliated properties. Basically propose applications of stronger than presently available to Supor showing "ADR" proposed resources and repositioning in addition to the Company's and its Real Property presently limited strengths to be independently and or jointly developed thus releasing those other Madison properties from overbearing encumbrance as much as feasibly possible given the escalated rates and inflation since the Madison Capital loans were originated, thus, generally and specifically improving the overall fiscal health for many of the related Supor family improved fiscal health outside of their business with "ADR" sided emphasized and secured as much as possible capabilities, mechanisms, and matters. All of which and all contained or arising from the same and 50% of the same including savings to be calculated as contributing "Capital Contribution " of and by the Managing Member.

Managing Member reserves the right to compensate at their and the Company's sole cost, choosing, and approval at their sole discretion an attorney of their choosing to represent "Supor" on and in all matters they determine effects the Company which may  include their discretionary best interest representation of "Supor" as it may or may not affect the Company's best interests and as Managing Member deems appropriate.   Managing Member reserves the right to dispute or litigate and suspend and or cancel or modify any matter or overcharge, if any, or pursue any legal cause of action (including but not limited to judicial intervention) to reduce the disputed Mortgage Balance (prior to the actual refinance closing or restructuring of the same) with the intent being that any gross net savings resulting from same are realized by the Company.  The Managing Member reserves the right, in its sole discretion, to refinance only a portion of or all of  the Real Property and upon such refinance to leave a portion of the Real Property unencumbered. Supor and related Supor parties relating to the mortgages and other properties shall fully cooperate and support such action if required by Company on a Time is of the Essence Basis. Additionally, "ADR" shall arrange for the Company:

(i)  to satisfy the disclosed liens and/or expenses currently encumbering the Real Property;

(ii)  to cover by credit enhancement or otherwise of behalf of the company norn advance with the intent of repayment , the initial startup costs including, but not limited to the initial, planning, design, entitlement amendment process, professional and other  legal fees for the formation of  the Company and the structuring of the refinancing addressed above;

(iii)  to cover the costs and expenses associated with any transfer of the Real Property to the Company including transfer taxes, and similar costs and expenses which may not be covered from the refinance proceeds.  Managing Member shall maintain its best effort to have all closing costs and taxes paid or paid back from future restructuring finance and refinance costs as opposed to from any Members additional required investment or further contribution when deemed in the best interest of the Company and its Members.

(iv) to meet the ongoing costs and expenses of the Company and the development of the Real Property which are not met from anticipated debt proceeds, permanent takeout loan proceeds, revenues generated from the sale or lease of the Real Property or other sources.

(c) "Supor"  shall upon, after, and prior to the execution of this Agreement, contribute all right, title and interest in any work product obtained or rendered by or to "Supor", and their product costs including but not limited to the following:

Any and all planning, entitlements , architectural or engineering permits, specifications, zoning submissions, surveys, building department submissions, applications, approved plans, appraisals (including to be required updates) compliance with outstanding objections' remedies and cures, if any, all certified Phase I and Phase II environmental studies and reports; certified appraisal reports, stipulations, forbearance agreements, prior litigations and records on pending matters that could adversely or otherwise effect the Company or "Supor" or Managing Members best interests, and all other professional work product items obtained with respect to the planning, design, entitlement with respect to and or could relate to the development of the "Real Property" or any property in the vicinity of the "Real Property" for which same was prepared for or currently exists.  The foregoing shall be provided immediately and in adequate form to enable the Managing Member to perform under this Agreement in a timely and best served fashion.


Section 6.2  <u>Neighboring Expansion Contribution Possibilities.</u>
"Supor" having and enjoying an excellent reputation in the Community and among their Harrison and Kearny neighbors as well as many of their own neighboring and local properties outside of the scope of this Agreement, there exists and will continually arise

the opportunities to expand the Company's and or the Company's Affiliates Holdings, developments, and or portfolio and business opportunities which is so desire on a case by case basis accordingly subject to Managing Members final discretion and strategy for the Company. "Supor" negotiate and canvas some of these possible opportunities in the best interest without circumvention or competition of any kind in and of the Company's best interests first to determine whether a lease, development, purchase, oe other business or legal opportunity makes sense for the Company to exclusively consider in the Company's best interest first. This shall include the possibility of the currently negotiated lease with the option to purchase of the Port Authority Piece involving and proximate to the "RDA" plan reference herein identified at and around the real property owned by the Port AuthorityTrans Hudson Corp. (Block 137, Lot 1) and other neighboring "RDA" real properties or those properties in near proximity to the same. or other "ADR" and Supor Family related properties in the vicinity of the same. It is agreed that all such properties shall afford the Company exclusive Rights to Purchase Options established upon the execution of this Agreement to be finally determined and reserved at the discretion of the Managing Member. The Members agree that the Company or Managing Member shall not be obligated to lease of purchase any expansion property but shall maintain their exclusive right to the same and have right of first and last refusal for any opportunity to purchase, lease, develop, operate under similar terms outlined in this Agreement for any "Supor" related and or Supor Family owned, leased, operated independent from this Agreement Portfolio Property whether such property is directly or indirectly available accordingly.

Section 6.3 Obtaining Financing. "Supor" and all related "Supor" parties and family members, Affiliates, interests, members, and their related Persons and third parties shall fully cooperate and provide all that is required to assist for success in all applications and measures required of them with respect to any financing best effort on a Time is of the Essence manner without exception or excuse under any circumstance. All that they have, know,m possess shall be shared with Company on such a basis for any business, legal, finance, operation, entitlement , design, development, tax, and affair at no cost to Company or Managing Member

Section 6.4 Additional Capital Contributions. No Additional Capital Contribution shall be required of "Supor". Any Additional Capital Contribution to be made by the Company or Managing Member shall NOT result in the dilution of the " Supor " Membership Interest. Any funds made available by the Managing Member to the Company either directly or indirectly shall be deemed Additional Capital.

Section 6.5   Board of Advisors.   Each 50/50 Members of the Company shall name and appoint up to three (3) authorized representatives with no employment rights or status but as independent contractors of their representative appointing Members to advise and communicate on their respective Members behalf. No such party shall be paid, compensated, entitled to benefits, or have any authoritative or administrative voting or other binding or acting authority or right whatsoever for the Company or as an advisory board member and appointee but rather shall serve on a confidential and non circumvention agreed to private and confidential basis only having first fully executed and agreed be abing by and with and executing the Confidentiality and Non Circumvention Agreement attached hereto in Schedule D of this Agreement which will be strictly enforced.  The Parties hereby recognize that the principal of ADR and his  relatives enjoy an excellent reputation in the arts/ entertainment industry and community as well as the financial and real estate development industries and although family member may be Hollywood and Academy Award Members -Acclaimed  Golden Globe Hollywood Foreign Press and other industry acclaimed talents with a large repertoire of some of the industry's most celebrated and successful films and content, have build and participated in many world renowned developments, and known to be celebrated by major press as a "Well Known Financier"- "Mogul", and both parents described as a "Power Couple" ,   the undersigned has spent a lot of resources to insure that his name is not to be known as a public figure and the Members and their associated parties to the Confidentiality and Non Circumvention which is a major materia part to this Agreement agree to not violate any part of such executed agreement found in Schedule D hereof acknowledging that the excellent covet reputation of the undersigned demands strict compliance with the same insofar as the same and the relationships and credibility that comes with that has a far greater value in the short and long term than any business ande or legal affair associated with any Company Agreement or interaction between the Parties does and without the strict accordance, privacy, confidentiality and non circumvention clause herein and contain within additional applicable terms and conditions. The Managing Member would not be entering into this Agreement or any Company Agreement of any kind with any Supor Party   Therefore if any event or instance violates,

impedes, conflicts, or otherwise damages the Schedule D Agreement or anything stated related to the above , it is hereby agreed  the Managing Member on behalf of the Company reserves the exclusive right  to terminate any advisory board appointee if they violate this required in advance written  agreement which may be amended from time to time by the Managing Member.  In the case of a second violation,  after due notice of such a violation by Supor or its Representatives as defined in the Schedule D agreement, there shall be

cause for the Managing Member to require and be entitled to Supor appointed Advisory appointees and damages may be sought accordingly.

Section 6.6  <u>Capital Account.</u>  A separate capital account shall be maintained for each Member or permitted transferee of a Membership Interest throughout the term of the Company in accordance with the rules of the Tax Regulations in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)  To each Member's Capital Account there shall be credited (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in the Tax Regulations); (ii) the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated; and

(b)  To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in the Tax Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of losses or items of loss or deduction that are specially allocated; and

(c) The Capital Account of a permitted transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the permitted transferee Member's Membership Interest was obtained; and

(d) In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations; and

(e) The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704 (b) of the Code and Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a

manner consistent with such Tax Regulations.   In the event the Managing Member determines that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with the Code or such Tax Regulations, the Members may make such modifications, provided that it will not materially alter the economic agreement among the Members.   The Members also shall (i) make any adjustments that are  necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

Section 6.7 <u>No Obligation to Restore Deficit Balance</u>.  Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

Section 6.8 <u>Withdrawal; Successors</u>.  A Member shall not be entitled to withdraw any part of its Capital Contribution or Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement.

Section 6.9 <u>Interest.</u>  No Member shall be entitled to interest on such Member's Capital Contribution or on any Profits retained by the Company.

Section 6.10 <u>No Personal Liability</u>.  No Member shall have any personal liability for the repayment of any Capital Contributions of any Member.

# ARTICLE VII

## Allocations and Distributions

Section 7.1 <u>Profits.</u>  After giving effect to the special allocations set forth in Sections 7.3 and 7.4, Profits for any Fiscal Year shall be allocated pro rata in proportion to the Distributive Interest of the Members as identified in Schedule "A" of this Agreement.

Section 7.2  Losses.  Losses shall be allocated pro rata in proportion to the Distributive Interest of the Members as identified in Schedule "A" in this Agreement.

Section 7.3  Special Allocations.  Unless determined otherwise by the Managing Member, the following special allocations shall be made in the following order as allowable by law:

(a)  Members Minimum Gain Chargeback.  Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations,  notwithstanding any other provision of this Article VII, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse  Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.7042(l)(5) of the Tax Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.7042(i)(4) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.7042(i)(4) and 1.704-2(j)(2) of the Tax Regulations.  This Section 7.3 (b) is intended to comply with the minimum gain chargeback required in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

(b)  Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.7041(b)(2)(ii)(d)(4), Section 1.7041(b)(2)(ii)(d)(5), or Section 1.7041(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specifically allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 7.3(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VII have been tentatively made as if this Section 7.3(c) were not in this Agreement.

(c)  Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-

2(g)(1) and 1.704-2(i)(5) or the Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 7.3(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VII have been made as if Section 7.3(c) of this Section 7.3(d) were not in this Agreement.

(d) <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Membership Interest.

(e) <u>Partner Nonrecourse Deductions</u>. Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(l) of the Tax Regulations.

(f) <u>Mandatory Allocations Under Section 704(c) of the Code</u>.  Notwithstanding the foregoing provisions of this Section 7.3, in the event Section 704 (c) of the Code or Section 704 (c) of the Code principals applicable under Section 1.704-1(b)(2)(iv) of the Tax Regulations require allocations of profits or losses in a manner different than that set forth above, the provisions of Section 704(c) of the Code and the Tax Regulations thereunder shall control such allocations among the Members.  Any item of Company income, gain, loss and deductions with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company or which has been revalued for Capital Account purposes pursuant to Section 1.704-1(b)(2)(iv) of the Tax Regulations and which is required or permitted to be allocated to such Member for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in Section 1.704-3(b) of the Tax Regulations; <u>provided, however</u>, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with Section 1.704-3(c) of the Tax Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Members' book and tax Capital Accounts attributable to such property; <u>further provided, however</u>, that any other method allowable under applicable Tax Regulations may be used for any contribution of property as to which there is agreement between the contributing Member and the other Members.

Section 7.4   <u>Curative Allocations.</u>   The allocations set forth in Sections 7.3 (a) through (f) (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations.   It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 7.4.   Therefore, other items of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 7.1 and 7.2.   The Members (i) shall take into account future Regulatory Allocations under Section 7.3(a) and 7.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 7.3(e) and 7.3(f) and (ii) may reallocate profits and losses for prior open years (on items of gross income) and deduction for the current year and future years.   This Section 7.4 shall control notwithstanding any reallocations or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

Section 7.5   <u>Distribution of Net Cash Flow</u>   Net Cash Flow shall be distributed to the Members as follows:

Net  Cash Flow shall be allocated pro rata in proportion to the Distributive Interests of the Members and as provided for in Section 7.6.

Such distributions, shall be made the earlier of when available and within 90 days of the end of each Fiscal Year to those persons recognized on the books of the Company as Members or as Assignees on the last day of such Fiscal Year.

Section 7.6 <u>Priority Distribution.</u>  Notwithstanding anything to the contrary contained herein, the Company shall distribute the following sums from the cash flow of the Company accordingly:

(a)  Full reduction and satisfaction of the Refinance loan(s);

(b  Brokers: None.

(c)  Full reduction and satisfaction of any subsequent preliminary Madison take out or reduction loans or finance structuring and or  Construction loan(s) including payment of all debt service regardless of the lending source;

(d)   After maintaining adequate reserves, in the reasonable discretion of the Managing Member, the balance to be distributed pro rata in proportion to the Distributive Interests of the Members as identified in Schedule "A" of this Agreement. In addition, during the course of development, any unanimously agreed to net rental income post construction completion and permanent take out financing closing will be distributed, from time to time, pro rata to the Membership.

## ARTICLE VIII
## Taxes

Section 8.1  Tax Matters Partner.  The Members designated Managing Member as the Tax Matters Partner of the Company pursuant to Section 623(a)(7) of the Code.  Such Member shall not resign as the Tax Matters Partner unless, on the date of this Agreement or such resignation, the Company has designated another Member as Tax Matters Partner and such Member has given its consent in writing to its appointment as Tax Matters Partner.  The Tax Matters Partner is authorized to employ such accountants, attorneys, and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties.  In addition, such Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

## ARTICLE IX

## Transfer of Membership Interest.

Section 9.1  Transfer of Membership Interest.  With the exception of any other provision contained herein, the Membership Interest of any Member may not be sold, assigned, transferred, gifted, exchanged, bequeathed, or otherwise disposed of in whole or in part, and a transferee shall not have a right to become a Member unless the following terms and conditions have been satisfied:

(a)   The Managing Member shall have consented in writing to the transfer and substitution; and with respect to the transfer by a Member of its membership interest to a person other than a Permitted Transferee, the unanimous consent of the Members is obtained;

(b)   The transferee shall have assumed the obligations, if any, of the transferor to the Company, including the obligation to fulfill the pro rata portion of the transferor's then existing or subsequently arising commitment allocable to the Membership Interest being transferred or portion thereof;

(c)   The transferee has executed this Agreement; and

(d) The transferor and the transferee shall have complied with such other requirements as all of the Members may reasonably impose, including the conditions that the transferee:

(i) Assumed all costs incurred by the Company in connection with the transfer;

(ii) Furnished the Company with a written opinion of counsel, satisfactory in form and substance to counsel for the Company, that such transfer complies with applicable federal and state securities laws and the Agreement and that such transfer, for federal income tax purposes, will not cause the termination of the Company under Section 708(b) of the Code; and

(iii)   Complied with such other reasonable conditions as the Managing Member may reasonably require from time to time.

(e)   Notwithstanding the foregoing, a Member may transfer the economic rights in the Company (i.e. the right to such Member's share of the profits and losses of the Company and the right to receive distributions from the Company, but not the voting rights with respect thereto) to his, her or its spouse, child and/or a spouse or either a child and/or a trust for the benefit (exclusively) of any of the foregoing or a parent or an entity wholly owned by the principals or a Member, upon the condition, however, that the transferor shall remain liable to the Company and its other Member with respect to that Member's commitment created or referred to under the terms of this Agreement.

Section 9.2   Right of First Refusal. "Supor" shall afford "ADR" right of first refusal before allowing any transfer application or thawing marketed their remaining interests but if them do so, any transferee coupled with their or any party's Membership Interest shall never exceed in the aggregate more than a 49% total Membership Interest in the Company.

Section 9.3   Status of Substitute Member.   A Substitute Member admitted to the Company shall have all the rights of a Member and shall obtain the Membership Interest

of the transferring Member as set forth in Schedule "A" which shall be amended to reflect the admission of the Substitute Member.

Section 9.4  <u>No Pledge or Encumbrance of Interests</u>.  No Member may pledge or encumber a Membership Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the advance written and duly authorized consent of the Managing Member executing this Agreement below. .

Section 9.5  <u>Member's Death, Dissolution or Incompetency</u>.  Upon the death, dissolution, or adjudication of incompetence of a Member, such Member's successors, executors, administrators or legal representatives shall have all the right of a Member (Except as provided by the last sentence of Section 9.6) for the purpose of settling or managing such Member's estate, AT THE SOLE APPOINTMENT OF JOSEPH SUPOR III IN HIS CAPACITY AS THE AUTHORIZED REPRESENTATIVE FOR ALL SUPOR ENTITIES AND INTERESTS AND AS A THE SOLE TRUSTEE FOR ANY COMPANY, PERSON. ENTITY, OR INTEREST IN ANY SUPOR PROPERTY AND EXCLUSIVELY FOR THIS COMPANY.  HE WILL WITHIN SEVEN BUSINESS DAYS NOTIFY AND LEGALLY PROVIDE THE COMPANY WITH A STATEMENT DETAILING ALL ASPECTS OF WHO AND HOW HE AUTHORIZES TO BE THE AUTHORIZED REPRESENTATIVE IN   ANY  SUCH  MATTERS  OF  HIS SUCCESSION IS SHE SHOULD NOT BE ABLE TO ACT AT FULL CAPACITY OR AT ALL TO BE DETERMINED BY HIM. THE SAME SHALL BE FULLY RESPECTED AND ADHERED TO ACCORDINGLY, WITHOUT EXCEPTION, AT HIS PRESTATED CHOICE AND WILL. As for the Managing Member , the same shall be the undersigned's father with the advice but not consent of Joseph C. Vozza, Esq. and Thomas J. Kellerman until the undersigned's father elects to appoint a substitute authorized representative and replacement Managing Member at his sole discretion  accordingly - including such power as such Member possessed to substitute a successor as a transferee of such Member's Membership Interest in the Company and to join with such transferee in making the application to substitute such transferee as a Member.

Section 9.6  <u>Transfer Not in Compliance with this Article Void</u>.  Any attempted transfer of a Membership Interest, or any part thereof, not in compliance with this Article shall be void <u>ab</u> <u>initio</u> and ineffectual and shall not bind the Company.  Any transfer in contravention of this Article IX and any transfer which is made that would cause a termination of the Company for federal income tax purposes under Section 708(b) of the Code shall be void <u>ab</u> <u>initio</u> and ineffectual and shall not bind the Company or the other Members.

Section 9.7 <u>Voluntary Withdrawal</u>.  No Member shall have the right or power of Voluntary Withdrawal from the Company.

Section 9.8 <u>Involuntary Withdrawal</u>. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an interest holder but shall not become a Member without the unanimous consent of the remaining Members.  If the Company is continued the successor interest holder shall have all the rights of a Member but shall not be entitled to receive in liquidation of the interest the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company.

## ARTICLE X

## Dissolution and Winding Up.

Section 10.1 <u>Dissolution.</u>  The Company shall be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)  The expiration of the term of the Agreement, unless the Company is continued with the consent of a majority in interest of the Membership Interest of the Members;

(b)  The unanimous written consent of all of the Members; and

(c)  The sale of all or substantially all the assets and property of the Company.

Section 10.2 <u>Limited Right to Transfer</u>.  N/A.

Section 10.3 <u>Effect of Dissolution.</u>  Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of New York and/or other applicable State Authority.

Section 10.4 <u>Distribution of Assets on Dissolution</u>.  Upon the winding up of the Company, the Members acting together or such Person(s) designated by the Members representing at least a majority of the Membership Interest shall take full account of the

assets and liabilities of the Company, shall liquidate the assets (unless the Members determine that a distribution of any Company property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a) First, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses or liquidation;

(b) Second, to the setting up of any reserves which the Members may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company.  Such reserves may be paid over by the Members to an escrow agent or trustee selected by the Members to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Members shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c) Then, in accordance with Section 7.6 (a), (b) and (c) to the extent any items (a), (b) and (c) remain unsatisfied.

(d) Such distributions shall be in cash or property or partly in both, as determined by the Managing Member.

(e) If at the time of liquidation the Managing Member shall determine that an immediate sale of some or all the Company's property would cause undue loss to the Members, the Managing Member may, in order to avoid such loss, defer liquidation.

(f) Then, to the Members pro rata in proportion to their Distributive Interest.

Section 10.5    <u>Winding Up and Filing Articles of Dissolution.</u>    Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of New York (and/or other applicable State authority for filing).  The articles of dissolution shall set forth the information required by the Act.  The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate

provision therefore has been made, and all of the remaining property of the Company has been distributed to the Members.

# ARTICLE XI

## More Miscellaneous.

Section 11.1  Notices.   Notices to the Company shall be sent to the principal office of the Company as stated above and additionally by Email. Notices to the Members shall be sent to their addresses AND the email addresses set forth on Schedule "A".  Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 11.1.  Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered by U.S. Certificate of Mailing, or Certified Mail Return Receipt Requested, or  U.S. Express Mail to such Members at such address AND to the email addresses disclosed in Schedule A for each respective Member.

Section 11.2  Headings.  All Article and Section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or Section.

Section 11.3  Entire Agreement.  This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

Section 11.4  Binding Agreement.  The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

Section 11.5  Severability.  If any portion of the Agreement, or the application of such provision to any party, person or circumstance, shall be held invalid, illegal or unenforceable, the remainder of the Agreement, or the application of such provision to a party, person or circumstances other than those as to which it is held invalid, illegal or unenforceable shall not be affected thereby.  If the operation of any provision of the Agreement would contravene the provisions of the Act, such provisions shall be void and ineffectual.

Section 11.6  <u>Counterparts.</u>  The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart of the Agreement shall for all purposes be deemed a fully executed instrument.

Section 11.7  <u>Governing Law</u>.  The Agreement shall be governed by and construed in accordance with the laws of the State of New York.  In any legal suit, action, proceeding or controversy arising out of or relating to the Agreement the parties hereto irrevocably consent to the sole and exclusive jurisdiction of the Supreme Court of the State of New York located in whatever County the Company maintains its Principal Office in at the time any law seeks to be determined or applied to the Company at such time a response may be required by and  and the parties waive any objection which such party may have now or hereafter to the venue of any such suit, action, proceeding or controversy.

Section 11.8  <u>No Right of Creditors and Third Parties Under Agreement</u>.  The Agreement is entered into among the Company, its Members, and their successors and assignees. The  Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.  Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

Section 11.9  <u>General Interpretive Principles.</u>  For purposes of the Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) The terms defined in the Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) Accounting terms not otherwise defined herein have the meaning given to them in the United States in accordance with generally accepted accounting principles; and

(c) References herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of the Agreement - any error in identification of the same shall not negate or alter the intended meaning and purpose of the same.

Section 11.10  <u>Further Assurances.</u>  Each Member hereby agrees to execute and deliver such further documents and instruments as otherwise reasonably required to effectuate the intent of the Agreement in a timely fashion.

Section 11.11  <u>Waivers, Rights and Remedies Cumulative.</u>  The failure of any party to pursue any remedy for breach or insist upon the strict performance of any covenant or condition in the Agreement shall not constitute a waiver of such right with respect to any subsequent breach.  Except as otherwise set forth herein, the rights and remedies are cumulative, and the pursuit of any one right shall not preclude, or constitute a waiver of, the right to pursue any other remedies.  All rights and remedies provided under the Agreement are in addition to any other rights the parties may have in law or equity.

Section 11.12  <u>Previous Liabilities.</u>  Supor hereby represents that with the exception of the previously referenced Mortgage Balance encumbering the Real Property and Supor, (to be satisfied and or remedied or restructured at the refinance and/or construction loan closings); there are no other liabilities or obligations tax or otherwise that the Company shall be responsible for satisfying.  Any and all other liabilities or obligations that may be owed prior to the execution of this Agreement, shall not be the responsibility of the Company or the Managing Member.  In the event there are past liabilities or obligations, or encumbrances of any kind effecting this Agreement, the "Real Property" or the Company in any adverse manner, Managing Member for the Company, may at their sole discretion remediate or  satisfy the same in a manner deemed necessary, at their sole discretion, and offset any/all costs and expenses relating to same from the responsible party ("Supor"and or Supor related  partners) as they deem appropriate; including but not limited to reasonable legal fees and court costs incurred as a result of same.

Section 11.13 <u>Confidentiality, Non-Circumvention, and Member Privacy.</u>  "Supor" and its partners shall agree to the confidentiality, non-circumvention, as set forth in Schedule " D " herein.

Section 11.14 <u>Representation by Counsel</u>.  Each Member represents that it has had an opportunity to review this Agreement prior to execution with independent

legal counsel of their choice and will not contest or argue this defense by their hereby election not to do so.

IN WITNESS WHEREOF, the fully authorized parties hereto have executed the Agreement as of the date of the Agreement.

Agreed to by and between

The Members:

1. American Dream Resorts, Ltd. ("ADR" , and as on behalf of "Managing Member" and "Member " of and for the "Company" being Deed Grantee)

By: _____

Joseph Gentile ("JR"), ,aka officially Joseph J. Gentile  President

NOTARY PUBLIC :

STATE OF NEW JERSEY:

                                              ss:

COUNTY OF HUDSON:

I CERTIFYthat on  the ____, of May 2023,  Joseph Gentile ("JR") , aka  officially Joseph J. Gentile , personally came before me and acknowledged under oath, to my satisfaction , that this person :

(a)      Is named and personally signed this Agreement signed above.


_____
NOTARY PUBLIC SIGNATURE


Two other Agreement required Signatures (Joseph Supor aka Joseph Supor III and Roseann Supor) with respective notary public witnesses  are continued on the next  2 pages.
AND

2.  Supor Properties Enterprises LLC ("Supor",   Joseph Supor aka Joseph Supor III, personally  and as:  Managing Member of Supor Properties Enterprises  LLC, as well as S&B Realty , and as Trustee for the Marital Trust Under the Last Will and Testament of Joseph Supor , Jr.,  and as the Authorized Representative of all relevant and required Supor related Persons and parties  and as Authorized Deed Grantor Deed Grantor related and  as  Authorized Representative member of the Grantor  and as Member" of the "Company" . In all capacities as required by law as Authorized Representative for all of the above and all hereby represented and required and binding on the Agreement parties, Company, and Members)

By: _____
Joseph Supor aka Joseph Supor III, et al
Authorized representative for all of the above and required


NOTARY PUBLIC

STATE OF NEW JERSEY:
                                                            ss:
COUNTY OF HUDSON:

I CERTIFYthat on  the  ____, of May 2023,  Joseph Supor  aka  Supor III , personally came before me and acknowledged under oath, to my satisfaction , that this person :

(b)      Is named and personally signed this Agreement signed above.


_____
NOTARY PUBLIC SIGNATURE

 Roseann Supor 's signature with the respective notary public witnessed affirmation  is continued on the next  page.

AND


 3.  Supor Properties Enterprises LLC ("Supor",  Roseann  Supor  for Deed Grantor Supor Properties Enterprises  LLC, as well as S&B Realty , and for the Marital Trust Under the Last Will and Testament of Joseph Supor , Jr.,  and as the Authorized Representative of all relevant and required Supor related Persons and parties  and as member of Supor  and as Authorized Representative of the  "Member" or the "Company" . In all capacities as required by law as Authorized Representative for all of the above and all hereby represented and required and binding on the Member parties, Company, and Members)


    By: _____
Roseann Supor , et al
Authorized representative for all of the above and required


NOTARY PUBLIC

STATE OF NEW JERSEY:

                                                    ss:

COUNTY OF HUDSON:

I CERTIFYthat on  the ____, of May 2023,  Joseph Supor  aka  Supor III , personally came before me and acknowledged under oath, to my satisfaction , that this person :

(c)      Is named and personally signed this Agreement signed above.


_____
NOTARY PUBLIC SIGNATURE

## SCHEDULE A

NAME                                    MEMBERSHIP INTEREST          MEMBERSHIP
STATUS

SUPOR PROPERTIES ENTERPRISES LLC ("Supor"")        50..0%
"Member"OF "Company"
 EIN: _____
Address: 433 Bergen Avenue, Kearny, New Jersey 07032
Email Address: OWNER24@JSUPOR.COM


American Dream Resorts, Ltd.  ("ADR")                  50.0%
"Managing Member" and "Member" of "Company:
 EIN: _____
Address: 135 Pinelawn Road, 125N, Melville, NY 11747
 Email Address:  JR@AMERICANDREAMRESORTS.COM


MEMBER DISTRIBUTIVE INTERESTS:
* All Distributions, Profits and Losses shall be distributed accordingly:

"Supor"                 50%
"ADR "                  50%

## SCHEDULE B

### MADISON LOAN DOCUMENTS

( KEVIN TO ATTACH HERE. GOING TO NEED FOUR (4 ) COMPLETE COPIES for this agreement and a total of 36 copies for all nine agreements in toal as attachments )

### SCHEDULE C

**DEED/ LEGAL DESCRIPTION TO BE RECORDED**

**AND AS PROVIDED FOR UNDER DEFINITION(S) SECTION OF THIS
AGREEMENT (ab) - REAL PROPERTY  aka**

*BLOCK: 149*
*LOT:     1.02*
*"SUPOR" REPRESENTED APPROXIMATE ACREAGE:  1.25  acres.*

WE HAVE THESE AND WILL MAKE 4
COPIES OF EACH WHEN WE GET THERE
LATER FOR EACH AGREEMENT TO
ATTACH X 9 AGREEMENTS OR A TOTAL
OF 36 COPIES INCLUDING THIS
AGREEMENT

**SCHEDULE D**

*Confidentiality, Non-circumvention Agreement*

( KEVIN TO ATTACH HERE. GOING TO NEED FOUR (4 ) COMPLETE COPIES OF ALL PAGES : final version sent this morning - will need 4 complete copies x 9 templated agreements or a total of 36 copies INCLUDING THIS AGREEMENT for all the agreements- please have ready )

## SCHEDULE E

### *2017, 2021, 2023 RDA Agreements and approval with Extension Renewal Letter from HRA and the Town of Harrison, entire approved ADA,*

( KEVIN TO ATTACH HERE. GOING TO NEED FOUR (4 ) COMPLETE COPIES OF ALL OF THE ABOVE FOR THIS AGREEMENT AND A TOTAL OF 5 SETS OF EVERYTHING X 5 RDA COMPANIES (WITH 6 PROPERTIES BUT 2 & 3 ARE COMBINED FOR ONE COMPANY AGREEMENT. TOTAL OF 25 COPIES FOR IT ALL  . FOR OTHER 4 NON RDA PROPERTIES (STUDIO SIDE- WILL NEED 4 COPIES OF STUDIO MASTER PLAN AGREEMENT OR APPROVALS OR A TOTAL OF 4 X 4 COPIES OR 16 COPIES READY TO ATTACH.

**SCHEDULE F**

*Latest (2019) approved RDA Master Plan Conceptual Designs and final approved Design Scheme*

( KEVIN TO ATTACH HERE. GOING TO NEED FOUR (4 ) COMPLETE COPIES OF ALL PAGES FOR TOTAL OF 5 RDA SIDED PROPERTIES OR A TOTAL OF 20 RDA SIDED PROPERTY ATTACHMENTS. AND FOR THE STUDIO SIDE PROPERTIES , 4 PROPERTIES X 4 COPIES OF CONCEPTUAL STUDIO CAMPUS MASTER  PLAN  = 16 copies of the same to attach )

## SCHEDULE G

**TRUSTEE AUTHORIZATION AUTHORIZING JOSEPH SUPOR ALA JOSEPH SUPOR III AS TRUSTEE AND AUTHORIZED REPRESENTATIVE TO FULLY ACT UPON THE BEHALF OF THE MARITAL TRUST UNDER THE LAST WILL AND TESTAMENT OF JOSEPH DUPOR , JR. WHICH SUPOR HEREBY REPRESENTS IS IN GOOD STANDING, CURRENT, AND HEREBY AUTHORIZED FULLY ACT UPON AND FULLY BIND THE AFOREMENTIONED TRUST AND ANY OTHER APPLICABLE SUCCESSION , INTEREST, RIGHT, TITLE, AND LEGAL AUTHORITY TO ACT AND HAS DONE SO HEREIN IN THIS "AGREEMENT ALONG WITH ALL OTHER SUPOR RELATIVE AND REQUIRED PERSONS, ENTITIES, PARTIES REQUIRED TO EXECUTE AND ACT IN ACCORDANCE WITH THIS AGREEMENT WITH ALL OF ITS TERMS AND CONDITIONS.**

( KEVIN TO ATTACH HERE. GOING TO NEED FOUR (4 ) COMPLETE COPIES OF ALL PAGES x any and all marital trust involved properties and agreements.  )

**CONFIDENTIALITY & NON CIRCUMVENTION AGREEMENT**

This Confidentiality Agreement (this "<u>Agreement</u>") made this 8th day of May, 2023, by and between & collectively among independent entities RDA 1: Supor Properties LLC; RDA 2&3: Supor Properties LLC; RDA 4: J Supor 136-1 Realty, LLC; RDA 5: Supor 172 Realty LLC; RDA 6: Supor Properties 600 Urban Renewal LLC; Supor MT, LLC; Supor Studio City 2 LLC; Supor Studio City 3 LLC; Supor Studio City 4 LLC with their address at % Joseph C. Vozza, Esq., 135 Pinelawn Road, Suite 125 North, Melville, NY 11747 and American Dream Resorts, Ltd. and their independent managing agents TeamDream, Inc., DreamLand Castle, Inc., American Dream Studios, Ltd., Dream-Your-Dream Events Corp., and any of their Principals, Shareholders, executives, Attorneys, agents, partners, relatives, family members, heirs, trustees, Directors, employees, contractors, professionals, assigns, designees, investors, lenders, successors, and related Persons and entities including but not limited to future parties of such parties to be named from time to time that shall become protected upon the Notice of the same as if they had executed this Agreement (collectively, the "<u>Disclosing Party</u>") and  collectively among independent entities, but all collectively responsible: Supor Properties Enterprises, LLC; J Supor 136-1 Realty LLC; Supor 172 Realty LLC; Supor Properties 600 Urban Renewal LLC; Joseph Supor aka Joseph Supor III; Joseph Supor III, as Trustee for The Marital Trust Under the last Will and Testament of Joseph Supor, Jr; Roseann Supor, Roseann Supor for The Marital Trust Marital Trust Under the last Will and Testament of Joseph Supor, Jr; Supor Family LLC; Supor Properties-400 LLC, JS Realty Properties LLC, JL Realty Properties LLC; S&B Realty , and any/all past, current, or future Supor Family Company related, owned, managed, contracted third party and or associated party including but not limited to any; principals, shareholders, members, managers, executives, attorneys, agents, partners, relatives, family members, heirs, trustees, directors, employees, contractors, assigns, designees, investors, lenders, successors, and related Persons/Parties/Entities, but not limited to all such related parties and persons unamed, but related to any of the aforementioned named Parties (collectively the "<u>Recipient</u>" or

1

"Recipient's"), having an address at 433 Bergen Avenue, Kearny, NJ 07032.  The Disclosing Party and the Recipient may be referred to herein collectively as the "Parties" and each individually as a collectively responsible "Party".  All capitalized terms used in this Agreement, unless otherwise defined herein, shall have the meanings given to such terms in Section 1 hereof.

WHEREAS, the Recipient has previously obtained and/or desire to obtain confidential and proprietary information from Disclosing Party for the purpose of benefiting and officiating  from a business relationship with Disclosing Party in connection with Project(s), and

WHEREAS, the Disclosing Party desires to share information with the Recipients and other third parties which are intended to benefit the Parties conditioned on the understanding that the Recipient will not disclose the information or use such information to the disadvantage of the Disclosing Party.

NOW, THEREFORE, in consideration of the provisions and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.    Definitions.

"Confidential Information" means all information and data concerning the Project or the Disclosing Party's or any of its Representatives' business processes, organization, strategies or prospects; merchandise designs and strategies; customer or supplier information; stores project components- theming - demographic information; marketing, leasing, sponsorship and branding studies,any aspect of development or its financing and or applications of any kind; status reports, deals, strategies and/or plans; technical know-how, software, pricing, inventory levels; historical and projected rent, revenue, sales, expenses

2

and margins; all financial statements and projections; all existing and potential debt and equity financing and capital structures; all development and other budgets, schedules and progress reports; any information prepared by consultants; or any other information or data similar to the foregoing, which is, has been, or will be developed, planned, or acquired for the Project(s) as well as previous developments or planned projects including any hybrid adaptations in whole or in part, , in whatever form or format (oral, electronic or physical) that information is communicated, whether provided before or after the date of this Agreement, whether provided by Disclosing Party or any of its Representatives, and whether or not marked or identified as confidential, intellectual property, copyright, trademark, or otherwise proprietary. Confidential Information shall also include any such information regarding anything arising from and The actual agreements made or to be made between any of other respective parties for any Real Property or Company Related project and or business, legal development, finance, generational matter alike with the same concerning any American Dream Studios created or planned projects considered/created projects, any project planned or conceived for the Harrison/Kearny Projects in New Jersey (**all of the above hereinafter "Project(s)")** The term "Confidential Information" shall not include: (1) any information or data that was generally available to the public prior to the time of first disclosure to the Recipient (other than as a result of being disclosed in breach of this Agreement); or (2) any information or data that was developed independently by the Recipient prior to the time any Confidential Information was first disclosed by Disclosing Party or its Representatives and without the knowledge, aid, application or use of the Confidential Information.

"<u>Disclosing Party</u>" means the Disclosing Party as defined in the preamble above.

"<u>Project</u>" means any business opportunity, project or prospect in any area introduced by the Disclosing Party or its Representatives to the Recipient, including, but not limited to, the development, planning, leasing, financing and operation in connection with any of the Properties, also in addition to as defined elsewhere herein.

"<u>Recipient</u>" means, individually and collectively, the Recipient as defined in the preamble above, together with all direct and indirect affiliates, companies, subsidiaries, corporations and entities that are related to, associated or affiliated with, or managed by Recipient, together with their respective successors and assigns, in addition to as defined everywhere herein.

"<u>Representatives</u>" means, with respect to each Party, such Party and any other related entities or persons, together with their respective members, shareholders and other equity holders, financiers, lenders, investors, guarantors, and their collective directors, officers, contractors, employees, agents, attorneys, professionals,  advisors. and advance approved or permitted assigns.

2.    <u>Confidentiality Obligations</u>.  Recipient represents, warrants and covenants to the Disclosing Party that Recipient and its Representatives shall:

(a)    keep the Confidential Information strictly confidential and shall not distribute, disclose or disseminate in any way or form the Confidential Information to anyone without the express prior written consent of the Disclosing Party, except as expressly provided in <u>Section 3</u> hereof;

(b)    treat the Confidential Information with the same degree of care as is used with respect to the Recipient's own information of like importance that is to be kept secret, but in no event less than reasonable care;

(c)    use the Confidential Information solely for the purpose of evaluating the business relationship and not for any other

reason or purpose, without the express written consent of Disclosing Party; and

(d)    not make any copies of all or part of the Confidential Information, except as expressly provided in <u>Section 3</u> hereof, without the prior written consent of the Disclosing Party.

Without the prior written consent of Disclosing Party, or except as may be required by law, neither Recipient nor any of its Representatives shall disclose to any person that discussions or negotiations are taking place between Disclosing Party and Recipient concerning the business relationship, including the status of such discussions or negotiations. Recipient may not, in any event, engage in any advertising, marketing or promotion that discloses the existence of this Agreement or the proposed business relationship between Recipient and Disclosing Party.

3.    <u>Permitted Disclosures</u>.

(a)    Recipient may make a disclosure of Confidential Information to Recipient's Representatives only if such Representatives (i) need to know such information for the purpose of evaluating the business relationship, (ii) are informed by Recipient of the confidential nature of the Confidential Information; and (iii) agree in writing to be bound by the terms of this Agreement for the benefit of the Disclosing Party. Recipient agrees that it shall ensure its Representatives' compliance with this Agreement and shall be jointly and severally responsible for any breach of this Agreement by any of its Representatives. Recipient shall promptly notify the Disclosing Party if Recipient becomes aware of any breach of confidence by any of its Representatives and provide the Disclosing Party with all reasonable assistance, at Recipient's cost, in connection with any proceedings which the Disclosing Party may institute against Recipient. Upon Disclosing Party's request, Recipient shall identify all Representatives to whom Recipient has provided Confidential Information.

Recipients will not discuss the Project with, or provide access to any Confidential Information to, any Representatives of the Disclosing Party who have not first been identified and approved, in writing, in advance, by the Disclosing Party as participating in the Project. Pre Agreed to Disclosing Party Authorized Non Voting or Administrative/ Non- Authoritative Board of Manager approved Parties of Communication shall initially be Joseph Gentile ("JR"), Joseph Gentile, A Gentile Family Member to be assigned from time to time, Joseph C. Vozza, Esq., Thomas J. Kellermann CPA, Likewise for Recipient shall be Joseph Supor III, Linda Supor, Kevin Cassidy, Louis Pontoriero, and whomever Joseph Supor III shall name or change from time to time subject to the terms of each Company's operating agreements.

(b)    In the event that Recipient (or anyone to whom Recipient transmits the Confidential Information, including its Representatives, whether or not in compliance with this Agreement) is requested, pursuant to subpoena, requests from regulatory bodies or agencies, or other legal process, to disclose any of the Confidential Information, Recipient shall immediately notify Disclosing Party in writing of the existence, terms and circumstances surrounding such request so that Disclosing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. Recipient shall cooperate with the Disclosing Party, at Recipient's cost, to avoid or limit disclosure and to gain assurances as to confidentiality from the entity to which the Confidential Information is to be disclosed. In the event (i) such protective order or other remedy is not obtained, or (ii) Disclosing Party waives compliance with the provisions of this Agreement, Recipient (or such other person who received the Confidential Information) shall furnish only that portion of the Confidential Information that is legally minimally required.

4.    <u>Return of Confidential Information</u>.    All Confidential Information shall remain the property of Disclosing Party.

Immediately following the earlier of: (a) the end of Recipient's involvement with the Disclosing Party with respect to the Project; or (b) receipt of a written request from the Disclosing Party, Recipient shall:

    (i)    return to the Disclosing Party or destroy all documents and materials (including computer media) or such parts thereof that contain or reflect any Confidential Information, together with any copies which are in the Recipient's possession or control or are in the possession or control of any of its Representatives, provided that such information is in a form which is capable of delivery or destruction;

    (ii)    permanently erase all Confidential information from any computer, word processor, mobile telecommunications device or similar device into which it was programmed by or on behalf of Recipient or by or on behalf of its Representatives; and

    (iii)    provide Disclosing Party with a letter signed by its authorized officers confirming its compliance with clauses (i) and (ii) above.

Recipient acknowledges that neither the destruction, return nor deletion of any Confidential Information will release it from the obligations contained in this Agreement. Recipient shall be permitted to retain Confidential Information to comply with applicable law or regulation or bona fide internal compliance policy requirements (provided that the confidentiality obligations contained in this Agreement shall continue to apply to such retained Confidential Information for so long as it is retained.)

5. <u>No Commitment</u>. The furnishing of the Confidential Information does not constitute an offer or an acceptance of any nature whatsoever, nor form the basis of any representation in relation to any contract. No commitment or legal obligation of any kind whatsoever exists on the part of either Party to enter into a business relationship, or as to what the specific terms of such a relationship might be. Each

Party is free to terminate discussions concerning a possible business relationship at any time.  Further, the Recipient shall have the right to refuse to accept any information under this Agreement and nothing herein shall obligate the Disclosing Party to disclose to the Recipient any particular information.  Nothing contained or implied in this Agreement creates a joint venture or partnership between the Parties or makes one Party the agent or legal representative of the other Party for any purpose. Notwithstanding anything to the contrary, Recipient and its Representatives hereby agree that they will not, without the prior written consent of the Disclosing Party, (i) circumvent, or cause, permit or assist others to circumvent, the Disclosing Party or any of its related parties with respect to the Project,  (ii) communicate with, negotiate with, or enter into, or cause, permit or assist others to enter into, any transaction or agreement with any person, entity or lender to acquire any direct or indirect debt, equity, property or other interest relating to the Project, (iii) communicate with an existing or potential tenant, licensee or sponsor with respect to the Project or (iv) conduct any business, obtain any beneficial interest or have any involvement related to the Project in any manner whatsoever. Neither Recipient nor any of its Representatives will, for any purpose whatsoever, without the prior written consent of the Disclosing Party, contact (directly or indirectly) any person or any entity involved, or potentially involved, in any business dealing with the Disclosing Party, or solicit or hire any staff or consultant of the Disclosing Party unless agreed to otherwise, in writing, by the Parties.

6.    No Representations or Warranties.    Recipient shall be responsible for making its own decisions in relation to the Confidential Information and any other information relating to the Project and acknowledges that neither Disclosing Party nor any of its Representatives make any representation, warranty or undertaking, express or implied, as to the accuracy, reliability, completeness or reasonableness of the Confidential Information or any other information relating to the Project.

7.    <u>Intellectual Property</u>. It is understood that no copyright, trademark, patent or other proprietary right or license is granted by this Agreement, and Disclosing Party expressly reserves all rights thereto.  The disclosure of Confidential Information and any materials that may accompany the disclosure shall not result in any obligation to grant the Recipient any rights therein.  Recipients may not use or simulate names, brands, logos, themes, designs, components, components, business plans or elements of the same, service or trademarks of Disclosing Party or its affiliates for any business purpose whatsoever, and Disclosing Party reserves all rights and equity in law for the protection of its intellectual property.

8.    <u>Term</u>.  This Agreement shall be effective as of the date on which it has been executed by both of the Parties, but its terms shall apply to disclosures made before and after the effective date.  This Agreement shall automatically terminate five (5) years from its effective date at which time another of exact terms and conditions will be reinstated for another five (5) years, and so on. If such renewal is not effectuated, it is agreed that this Agreement will automatically continue to be renewed.   The rights and obligations that accrue prior to any termination, as set forth herein, shall survive the termination of this Agreement.

9.    <u>Injunctive Relief/Attorneys' Fees</u>.  Recipient acknowledges that money damages may not be a sufficient remedy for breach of this Agreement and Disclosing Party shall be entitled to seek preliminary and permanent injunctive relief for any such breach without having to prove actual damages, which rights shall be cumulative and in addition to any other rights or remedies to which Disclosing Party may be entitled at law or in equity.  If enforcement of the obligations herein is required, the Recipient shall reimburse Disclosing Party for all costs and expenses, including reasonable attorneys' fees, incurred by Disclosing Party in this regard.

10.    <u>Governing Law/Venue</u>.  This Agreement shall be governed by the laws of the State of New York, applied without regard to conflict

of laws principles. Any dispute arising in connection with this Agreement will be heard only in a state or federal court situated within the State of New York, sitting in whatever County the Deed Holding Companies Principal Offices are located in like manner as specified in their operating agreements, as applicable, or in any court within that jurisdiction. The Parties hereby irrevocably consent to the jurisdiction of those courts in such matters. THE PARTIES HERETO HEREBY AGREE TO WAIVE THE RIGHT TO A JURY TRIAL.

11. <u>No Waiver</u>. No failure or delay by Disclosing Party in exercising any right, power or privilege under this Agreement or by law shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder or by law.

12. <u>No Assignment</u>. Recipients may not assign any or all rights, powers, privileges and/or obligations under this Agreement without Disclosing Party's prior written consent. Any attempted assignment without such consent shall render the assignment null and void *ab initio*. Subject to the limitations set forth in this Agreement, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns.

13. <u>Notices</u>. All notices shall be given by hand delivery or via overnight courier to the addresses set forth below, and by email and to the following persons or entities at the email address to be provided by the Parties within Seven Days from the execution of this Agreement.

AND shall be deemed received (i) if by hand delivery, upon receipt or (ii) if by overnight courier, upon receipt or refusal of delivery. Notices to Parties at the offices identified above.

14. <u>Miscellaneous</u>. This Agreement represents the entire understanding and agreement of the Parties, and supersedes all prior communications, agreements and understandings, relating to the

subject matter hereof.  The provisions of this Agreement may not be modified, amended or waived, except by a written instrument duly executed by the Parties.  If any provision of this Agreement is declared invalid or unenforceable pursuant to State or Federal law, the remaining provisions of this Agreement shall remain in full force and effect and binding on the Parties.  The rights and remedies provided by this Agreement are cumulative and are not exclusive of any rights or remedies provided by law.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement. Facsimile and PDF signatures shall have the same validity and effect as original signature.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.


"Disclosing Party"                                          NOTARY



By:  _____
Name:    Joseph Gentile ("JR,")
Title: President



**AND**



"Recipients "                                               NOTARY

Authorized Representative of All Recipient Parties


By: _____
Name:      Joseph Supor aka Joseph Supor III
Title: In all of his respective capacities

BARGAIN AND SALE (Covenants as to Grantor's Acts)

**PLEASE RECORD AND RETURN TO:**                    **Prepared by**

**RDA1:Supor Properties Enterprises LLC**
**c/o Joseph C. Vozza, Esq.**
**123 North Sea Road, # 516, Southampton, NY**

# *DEED*

This Deed is made on **May 5, 2023**
            **BETWEEN**
                    **Super Properties Enterprises LLC**
whose address is:  **433 Bergen Avenue, Kearney, New Jersey 07032**

                                        referred to as the **Grantor**.

        **AND**
            **RDA1:Supor Properties Enterprises LLC**

whose address is:  **c/o Joseph C. Vozza, Esq., 135 Pinelawn Road, 125N, Melville, New York 11747**
                                        referred to as the **Grantee**.

The words "Grantor" and "Grantee" shall mean all Grantors and all Grantees listed above.

***TRANSFER OF TITLE.***    The grantor does hereby grant and convey the property described below to
the Grantee.

***CONSIDERATION.***   This transfer of ownership is made for the sum and consideration of 1.00.  The
Grantor acknowledges receipt of this money.

***TAX MAP REFERENCE.***   The property located in the Municipality of **Harrison**, Block No. **137** Lot No.
**17.02,**    Account No.        Commonly known as **1000 Frank E. Rodgers Boulevard, Harrison, NJ 07029.**

***PROPERTY DESCRIPTION.***    The property consists of all the land, buildings,  structures and
improvements contained on the property, and is located in the  Town of **Harrison**, County of **Hudson**
and State of New Jersey, and is described as follows:

☒ See Schedule 'A' attached and made a part thereof.

**BEING THE SAME LAND AND PREMISES** conveyed to the Grantor by deed from **S&B Realty, a
New Jersey Partnership** dated **September 21, 2017** and recorded in the Office of **the Hudson** County
Clerk on **November 8, 2017** in Deed Book **9253** Page **147.**

**PROMISES BY GRANTOR.**   The Grantor promises and warrants that Grantor, by acts of the Grantor, has not encumbered the property.  This promise means that the Grantor has not allowed anyone else to obtain any legal right which would affect the property being transferred (such as a mortgage or entering a judgment against the Grantor).

**SIGNATURES.**       The Grantor signs this Deed as of date first above written.

_____                   _____
Witness

_____                   _____
Witness

**STATE OF** _____:
                                          **ss:**
**COUNTY OF** _____:

I CERTIFY that on _____,
_____ personally came before me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each person):
(a)     is named in and personally signed this Deed.
(b)     signed, sealed and delivered this Deed as his/her act and deed; and
(c)     the full and actual consideration paid or to be paid for the transfer of title as defined by N.J..S.A.46:15-5, is         .

_____
Notary Public

**STATE OF** _____      :
                                          **ss:**
**COUNTY OF** _____      :

I CERTIFY that on _____
_____
Personally came before me and stated to my satisfaction that this person (or if more than one, each person):
(a)     was the maker of the attached Deed.
(b)     was authorized to and did execute this Deed as _____ of _____, the entity named in this Deed;
(c)     made this Deed for $        as the full and actual consideration paid or to be paid for the transfer of title (Such consideration is defined in N.J..S.A.46:15-5; and
(d)     executed this Deed as the act of the entity.

_____
Notary Public

## LEGAL DESCRIPTION

ALL THAT CERTAIN LOT, PARCEL OR TRACT OF LAND, SITUATE AND LYING IN THE TOWN OF HARRISON, COUNTY OF HUDSON, STATE OF NEW YORK AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ESTABLISHED AS FOLLOWS:  COMMENCING AT A POINT IN THE EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH (F/K/A SOUTH FOURTH STREET) AT A POINT THEREIN DISTANT AS MEASURED ALONG THE SAID EASTERLY LINE OF FRANK E. RODGERS BOULEVARD SOUTH ON A COURSE OF NORTH 1 DEGREE 47 MINUTES EAST, 1473.49 FEET FROM A POINT IN THE PIER HEAD AND BULKHEAD LINE OF THE PASSAIC RIVER AS FIXED BY THE UNITED STATES HARBOR LINE BOARD AND APPROVED MAY 22, 1916 AND FROM THENCE RUNNING

1. NORTH 1 DEGREE 47 MINUTES EAST 150.76 FEET TO A POINT; THENCE

2. SOUTH 88 DEGREES 13 MINUTES EAST 398.83 FEET TO A POINT; THENCE

3. NORTH 1 DEGREE 47 MINUTES EAST 70.00 FEET TO A POINT; THENCE

4. SOUTH 88 DEGREES 13 MINUTES EAST 126.77 FEET TO A POINT; THENCE

5. SOUTH 01 DEGREE 47 MINUTES WEST 220.76 FEET TO A POINT; THENCE

6. NORTH 88 DEGREES 13 MINUTES WEST 59.85 FEET TO A POINT; THENCE

7. NORTH 01 DEGREE 47 MINUTES EAST 78.00 FEET TO A POINT; THENCE

8. NORTH 88 DEGREES 13 MINUTES WEST 314.00 FEET TO A POINT; THENCE

9. SOUTH 1 DEGREE 47 MINUTES WEST 78.00 FEET TO A POINT; THENCE

10. NORTH 88 DEGREES 13 MINUTES WEST 151.75 FEET TO THE POINT OR PLACE OF BEGINNING

THE ABOVE DESCRIPTION IS IN ACCORDANCE WITH A SURVEY MADE BY BORRE, MCDONALD & WATSON, LAND SURVEYORS, DATED AUGUST 11, 2010

FOR INFORMATIONAL PURPOSES ONLY:  ALSO KNOW AS LOT 17.02 IN BLOCK 137 ON THE TOWN OF HARRISON TAX MAP

GIT/REP-3
(2-21)
(Print or Type)

## State of New Jersey
## Seller's Residency Certification/Exemption

### Seller's Information

**Name(s)**
Supor Properties Enterprises LLC

**Current Street Address**
433 Bergen Avenue

| City, Town, Post Office | State | ZIP Code |
|---|---|---|
| Kearny | NJ | 07032 |

### Property Information

| Block(s) | Lot(s) | Qualifier |
|---|---|---|
| 137 | 17.02 | |

**Street Address**
1000 Frank E. Rodgers Boulevard

| City, Town, Post Office | State | ZIP Code |
|---|---|---|
| Harrison | NJ | 07029 |

| Seller's Percentage of Ownership | Total Consideration | Owner's Share of Consideration | Closing Date |
|---|---|---|---|
| 100 | 0.00 | 0.00 | 5/5/2023 |

### Seller's Assurances (Check the Appropriate Box) (Boxes 2 through 16 apply to Residents and Nonresidents)

1. ☐ Seller is a resident taxpayer (individual, estate, or trust) of the State of New Jersey pursuant to the New Jersey Gross Income Tax Act, will file a resident Gross Income Tax return, and will pay any applicable taxes on any gain or income from the disposition of this property.

2. ☐ The real property sold or transferred is used exclusively as a principal residence as defined in 26 U.S. Code section 121.

3. ☐ Seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure or in a transfer in lieu of foreclosure with no additional consideration.

4. ☐ Seller, transferor, or transferee is an agency or authority of the United States of America, an agency or authority of the State of New Jersey, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

5. ☒ Seller is not an individual, estate, or trust and is not required to make an estimated Gross Income Tax payment.

6. ☐ The total consideration for the property is $1,000 or less so the seller is not required to make an estimated Income Tax payment.

7. ☐ The gain from the sale is not recognized for federal income tax purposes under 26 U.S. Code section 721, 1031, or 1033 (CIRCLE THE APPLICABLE SECTION). If the indicated section does not ultimately apply to this transaction, the seller acknowledges the obligation to file a New Jersey Income Tax return for the year of the sale and report the recognized gain.
   ☐ Seller did not receive non-like kind property.

8. ☐ The real property is being transferred by an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this State.

9. ☐ The real property being sold is subject to a short sale instituted by the mortgagee, whereby the seller agreed not to receive any proceeds from the sale and the mortgagee will receive all proceeds paying off an agreed amount of the mortgage.

10. ☐ The deed is dated prior to August 1, 2004, and was not previously recorded.

11. ☐ The real property is being transferred under a relocation company transaction where a trustee of the relocation company buys the property from the seller and then sells the house to a third party buyer for the same price.

12. ☐ The real property is being transferred between spouses or incident to a divorce decree or property settlement agreement under 26 U.S. Code section 1041.

13. ☐ The property transferred is a cemetery plot.

14. ☐ The seller is not receiving net proceeds from the sale. Net proceeds from the sale means the net amount due to the seller on the settlement sheet.

15. ☐ The seller is a retirement trust that received an acknowledgment letter from the Internal Revenue Service that the seller is a retirement trust, and is therefore not required to make the estimated Gross Income Tax payment.

16. ☐ The seller (and/or spouse/civil union partner) originally purchased the property while a resident of New Jersey as a member of the U.S. Armed Forces and is now selling the property as a result of being deployed on active duty outside of New Jersey. (Only check this box if applicable and neither boxes 1 nor 2 apply.)

### Seller's Declaration

The undersigned understands that this declaration and its contents may be disclosed or provided to the New Jersey Division of Taxation and that any false statement contained herein may be punished by fine, imprisonment, or both. I furthermore declare that I have examined this declaration and, to the best of my knowledge and belief, it is true, correct and complete. By checking this box ☐ I certify that a Power of Attorney to represent the seller(s) has been previously recorded or is being recorded simultaneously with the deed to which this form is attached.

| Date | Signature (Seller) | Indicate if Power of Attorney or Attorney in Fact |
|---|---|---|
| | | |

| Date | Signature (Seller) | Indicate if Power of Attorney or Attorney in Fact |
|---|---|---|
| | | |

GIT/REP-3                                                                                                                      Page 2
(2-21)                          **Seller's Residency Certification/Exemption Instructions**

Individuals, estates, trusts, or any other entity selling or transferring property in New Jersey must complete this form if they are not subject to the Gross Income Tax estimated payment requirements under <u>N.J.S.A.</u> 54A:8-9. A nonresident seller is required to make an estimated Income Tax payment if none of the Seller's Assurances apply in the Seller's Assurances section of this form (GIT/REP-3). If one of the Seller's Assurance boxes on the GIT/REP-3 applies to the transfer, complete the form following the instructions below. Do not submit a completed GIT/REP-3 to the Division of Taxation. **Note:** Boxes 2 through 16 also apply to nonresidents.

**Name(s).** Enter the name of the seller. If there is more than one seller, each must complete a separate form unless they are a married/civil union couple that files their Income Tax returns jointly.

**Address.** Enter the seller's primary residence or place of business. Do not use the address of the property being sold. The seller is considered to be a nonresident unless a new residence (permanent place of abode, domicile) has been established in New Jersey and the new residence is listed here. Part-year residents are considered nonresidents.

**Property Information.** Enter the information listed on the deed of the property being sold. Enter the seller's percentage of ownership, the total consideration for the transaction, the seller's share of that consideration, and the closing date.

**Consideration.** "Consideration" means, in the case of any deed, the actual amount of money and the monetary value of any other thing of value constituting the entire compensation paid or to be paid for the transfer of title to the lands, tenements, or other realty, including the remaining amount of any prior mortgage to which the transfer is subject or which is assumed and agreed to be paid by the grantee and any other lien or encumbrance not paid, satisfied, or removed in connection with the transfer of title. If there is more than one owner, indicate the seller's portion of the total consideration received. If the total consideration for the property is $1,000 or less, the seller must check box 6 under Seller's Assurances.

**Seller's Assurances.** Check the appropriate box(es). If one or more of the Seller's Assurances applies, the seller is not required to make an estimated Income Tax payment at this time.

Any seller claiming the principal residence exemption (box 2) must also be claiming an income/gain exclusion for the property being sold on their federal income tax return (26 U.S. Code section 121).

**1031 like-kind exchange.** A nonresident who completes the GIT/REP-3 and claims exemption for a 1031 transaction (box 7) must show the value of the like-kind property received. If the transaction includes non-like kind property (i.e., money, stocks, etc.), the seller must also complete the GIT/REP-1, Nonresident Seller's Tax Declaration, show the greater of the consideration or the fair market value of the non-like kind property received, and remit an estimated tax payment of 2% of that amount. If the transaction is a deferred like-kind exchange and the seller receives non-like kind property, the qualified intermediary (QI) must remit an estimated tax payment of 2% of the greater of the consideration or the fair market value of any non-like kind property when the 1031 transaction is completed. If the deferred exchange is voided, the QI must complete a GIT/REP-1, Nonresident Seller's Tax Declaration, and remit an estimated tax payment of 2% of the total consideration with an NJ-1040-ES Voucher.

**Example:** Mr. Smith is a nonresident of New Jersey who exchanges rental property A with a fair market value of $1.2 million for rental property B with a fair market value of $1.0 million and receives $200,000 in cash (non-like kind property). An estimated tax payment is required on the $200,000 non-like kind property for nonresidents.

| | |
|---|---|
| PROPERTY A | $ 1,200,000 |
| PROPERTY B | $ 1,000,000 |
| CASH | $ 200,000 |
| Estimated tax payment for GIT/REP-1 | $ 4,000 |

Box 16 is only for sellers and their spouses/civil union partners if the sellers and/or their spouses/civil union partners are members of the U.S. Armed Forces. **Note:** Stolen Valor is a crime in New Jersey pursuant to <u>N.J.S.A.</u> 38A:14-5.

**Signature.** The seller must sign and date the Seller's Declaration. If the seller has appointed a representative who is signing the Seller's Declaration on their behalf, either the Power of Attorney executed by the seller must have been previously recorded or recorded with the deed to which this form is attached, or a letter signed by the seller granting authority to the representative to sign this form must be attached.

The seller must give the completed GIT/REP-3 to the settlement agent at closing. The county clerk will attach this form to the deed when recording it. If the form is not completed in its entirety, or if the settlement agent does not submit the original form with the deed, the county clerk will not record the deed.

RTF-1 (Rev. 7/14/10)

MUST SUBMIT IN DUPLICATE

STATE OF NEW JERSEY

**AFFIDAVIT OF CONSIDERATION FOR USE BY SELLER**

(Chapter 49, P.L.1968, as amended through Chapter 33, P.L. 2006) **(N.J.S.A.** 46:15-5 et seq.)

**BEFORE COMPLETING THIS AFFIDAVIT, PLEASE READ THE INSTRUCTIONS ON THE REVERSE SIDE OF THIS FORM.**

STATE OF NEW JERSEY

}SS. County Municipal Code

COUNTY    Hudson         0904

| | FOR RECORDER'S USE ONLY |
|---|---|
| | Consideration $ |
| | RTF paid by seller $ |
| | Date_____ By_____ |

MUNICIPALITY OF PROPERTY LOCATION   Harrison

*Use symbol "C" to indicate that fee is exclusively for county use.

**(1)** PARTY OR LEGAL REPRESENTATIVE *(See Instructions #3 and #4 on reverse side)*

Deponent,   Joseph Gentile, Jr.         , being duly sworn according to law upon his/her oath,
            **(Name)**

deposes and says that he/she is the Authorized Member    in a deed dated May 5, 2023         transferring
**(Grantor, Legal Representative, Corporate Officer, Officer of Title Company, Lending Institution, etc.)**

real property identified as Block number   137         Lot number   17.02         located at

1000 Frank E. Rodgers Boulevard, Harrison, New Jersey 07029        and   annexed   thereto.
**(Street Address, Town)**

**(2)** CONSIDERATION  $ 0.00         (Instructions #1 and #5 on reverse side)■ no prior mortgage to which property is subject.

**(3)** Property transferred is Class 4A   4B   4C (circle one). If property transferred is Class 4A, calculation in Section 3A below is required.

**(3A)** REQUIRED CALCULATION OF EQUALIZED VALUATION FOR ALL CLASS 4A (COMMERCIAL) PROPERTY TRANSACTIONS:
*(See Instructions #5A and #7 on reverse side)*
**Total Assessed Valuation ÷ Director's Ratio = Equalized Assessed Valuation**

$_____ ÷ _____ % = $_____

If Director's Ratio is less than 100%, the equalized valuation will be an amount greater than the assessed value. If Director's Ratio is equal to or in excess of 100%, the assessed value will be equal to the equalized valuation.

**(4)** FULL EXEMPTION FROM FEE *(See Instruction #8 on reverse side)*
Deponent states that this deed transaction is fully exempt from the Realty Transfer Fee imposed by C. 49, P.L. 1968, as amended through C. 66, P.L. 2004, for the following reason(s). Mere reference to exemption symbol is insufficient. Explain in detail.

**(5)** PARTIAL EXEMPTION FROM FEE *( Instruction #9 on reverse side)*
**NOTE:** All boxes below apply to grantor(s) *only*. **ALL BOXES IN APPROPRIATE CATEGORY MUST BE CHECKED.** Failure to do so will void claim for partial exemption. Deponent claims that this deed transaction is exempt from State portions of the Basic, Supplemental, and General Purpose Fees, as applicable, imposed by C. 176, P.L. 1975, C. 113, P.L. 2004, and C. 66, P.L. 2004 for the following reason(s):

A.  SENIOR CITIZEN   Grantor(s) □ 62 years of age or over. * *( Instruction #9 on reverse side for A or B)*
B.  BLIND PERSON     Grantor(s) □ legally blind or; *
    DISABLED PERSON  Grantor(s) □ permanently and totally disabled □ receiving disability payments □ not gainfully employed*

    Senior citizens, blind persons, or disabled persons must also meet **all of the following** criteria:
    □ Owned and occupied by grantor(s) at time of sale.    □ Resident of State of New Jersey.
    □ One or two-family residential premises.              □ Owners as joint tenants must all qualify.

    *IN CASE OF HUSBAND AND WIFE, PARTNERS IN A CIVIL UNION COUPLE, ONLY ONE GRANTOR NEED QUALIFY IF TENANTS BY THE ENTIRETY.

C.  LOW AND MODERATE INCOME HOUSING *(Instruction #9 on reverse side)* IF APPLIES ALL BOXES MUST BE CHECKED.
    □ Affordable according to H.U.D. standards.    □ Reserved for occupancy.
    □ Meets income requirements of region.         □ Subject to resale controls.

**(6)** NEW CONSTRUCTION *(Instructions #2, #10 and #12 on reverse side)* IF APPLIES ALL BOXES MUST BE CHECKED.
    □ Entirely new improvement           □ Not previously occupied.
    □ Not previously used for any purpose. □ "NEW CONSTRUCTION" printed clearly at top of first page of the deed.

**(7)** RELATED LEGAL ENTITIES TO LEGAL ENTITIES *(Instructions #5, #12, #14 on reverse side)* IF APPLIES ALL BOXES MUST BE CHECKED.
    ■ No prior mortgage assumed or to which property is subject at time of sale.
    ■ No contributions to capital by either grantor or grantee legal entity.
    ■ No stock or money exchanged by or between grantor or grantee legal entities.

**(8)** INTERCOMPANY TRANSFER IF APPLIES ALL BOXES MUST BE CHECKED. *(Instruction #15 on reverse side)*
    □ Intercompany transfer between combined group members as part of the unitary business
    □ Combined group NU ID number **(Required)**

**(9)** Deponent makes this Affidavit to induce county clerk or register of deeds to record the deed and accept the fee submitted herewith in accordance with the provisions of Chapter 49, P.L. 1968, as amended through Chapter 33, P.L. 2006.

Subscribed and sworn to before me
this      day of       , 20

_____        _____
Signature of Deponent             Grantor Name

_____        _____
Deponent Address                  Grantor Address at Time of Sale

                    XXX-XX-X
Last three digits in Grantor's Social Security Number   Name/Company of Settlement Officer

| FOR OFFICIAL USE ONLY | |
|---|---|
| Instrument Number_____ | County_____ |
| Deed Number_____ | Book_____ Page_____ |
| Deed Dated_____ | Date Recorded_____ |

County recording officers shall forward one copy of each RTF-1 form when Section 3A is completed to:    **STATE OF NEW JERSEY**
**PO BOX 251**
**TRENTON, NJ 08695-0251**
**ATTENTION: REALTY TRANSFER FEE UNIT**

The Director of the Division of Taxation in the Department of the Treasury has prescribed this form as required by law, and may not be altered or amended without prior approval of the Director. For information on the Realty Transfer Fee or to print a copy of this Affidavit, visit the Division of Taxation website at:
**https://www.state.nj.us/treasury/taxation/lpt/localtax.shtml**

**INSTRUCTIONS FOR FILING – AFFIDAVIT OF CONSIDERATION FOR USE BY SELLER**

**1. STATEMENT OF CONSIDERATION AND REALTY TRANSFER FEE PAYMENT ARE PREREQUISITES FOR DEED RECORDING**

No county recording officer shall record any deed evidencing transfer of title to real property unless (a) the consideration is recited in the deed, or (b) an Affidavit by one or more of the parties named in the deed or by their legal representatives declaring the consideration is annexed for recording with the deed, and (c) for conveyances and transfers of property for which the total consideration recited in the deed is not in excess of $350,000, a fee is remitted at the rate of $2.00/$500 of consideration or fractional part thereof not in excess of $150,000; $3.35/$500 of consideration or fractional part thereof in excess of $150,000 but not in excess of $200,000; $3.90/$500 of consideration or fractional part thereof in excess of $200,000. For transfers of property for which the total consideration recited in the deed is in excess of $350,000, a fee is remitted at the rate of $2.90/$500 of consideration or fractional part not in excess of $150,000; $4.25/$500 of consideration or fractional part thereof in excess of $150,000 but not in excess of $200,000; $4.80/$500 of consideration or fractional part thereof in excess of $200,000; $5.30/$500 of consideration or fractional part thereof in excess of $550,000 but not in excess of $850,000; $5.80/$500 of consideration or fractional part thereof in excess of $850,000 but not in $1,000,000; and $6.05/$500 of consideration or fractional part thereof in excess of $1,000,000, which fee shall be paid in addition to the recording fees imposed by Chapter 123, P.L. 1965, Section 2 (C. 22A:4-4.1) as amended by Chapter 370, P.L. 2001, through Chapter 66, P.L. 2004, which fee shall be paid to the county recording officer at the time the deed is offered for recording/transfer. Of these fees, $.75/$500 of consideration or fractional part in excess of $150,000 paid to the State Treasurer is credited to the New Jersey Affordable Housing Trust Fund.

**2. WHEN AFFIDAVIT MUST BE ANNEXED TO DEED**

This Affidavit must be annexed to and recorded with all deeds when entire consideration is not recited in deed or the acknowledgement or proof of the execution, when the grantor claims a total or partial exemption from the fee, Class 4 property that includes commercial, industrial, or apartment property, and for transfers of "new construction." (See Instructions #10 and #12 below.)

**3. LEGAL REPRESENTATIVE**

"Legal representative" is to be interpreted broadly to include any person actively and responsibly participating in the transaction, such as, but not limited to: an attorney representing one of the parties; a closing officer of a title company or lending institution participating in the transaction; a holder of power of attorney from grantor or grantee.

**4. OFFICER OF CORPORATE GRANTOR/OFFICER OF TITLE COMPANY OR LENDING INSTITUTION**

Where a deponent is an officer of corporate grantor, state the name of corporation and officer's title or where a deponent is a closing officer of a title company or lending institution participating in the transaction, state the name of the company or institution and officer's title.

**5. CONSIDERATION**

"Consideration" means in the case of any deed, the actual amount of money and the monetary value of any other thing of value constituting the entire compensation paid or to be paid for the transfer of title to the lands, tenements or other realty, including the remaining amount of any prior mortgage to which the transfer is subject or which is assumed and agreed to be paid by the grantee and any other lien or encumbrance not paid, satisfied or removed in connection with the transfer of title. (C. 49, P.L. 1968, Section 1, as amended.)

**5A. CLASS 4A "COMMERCIAL PROPERTIES" DEFINED**

Class 4A "Commercial properties" as defined in N.J.A.C. 18:12-2.2 means "any other type of income-producing property other than property in classes 1, 2, 3A, 3B, and those properties included in classes 4B and 4C." A quarterly audit of all Class 4A sales submitted by the municipal assessor through the SR-1A/equalization process will determine whether a Class 4A transaction was recorded without proper documentation and the required Affidavits of Consideration.

**6. DIRECTOR'S RATIO**

"Director's Ratio" means the average ratio of assessed to true value of real property for each taxing district as determined by the Director, Division of Taxation, in the Table of Equalized Valuations promulgated annually on or before October 1 in each year pursuant to N.J.S.A. 54:1-35.1. The Table is used in the calculation and apportionment of distributions pursuant to the State School Aid Act of 1954.

**7. EQUALIZED VALUE**

"Equalized Value" means the assessed value of the property in the year that the transfer is made, divided by the Director's Ratio. The Table of Equalized Valuations is promulgated annually on or before October 1 in each year pursuant to N.J.S.A. 54:1-35.1.

**(Example: Assessed Value = $1,000,000; Director's Ratio = 80%. $1,000,000 ÷ .80 = $1,250,000)**

**8. FULL EXEMPTION FROM THE REALTY TRANSFER FEE (GRANTOR/GRANTEE)**

The fee imposed by this Act shall not apply to a deed:

(a) For consideration of less than $100; (b) By or to the United States of America, this State, or any instrumentality, agency or subdivision; (c) Solely in order to provide or release security for a debt or obligation; (d) Which confirms or corrects a deed previously recorded; (e) On a sale for delinquent taxes or assessments; (f) On partition; (g) By a receiver, trustee in bankruptcy or liquidation, or assignee for the benefit of creditors; (h) Eligible to be recorded as an "ancient deed" pursuant to R.S. 46:16-7; (i) Acknowledged or proved on or before July 3, 1968; (j) Between husband and wife/civil union partners, or parent and child; (k) Conveying a cemetery lot or plot; (l) In specific performance of a final judgment; (m) Releasing a right of reversion; (n) Previously recorded in another county and full Realty Transfer Fee paid or accounted for as evidenced by written instrument, attested to by the grantee and acknowledged by the county recording officer of the county of such prior recording, specifying the county, book, page, date of prior recording, and amount of Realty Transfer Fee previously paid; (o) By an executor or administrator of a decedent to a devisee or heir to effect distribution of the decedent's estate in accordance with the provisions of the decedent's will or the intestate laws of this State; (p) Recorded within 90 days following the entry of a divorce/dissolution decree which dissolves the marriage/civil union partnership between grantor and grantee; (q) Issued by a cooperative corporation, as part of a conversion of all the assets of the cooperative corporation into a condominium, to a shareholder upon the surrender by the shareholder of all of the shareholder's stock in the cooperative corporation and the proprietary lease entitling the shareholder to exclusive occupancy of a portion of the property owned by the corporation.

**9. PARTIAL EXEMPTION FROM THE REALTY TRANSFER FEE (C. 176, P.L. 1975; C. 113, P.L. 2003; C. 66 P.L. 2004)**

The following transfers of title to real property shall be exempt from State portions of the Basic Fee, Supplemental Fee, and General Purpose Fee, as applicable: 1. The sale of any one or two-family residential premises which are owned and occupied by a senior citizen, blind person, or disabled person who is the seller in such transaction; provided, however, that except in the instance of a husband and wife/partners in a civil union couple, no exemption shall be allowed if the property being sold is owned as joint tenants and one or more of the owners is not a senior citizen, blind person, or disabled person; 2. The sale of Low and Moderate Income Housing conforming to the requirements as established by this Act.

For the purposes of this Act, the following definitions shall apply:

"Blind person" means a person whose vision in his better eye with proper correction does not exceed 20/200 as measured by the Snellen chart or a person who has a field defect in his better eye with proper correction in which the peripheral field has contracted to such an extent that the widest diameter of visual field subtends an angular distance no greater than 20°.

"Disabled person" means any resident of this State who is permanently and totally disabled, unable to engage in gainful employment, and receiving disability benefits or any other compensation under any federal or State law.

"Senior citizen" means any resident of this State of the age of 62 or over.

"Low and Moderate Income Housing" means any residential premises, or part thereof, affordable according to Federal Department of Housing and Urban Development or other recognized standards for home ownership and rental costs occupied or reserved for occupancy by households with a gross income equal to 80% or less of the median gross household income for households of the same size within the housing region in which the housing is located, but shall include only those residential premises subject to resale controls pursuant to contractual guarantees.

"Resident of the State of New Jersey" means any claimant who is legally domiciled in this State when the transfer of the subject property is made. Domicile is what the claimant regards as the permanent home to which he intends to return after a period of absence. Proofs of domicile include a New Jersey voter registration, motor vehicle registration and driver's license, and resident tax return filing.

**10. TRANSFERS OF NEW CONSTRUCTION**

"New construction" means any conveyance or transfer of property upon which there is an entirely new improvement not previously occupied or used for any purpose. On transfers of new construction, the words "NEW CONSTRUCTION" shall be printed clearly at the top of the first page of the deed, and an Affidavit by the grantor stating that the transfer is of property upon which there is new construction shall be appended to the deed.

**11. REALTY TRANSFER FEE IS A FEE IN ADDITION TO OTHER RECORDING FEES**

The county recording officer is required to collect the Realty Transfer Fee at the time the deed is offered for recording/transfer.

**12. PENALTY FOR WILLFUL FALSIFICATION OF CONSIDERATION AND TRANSFERS OF NEW CONSTRUCTION**

Any person who knowingly falsifies the consideration in a deed or in the proof or acknowledgement of the execution of a deed or in an affidavit annexed to a deed declaring the consideration therefor or a declaration in an affidavit that a transfer is exempt from recording fee is guilty of a crime of the fourth degree (Chapter 308, P.L. 1991, effective June 1, 1992). Grantors conveying title of new construction who fail to subscribe and append to the deed an affidavit to that effect in accordance with the provisions of subsection c. of section 2 of Chapter 49, P.L. 1968 (C.46:15-6) is guilty of a disorderly persons offense. The Division of Taxation is entitled to review the Fees collected pursuant to the State Uniform Procedure Law. The Director of the Division of Taxation is authorized to make deficiency assessments to taxpayers who have, intentionally or mistakenly, underestimated the consideration or sales price of properties on the Affidavit of Consideration attached to deeds and upon which the Realty Transfer Fee is based.

**13. COUNTY/MUNICIPAL CODES**

County/Municipal codes may be found at https://www.state.nj.us/treasury/taxation/pdf/lpt/cntycode.pdf.

**14. LEGAL ENTITIES TRANSFERRING NEW JERSEY REAL ESTATE TO RELATED LEGAL ENTITIES**

Legal entities transferring New Jersey real estate to related legal entities are not exempt from the Realty Transfer Fee if the consideration, as defined in the law, is $100 or more. Such consideration includes the actual amount of money and/or the monetary value of any other thing of value constituting the entire compensation paid, such as the dollar value of stock included in the transaction or any enhancement to or contribution to the capital or either legal entity resulting from the transfer, or remaining balances of any prior mortgage to which the property is subject or which is assumed and agreed to be paid by the grantee and any other lien or encumbrance not paid, satisfied or removed in connection with the transfer of title.

**15. INTERCOMPANY TRANSFER BETWEEN COMBINED GROUP MEMBERS THAT FILE A NEW JERSEY COMBINED RETURN**

Transfers of real property that are intercompany transfers between combined group members filing a New Jersey combined return as part of the unitary business of the combined group are exempt from the grantor and grantee fees. Transfers must indicate the combined group NU identification number assigned by the Division of Taxation. If the NU number has not been assigned for any reason then the RTF number and a refund may be applied for.